**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN CIVIL LIBERTIES UNION and
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

              Plaintiffs,

    v.

DEPARTMENT OF JUSTICE,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF STATE, and CENTRAL
INTELLIGENCE AGENCY,

              Defendants.

No. 1:10-CV-436 (RMC)
Judge Rosemary M. Collyer

**PLAINTIFFS' OPPOSITION TO DEFENDANT CIA'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs American Civil Liberties Union and American Civil Liberties Union

Foundation hereby oppose Defendant CIA's motion for summary judgment and cross-move for

partial summary judgment pursuant to Federal Rule of Civil Procedure 56(a).

November 1, 2010

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
   of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel: (202) 457-0800
Fax: (202) 452-1868
artspitzer@aol.com

Alexander A. Abdo
Ben Wizner
Jonathan Manes
American Civil Liberties Union
   Foundation
125 Broad Street, 18th Floor
New York, NY 10004

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION and AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br><br>        Plaintiffs,<br><br>    v.<br><br>DEPARTMENT OF JUSTICE, DEPARTMENT OF DEFENSE, DEPARTMENT OF STATE, and CENTRAL INTELLIGENCE AGENCY,<br><br>        Defendants. | No. 1:10-CV-436 (RMC)<br>Judge Rosemary M. Collyer |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO DEFENDANT CIA'S MOTION FOR SUMMARY JUDGMENT AND
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... i

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 3

STANDARD OF REVIEW ......................................................................................................... 4

ARGUMENT ........................................................................................................................... 7

    I.    THE CIA'S *GLOMAR* RESPONSE PURSUANT TO EXEMPTIONS 1
        AND 3 IS IMPROPER ...................................................................................................8

      A.    The CIA has officially acknowledged its involvement in drone strikes ......................... 9

      B.    The use of drones to target and kill individuals is not an "intelligence
          activity" or an "intelligence source or method" ............................................................ 15

      C.    Confirming the existence of responsive records could not reasonably be
          expected to result in damage to the national security .................................................. 20

CONCLUSION........................................................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**

*Am. Civil Liberties Union v. Dep't of Def.*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) ...................... 6

*Am. Civil Liberties Union v. Dep't of Def.*, No. 1:04-CV-4151 (S.D.N.Y. Dec. 29, 2009) ......... 18

*Campbell v. U.S. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998) ................................. 7

*Carney v. U.S. Dep't of Justice*, 19 F.3d 807 (2d Cir. 1994)...................................... 5

*\*Cent. Intelligence Agency v. Sims*, 471 U.S. 159 (1985) ..................................... 16, 18

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918 (D.C. Cir. 2003)...................... 8

*Gardels v. Cent. Intelligence Agency*, 689 F.2d 1100 (D.C. Cir. 1982) .................................... 7, 9

*Goldberg v. U.S. Dep't of State*, 818 F.2d 71 (D.C. Cir. 1987).......................................... 7

*King v. U.S. Dep't of Justice*, 830 F.2d 210 (D.C. Cir. 1987) ..................................... 5, 6

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009)........................................... 5

*Maynard v. Cent. Intelligence Agency*, 986 F.2d 547 (1st Cir. 1993) ......................................... 17

*Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981).................................. 17

*Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) .......................... 4

*Navasky v. Cent. Intelligence Agency*, 499 F. Supp. 269 (S.D.N.Y. 1980) ................................. 18

*Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976)....................... 2, 6, 15, 17

*Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810 (D.C. Cir. 2008) ..................................... 5

*Ray v. Turner*, 587 F.2d 1187 (D.C. Cir. 1978)........................................................ 8

*U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) ........................................... 5

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ....................................................... 19

*Wash. Post v. U.S. Dep't of Def.*, 766 F. Supp. 1 (D.D.C. 1991) ................................... 20

*\*Weissman v. Cent. Intelligence Agency*, 565 F.2d 692 (D.C. Cir. 1977).................................... 17

*\*Wilner v. Nat'l Sec. Agency*, 592 F.3d 60 (2d Cir. 2009) .................................... 6, 9, 14

*Wilson v. Cent. Intelligence Agency*, 586 F.3d 171 (2d Cir. 2009) ............................... 14

*Wolf v. Cent. Intelligence Agency*, 473 F.3d 370 (D.C. Cir. 2007) .......................................... 9, 14

**Statutes**

5 U.S.C. § 552 ...................................................................................................................... 5, 16

**Other Authorities**

Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) .............................................. 8, 16, 20

## INTRODUCTION

This case concerns a Freedom of Information Act ("FOIA") request for information pertaining to the Central Intelligence Agency's use of unmanned aerial vehicles—commonly referred to as "drones"—to target and kill individuals, including U.S. citizens.  Plaintiffs' request seeks basic information about the targeted-killing program, including: (1) information about the legal basis for the use of drones to conduct targeted killings; (2) information regarding the rules and standards used by the CIA to determine when and where these weapons may be used, the targets they may be used against, and the processes in place to decide whether their use is legally permissible in particular circumstances, especially in light of anticipated civilian casualties; (3) information about how the consequences of drone strikes are assessed, including methods for determining the number of civilian casualties; and (4) information about the frequency of drone strikes and the individuals who have been killed or injured in these operations.

Despite the manifest public interest in these records, which would allow meaningful and informed public debate on a pressing topic, the CIA has refused to process Plaintiffs' request, claiming—under FOIA Exemptions 1 and 3—that it can neither confirm nor deny the existence of responsive records without disclosing "intelligence sources or methods" or "intelligence activities," thereby compromising the nation's security.  The core fact that responding to Plaintiffs' request would divulge, according to the CIA, is whether the CIA is involved in drone strikes.  *See* Def.'s Mot. for Summ. J. ("Def.'s Br.") 11 ("if the CIA were to respond to this request by admitting that it possessed responsive records, it would indicate that the CIA was involved in drone strikes or at least had an intelligence interest in drone strikes").

The CIA may not protect that fact under Exemptions 1 and 3 through a *Glomar* response[1] for two reasons.  First, the CIA's Director has already officially acknowledged that the CIA engages in the targeted killing of individuals using drones.  His public revelations confirm that the CIA possesses records relating to the use of drones to target and kill individuals and thus that the CIA may not refuse to confirm or deny that fact.  Moreover, numerous unidentified U.S. officials have discussed the CIA's targeted-killing program in the media.  Though not official disclosures, those leaks belie the CIA's claim that it cannot confirm that it possesses records responsive to Plaintiffs' request without seriously jeopardizing the nation's security.  Were such harm likely or even plausible, high U.S. officials would not have leaked the information they have.  Nor, more significantly, would the CIA's Director have discussed the program publicly.  The CIA's drone program is no secret.

The CIA's *Glomar* response is additionally improper because the targeted killing of individuals is not an *intelligence* activity, source, or method.  The CIA's program is concerned with the *killing* of individuals, not with the gathering of intelligence.  Processing Plaintiffs' request would not, therefore, reveal an intelligence activity, source, or method.  The CIA attempts to obscure this mismatch between its authority to conceal information and the nature of the program at issue through artful wording.  *See, e.g.*, Decl. of Mary Ellen Cole ("Cole Decl.") ¶ 32 ("acknowledging the existence or nonexistence of the requested records reasonably could be expected to cause damage to the national security by disclosing whether or not the CIA is engaged in or otherwise interested in clandestine intelligence activities *related to* drone strikes" (emphasis added)); *id.* ¶ 33 (discussing possible disclosure of "any CIA *interest in* drone strikes"

---

[1] The *Glomar* response takes its name from the Hughes Glomar Explorer, an oceanic research vessel at issue in the case that first authorized the government to refuse to confirm or deny the existence of records responsive to a FOIA request.  *Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976).

(emphasis added)).  But that conspicuous effort only highlights what common sense makes clear: a targeted-killing program is not an intelligence program.  Of course, the CIA's drone program might rely on undisclosed, and therefore protectable, intelligence sources and methods.  But those intelligence details do not warrant a *Glomar* response to Plaintiffs' request because they would not be disclosed by the mere confirmation that the CIA possesses responsive records, and they may be protected after processing through the invocation of individual exemptions to release.

For these reasons, the Court should deny the CIA's motion for summary judgment, grant Plaintiffs' cross-motion for partial summary judgment, and order the CIA to produce records responsive to Plaintiffs' request or to claim individual exemptions to production of each record or portion thereof.

## BACKGROUND

On January 13, 2009, Plaintiffs filed a FOIA request with the Department of Defense, the Department of Justice, the Department of State, and the CIA, seeking ten categories of records relating to the use of unmanned aerial vehicles, or "drones," to target and kill individuals, including U.S. citizens.  Plaintiffs hereby abandon requests numbered 1.B. and 2 with respect to the CIA.  This opposition and cross-motion concerns the remaining requests for information relating to:

1.   "the legal basis in domestic, foreign and international law upon which unmanned aerial vehicles ('UAVs' or 'drones') can be used to execute targeted killings ('drone strikes')";

3.   "the selection of human targets for drone strikes and any limits on who may be targeted by a drone strike";

4.  "civilian casualties in drone strikes";

5.  "the assessment or evaluation of individual drone strikes after the fact";

6.  "any geographical or territorial limits on the use of UAVs to kill targeted individuals";

7.  "the number of drone strikes that have been executed for the purpose of killing human targets, the location of each such strike, and the agency of the government or branch of the military that undertook each such strike";

8.  "the number, identity, status, and affiliation of individuals killed in drone strikes";

9.  "who may pilot UAVs, who may cause weapons to be fired from UAVs, or who may otherwise be involved in the operation of UAVs for the purpose of executing targeted killings"; and

10. "the training, supervision, oversight, or discipline of UAV operators and others involved in the decision to execute a targeted killing using a drone."

*See* Decl. of Alexander A. Abdo ("Abdo Decl.") Ex. A (Plaintiffs' FOIA request).

On March 9, 2010, the CIA responded to the request by refusing to confirm or deny the existence of responsive records.  The remaining defendants are searching for responsive records pursuant to a negotiated schedule approved by the Court.  *See* Minute Order (July 28, 2010). The Department of Defense has produced a single record in response to the request; the other defendants have not yet produced any.

## STANDARD OF REVIEW

Congress enacted FOIA to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242

(1978).  "Although Congress enumerated nine exemptions from the disclosure requirement, 'these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'"  *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 813 (D.C. Cir. 2008) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)) (internal quotation marks omitted).  "Accordingly, FOIA's exemptions are to be narrowly construed."  *Id.*  "The burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records' or have not been 'improperly' 'withheld.'"  *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989).  Accordingly, a FOIA plaintiff is entitled to summary judgment under Federal Rule of Civil Procedure 56 where the agency fails to justify its withholdings.  *Tax Analysts*, 492 U.S. at 142; 5 U.S.C. § 552(a)(4)(B).

In supporting its withholding decisions, the agency must provide "reasonably detailed explanations why any withheld documents fall within an exemption."  *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).  "The significance of agency affidavits in a FOIA case cannot be underestimated.  As, ordinarily, the agency alone possesses knowledge of the precise content of documents withheld, the FOIA requester and the court both must rely upon its representations for an understanding of the material sought to be protected."  *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987) (footnotes omitted).  "Affidavits submitted by a governmental agency in justification for its exemption claims must therefore strive to correct, however, imperfectly, the asymmetrical distribution of knowledge that characterizes FOIA litigation."  *Id.*  "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden."  *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009).  "To accept an inadequately supported exemption claim 'would constitute an abandonment of the trial court's obligation under the FOIA to conduct a *de novo*

review."  *King*, 830 F.2d at 219 (quoting *Allen v. Cent. Intelligence Agency*, 636 F.2d 1287, 1293 (D.C. Cir. 1980)).

In exceptionally limited circumstances, the government may refuse altogether to respond to a FOIA request: where a "FOIA exemption would itself preclude . . . *acknowledgment*" that the agency possesses or does not possess responsive records.  *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009) (quoting *Minier v. Cent. Intelligence Agency*, 88 F.3d 796, 800 (9th Cir. 1996)).  Such a response is commonly referred to as a *Glomar* response, after the Hughes Glomar Explorer, an oceanic research vessel at issue in the case that established the doctrine. *See Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976).  In analyzing a *Glomar* response, courts apply the same burden and standard of review applicable to traditional claims of exemption.  *Wilner*, 592 F.3d at 68.  The CIA must provide "'a detailed affidavit showing that the information [it refuses to confirm or deny] logically falls within the claimed exemptions.'"  *Id.* (quoting *Minier v. Cent. Intelligence Agency*, 88 F.3d 796, 800 (9th Cir. 1996)).  Conclusory, vague, or sweeping justifications will not suffice.  Moreover, careful scrutiny of *Glomar* responses is particularly important because the result is to deny the public any access to governmental records of often pressing importance on matters of great public interest.  *See also Am. Civil Liberties Union v. Dep't of Def.*, 389 F. Supp. 2d 547, 561 (S.D.N.Y. 2005) ("The danger of Glomar responses is that they encourage an unfortunate tendency of government officials to over-classify information, frequently keeping secret that which the public already knows, or that which is more embarrassing than revelatory of intelligence sources or methods.").

**ARGUMENT**

The CIA's sweeping *Glomar* response to Plaintiffs' FOIA request attempts to conceal primarily a single core fact: whether or not the CIA possesses records relating to the use of drones to target and kill individuals. *See* Def.'s Br. 12; Cole Decl. ¶¶ 19, 21–22.[2]  That fact may not be protected by a *Glomar* response for two reasons: (1) the CIA has already officially acknowledged its involvement in the use of drones to target and kill individuals, and (2) targeted killing is not an "intelligence source or method."  The CIA fails to adequately grapple with either of these deficiencies and instead uses vague and conclusory reasoning in an attempt to keep secret what is already confirmed.

The government is left to rely on the unquestioning deference it seeks from the Court on the basis of the national-security character of Plaintiffs' FOIA request.  *See* Def.'s Br. 6–7.  It is true that courts typically accord "substantial weight" to the government's declarations in the context of national security, but that deference is due only when the government's affidavits "'contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record.'"  *Gardels v. Cent. Intelligence Agency*, 689 F.2d 1100, 1105 (D.C. Cir. 1982) (quoting *Halperin v. Cent. Intelligence Agency*, 629 F.2d 144, 148 (D.C. Cir. 1980)); *see also Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987) (even in the national-security context, courts must not "relinquish[] their independent responsibility" to review an agency's withholdings); *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) ("deference is not equivalent to acquiescence").  As elaborated below, the conditions that would merit such deference are not

---

[2] Plaintiffs' abandonment of requests numbered 1.B and 2 as to the CIA moots the CIA's arguments concerning relationships between the CIA and foreign governments with respect to drone strikes.  *See, e.g.*, Def.'s Br. 12; Cole Decl. ¶¶ 23, 25, 36–38.

satisfied here because the CIA's declaration lacks specificity with regard to the relevant issues and is contradicted by evidence attached hereto.

Moreover, the deference sought by the government is not appropriate given the nature of Plaintiffs' challenges.  Deference is appropriate principally to the government's predictions of harm that would flow from the disclosure of sensitive information.  *See, e.g.*, *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003) ("we have consistently deferred to executive affidavits predicting harm to the national security"); *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978) ("the executive ha[s] unique insights into what adverse affects might occur as a result of public disclosure of a particular classified record" (internal quotation marks omitted)).  This case does not implicate such predictive judgments.  Rather, it primarily concerns two questions within this Court's, and not the government's, expertise: (1) the empirical question, based on evidence attached to this memorandum, whether the CIA has officially acknowledged its involvement in drone strikes, and (2) the statutory and regulatory question whether targeted killing is an "intelligence activity" or an "intelligence source or method."

## I.  THE CIA'S *GLOMAR* RESPONSE PURSUANT TO EXEMPTIONS 1 AND 3 IS IMPROPER

The CIA argues that responding to Plaintiffs' FOIA request would compromise information protected from disclosure by Exemptions 1 and 3.  Specifically, the CIA contends that the fact whether it possesses records relating to drone strikes is an "intelligence activity" or "intelligence source or method" within the meaning of the executive order associated with Exemption 1, Cole Decl. ¶ 33; Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009), as well as the National Security Act of 1947 and the Central Intelligence Agency Act of 1949, which are withholding statutes for the purpose of Exemption 3, Cole Decl. ¶¶ 40–41.  That

contention is belied by the CIA's own disclosures and by the self-evident fact that targeted killing is not an "intelligence activity" or an "intelligence source or method"—except in the most Orwellian sense.

### A.      The CIA has officially acknowledged its involvement in drone strikes

The CIA's *Glomar* response under Exemptions 1 and 3 should be rejected because the agency has officially acknowledged its involvement in drone strikes.

A *Glomar* response is appropriate if "the CIA demonstrates that an answer to the [FOIA request] 'can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods.'" *Gardels*, 689 F.2d at 1103 (quoting *Halperin*, 629 F.2d at 147). But the government is "precluded from making a *Glomar* response if the existence or nonexistence of the specific records sought by the FOIA request has been the subject of an official public acknowledgment." *Wilner*, 592 F.3d at 70. In other words, "[i]f the government has admitted that a specific record exists, a government agency may not later refuse to disclose whether that same record exists or not." *Id.* A FOIA requester challenging a withholding on the basis of official acknowledgment must satisfy three criteria. "'First, the information requested must be as specific as the information previously released. Second, the information requested must match the information previously disclosed . . . . Third, . . . the information requested must already have been made public through an official and documented disclosure.'" *Wolf v. Cent. Intelligence Agency*, 473 F.3d 370, 378 (D.C. Cir. 2007) (quoting *Fitzgibbon v. Cent. Intelligence Agency*, 911 F.2d 755, 765 (D.C. Cir. 1990)).

Here, the CIA has claimed that the intelligence activity, source, or method protected by its *Glomar* response is whether the CIA is involved in drone strikes. *See* Cole Decl. ¶ 19 ("if the CIA were to respond to this request by admitting that it possessed responsive records, it would

indicate that the CIA was involved in drone strikes or at least had an intelligence interest in drone strikes"); *id.* ¶ 22 ("Whether or not the CIA possesses legal opinions concerning drone strikes would itself be classified because the answer provides information about the types of intelligence activities in which the CIA may be involved or interested."); *id.* ("the response would reveal whether or not the CIA was specifically involved in target selection, which would itself be a classified fact as the CIA has never officially acknowledged whether or not it is involved in drone strikes"); *id.* ("If the CIA were to respond with anything other than a Glomar, it would unquestionably reveal whether or not the CIA was involved in drone strike operations, which is a classified fact.").

The CIA has already publicly acknowledged that fact. On May 18, 2009, CIA Director Leon E. Panetta appeared before the Pacific Council on International Policy. A transcript of his opening remarks and his responses to questions from the audience appears on the CIA's website.[3] One member of the audience asked Mr. Panetta the following question:

> You mentioned that you believe the strategy in Pakistan is working—the President's strategy in Pakistan in the tribal regions, which is the drone—*the remote drone strikes.* You've seen the figures recently from David Kilcullen and others that the strikes have killed 14 midlevel operatives and 700 civilians in collateral damage. And his assessment as a counterinsurgency expert is it's creating more anti-Americanism than it is disrupting al-Qaeda networks.

Abdo Decl. Ex. B at 9–10 (emphasis added). Mr. Panetta responded to the question about the drone strikes as follows:

> On the first issue, obviously because these are covert and secret operations I can't go into particulars. *I think it does suffice to say that these operations have been very effective because they have been very precise in terms of the targeting and it involved a minimum of collateral damage.* I know that some of the—sometimes

---

[3] *See* Abdo Decl. Ex. B (Leon E. Panetta, Director's Remarks at the Pacific Council on International Policy (May 18, 2009), *available at* https://www.cia.gov/news-information/speeches-testimony/directors-remarks-at-pacific-council.html (last visited October 28, 2010)).

the criticisms kind of sweep into other areas from either plane attacks or attacks from F-16s and others that go into these areas, which do involve a tremendous amount of collateral damage.  And sometimes I've found in discussing this that all of this is kind of mixed together.  *But I can assure you that in terms of that particular area, it is very precise and it is very limited in terms of collateral damage and, very frankly, it's the only game in town in terms of confronting and trying to disrupt the al-Qaeda leadership.*

*Id.* at 10 (emphasis added).

The audience member asked specifically about the CIA's "remote drone strikes," and Mr. Panetta responded straightforwardly that "these operations have been very effective," that "they have been very precise," that they "involved a minimum of collateral damage," and that they are "the only game in town in terms of confronting and trying to disrupt the al-Qaeda leadership."  It is true that Mr. Panetta stated that he could not "go into particulars," but the details he did provide officially acknowledge, at least: (1) that the CIA is involved in drone strikes, (2) that the CIA believes drone strikes to be "very effective," (3) that the drone strikes have "involved a minimum of collateral damage," and (4) that the CIA believes that drones strikes are "the only game in town in terms of confronting and trying to disrupt the al-Qaeda leadership."[4]

Mr. Panetta has made similar on-the-record statements in the media.  In an interview with the Washington Post, Mr. Panetta described the drone strikes in Pakistan as "the most aggressive operation that CIA has been involved in in our history."  Abdo Decl. Ex. C at 1.[5]  Referring to

---

[4] Defendant's amici contend that Mr. Panetta's introductory disclaimer—"I can't go into particulars"—somehow nullifies the effect of his later admissions.  Amici Br. 14–15.  This quite clearly ignores that Mr. Panetta, in response to an inquiry about "remote drone strikes," explained his position about "these operations."  Abdo Decl. Ex. B at 10.  In any event, Mr. Panetta in the same statement did admit to discussing particulars: "But I can assure you that *in terms of that particular area*, it is very precise and it is very limited in terms of collateral damage and, very frankly, it's the only game in town in terms of confronting and trying to disrupt the al-Qaeda leadership."  *Id.* (emphasis added).

[5] Peter Finn & Joby Warrick, *Al-Qaida Crippled as Leaders Stay in Hiding, CIA Chief Says*, Wash. Post, Mar. 17, 2010, *available at* 2010 WLNR 5571794.

the drone/targeted-killing program, he stated that "[t]hose operations are seriously disrupting al-

Qaida" and that "we really do have them on the run." *Id.*

Mr. Panetta has even gone so far as to acknowledge the targets of particular strikes.

When asked about the March 8, 2010 killing of Hussein al-Yemeni in a "drone strike" of a

suspected bomb-making facility in Miran Shah, Pakistan, Mr. Panetta commented that "We now

believe that al-Yemeni, who was one of the top 20 [al Qaeda leaders], was one of those who was

hit." Abdo Decl. Ex. D at 1 (alteration in original).[6]  He lauded the strike and the message it

sent:

> "Anytime we get a high value target that is in the top leadership of al Qaeda, it
> seriously disrupts their operations," Mr. Panetta said.  "It sent two important
> signals," Mr. Panetta said.  "No. 1 that we are not going to hesitate to go after
> them wherever they try to hide, and No. 2 that we are continuing to target their
> leadership."

*Id.* at 2.

In a similar acknowledgment, Mr. Panetta confirmed, during a videotaped interview with

ABC News, that the CIA had killed al Qaeda's third in charge:

> But having said that, the more we continue to disrupt Al Qaida's operations, and
> we are engaged in the most aggressive operations in the history of the CIA in that
> part of the world, and the result is that we are disrupting their leadership.  We've
> taken down more than half of their Taliban leadership, of their Al Qaida
> leadership.  *We just took down number three in their leadership a few weeks ago.*

*Id.* Ex. E at 4 (emphasis added).[7]  The drone strike on that individual—al Qaeda's "number

three"—had been widely reported in the weeks leading up to Mr. Panetta's interview.  *See, e.g.*,

---

[6] Siobhan Gorman & Jonathan Weisman, *Drone Kills Suspect in CIA Suicide Bombing*, Wall St. J., Mar. 18, 2010, *available at* http://online.wsj.com/article/SB10001424052748704059004575128123449551524.html.

[7] *Jake Tapper Interviews CIA Director Leon Panetta*, ABC News, June 27, 2010, *available at* http://abcnews.go.com/ThisWeek/week-transcript-panetta/story?id=11025299&page=1.  The video recording of the interview is also available at the internet link provided.

*id.* Exs. F–G.[8]  The White House also commented on the drone strike, describing al Qaeda's

third in charge as the "biggest target to be either killed or captured in five years."  *Id.* Ex. H.[9]

In sum, these official disclosures clearly confirm the CIA's involvement in drone strikes

and that the CIA possesses records responsive to Plaintiffs' FOIA request.  The CIA argues that

it has not officially acknowledged its involvement in drone strikes for several reasons.  None has

any merit.

First, the CIA attempts to characterize the disclosures relied upon by Plaintiffs as

"unsourced," "from former government officials," from "anonymous individuals," "attempts at

deduction or mere conjecture," or "statements by former government employees."  Def.'s Br.

22–24.  In their administrative appeal, Plaintiffs did cite unofficial sources for a different

proposition—relating to the requirement under Exemption 1 that a disclosure reasonably be

expected to cause harm—but all of the sources discussed above are official, public statements by

the CIA's Director and the White House.

Next, the CIA claims that the statements relied upon above are "selectively quoted" and

based on "inferences drawn by journalists."  Def.'s Br. 24.  With respect to the most detailed of

the official disclosures relied upon, this is patently untrue.  The statements of Mr. Panetta at the

Pacific Council on International Policy have been reproduced from a transcript of the event

published on the website of the CIA itself, and Mr. Panetta's statement to ABC News,

confirming that the CIA killed al Qaeda's third in charge, was transcribed and videotaped and

can be viewed online.  *See supra* note 7.

---

[8] Eric Schmitt, *American Strike Is Said to Kill a Top Qaeda Leader*, N.Y. Times, May 31, 2010, *available at* http://www.nytimes.com/2010/06/01/world/asia/01qaeda.html; Justin Fishel, *CIA Drone Strike Kills Al-Qaeda #3*, FOX News, June 1, 2010, *available at* http://liveshots.blogs.foxnews.com/2010/06/01/cia-drone-strike-kills-al-qaeda-3/.

[9] Press Briefing by Press Secretary Robert Gibbs, White House (June 1, 2010), *available at* http://www.whitehouse.gov/the-press-office/press-briefing-press-secretary-robert-gibbs-6110.

Moreover, the Court may consider the media quotations of Mr. Panetta.  In arguing official acknowledgment, it is Plaintiffs' "initial burden of pointing to specific information in the public domain."  *Wolf*, 473 F.3d at 378 (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)).  Plaintiffs have satisfied that burden by adducing an array of statements by Mr. Panetta all corroborating the same fact.  The CIA now bears the burden of overcoming the weight of those disclosures, but it may not do so by simply and conclusorily denying their accuracy without proffering any contrary evidence.  The CIA's attempt to do so appears to stem from its mistaken belief that public statements of authorized officials cannot constitute official acknowledgments.  *See, e.g.*, Def.'s Br. 22–23.  That is not the law.  At most, courts have made clear that "public speculation" and "widespread public discussion" do not officially confirm classified facts.  *See, e.g.*, *Wilson v. Cent. Intelligence Agency*, 586 F.3d 171, 174 & n.2 (2d Cir. 2009) (holding that unauthorized disclosure of classified facts does not officially disclose those facts); *Wolf*, 473 F.3d at 378 ("An agency's official acknowledgment of information by prior disclosure, however, cannot be based on mere public speculation, no matter how widespread.").  But Plaintiffs' claim of official acknowledgment does not rest on speculation or discussion by the *public*; it rests upon official statements by the CIA's Director.  Notably, the CIA has not denied that the statements were made, much less offered evidence supporting such a denial.

Finally, the CIA suggests in a footnote that a *Glomar* response is still appropriate even if the Court finds that the CIA officially acknowledged its involvement in drone strikes.  Def.'s Br. 23 n.7.  That is not so.  The primary case relied upon by the CIA is *Wilner*, in which the plaintiffs sought records regarding the warrantless wiretapping of their communications with particular clients at Guantánamo Bay.  592 F.3d at 64.  In response to the government's *Glomar* response, the plaintiffs argued that the government had already officially acknowledged the

warrantless wiretapping program, known as the Terrorist Surveillance Program ("TSP").  *Id.* at 69.  The Second Circuit held that the government's official acknowledgment of the TSP did not preclude the government from withholding more specific information about the program—i.e., whether particular individuals had been surveilled—that had *not* been officially acknowledged. *Id.* ("The record is clear that, although the general existence of the TSP has been officially acknowledged, the specific methods used, targets of surveillance, and information obtained through the program have not been disclosed.").  This case is different, as the fact underlying the CIA's *Glomar* response is identical to the fact officially acknowledged: that the CIA is involved in drone strikes.[10]

For these reasons, the CIA has officially acknowledged that it is involved in drone strikes, and the Court should order it to process Plaintiffs' FOIA request.

**B.   The use of drones to target and kill individuals is not an "intelligence activity" or an "intelligence source or method"**

The CIA's *Glomar* response under Exemptions 1 and 3 should also be rejected because the use of drones to target and kill individuals is not an "intelligence activity" or an "intelligence source or method" within the meaning of Executive Order 13,526, the Central Intelligence Agency Act of 1949, or the National Security Act of 1947.

To assert a *Glomar* response, the CIA must establish that confirming or denying the existence of records responsive to Plaintiffs' request would itself reveal information protected from disclosure by FOIA.  Here, the CIA argues that responding to Plaintiffs' FIOA request would reveal whether the CIA is involved in drone strikes, which, the CIA asserts, is protected

---

[10] The CIA also cites *Phillippi*, but that case involved media attempts to convert private discussions into official disclosures.  *Phillippi*, 655 F.2d at 1327–28, 1330–31.  Here, by contrast, Plaintiffs rely on public comments by authorized officials, statements that the CIA does not deny were made.

from disclosure by Exemptions 1 and 3.  Exemption 1 allows the government to withhold information that falls within an applicable executive order and that has been properly classified pursuant to that order.  5 U.S.C. § 552 (b)(1) .  The CIA relies upon Executive Order 13,526, which allows the classification of, among other things, "intelligence activities" and "intelligence sources or methods," Exec. Order No. 13,526, § 1.4(c), if disclosing that information "could be expected to result in damage to the national security," *id.* § 1.1(a)(4).  Exemption 3 allows the government to withhold information that is "specifically exempted from disclosure by statute."  5 U.S.C. § 552 (b)(3).  Here, the CIA relies upon the National Security Act of 1947 and the Central Intelligence Agency Act of 1949, which, like Executive Order 13,526, allow the withholding of "intelligence sources and methods."

The relevant question of law in this case, accordingly, is whether the CIA's use of drones to target and kill individuals is an "intelligence" activity, source, or method.  It is not.

In *Central Intelligence Agency v. Sims*, the Supreme Court adopted a common-sense definition of the statutory power to protect "intelligence sources and methods," remarking that "Congress simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the Agency needs to perform its statutory duties with respect to foreign intelligence."  471 U.S. 159, 169–70 (1985).  The Court quoted with approval the definition of "foreign intelligence" provided by General Vandenberg, a director of the CIA: "foreign intelligence [gathering] consists of securing all possible data pertaining to foreign governments or the national defense and security of the United States."  *Id.* at 170 (alteration in original)

(quoting *National Defense Establishment: Hearings on S. 758 Before the S. Comm. on Armed Servs.*, 80th Cong. 497 (1947) (Senate Hearings)).[11]

The D.C. Circuit has similarly made clear that the CIA's authority to withhold information as an "intelligence activity" or "intelligence source and method" is broad but not unlimited.  In *Weissman v. Central Intelligence Agency*, 565 F.2d 692, 694–96 (D.C. Cir. 1977), for example, the D.C. Circuit held that the CIA's authority to protect "intelligence sources and methods" did not extend to domestic law-enforcement functions because the text of the National Security Act of 1947 excluded such activities from the CIA's mandate.  In so holding, the court relied upon: (1) the text of the National Security Act, which "specifically provided that the 'Agency shall have no police, subpena, law-enforcement powers, or internal-security functions,'" *id.* at 695; (2) its legislative history, which confirmed that Congress had "chose[n] to limit the Agency's activities to intelligence gathering abroad," *id.*; and (3) the findings of the so-called Church Committee Report, which buttressed the court's conclusion, *see, e.g., id.* at 696 ("'Given the prohibition against internal security functions, it is unlikely that the ['intelligence sources and methods'] provision was meant to include investigations of private American nationals who had no contact with the CIA, on the grounds that eventually their activities might threaten the Agency.'" (quoting S. Rep. No. 94-755, Book I, at 139 (1976))).

---

[11] Although *Sims* addressed the scope of protected sources and methods under Exemption 3, the definition of the phrase as incorporated by Exemption 1 is identical.  *See, e.g., Maynard v. Cent. Intelligence Agency*, 986 F.2d 547, 555 (1st Cir. 1993) ("When, as here, Exemptions 1 and 3 are claimed on the basis of potential disclosure of intelligence sources or methods, the standard of reviewing an agency's decision to withhold information is essentially the same."); *Military Audit Project v. Casey*, 656 F.2d 724, 736 n.39 (D.C. Cir. 1981) (noting that Exemption 3 provides overlapping protection with Exemption 1 where disclosure of classified information would reveal intelligence sources and methods); *Phillippi*, 546 F.2d at 1015 n.14 (noting that the "inquiries into the applicability of the two exemptions [1 and 3] may tend to merge" with regard to classification of intelligence sources and methods).

Other courts have likewise rejected unbounded constructions of the CIA's withholding authority. *See, e.g.*, *Navasky v. Cent. Intelligence Agency*, 499 F. Supp. 269, 274 (S.D.N.Y. 1980) (holding that the CIA's book-publishing propaganda was not an "intelligence source or method" that had been "contemplated by Congress"); *Am. Civil Liberties Union v. Dep't of Def.*, No. 1:04-CV-4151 (S.D.N.Y. Dec. 29, 2009) (dkt. no. 398) (rejecting the CIA's attempt to withhold a "source of authority" as an "intelligence method").[12]

The logic of *Sims* and *Weissman* compel the conclusion that Plaintiffs' request does not seek any information about "intelligence sources and methods," but rather about a killing program. Basic information about the scope, limits, oversight, and legal basis of this killing program cannot sensibly be described as "intelligence sources or methods." Using drones to conduct targeted killings simply has nothing to do with "securing . . . *data* pertaining to foreign governments or the national defense and security of the United States." *Sims*, 471 U.S. at 171 (emphasis added) (internal quotation marks omitted). Information about the CIA's drone program therefore falls outside the scope of "intelligence sources and methods" as set out in *Sims*.

To the extent that some documents encompassed by the Request would actually reveal "intelligence sources and methods," portions of those particular documents may well be exempt from disclosure. But the protection afforded particular records regarding "intelligence sources and methods" does not justify a blanket *Glomar* response and does not permit the CIA to avoid its obligation to search for responsive records and to release those records (or to explain why

---

[12] A copy of Judge Hellerstein's December 29, 2009 opinion in *American Civil Liberties Union v. Department of Defense* is attached to the Abdo Declaration as Exhibit I, along with a redacted transcript of an *in camera* proceeding—referenced in the opinion—during which Judge Hellerstein more fully explained his rejection of the CIA's attempt to label a "source of authority" as an "intelligence method." The government has appealed from Judge Hellerstein's judgment.

particular documents must be withheld).  The subject of Plaintiffs' request is a program of targeted killing, not intelligence-gathering.  As such, most, if not all, of the records sought would disclose not intelligence sources or methods, but only basic information about the scope, limits, oversight, legal basis, and consequences of this targeted-killing program.

The CIA argues in the alternative that even if it were required to confirm or deny the existence of records relating to drone strikes, indexing those records pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), would independently disclose "intelligence sources and methods."  Def.'s Br. 12 n.5; Cole Decl. ¶ 20.  This argument is both premature and overreaching.  It is premature because the precise content of the CIA's *Vaughn* index need not be resolved until the Court rejects the CIA's *Glomar* response and the CIA searches for responsive records.  And it is overreaching because even if indexing certain documents would reveal "intelligence sources or methods," indexing (or releasing) others certainly would not.  For example, the CIA quite likely possesses legal memoranda regarding its use of drones.  Indexing or releasing those memoranda would reveal nothing claimed by the CIA to be protected from indexing.  *See* Cole Decl. ¶ 20 (claiming that an index of responsive documents "would reveal additional information about the depth and breadth of the CIA's involvement, or interest, in drone strikes").

For these reasons, the CIA's use of drones to target and kill individuals is not an "intelligence" activity, source, or method, and the Court should order the CIA to process Plaintiffs' FOIA request.

### C. Confirming the existence of responsive records could not reasonably be expected to result in damage to the national security

The CIA's *Glomar* response pursuant to Exemption 1 is additionally improper because no damage to the national security could reasonably be expected to flow from acknowledging the existence of records responsive to Plaintiffs' request.[13]

To sustain its *Glomar* response under Exemption 1, the CIA bears an additional burden under Executive Order 13,526: information may be withheld only if "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, . . . and . . . is able to identify or describe the damage." Exec. Order No. 13,526, § 1.1(a)(4). Where, as here, the government seeks to protect information that is already in the public domain in whole or in part, it must explain how additional disclosure could damage the national security. *Wash. Post v. U.S. Dep't of Def.*, 766 F. Supp. 1, 10–12 (D.D.C. 1991).

As detailed above, the CIA has officially acknowledged its involvement in drone strikes. Accordingly, its *Glomar* response fails, as supplementary confirmation of the CIA's involvement in drone strikes can do no harm. In addition to public comments by Mr. Panetta about the CIA's use of drones, however, numerous other public comments by U.S. officials and others make the CIA's predictions of harm disingenuous and lacking in credibility. *See* Abdo Decl. Exs. J–Q.[14]

---

[13] In this case, the Exemption 1 and Exemption 3 analyses are virtually identical, except that the CIA bears an additional burden under Exemption 1 of demonstrating a reasonable expectation of harm from disclosure. Strictly speaking, the Court need not reach the harm analysis, however, because Plaintiffs' arguments regarding official acknowledgment and the meaning of "intelligence sources and methods" are independently dispositive as to both claims of exemption, and because the CIA's failure to satisfy the harm requirement of Exemption 1 cannot defeat the invocation of Exemption 3.

[14] Greg Miller, *CIA Using Military Drones in Pakistan*, Wash. Post, Oct. 3, 2010, *available at* 2010 WLNR 19596415 ("The CIA is using an arsenal of armed drones and other equipment provided by the U.S. military to secretly escalate its operations in Pakistan by striking targets

Those statements reveal the extent to which the CIA's drone program has been publicly

discussed.  For example, intelligence officials have been cited describing the standards and

procedures used in order to authorize a CIA targeted killing using drones.  *See, e.g.*, *id.* Exs. N,

R–S.[15]  Details about particular CIA drone strikes have also been widely reported.  For instance,

---

beyond the reach of American forces based in Afghanistan, U.S. officials said."); *id.*
("'Increasing the operational tempo against terrorists in Pakistan has been in the works since last
year,' a U.S. official said.  'The CIA sought more resources to go after terrorists in Pakistan,
which the White House strongly supported.'"); Mark Mazzetti & Eric Schmitt, *C.I.A. Steps Up
Drone Attacks on Taliban in Pakistan*, N.Y. Times, Sept. 27, 2010, *available at*
http://www.nytimes.com/2010/09/28/world/asia/28drones.html ("The C.I.A. has drastically
increased its bombing campaign in the mountains of Pakistan in recent weeks, American officials
said."); David S. Cloud, *U.S. Citizen Anwar Awlaki Added to CIA Target List*, L.A. Times, Apr.
6, 2010, *available at* http://articles.latimes.com/2010/apr/06/world/la-fg-yemen-cleric7-
2010apr07 (citing U.S. officials as disclosing that "Anwar Awlaki, 38, who was born in New
Mexico, recently was added to the CIA target list after a special government review of his
activities"); Greg Miller, *Muslim Cleric Aulaqi Is 1st U.S. Citizen on List of Those CIA Is
Allowed to Kill*, Wash. Post, Apr. 7, 2010, *available at* http://www.washingtonpost.com/wp-
dyn/content/article/2010/04/06/AR2010040604121.html ("A Muslim cleric tied to the attempted
bombing of a Detroit-bound airliner has become the first U.S. citizen added to a list of suspected
terrorists the CIA is authorized to kill, a U.S. official said Tuesday."); Greg Miller, *U.S. Citizen
in CIA's Cross Hairs*, L.A. Times, Jan. 31, 2010, *available at*
http://articles.latimes.com/2010/jan/31/world/la-fg-cia-awlaki31-2010jan31 (noting statements
by current and former intelligence officials about the CIA's targeted killing program); John J.
Lumpkin, *Bush Order: CIA Can Kill Americans in Al Qaeda*, Chi. Trib., Dec. 4, 2002, *available
at* 2002 WLNR 12684412 ("U.S. citizens working for Al Qaeda overseas can legally be targeted
and killed by the CIA under President Bush's rules for the war on terrorism, U.S. officials say.");
Editorial, *Lethal Force Under Law*, N.Y. Times, Oct. 10, 2010, *available at* 2010 WLNR
20226655 ("Privately, government officials say no C.I.A. drone strike takes place without the
approval of the United States ambassador to the target country, the chief of the C.I.A. station, a
deputy at the agency, and the agency's director."); Julian E. Barnes & Adam Entous, *Wider Role
for CIA Sought*, Wall St. J., Oct. 23, 2010, *available at*
http://online.wsj.com/article/SB10001424052702304354104575568621818109684.html?mod=g
ooglenews_wsj ("The number of CIA personnel in Pakistan has grown substantially in recent
years.  The exact number is highly classified.  The push for more forces reflects, in part, the
increased need for intelligence to support the CIA drone program that has killed hundreds of
militants with missile strikes.").

[15] Miller, *U.S. Citizen in CIA's Cross Hairs*, *supra* note 14 ("Decisions to add names to the
CIA target list are 'all reviewed carefully, not just by policy people but by attorneys,' said the
second U.S. official.  'Principles like necessity, proportionality, and the minimization of collateral
damage—to persons and property—always apply.'"); Dana Priest, *U.S. Military Teams,
Intelligence Deeply Involved in Aiding Yemen on Strikes*, Wash. Post, Jan. 27, 2010, *available at*

a number of articles describe the circumstances surrounding Mr. Panetta's personal authorization of the August 5, 2009 drone strike that killed Baitullah Mehsud. *See, e.g.*, *id.* Exs. S–T.[16]  A flurry of more recent articles have focused on the CIA's decision to authorize the targeted killing of a U.S. citizen. *See, e.g.*, *id.* Exs. L–M, U.[17]

In short, it is no secret that the CIA uses drones to target and kill individuals, and no additional harm could reasonably be expected to flow from the CIA's confirmation that it

---

http://www.washingtonpost.com/wp-dyn/content/article/2010/01/26/AR2010012604239.html ("After the Sept. 11 attacks, Bush gave the CIA, and later the military, authority to kill U.S. citizens abroad if strong evidence existed that an American was involved in organizing or carrying out terrorist actions against the United States or U.S. interests, military and intelligence officials said. The evidence has to meet a certain, defined threshold.  The person, for instance, has to pose 'a continuing and imminent threat to U.S. persons and interests,' said one former intelligence official."); Peter Finn & Joby Warrick, *Panetta Wins Friends But also Critics with Stepped-Up Drone Strikes*, Wash. Post, Mar. 21, 2010, *available at* 2010 WLNR 5874638 ("Panetta personally authorizes every strike, sometimes reversing his decision or reauthorizing a target if the situation on the ground changes, according to current and former senior intelligence officials.  'He asks a lot of questions about the target, the intelligence picture, potential collateral damage, women and children in the vicinity,' said the senior intelligence official.").

[16] Finn & Warrick, *Panetta Wins Friends But also Critics with Stepped-Up Drone Strikes*, *supra* note 15 ("On the morning of Aug. 5, CIA Director Leon Panetta was informed that Baitullah Mehsud was about to reach his father-in-law's home. . . . Panetta was pulled out of a White House meeting and told that Mehsud's wife was also on the rooftop, giving her husband a massage.  Mehsud, implicated in suicide bombings and the assassination of former Pakistani Prime Minister Benazir Bhutto, was a major target.  Panetta told his officers to take the shot. Mehsud and his wife were killed."); Jane Mayer, *The Predator War*, New Yorker, Oct. 26, 2009, *available at* http://www.newyorker.com/reporting/2009/10/26/091026fa_fact_mayer.

[17] Cloud, *supra* note 14 (citing U.S. officials as disclosing that "Anwar Awlaki, 38, who was born in New Mexico, recently was added to the CIA target list after a special government review of his activities"); Miller, *Muslim Cleric Aulaqi Is 1st U.S. Citizen on List of Those CIA Is Allowed to Kill*, *supra* note 14 ("A Muslim cleric tied to the attempted bombing of a Detroit-bound airliner has become the first U.S. citizen added to a list of suspected terrorists the CIA is authorized to kill, a U.S. official said Tuesday."); Scott Shane, *U.S. Approves Targeted Killing of American Cleric*, N.Y. Times, Apr. 6, 2010, *available at* http://www.nytimes.com/2010/04/07/world/middleeast/07yemen.html ("The Obama administration has taken the extraordinary step of authorizing the targeted killing of an American citizen, the radical Muslim cleric Anwar al-Awlaki, who is believed to have shifted from encouraging attacks on the United States to directly participating in them, intelligence and counterterrorism officials said Tuesday.").

possesses records responsive to Plaintiffs' FOIA request. This is particularly so given the illogical claim of harm provided by the CIA. It contends that revealing whether it is involved in drone strikes would harm the national security because hostile groups might "take countermeasures to nullify [the] effectiveness" of drone strikes. Cole Decl. ¶ 34. There are two obvious errors in this logic. First, the use of drones is not a secret method of killing: it is a dramatic public event, in which an individual is killed by an explosive missile. Witnesses are common, as are reports of such strikes, both in the United States and abroad. Thus, our enemies are well aware of the occurrence of drone strikes through personal experience and are surely taking whatever "countermeasures" are possible, whether the CIA confirms its involvement or not. Second, whether or not the CIA has confirmed its involvement in drone strikes, the United States government incontrovertibly has. On March 25, 2010, for example, the Legal Adviser of the Department of State defended the United States' ongoing use of "unmanned aerial vehicles" to conduct "lethal operations" in a closely watched and widely publicized speech at the Annual Meeting of the American Society of International Law. Abdo Decl. Ex. V.[18] There is official acknowledgment, accordingly, that the U.S. government uses drones to target and kill our enemies. It is difficult to fathom how also knowing *which agency* directs those strikes—whether the Department of Defense or the CIA—would affect the ability of our enemies to take "countermeasures." The CIA provides no explanation, pretending that this flaw in its reasoning

---

[18] Harold Hongju Koh, Legal Adviser, U.S. Department of State, *The Obama Administration and International Law*, Mar. 25, 2010, *available at* http://www.state.gov/s/l/releases/remarks/139119.htm ("In U.S. operations against al-Qaeda and its associated forces—including lethal operations conducted with the use of unmanned aerial vehicles—great care is taken to adhere to these principles in both planning and execution, to ensure that only legitimate objectives are targeted and that collateral damage is kept to a minimum."); *id.* ("What I can say is that it is the considered view of this Administration—and it has certainly been my experience during my time as Legal Adviser—that U.S. targeting practices, including lethal operations conducted with the use of unmanned aerial vehicles, comply with all applicable law, including the laws of war.").

does not exist.  Nor does it address the disparity between its refusal to confirm or deny the existence of responsive records and the responses of the other agencies served with Plaintiffs' FOIA request.  The other agencies are searching for records and have already produced one forty-seven page document.  They have, therefore, confirmed the existence of responsive records, obviously concluding that no damage to the national security will occur.  The CIA has failed to explain why the Department of Defense, Department of Justice, and Department of State are wrong.

For these reasons, the CIA has failed to sustain its burden under Exemption 1 of demonstrating a reasonable expectation of harm were it to acknowledge, once again, its involvement in drone strikes.

## CONCLUSION

For the foregoing reasons, the Court should deny the CIA's motion for summary judgment, grant Plaintiffs' cross-motion for partial summary judgment, and order the CIA to produce records responsive to Plaintiffs' request or to claim individual exemptions to production of each record or portion thereof.

November 1, 2010                                    Respectfully submitted,

 */s/ Arthur B. Spitzer*
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
    of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel: (202) 457-0800
Fax: (202) 452-1868
artspitzer@aol.com

Alexander A. Abdo
Ben Wizner
Jonathan Manes
American Civil Liberties Union

Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel:  (212) 549-2517
Fax:  (212) 549-2654
aabdo@aclu.org