**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al.,      ) ) ) ) Plaintiffs,      ) ) v.      ) RMC ) DEPARTMENT OF JUSTICE, et al.,      ) ) ) Defendants.      ) ) | Civil Action No. 1:10-cv-00436- |

**DEFENDANT CIA'S OPPOSITION TO PLAINTIFFS' CROSS MOTION FOR PARTIAL SUMMARY AND REPLY MEMORANDUM IN SUPPORT OF THE CIA'S MOTION FOR SUMMARY JUDGMENT**

TONY WEST
Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs
Branch

AMY E. POWELL (N.Y. Bar)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W
Washington, D.C. 20001
Telephone: (202) 514-9836
Fax: (202) 616-8202
amy.powell@usdoj.gov

# **TABLE OF CONTENTS**

**PAGE**

INTRODUCTION..................................................................................................................... 1

ARGUMENT............................................................................................................................ 2

I.     THE CIA'S GLOMAR RESPONSE IS PROPER UNDER
EXEMPTION 3................................................................................................................ 2

      A.    The CIA Act Provides an Adequate and Independent Basis
for Withholding that Plaintiffs Have Not Fully Disputed...................................... 3

      B.    The National Security Act Also Justifies the CIA's Glomar
Response. ............................................................................................................... 4

II.    EXEMPTION 1 JUSTIFIES THE CIA'S GLOMAR RESPONSE
BECAUSE THE EXISTENCE OR NONEXISTENCE OF
RESPONSIVE RECORDS IS PROPERLY CLASSIFIED............................................... 8

      A.    The Existence or Nonexistence of Responsive Records Falls
Within the Protected Categories Listed in Section 1.4 of
E.O. 13526. ........................................................................................................... 9

      B.    A Classification Authority Has Properly Determined that
Disclosure of the Information Could Result in Damage to
National Security................................................................................................. 10

III.   THE CIA HAS NOT OFFICIALLY ACKNOWLEDGED THE
EXISTENCE OR NONEXISTENCE OF RESPONSIVE RECORDS. ........................... 13

CONCLUSION....................................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                    <u>PAGE(S)</u>

*ACLU v. Dep't of Defense*,
    664 F. Supp. 2d 72 (D.D.C. 2009). ........................................................ 6

*ACLU v. Dep't of Defense*,
    -- F. Supp. 2d -- 2010 WL 2787645 (S.D.N.Y. 2010). ........................... 8

*Afshar v. Dep't of State*,
    702 F.2d 1125 (D.C. Cir. 1983). .................................................. <u>passim</u>

*Agee v. CIA*,
    524 F. Supp. 1290 (D.D.C. 1981). ....................................................... 7

*Amnesty Int'l v. CIA, --*,
    F. Supp. 2d -- 2010 WL 3033822 (S.D.N.Y. 2010)................................ 8

*Baker v. Central Intelligence Agency*,
    580 F.2d 664 (D.C. Cir. 1978). ...................................................... 3, 4

*CIA v. Sims*,
    471 U.S. 159 (1985)...................................................... <u>passim</u>

*Ctr. For Nat'l Sec. Studies v. DOJ*,
    331 F.3d 918 (D.C. Cir. 2003). ......................................................... 10

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C. Cir. 1990). ................................................... 10, 12

*Frugone v. CIA*,
    169 F.3d 772 (D.C. Cir. 1999). ......................................................... 10

*Gardels v. CIA*,
    689 F.2d 1100 (D.C. Cir. 1982). ........................................................ 6

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009). ......................................................... 10

*Lesar v. DOJ*,
    636 F.2d 472 (D.C. Cir. 1980). ......................................................... 7

*Military Audit Project v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981). .................................................. <u>passim</u>

*Morley v. CIA*,
    699 F. Supp. 2d 244 (D.D.C. 2010). ..................................................................... 6

*Navasky v. CIA*,
    499 F. Supp. 269 (S.D.N.Y. 1980)........................................................................ 7

*Phillippi v. CIA*,
    655 F.2d 1325 (D.C. Cir. 1981). .................................................................. 13, 16

*Riquelme v. CIA*,
    453 F. Supp. 2d 103 (D.D.C. 2006). ............................................................ 3, 7, 12

*Students Against Genocide v. Dep't of State*,
    50 F. Supp. 2d 20 (D.D.C. 1999), aff'd, 257 F.3d 828 (D.C. Cir. 2001). ............................ 12

*Valfells v. CIA*,
    717 F. Supp. 2d 110 (D.D.C. 2010). ............................................................. 12, 15

*Washington Post v. Dep't of Defense*
    766 F. Supp. 1 (D.D.C. 1991). ........................................................................ 12

*Weissman v. CIA*,
    565 F.2d 692 (D.C. Cir. 1977). ....................................................................... 7

*Wheeler v. CIA*,
    271 F. Supp. 2d 132 (D.D.C. 2003). ................................................................... 7

*Wilner v. Nat'l Security Agency*,
    592 F.3d 60 (2d Cir. 2009)......................................................................... 7, 14

*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009)......................................................................... 13

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007). .............................................................. <u>passim</u>

## STATUTES

50 U.S.C. § 403g............................................................................................ 3

50 U.S.C. § 403-1(i)(1). ................................................................................. 3, 4

**MISCELLANEOUS**

Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009)................................................. <u>passim</u>

# INTRODUCTION

Defendant Central Intelligence Agency ("the CIA") hereby submits this memorandum in opposition to Plaintiffs' motion for partial summary judgment and in support of its motion for summary judgment.  Plaintiffs American Civil Liberties Union and American Civil Liberties Union Foundation (collectively, "Plaintiffs" or "the ACLU") have made a broad request for records relating to various aspects of  the alleged "use of unmanned aerial vehicles ('UAVs') — commonly referred to as 'drones' … — by the CIA and the Armed Forces for the purposes of killing targeted individuals."  As previously explained, whether or not the CIA possesses responsive records concerning drone strikes is a currently and properly classified fact that is exempt from disclosure under FOIA Exemptions 1 and 3.

Plaintiffs' opposition and motion wholly fail to address many of the issues advanced in the CIA's motion for summary judgment.  For example, the CIA Act provides an adequate and independent basis for the CIA's Glomar response because to confirm or deny the existence of responsive records would reveal a "function" of the CIA.  No further finding of harm to national security is necessary for the Court to rule under Exemption 3.

The CIA continues to assert additional grounds for non-disclosure – including the National Security Act under Exemption 3 and Executive Order 13526 under Exemption 1 – because to confirm or deny the existence of responsive records would reveal potential intelligence activities, sources, and methods related to drone strikes (or lack thereof), including whether or not the CIA engages in certain foreign activities related to drone strikes and whether or not the CIA has an intelligence interest in drone strikes.  Without explanation, the ACLU completely ignores the category of "foreign activities" and brushes off the idea of an intelligence interest being protected under Exemptions 1 and 3.  The ACLU instead invites this Court to overrule the reasoned judgments of the CIA as to what information must be protected from

disclosure under Exemptions 1 and 3, ignoring the Supreme Court's admonition that the CIA is owed substantial deference when making these determinations.  The ACLU's attempt to substitute its own assessment of the risk to national security posed by its FOIA request for that of the CIA should be rejected for the same reason.[1]

Finally, the ACLU's argument that the CIA has waived the Glomar response by official disclosure ignores the stringent standard for a finding of waiver in this area.  None of the alleged disclosures are official, authorized statements that reveal the precise information at issue – the existence or nonexistence of responsive records or of an intelligence interest in drone strikes. The ACLU's unsupported inferences drawn from press reports do not suffice to overcome the reasoned declaration of the CIA.

## ARGUMENT

## I.      THE CIA'S GLOMAR RESPONSE IS PROPER UNDER EXEMPTION 3

As previously explained, the CIA Act and the National Security Act provide independent statutory bases for the CIA's Glomar response under Exemption 3.  *See* CIA Summ. J. Br. at 16-21.  These statutes do not require a determination that the disclosure of information would be expected to result in damage to the national security, a fact that Plaintiffs do not dispute.  *See* CIA Summ. J. Br. at 17.  Although the CIA has properly determined that the national security would be harmed if any of the information at issue were released, if the Court is satisfied that the CIA's Glomar response is proper under Exemption 3, it need not even conduct the additional analysis required under Exemption 1.  *See id.*

---

[1] As previously stated, if the Court desires, the CIA is prepared to supplement its unclassified declaration with a classified declaration containing additional information that the CIA cannot file on the public record.

A.     **The CIA Act Provides an Adequate and Independent Basis for Withholding that Plaintiffs Have Not Fully Disputed**

The CIA Act is an Exemption 3 statute that protects the "functions" of the CIA from disclosure.  *See* 50 U.S.C. § 403g (providing that "the Agency shall be exempted from the provisions of . . . any other law which require[s] the publication or disclosure of the organization, *functions*, names, official titles, salaries, or numbers of personnel employed by the Agency" (emphasis added)); *Baker v. Central Intelligence Agency*, 580 F.2d 664, 668-69 (D.C. Cir. 1978); *Riquelme v. CIA*, 453 F. Supp. 2d 103, 111-12 (D.D.C. 2006); CIA Summ. J. Br. at 17-19. Plaintiffs' opposition ignores the CIA Act and focuses instead on whether the protected information relates to "sources and methods" under Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13526"), and the National Security Act, 50 U.S.C. § 403-1(i)(l) ("NSA"). The CIA Act, however, is a distinct withholding statute, *see Baker*, 580 F.2d at 668-69, and it independently justifies the CIA's Glomar response in this case.

To disclose the existence or nonexistence of responsive records would reveal the functions of CIA personnel, including their involvement or non-involvement in drone strikes, and any related intelligence interest in drone strikes.  Indeed, one important thrust of Plaintiffs' request seems to be ferreting out exactly which agencies and personnel are involved in drone strikes and in what capacity.  *See, e.g.*, CIA Request (Exhibit A to Declaration of Mary Ellen Cole, Docket No. 15-2) at 4 ("It appears, therefore, that lethal force is being exercised by individuals who are not in the military chain of command"), *id*. at 5 ("It is unclear . . . how targets are selected . . . and who is making operational decisions about particular strikes."), *id.* at 6 (category 1.F seeking records regarding "whether drones can be used by the CIA . . . in order to execute targeted killings"); *id*. at 6 (category 3 seeking records "pertaining to the selection of human targets for drone strikes); *id.* at 7 (category 5 seeking records "pertaining to the

assessment or evaluation of individual drone strikes after the fact"), and *id.* at 7 (categories 9-10 seeking records "pertaining to the involvement of CIA personnel" in drone strikes and the piloting and operation of drones).  For example, it would reveal a great deal about the functions of CIA personnel if, hypothetically, the CIA possessed records responsive to the target selection categories of the request, *see* CIA Request ¶¶ 1-3, but not the post-strike analysis and evaluation categories.  *See* CIA Request ¶¶ 4, 5, 7, 8.  Similarly, it would reveal something else about the functions of CIA personnel if the CIA had records responsive to the target selection and analysis categories but not the pilot training and oversight categories.  *See* CIA Request ¶¶ 9-10.  Still further, if the CIA did not possess records responsive to any of these categories, it would reveal that CIA personnel were not performing any of these potential functions related to drone strikes. For all of the reasons previously stated, a non-Glomar response by the CIA to any of Plaintiffs' requests, including a response confirming the nonexistence of any responsive records, would reveal the functions of CIA personnel.  *See* Cole Decl. ¶ 41.[2]

### B.  The National Security Act Also Justifies the CIA's Glomar Response

As previously explained, the NSA is an Exemption 3 Statute that protects "intelligence sources and methods" from disclosure, *see* 50 U.S.C. § 403-1(i)(1), and courts defer to the expertise of the agency in determining whether particular information at issue could disclose sources and methods, *see CIA v. Sims*, 471 U.S. 159, 180 (1985).  *See* CIA Summ. J. Br. at 19-21.

---

[2] Plaintiff cites D.C. cases for the proposition that the scope of the phrase "sources and methods" under Exemption 3 is identical the scope of that phrase under Exemption 1.  *See* Pls' Opp. at 17.  While accurate, the term "functions" in the CIA Act is broader than simply "sources and methods."  Indeed, this Circuit has held that information subject to protection under the CIA Act does not even need to be connected to "the security of foreign intelligence activities or the protection of intelligence sources and methods." *Baker*, 580 F.2d at 668.

The Plaintiffs' blanket assertion that drone strikes are not an intelligence source or method fails to address the specific reasons given in the Cole Declaration for non-disclosure. Plaintiffs' strawman – that the "CIA's [alleged] use of drones to target and kill individuals" is not a method of "securing data" – is non-responsive to the actual rationale given by the CIA. The CIA's Glomar response does not rest on the CIA hypothetically having its own drone strike program, which is the premise upon which Plaintiffs' argument is built.[3]   The Cole Declaration makes clear that confirming or denying the existence of responsive CIA records would at a minimum reveal the intelligence interests of the CIA related to this particular device or these alleged foreign activities of the U.S. government.   *See* Cole Decl. ¶¶ 32-35.   Such intelligence interests of the CIA, which do not in any way equate to the CIA directly engaging in drone strikes, are precisely the type of information protected by the NSA.   The Cole Declaration also explains that information about any level of potential CIA involvement in drone strikes, even indirect involvement, would be protected from disclosure under the NSA.   For example, if hypothetically the CIA were involved by "providing supporting intelligence" to another agency's drone strike program, Cole Decl. ¶ 19, that action would plainly relate to CIA intelligence methods that are protected under the NSA.   As discussed in Section I, Plaintiffs' FOIA request is designed to ferret out precisely these type of intelligence interests and activities of the CIA related to drone strikes.

Accordingly, confirming existence or nonexistence of responsive CIA records could reveal the capabilities, resources, and interests of the CIA related to drone strikes, including any intelligence-support roles that it may or may not fill.   *See id*. ¶¶ 19, 21.   A hostile observer could deduce particular intelligence activities and sources and methods from the existence or

---

[3] By making this narrow argument Plaintiffs are inviting the Court to opine on the legality of this alleged CIA activity, but as discussed below, such an inquiry is not proper in this forum.   *See infra* at 7-8.

nonexistence of CIA information related to drone strikes.  The CIA therefore has properly

determined that such disclosures could reveal information about the intelligence sources and

methods of the CIA.  *See* CIA Summ. J. Br. at 11-12; Cole Decl. ¶¶ 19-26, 32-35.  Such

judgments are well "within defendants' broad discretion to determine 'whether disclosure of

information may lead to an unacceptable risk of compromising the intelligence-gathering

process.'"  *See ACLU v. Dep't of Defense*, 664 F. Supp. 2d 72, 78 (D.D.C. 2009) (quoting *Sims*,

471 U.S. at 180), and Exemption 3 is not a means for second-guessing the CIA Director's

judgments in this regard.  As the Supreme Court has stated, "[t]he decisions of the [CIA]

Director, who must of course be familiar with the 'whole picture,' as judges are not, are worthy

of great deference given the magnitude of the national security interests and potential risks at

stake."  *Sims*, 471 U.S. at 179.

  None of Plaintiffs' cited cases disputes the significant deference that is owed to the CIA

in making these judgments under the NSA.  To the contrary, in *CIA v. Sims*, the Supreme Court

directed that "intelligence sources and methods" be interpreted broadly to encompass any

sources and methods related to foreign intelligence, including an "infinite variety of diverse

sources."  471 U.S. at 169-73.  Nowhere does the Court suggest that the power to protect sources

and methods is strictly limited to the direct revelation of identities of particular sources of data.

Indeed, the Court specifically noted that "Congress intended to give the Director of Central

Intelligence broad power to protect the secrecy and integrity of the intelligence *process*."  *Id*. at

170 (emphasis added); *see also Gardels v. CIA*, 689 F.2d 1100, 1104 (D.C. Cir. 1982) (finding

that foreign intelligence agencies could deduce sources and methods from CIA's interest in a

particular university); *Morley v. CIA*, 699 F. Supp. 2d 244, 257-58 (D.D.C. 2010) (upholding

CIA's Glomar response to plaintiff's request concerning covert CIA operations pursuant to

Exemptions 1 and 3).[4]  Similarly, in *Weissman v. CIA*, 565 F.2d 692, 694, 698 (D.C. Cir. 1977),

the D.C. Circuit rejected the specific claim of a *law enforcement* exemption because the CIA was

not authorized to conduct domestic law enforcement functions.  *Id*. at 694-96.  The Court,

however, confined its ruling to the law enforcement exemption, upheld the applicability of

Exemptions 1 and 3 in general, and noted that on remand the CIA "may well be able to show that

the claim of exemption (b)(3) alone . . . is sufficient to protect the [same information] against

disclosure . . . ."  *Id.* [5]

At best, Plaintiffs' position amounts to an argument that the alleged underlying CIA

activity at issue would not be a *legal* activity of the CIA.  Numerous courts have rejected the

notion that FOIA lawsuits can be used to assess the legality of alleged agency action.  *See Wilner*

*v. Nat'l Security Agency*, 592 F.3d 60 (2d Cir. 2009) (declining to consider the alleged illegality

of the Terrorist Surveillance Program in upholding the NSA's Glomar response); *Agee v. CIA*,

524 F. Supp. 1290, 1292 (D.D.C. 1981) ("While some of the documents shed light on the legality

or illegality of CIA's conduct, the (b)(1) or (b)(3) claims are not pretextual. Any possibility of

illegal conduct on the part of the CIA does not defeat the validity of the exemptions claimed.");

*Lesar v. DOJ*, 636 F.2d 472, 483 (D.C. Cir. 1980) (holding that although the "surveillance of

[the FBI's target] strayed beyond the bounds of its initial lawful security aim, that does not

preclude the possibility that the actual surveillance documents and the Task Force materials that

---

[4] This is consistent with cases in which CIA has refused to confirm or deny whether the CIA has gathered intelligence about a particular target.  *See, e.g., Riquelme*, 453 F. Supp. 2d at 109; *Wheeler v. CIA*, 271 F. Supp. 2d 132, 140 (D.D.C. 2003).

[5] Plaintiffs cite *Navasky v. CIA* for the proposition that CIA's authority to withhold is not "unbounded." In *Navasky*, the Court held that the identities of authors, books and publishers engaged in acknowledged CIA propaganda efforts were not themselves intelligence sources and methods, but nonetheless noted that nondisclosure could be justified if the disclosure of such identities would lead to disclosure of sources and methods.  *See Navasky v. CIA*, 499 F. Supp. 269, 274-75 (S.D.N.Y. 1980).  Here, the CIA has explicitly and reasonably tied its Glomar policy to the disclosure of sources and methods.

comment upon those documents may nevertheless contain information of a sensitive nature, the

disclosure of which could compromise legitimate secrecy needs"); *ACLU v. Dep't of Defense*, --

F. Supp. 2d --, 2010 WL 2787645 (S.D.N.Y. 2010); *Amnesty Int'l v. CIA*, -- F. Supp. 2d --, 2010

WL 3033822 (S.D.N.Y. 2010) ("[B]ecause the records at issue fall under the coverage of

Exemption 3, the CIA is permitted to withhold their disclosure regardless of the alleged illegality

of the practices contained therein.").  As articulated by the court in a recent FOIA challenge

brought by the same Plaintiffs in the Southern District of New York, this attempt "to limit

Exemption 3 to 'lawful' intelligence sources and methods … finds no basis in the statute" and

would "confer an unwarranted competence to the district court to evaluate national intelligence

decisions*." ACLU v. Dep't of Defense*, 2010 WL 2787645, at *5.  As that court properly

concluded, "Courts are not invested with the competence to second-guess the CIA Director

regarding the appropriateness of any particular intelligence source or method." *Id.*  For these

reasons, the legality of the alleged CIA involvement in drone strikes is simply not an appropriate

element of the analysis under Exemption 1 or Exemption 3.[6]

## II.     EXEMPTION 1 JUSTIFIES THE CIA'S GLOMAR RESPONSE BECAUSE THE EXISTENCE OR NONEXISTENCE OF RESPONSIVE RECORDS IS PROPERLY CLASSIFIED

As previously explained, information is properly classified under Executive Order 13526

if:  (1) an original classification authority classifies the information; (2) the United States

Government owns, produces, or controls the information; (3) the information is within one of

eight protected categories listed in section 1.4 of the Order; and (4) the original classification

authority determines that the unauthorized disclosure of the information reasonably could be

expected to result in a specified level of damage to the national security, and the original

---

[6] The CIA cannot classify information for the purpose of hiding illegal conduct.  The CIA affirmed that it has not done so here.  Cole Decl.  ¶ 31.

classification authority is able to identify or describe the damage.  *See* E.O. 13526, § 1.1(a).

Plaintiffs concede that the information at issue is government-controlled information that has

been classified by an original classification authority.  They dispute that the existence or

nonexistence of responsive records falls within a protected category.  In addition, although

Plaintiffs concede that a classification authority determined that the disclosure could cause harm

to national security, they dispute the substance of that determination.

> **A.     The Existence or Nonexistence of Responsive Records Falls Within the**
> **Protected Categories Listed in Section 1.4 of E.O. 13526**

Plaintiffs dispute that the existence or nonexistence of responsive records falls within a

protected category under E.O. 13526.  The CIA has previously explained that the existence or

nonexistence of responsive records is properly classified under section 1.4(c) (information

concerning "intelligence activities (including covert action), intelligence sources or methods, or

cryptology") or section 1.4(d) (information concerning "foreign relations or foreign activities of

the United States, including confidential sources").  To begin, although Plaintiffs have

withdrawn categories 1.B and 2 of their FOIA request, they still ignore the other specific

categories that the Cole Declaration uses to illustrate the concerns implicated by Plaintiffs'

request, such as those seeking records regarding particular types of intelligence analysis or the

operation and targeting practices of drones.  *See* CIA Summ. J. Br. at 12, 13-14; Cole Decl. ¶¶

22, 23, 38.  Such information concerning the CIA's involvement or intelligence interest in these

various aspects of drone strikes (or lack thereof) plainly relates to the "intelligence activities" of

the CIA and thus is covered by section 1.4(c).  Moreover, Plaintiffs appear to concede that each

category of records in their request seeks information relating to "foreign relations or foreign

activities" of the United States, meaning the entire request necessarily falls within the ambit of

section 1.4(d).  *See* CIA Summ. J. Br. at 13-14; Cole Decl. ¶¶ 36-38.  Accordingly, the Court

could find that the information requested falls within the protected categories of information relating to "intelligence activities" or "foreign relations or foreign activities" without reaching Plaintiffs' unnecessarily narrow focus on "intelligence sources and methods."  Nonetheless, as explained above in Part I.B, disclosure of the existence or nonexistence of responsive records would reveal intelligence sources and methods as well.  As previously explained, courts routinely defer to the reasoned determination of the Executive Branch in this arena.  *See, e.g., Sims*, 471 U.S. at 179; *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009); *Ctr. For Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 927 (D.C. Cir. 2003).

**B.     A Classification Authority Has Properly Determined that Disclosure of the Information Could Result in Damage to National Security**

Plaintiffs devote some portion of their brief to explaining why the ACLU does not believe that disclosure of the existence or nonexistence of responsive records would cause damage to national security.  As an initial matter, this approach wholly ignores the proper standard.  *See* CIA Summ. J. Br. at 6-7.  Courts do not second-guess the facially reasonable concerns of the Executive Branch in this area.  *See Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) (remarking, "[m]indful that courts have little expertise in either international diplomacy or counterintelligence operations," that the court was "in no position to dismiss the CIA's facially reasonable concerns" about the potential security risk that disclosure would cause); *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (holding that the district court erred in "perform[ing] its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure").

In this case, the CIA has determined that revealing the existence or nonexistence of responsive records would harm national security by providing insight into CIA interests and capabilities, by revealing intelligence activities, sources and methods, and by damaging foreign

10

relations.  *See* CIA Summ. J. Br. at 14-16; Cole Decl. ¶¶ 24-26, 32-35.  Plaintiffs do not

seriously dispute many of these reasons and do not address some of the individual requests that

CIA singled out to illustrate the problematic nature of Plaintiffs' requests.  *See* Cole Decl. ¶¶ 23,

38.[7]  As an example, Plaintiffs do not appear to challenge in any way the CIA's determination

that a non-Glomar response could damage foreign relations.[8]

   The ACLU largely relies upon the argument that there has been such widespread media

reporting about drone strikes that no possible additional damage could result from an official

confirmation of CIA involvement in those strikes.  *See* Pls' Br. at 20-24 (citing media reports

arguably related to drone strikes).  The public statements cited by Plaintiffs are not official

acknowledgements on behalf of the CIA, *see infra* Part III; Cole Decl. ¶¶ 43-45, and the CIA has

determined specifically that that the disclosures sought by Plaintiff could be expected to cause

damage to U.S. national security."  *See* Cole Decl. ¶ 26.  A ruling that CIA could not issue a

Glomar in such circumstances would cause "significant and far-reaching damage to the U.S.

national security."  *Id*. ¶ 44.  This is consistent with longstanding case law that, in terms of harm,

there is a substantial difference between media reporting and official statements.  The fact that

---

[7] Plaintiffs argue specifically that hostile entities could not deploy countermeasures against drone strikes. *See* Pls' Opp. at 23.  The ACLU's analysis is wholly unsupported by any authority and ignores the CIA's professional judgment that intelligence methods and interests beyond drone strikes themselves could be revealed by confirming or denying the existence or nonexistence of a CIA interest in drone strikes.  As the Cole Declaration explained, such a revelation could provide "valuable insight into the CIA's capabilities, interests and resources that our enemies could use to reduce the effectiveness of CIA's intelligence operations."  *See* Cole Decl. ¶ 24.  And Plaintiffs' argument also ignores the significant harm to foreign relations that could result from such disclosures.  *See id.* ¶ 25.

[8] The harm to foreign relations caused by confirming or denying CIA involvement in drone strikes was not limited to requests 1.B and 2 (now withdrawn).  As the Cole Declaration explained, "any response by the CIA that could be seen as a confirmation of its alleged involvement in drone strikes could raise questions with other countries about whether the CIA is operating clandestinely inside their borders, which in turn could cause those countries to respond in ways that would damage U.S. national interests."  Cole Decl.  ¶ 25; *see Afshar*, 702 F.2d at 1130-31 ("Unofficial leaks and public surmise can often be ignored by foreign governments that might perceive themselves to be harmed by disclosure of their cooperation with the CIA, but official acknowledgement may force a government to retaliate.")

some information related to a certain subject exists in the public domain, however, "does not

eliminate the possibility that further disclosures can cause harm to intelligence sources, methods,

and operations." *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835 (D.C. Cir.

2001) (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990)); *Afshar*, 702 F.2d at 1130;

*Military Audit Project v. Casey*, 656 F.2d 724, 725 (D.C. Cir. 1981); *Riquelme*, 453 F. Supp. 2d

at 109.[9]  It would set a dangerous precedent if unauthorized public statements could cause

otherwise classified information to become unclassified, and that is why this proposition has

been resoundingly rejected by the courts.

    As discussed below, there is no official information in the public sphere that confirms or

denies the alleged involvement of the CIA in drone strikes.  Moreover, the public "disclosures"

cited by Plaintiffs in this section are not disclosures at all.  *See* Plaintiffs Exhibits J-U.[10]  All but

one of the media reports cited in this section quote unnamed "officials" or unauthorized non-

government sources.[11]  Media reporting based on statements by unnamed "officials" clearly does

not impact the government's ability to classify information.  *See, e.g., Military Audit Project,*

---

[9] The single case that Plaintiffs cite is not to the contrary.  In *Washington Post v. Dep't of Defense*, the district court held that the CIA had not adequately explained why certain information should be withheld in light of public discussion from unofficial sources.  *See* 766 F. Supp. 1 (D.D.C. 1991).  This district court decision is inconsistent with other controlling D.C. Circuit cases.  *See Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007); *Military Audit Project*, 656 F.2d at 745; *Students Against Genocide v. Dep't of State*, 50 F. Supp. 2d 20, 25 (D.D.C. 1999), aff'd, 257 F.3d 828 (D.C. Cir. 2001).  Regardless, *Washington Post* is clearly distinguishable where, as here, the CIA has submitted a detailed declaration that considers the public discussion and explains the harms caused by official disclosure of the existence or nonexistence of responsive records.

[10] Two of the cited articles do not even mention drones, the centerpiece of Plaintiffs' request.  *See* Exhibit L, U.

[11] Only one item cited in this section of Plaintiffs' brief involves a current government official – a speech given by the Legal Advisor at the Department of State.  In a public speech, Harold Koh mentioned "lethal operations conducted with the use of unmanned aerial vehicles."  Koh did not mention the CIA, and thus his statement cannot even arguably undermine the CIA's Glomar.  *See also Valfells*, 717 F. Supp. 2d 110, 118-19 (D.D.C. 2010) (public disclosure by the FBI of alleged CIA information did not waive CIA Glomar).

656 F.2d at 744; *Wilson v. CIA*, 586 F.3d 171, 195 (2d Cir. 2009).  While a terrorist organization

or other hostile force could theoretically analyze such news reports, these statements do not

provide the same clear official confirmation that would be provided by official

acknowledgement, and they do not have the same effect on foreign relations.  *See, e.g., Afshar v.

Dep't of State*, 702 F.2d 1125, 1130-31 (D.C. Cir. 1983) ("Unofficial leaks and public surmise

can often be ignored by foreign governments that might perceive themselves to be harmed by

disclosure of their cooperation with the CIA, but official acknowledgement may force a

government to retaliate.").

## III.    THE CIA HAS NOT OFFICIALLY ACKNOWLEDGED THE EXISTENCE OR NONEXISTENCE OF RESPONSIVE RECORDS

Plaintiffs argue primarily that the CIA has waived a Glomar response by officially

acknowledging its involvement in drone strikes.  As Plaintiffs concede, an agency does not

waive an otherwise proper Glomar response unless an authorized government official acting in

his or official capacity clearly discloses precisely the same information that is being sought,

which in this context is confirmation of the existence or nonexistence of responsive CIA records.

*See* CIA Summ. J Br. at 21-25; *Wolf*, 473 F.3d at 378.  For example, the D.C. Circuit held that

the CIA may have waived a Glomar response where the CIA Director had read responsive

documents into the Congressional record.  *Id.* at 379.  Anything short of such a formal

acknowledgement is insufficient to waive a Glomar response.  *See Phillippi v. CIA*, 655 F.2d

1325, 1331 (D.C. Cir. 1981); *Military Audit Project*, 656 F.2d at 745; *Afshar*, 702 F.2d at 1130-

31.

None of the statements submitted by the Plaintiffs comes close to meeting the demanding

standard required for waiver of a Glomar response.  In their brief, Plaintiffs have limited their

focus to four statements from CIA Director Leon Panetta.  First, Plaintiffs point to remarks by

Director Panetta at the Pacific Council on International Policy on May 18, 2009.  *See* Pls'

Exhibit B at 30-31.  The question and the statement in context follow:

> Q: … You mentioned that you believe the strategy in Pakistan is working — the President's strategy in Pakistan in the tribal regions, which is the drone — the remote drone strikes. You've seen the figures recently from David Kilcullen and others that the strikes have killed 14 midlevel operatives and 700 civilians in collateral damage. And his assessment as a counterinsurgency expert is it's creating more anti-Americanism than it is disrupting al-Qaeda networks.

> And then secondly, President Musharraf told me when he was in office that the Pakistan nukes are safer than those in the former Soviet Union. Do you agree with that? Safely guarded — more safely guarded?

> MR. PANETTA: On the — are you hearing me okay? On the first issue, obviously because these are covert and secret operations I can't go into particulars. I think it does suffice to say that these operations have been very effective because they have been very precise in terms of the targeting and it involved a minimum of collateral damage. I know that some of the — sometimes the criticisms kind of sweep into other areas from either plane attacks or attacks from F-16s and others that go into these areas, which do involve a tremendous amount of collateral damage. And sometimes I've found in discussing this that all of this is kind of mixed together. But I can assure you that in terms of that particular area, it is very precise and it is very limited in terms of collateral damage and, very frankly, it's the only game in town in terms of confronting and trying to disrupt the al-Qaeda leadership.[12]

A careful reading of Director Panetta's statement reveals that he made no confirmation

whatsoever regarding whether or not the CIA possesses responsive records related to drone

strikes, which is the relevant inquiry here.  *See Wolf*, 473 F.3d at 379; *see also Wilner*, 592 F.3d

at 70.  Nor did he acknowledge the protected underlying information concerning whether or not

the CIA is involved in drone strikes (including in the target selection process or piloting of

drones) or whether or not the CIA has an intelligence interest in drone strikes.  Plaintiffs also

ignore the fact that Director Panetta never even mentioned the terms "drones" or "unmanned

aerial vehicles" in his statement.  Their argument instead rests on their own inferences about

---

[12] Available at https://www.cia.gov/news-information/speeches-testimony/directors-remarks-at-pacific-council.html

what they personally believe the Director meant based on the question and surrounding context. As this Court has acknowledged, however, these subjective deductions are not relevant to determining whether a statement constitutes an official acknowledgement on behalf of the government – and for good reason. *See Valfells v. CIA,* 717 F. Supp. 2d at 117-18. Regardless of what Plaintiffs believe they can surmise from this statement, it is clearly not the type of official acknowledgement that courts have envisioned as a waiver of a Glomar response. *Cf. Wolf*, 473 F.3d at 379 (finding CIA may have waived Glomar response where the CIA Director had read responsive documents into the Congressional record).

Plaintiffs also cite a *Washington Post* article which partially quotes Director Panetta as referring to "the most aggressive operation that CIA has been involved in in our history" and further stating that "[t]hose operations are seriously disrupting al-Qaida." Pls' Exhibit C (Joby Warrick & Peter Finn, *Al Qaida Crippled As Leaders Stay in Hiding, CIA Chief Says*, March 17, 2010). Plaintiffs apparently infer that the "operations" Director Panetta was referring to are drone strikes, but the quoted passages state no such thing. Once again, Plaintiffs are ignoring what the Director actually said and instead are substituting their own words or those of journalists. The same is true for the ABC News interview cited for support by Plaintiffs, in which Director Panetta referred to "the most aggressive operations in the history of the CIA" but made no mention whatsoever of drone strikes. Pls' Exhibit E (Transcript of ABC News *This Week*, June 27, 2010). Director Panetta's subsequent statement that "[w]e just took down number three in their leadership a few weeks ago" likewise does not mention anything about drone strikes and therefore does not impact the CIA's Glomar response. *Id*.

Finally, Plaintiffs cite a *Wall Street Journal* article for the proposition that Director Panetta has acknowledged the target of a particular drone strike. *See* Pls' Exhibit D (*See*

Siobhan Forman & Jonathan Weisman, *Drone Kills Suspect in CIA Suicide Bombing*, *Wall St. J.* March 18, 2010).  Director Panetta is quoted as stating that "[w]e now believe that al-Yemeni, who was one of the top 20 [al Qaeda leaders], was one of those who was hit," but this quotation states nothing about drone strikes or about the CIA.  Yet again, the article itself does not attribute any quotation to Director Panetta that could waive the CIA's Glomar response.[13]

As reaffirmed in the Cole Declaration, at no time has the CIA acknowledged the existence or nonexistence of CIA records responsive to Plaintiffs' FOIA request.  Cole Decl. ¶¶ 43.[14]  Plaintiffs' have not met their burden of pointing to official information in the public sphere that precisely matches the information at issue here (the existence or nonexistence of responsive records).  It is clear that there has been no such official confirmation, and Plaintiffs' inferences about what they believe the CIA Director meant to say do not suffice.  As this Circuit's precedent makes clear, the purported intelligence expertise of the FOIA requestor should not be substituted for that of the responsible federal agency.  *See Phillippi*, 655 F.2d at 1331; *Military Audit Project*, 656 F.2d at 745; *Afshar*, 702 F.2d at 1130-31.

## CONCLUSION

For the foregoing reasons, Defendant CIA respectfully requests that the Court grant summary judgment in its favor and deny Plaintiffs' motion for partial summary judgment.

---

[13] The other articles cited by Plaintiffs with respect to the death of this individual do not provide any official acknowledgement of CIA involvement in drone strikes.  *See* Pls' Exhibit F (not citing any named official sources); G (not citing any official source); Pls' Exhibit H (press briefing that does not mention the CIA, drones or even U.S. involvement).

[14] The articles cited by Plaintiffs, although not a statement of official CIA policy, actually affirm that Panetta did not confirm or deny CIA involvement in alleged drone strikes.  *See* Pls' Exhibit C (noting that the CIA "declines to acknowledge U.S. participation" and that Director Panetta "decline[ed] to comment on the strike itself . . . ."); Exhibit D ("Mr. Panetta didn't speak directly to the circumstances of the death."); Exhibit E ("I know you can't discuss certain classified operations or even acknowledge them . . . .").

Dated:  November 30, 2010                    Respectfully submitted,


                                             TONY WEST
                                             Assistant Attorney General

                                             RONALD C. MACHEN JR.
                                             United States Attorney

                                             ELIZABETH J. SHAPIRO
                                             Deputy Director, Federal Programs Branch


                                             /s/Amy E. Powell
                                             AMY E. POWELL (N.Y. Bar)
                                             Trial Attorney
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             20 Massachusetts Avenue, N.W.
                                             Washington, D.C. 20001
                                             Telephone: (202) 514-9836
                                             Fax: (202) 616-8202
                                             amy.powell@usdoj.gov