**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

AMERICAN CIVIL LIBERTIES UNION, *et al.*,

        Plaintiffs,

  v.

DEPARTMENT OF JUSTICE, *et al.*,

        Defendants.

No. 1:10-cv-00436-RMC

---

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
<u>CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

**ARGUMENT** ................................................................................................................................. 1

   **I.**   **THE CIA CANNOT SUSTAIN A BLANKET GLOMAR RESPONSE BECAUSE THE DIRECTOR OF THE CIA HAS OFFICIALLY ACKNOWLEDGED THAT THE CIA IS INVOLVED IN AND HAS AN INTEREST IN DRONE STRIKES** ................................................................................ 1

   **II.**   **THE CIA FAILS TO JUSTIFY ITS REFUSAL TO CONFIRM OR DENY THE EXISTENCE OF RESPONSIVE RECORDS UNDER FOIA EXEMPTIONS 1 AND 3** ................................................................................................... 4

      A.   Confirming or denying the existence of responsive documents would not reveal a "function" of the CIA within the meaning of the CIA Act, as construed in binding Circuit precedent. ................................................................................. 4

      B.   Confirming or denying the existence of documents responsive to some or all aspects of the request would not reveal "intelligence sources or methods" within the meaning of the CIA Act and NSA Act because targeted killing—the subject matter of the request—is not an intelligence source or method. ......................... 6

      C.   The CIA's Glomar Response fails under Exemption 1 because the question of whether the CIA possesses responsive records does not fall within any category of classifiable information. ................................................................................. 9

      D.   Because the public, official statements of the CIA Director and other officials go much further than merely confirming that the CIA possesses (or does not possess) records relating to drone strikes, the CIA fails to establish that merely confirming the existence of records would result in harm to national security. ........... 12

**CONCLUSION** ........................................................................................................................... 14

**ARGUMENT**

I. **THE CIA CANNOT SUSTAIN A BLANKET GLOMAR RESPONSE BECAUSE THE DIRECTOR OF THE CIA HAS OFFICIALLY ACKNOWLEDGED THAT THE CIA IS INVOLVED IN AND HAS AN INTEREST IN DRONE STRIKES.**

As detailed in Plaintiffs' opening brief, the CIA Director has repeatedly discussed U.S. drone strikes in public. Pls.' Opp. to Def. CIA's Mot. for Summ. J. and Cross-Mot. for Partial Summ. J. ("Pl. Br.") 9-15. His remarks have characterized the role of drone strikes ("the only game in town"), the success of U.S. drones at hitting particular targets ("We just took down number three in [al Qaida's] leadership a few weeks ago"), their success at avoiding civilian casualties ("it is very precise and it is very limited in terms of collateral damage"), and other aspects of the targeted drone killing program ("the most aggressive operation that the CIA has been involved in in our history"). *See id*. at 10-12. These public statements plainly acknowledge that the CIA is "involved in" drone strikes or has an "intelligence interest" in them. The CIA cannot therefore justify its Glomar response on the grounds that it seeks to maintain official ambiguity about these matters; its Director has long since foreclosed that possibility.

The CIA's attempts to dismiss the relevance of its Director's disclosures are unpersuasive. The CIA argues that these statements are not the kind of "formal acknowledgement" that is envisioned by the case law. *See* Def. CIA's Opp. to Pls.' Cross-Mot. for Partial Summ. J. and Reply Mem. in Supp. of the CIA's Mot. for Summ. J. ("Def. Opp.") 13. But the case law does not envision any particular form of acknowledgement; it requires only that information "have been made public through an official and documented disclosure." *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007). Statements made in public and on the record by the Director of an agency plainly meet this standard.

1

The government cites no case that supports its novel argument that official acknowledgements must take some particular form. Indeed, the example that the government principally relies on – a case in which the CIA Director read excerpts of responsive documents during his congressional testimony – demonstrates not only that official acknowledgements come in many forms, but that that public statements on the record by the CIA Director certainly *do* count as official acknowledgements. *See Wolf*, 473 F.3d at 379-80 (concluding that the CIA Director's statements precluded the CIA from refusing to confirm or deny the existence of documents about the subject matter of the Director's statements). The government suggests no way to distinguish the Director's statements before Congress and the on-the-record statements upon which Plaintiffs rely. Indeed, some of the Director's most relevant statements were regarded by the CIA itself as "official" enough to appear in a transcript posted by the Agency on its own website. *See* Pl. Br. 10-11 (citing the Director's statements before the Pacific Council on International Policy). Moreover, the government nowhere suggests that *any* of the statements upon which Plaintiffs rely were made by the Director in anything but his official public capacity. The CIA's effort to shut the Court's ears to the official public statements of its Director must be rejected.

When it comes to the actual substance of the Director's remarks, the government has little to say except that he did not use the word "drone" or the phrase "unmanned aerial vehicle." *See* Def. Opp. 14-16. But whether the Director uttered the word "drone" is not dispositive. If he were asked, "Does the CIA engage in drone strikes?," and answered "yes," that would surely count as an official acknowledgement, despite his spare response. The official acknowledgement doctrine does not include a "magic words" test, and the government's attempt to introduce one here should be rejected.

Reading the Director's statements in context, it is clear that they refer to drone strikes. They are unambiguous and cannot sensibly be read as statements about anything *other* than drone strikes. For instance, at the Pacific Council speech, he was asked a two-part question, the first part of which was specifically about "the President's strategy in Pakistan in the tribal regions, which is the drone—the remote drone strikes." Decl. of Alexander A. Abdo ("Abdo Decl."), Ex. B at 9-10. In his response, Director Panetta specifically referred to this part of the question ("On the first issue . . . ") and went on to comment that it "suffice[s] to say that these operations have been very effective because they have been very precise in terms of the targeting and it involved a minimum of collateral damage."). *Id.* "[T]hese operations" cannot refer to anything but the "remote drone strikes" about which the Director was asked. The other remarks cited by Plaintiffs also can be understood only as comments about drone strikes. Indeed, the government makes no attempt to suggest an alternative interpretation of his remarks.

The Director's remarks plainly acknowledge that the CIA is "involved in" or at least has an "intelligence interest" in drone strikes. In fact, they acknowledge much more. For example, his remarks at the Pacific Council, quoted above, acknowledge that the CIA is aware of the amount of collateral damage caused by U.S. drone strikes. *See id.* ("[T]hey have been very precise in terms of the targeting and it involved a minimum of collateral damage."). This information is directly responsive to an important part of Plaintiffs' request, which seeks information about civilian casualties. *See* Abdo Decl. Ex. A at 5-8 (FOIA Request, categories 1.C, 4, and 8). By merely confirming that it has responsive documents, the CIA would put no information into the public domain that has not already been acknowledged by its Director. The CIA therefore has not justified its blanket refusal to confirm or deny the existence of any documents responsive to any aspect of Plaintiffs' FOIA request.

3

## II. THE CIA FAILS TO JUSTIFY ITS REFUSAL TO CONFIRM OR DENY THE EXISTENCE OF RESPONSIVE RECORDS UNDER FOIA EXEMPTIONS 1 AND 3.

The government contends that its refusal to confirm or deny the existence of responsive records is justified under Exemption 1 or Exemption 3. These arguments fail, for the reasons set out in Plaintiffs' opening brief and below.

### A. Confirming or denying the existence of responsive documents would not reveal a "function" of the CIA within the meaning of the CIA Act, as construed in binding Circuit precedent.

The CIA contends that its Glomar response is justified under the CIA Act in order to protect "functions" of CIA personnel from disclosure. *See* Def. Opp. 3-4. That argument rests on an overbroad understanding of the CIA's authority to withhold information about its "functions" that has been squarely rejected by the D.C. Circuit.

The relevant provision of the CIA Act, 50 U.S.C. § 403g, has been definitively construed *not* to permit the CIA to withhold information about any and all "functions" of the CIA. In *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), the Court confronted precisely the same argument advanced by the CIA here: that "[section] 403g's reference to withholding information about 'functions . . . of personnel employed by the Agency' . . . allows the agency to refuse to provide any information at all about anything it does." 546 F.2d at 1015 n.14. Recognizing that "[t]his argument . . . would accord the Agency a complete exemption from the FOIA," *id,* the court rejected it. *See id.* ("We do not think that [section] 403g is so broad."). Instead, the court held that Section 403g is limited to protecting "intelligence sources and methods from unauthorized disclosure" and to exempt the CIA from "divulg[ing] information about its internal structure." *Id.*

This narrow interpretation of "functions . . . of [Agency] personnel," has been reiterated many times. *See Military Audit Project v. Casey*, 656 F.2d 724, 736 n.39 (D.C. Cir. 1981) ("section 403g is not broad enough to cover the withholding by the agency of any information whatever, but exempts the agency only from any other statute 'that would otherwise require the Agency to divulge information about its internal structure'" (quoting *Phillippi*, 546 F.3d at 1015 n.14)); *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1390 (D.C. Cir. 1979) (suggesting that, as construed, the CIA Act is "in effect no broader than Exemption 1"); *Baker v. CIA*, 580 F.2d 664, 670 (D.C. Cir. 1978) ("[o]nly the specific information on the CIA's personnel and internal structure that is listed in the statute will obtain protection from disclosure."). The limited scope of Section 403g was set out explicitly in *Military Audit Project v. Casey*, 656 F.2d at 736 n.39, which provides a helpful summary of the scope of the CIA Act's withholding provision:

> To summarize: (1) with regard to information about its "internal structure," the CIA is exempt from all provisions of the FOIA; (2) with regard to information that might reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods, the CIA is entitled to the protection of Exemption 3 of the FOIA, but is otherwise subject to the requirements of the FOIA.

If there remained any doubts that the CIA Act's reference to "functions" does not permit the CIA to withhold information about all of its activities, the D.C. Circuit has resolved those by repeatedly contrasting the broad authority afforded to the National Security Agency to withhold information about *all* of its activities with the narrower exemption to which the CIA is entitled. *See Hayden*, 608 F.2d at 1390 (noting that the NSA is permitted by statute to withhold "any information with respect to the activities" of that agency while the CIA has no such exemption); *see also Hayden v. Nat'l Sec. Agency*, 452 F. Supp. 247, 252 (D.D.C. 1978) ("[T]he scope of the exemption [afforded to the NSA] would appear to be considerably broader than that provided the

CIA under [section] 403g which the Court in *Phillippi* described as including any 'information about its internal structure' (quoting *Phillippi*, 546 F.2d at 1015 n.14)).

Binding case law therefore limits the scope of the protection afforded by the CIA Act to the "internal structure" of the CIA and "intelligence sources and methods." The government does not argue that its Glomar response is necessary to protect information about "internal structure," and its argument on the basis of "intelligence sources and methods" fails for the reasons discussed below and in Plaintiffs' opening brief.

> **B. Confirming or denying the existence of documents responsive to some or all aspects of the request would not reveal "intelligence sources or methods" within the meaning of the CIA Act and NSA Act because targeted killing—the subject matter of the request—is not an intelligence source or method.**

Plaintiffs' opening brief argued that the CIA may not refuse to confirm or deny the existence of any records about drone strikes because using a drone to conduct targeted killings is not an "intelligence source or method."

In response, the CIA has not argued that drone strikes are in fact an "intelligence method." Indeed, its brief fails to identify or explain what "sources" or "methods" of intelligence gathering would be compromised by merely confirming that the CIA maintains records about drone strikes. Instead, the Defendant simply asserts that any CIA "intelligence interest" and "involvement in" drone strikes "are protected from disclosure" without explaining how they would reveal a "source" or "method" of intelligence. *See, e.g.*, Decl. of Mary Ellen Cole ("Cole Decl.") ¶¶ 19, 21; Def. Opp. 5. To be sure, confirming the existence of responsive records would indicate that the CIA has an "interest" in targeted drone killing in some abstract sense, but an "interest" is different from an "intelligence source or method." And revealing the

CIA's "interest" in drone strikes simply does not reveal *anything* about any "source" or "method."[1]

The CIA's argument must therefore be understood as a plea to transform the CIA's authority to protect "intelligence sources or methods" into a power to withhold information about any "interest" of the CIA or its "involvement" in any activities that the CIA wishes to keep secret. But if the CIA could withhold any information that might disclose any "interest" or "involvement" of the CIA, it could withhold information about anything and everything that the CIA does. As the courts have repeatedly emphasized, the CIA—unlike the NSA—does not enjoy such authority to exempt its activities from FOIA. *See, e.g.*, *Hayden*, 608 F.2d at 1390; *Hayden*, 452 F. Supp. at 252 n.17.

In any case, Defendant's broad definition of "intelligence sources and methods" is inconsistent with the Supreme Court's decision in *CIA v. Sims*, which makes clear that the power to protect "intelligence sources or methods" extends only to "information [that] fall[s] within the Agency's mandate to conduct foreign intelligence." 471 U.S. 159, 169 (1985). Nothing in the case law suggests that this power to protect "sources" or "methods" is in fact a power to protect the mere "interest" or "involvement" of the CIA in any given subject matter.

The CIA responds, in part, by noting that *Sims* characterized the NSA Act as giving the CIA Director "broad power to protect the secrecy and integrity of the intelligence *process*." *See* Def. Opp. 6 (quoting *Sims*, 471 U.S. at 170 (emphasis added by Defendant)). But this is of little

---

[1] Moreover, the CIA mischaracterizes Plaintiffs' argument. The CIA states that "at best, Plaintiffs' position amounts to an argument that the alleged underlying CIA activity at issue would not be a *legal* activity of the CIA." Def. Opp. 7. But Plaintiffs have *never* argued that the CIA's Glomar response is improper because their FOIA request concerns illegal activity. Indeed, Plaintiffs' brief did not even assert that the CIA's targeted killing activities are illegal. The court should ignore this effort to vanquish a straw man.

7

use to the CIA, which seeks not to protect the secrecy of any aspect of its *intelligence* process, but rather to hide its "interest" or "involvement" in a killing program.

None of the cases cited by the CIA support its expansive view of "sources or methods" and, if anything, they underscore the unsustainability of its Glomar response on that basis. For instance, it cites *Gardels v. CIA* , 689 F.2d 1100 (D.C. Cir. 1982), as support for a broad view of the power to protect "intelligence sources and methods." Def. Opp. 6. In that case, the court upheld a Glomar response to a request for CIA records relating to "covert contact for foreign intelligence purposes between the Agency and individuals at" the University of California. 689 F.2d at 1102. The court's opinion makes clear that it upheld the Glomar response only because disclosing the existence of such records would reveal whether the CIA had actual intelligence *sources*—i.e. covert contacts with professors and others—at the university. *Id.* at 1103-05. The court never suggested that it would have been enough for the CIA simply to seek to hide its "interest" or "involvement" in the university—the novel theory that the CIA presses in this case—absent the explanation it gave as to how actual sources of intelligence or methods of intelligence gathering would be compromised by confirming the existence of covert contacts between the CIA and the university. Accordingly, *Gardels* highlights the gap in the Defendant's argument here: in contrast to *Gardels*, the CIA here provides no cogent explanation as to how disclosing the existence of records about a killing program would reveal any source or method of intelligence gathering.[2]

---

[2] The CIA also cites *Morley v. CIA*, 699 F. Supp. 2d 257 (D.D.C. 2010), as an instance where the courts upheld a Glomar response where Plaintiff's request concerned covert CIA operations. Def. Opp. 6-7. But in that case, the court upheld the Glomar response not on the grounds that the covert operations were "intelligence sources or methods," but rather because of potential damage to "foreign relations with those countries in which the covert actions occurred." *Morley*, 699 F. Supp. 2d at 257. As explained below, merely confirming or denying the

In the end, Plaintiffs' argument against the applicability of Exemption 3 is simple: because the request is squarely concerned with targeted killing, and because targeted killing is neither an "intelligence source or method" nor a "function" of the CIA within the meaning of the withholding statutes in question, the CIA cannot invoke Exemption 3 to refuse to confirm or deny the existence of any and all records responsive to every aspect of Plaintiffs' request. A concrete example will illustrate the point: The CIA has utterly failed to explain how disclosing the existence (or nonexistence) of legal memoranda about targeted drone strikes would compromise a source or method of intelligence. *See* Abdo Decl. Ex. A at 5-6 (FOIA Request, category 1). It cannot, therefore, invoke the protection for "sources and methods" to refuse to disclose whether such memoranda exist. The same reasoning holds for the CIA's refusal to confirm or deny the existence of records responsive to other aspects of Plaintiffs' request.

To the extent that some of the individual records responsive to this request are properly withheld as a source or method of intelligence, the FOIA process—including the preparation of *Vaughn* declarations—is sufficiently flexible to permit the CIA to fully and completely protect that information.

### C. The CIA's Glomar Response fails under Exemption 1 because the question of whether the CIA possesses responsive records does not fall within any category of classifiable information.

In order to justify a Glomar response under Exemption 1, the existence or non-existence of records must fall into one of the enumerated categories of classifiable information. The CIA contends that the existence or non-existence of records is classifiable under the rubric of "intelligence sources or methods," "intelligence activities," or "foreign relations or activities." *See* Def. Opp. 9; Exec. Order 13,526 § 1.4(c) and (d). Its reliance on "intelligence sources or

---

existence of responsive documents in this case would not damage foreign relations. *See infra* Part II.C.

9

methods" fails for the reasons already discussed. *See supra* Part II.B. Its Glomar response cannot be justified under the category of "intelligence activity" for similar reasons. Specifically, because killing is not an "intelligence activity"—a proposition that the Defendant does not dispute—the existence or nonexistence of records about targeted killing is not a fact that relates to "intelligence activity."

The only remaining ground for classification is as "foreign relations or activities." The CIA states that "Plaintiffs appear to concede that each category of records in their request seeks information relating to 'foreign relations or foreign activities' of the United States, meaning the entire request necessarily falls within the ambit of section 1.4(d)." Def. Opp. 9. The Defendant once again mischaracterizes Plaintiffs' position. Far from conceding that Plaintiffs' entire request seeks classifiable records, Plaintiffs' opening brief withdrew the two specific portions of their request that implicated foreign relations. *See* Pl. Br. 3. Plaintiff takes the view that once these portions of the request are withdrawn, the CIA's arguments with respect to "foreign relations" are moot. *See* Pl. Br. 3, 7 n.2.

The CIA appears to contend that its Glomar response is justified because the existence or non-existence of records still implicates "foreign relations," even though the request no longer seeks information about any relations with foreign countries—or, indeed, with any particular country—but rather seeks information about drone strikes in general. That argument fails, because even if some responsive records might individually be properly classified as relating to "foreign relations," the CIA cannot justify a blanket Glomar response on this ground. For instance, it remains entirely mysterious how the existence or nonexistence of legal memoranda governing the use of drones for targeted killings is a fact concerning the "foreign relations" of the United States. To be sure, references to particular countries might properly be redacted from

such documents, but the mere fact of their existence does not concern foreign relations and is not classifiable as such.

Furthermore, the mere fact that an activity occurs abroad is not sufficient to render it classifiable. Rather, the cases support the notion that in order to be classifiable under the rubric of "foreign relations" and withheld under Exemption 1, the information withheld must relate to relations with specific countries, and not simply to activities of the United States that occur abroad. *See, e.g.*, *Wolf v. CIA*, 473 F.3d 370, 367-77 (D.C. Cir. 2007) (Glomar response appropriate where confirming or denying the existence of documents relating to a deceased Colombian politician could adversely affect foreign relations with that specific country); *Morley v. CIA*, 699 F. Supp. 2d 244, 257 (D.D.C. 2010) (upholding Glomar response seeking information about covert actions of a specific CIA agent on the grounds that "disclosure could reasonably be expected to result in damage to the United States' foreign relations *with those countries in which the covert actions occurred*" (emphasis added)).

Merely confirming or denying that the CIA possesses records responsive to the request—which is global in scope, seeking information about targeted drone killing wherever it occurs—would not disclose anything about the relations with any particular foreign country. It follows that the CIA cannot sustain its blanket Glomar response by appealing to the "foreign relations" basis for classification.

Plaintiffs recognize that particular records responsive to the request may be properly classified, but those records can be withheld by the CIA in the ordinary course of processing the FOIA request. Furthermore, the FOIA process—including the preparation of *Vaughn* affidavits—provides the CIA ample opportunity to avoid disclosing information that is properly classified. What the Defendant may not do, however, is assert a blanket Glomar response under

Exemption 1—the result of which is to completely immunize the CIA from any disclosure obligations—unless it has established that the mere fact of the existence or nonexistence of responsive records is properly classifiable. It has not done so.

> **D. Because the public, official statements of the CIA Director and other officials go much further than merely confirming that the CIA possesses (or does not possess) records relating to drone strikes, the CIA fails to establish that merely confirming the existence of records would result in harm to national security.**

Even if the existence or non-existence of records falls into one or more categories of classifiable information, the Defendant's Glomar response must fail unless the CIA has established that "the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security." Exec. Order 13,526 § 1.1(a)(4). Plaintiffs have argued that in light of the numerous and detailed government statements about drone strikes—including the CIA Director's statements on the record, public statements by other senior government officials, and anonymous statements by current government officials reported in the press—the CIA has not met its burden to explain how merely confirming that the CIA possesses documents about drone strikes could result in any harm at all to national security. *See* Pl. Br. 9-12, 20-24. Nothing in the Defendant's opposition undermines this argument.

Defendant contends that confirming the existence of responsive documents would "provid[e] insight into CIA's interests and capabilities, by revealing intelligence sources and methods, and by damaging foreign relations." Def. Opp. 10-11. But, as already discussed, merely confirming that the CIA possesses documents about drone strikes would cause no such harm.

Much of the CIA's argument focuses on Plaintiffs' reliance on news reports citing anonymous current government officials. Defendant cites to cases that hold that such statements

are not official acknowledgements. *See* Def. Opp. 11-13. But this misses the point. Plaintiffs are relying on these sources not because they are official acknowledgements that might preclude classification, but because they demonstrate the large volume of information about drones strikes that the government has chosen to put in the public domain (anonymously or not). The public disclosure of this mass of information supports the conclusion that there would be no incremental harm if the CIA were to disclose that it possesses documents that are responsive to Plaintiffs' request.

In any case, Plaintiffs do not rely only on press reports, but also on the official, public statements of the CIA Director. *See* Pl. Br. 9-12, 20. In light of his statements, it will come as a surprise to precisely nobody that his agency possesses documents responsive to a FOIA request about targeted drone killings. The government has simply not met its burden of providing a reasonable explanation of the incremental harm that would be done by confirming or denying the existence of records. *See Wash. Post v. U.S. Dep't of Def.*, 766 F. Supp. 1, 10-12 (D.D.C. 1991) (holding that "the presence of information in the public domain" could not "be ignored by an agency when considering whether an official release of such information would harm the national security" and requiring the Department of Defense "to explain its justification for classifying the material" where "the harm from official release of information was not apparent" in light of the existence of such public information). In other words, the CIA's explanation of the harm that would result from disclosure of the existence of documents must take into account the import of the CIA Director's remarks and other government statements about drone strikes. *See id.* at 12 (holding that the existence of evidence in the public domain "requires the Court to investigate the agency's declarations more closely and determine whether the agency has

answered the questions raised by the plaintiff's evidence"). Because the CIA's submissions offer no such explanation, its Glomar response has not been justified under Exemption 1.

## **CONCLUSION**

For these reasons, Defendant's motion for summary judgment should be denied and Plaintiffs' cross-motion for partial summary judgment should be granted.

Respectfully submitted,

*/s/ Arthur B. Spitzer*
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel: (202) 457-0800
Fax: (202) 452-1868
artspitzer@aol.com

Jonathan Manes
Ben Wizner
Alexander Abdo
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel:  (212) 549-2517  (212) 519-7814
Fax:  (212) 549-2654  (212) 549-2654
jmanes@aclu.org

December 17, 2010