# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **AMERICAN CIVIL LIBERTIES,** **UNION,** *et al.*, | ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | **Civil Action No. 10-0436 (RMC)** |
| **DEPARTMENT OF JUSTICE,** *et al.*, | ) ) | |
| **Defendants.** | ) ) ) | |

## MEMORANDUM OPINION

Alarmed at the reported use of unmanned drones to kill selected human targets in Pakistan, Afghanistan, and elsewhere, the American Civil Liberties Union and the American Civil Liberties Union Foundation submitted identical broad requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to the Central Intelligence Agency, the Department of Defense, the Department of State, the Department of Justice, and DOJ's Office of Legal Counsel for records documenting the alleged practice. When the CIA refused to admit or deny that it had any relevant records, and therefore denied the FOIA request, Plaintiffs sued and cited public comments by Leon E. Panetta, former CIA Director, to support their argument that CIA use of drones has been officially acknowledged and that a program of drone strikes is not an intelligence activity, source or method protectable from disclosure under FOIA Exemptions 1 and 3. Plaintiffs read the FOIA exemption for intelligence gathering too narrowly and Mr. Panetta's comments too broadly. Whether or not the CIA has any relevant records, that fact is exempt from disclosure under FOIA. Summary judgment will be granted to the CIA.

# I. FACTS

Plaintiffs ACLU and ACLU Foundation followed the customary path before bringing this dispute to court. The background facts are uncontested and are taken from the declaration of Mary Ellen Cole, Information Review Officer for the CIA. *See* CIA's Mot. for Summ. J. [Dkt. # 15] ("CIA Mem."), Ex. 1 (Declaration of Mary Ellen Cole ("Cole Decl.")). In a letter to the CIA's Information and Privacy Coordinator on January 13, 2010 (incorrectly dated as January 13, 2009), Plaintiffs submitted a FOIA request seeking "records pertaining to the use of unmanned aerial vehicles ('UAVs')—commonly referred to as 'drones' and including the MQ-1 Predator and MQ-9 Reaper—by the CIA and the Armed Forces for the purpose of killing targeted individuals." Cole Decl., Ex. A (Jan. 13, 2010 FOIA Request) ("FOIA Request") at 2. In particular, Plaintiffs were seeking "information about the legal basis in domestic, foreign, and international law for the use of drones to conduct targeted killings." *Id*.

By letter dated March 9, 2010, the CIA issued a final response to Plaintiffs' request, stating that "the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your request." *Id*., Ex. B (Mar. 9, 2010 CIA Response). The CIA explained that the "fact of the existence or nonexistence of requested records is currently and properly classified and is intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended." *Id*. The CIA cited FOIA Exemptions 1 and 3 as the basis for its response. *Id*. Plaintiffs appealed this denial on April 22, 2010. Before the appeal was decided, Plaintiffs filed an amended complaint on June 1, 2010, adding the CIA as defendant.[1] The CIA

---

[1] Plaintiffs' January 13, 2010 FOIA request was simultaneously submitted to the U.S. Department of Defense, Department of Justice, DOJ's Office of Legal Counsel, Department of State, and CIA. Plaintiffs' original complaint brought suit against the Departments of Defense, Justice, and

thereafter closed the administrative appeal file.

Plaintiffs seek information on "drone strikes;" a term used by Plaintiffs (and the Court for the sake of consistency) to mean the "targeted killing" of a human with a drone. Paraphrasing the ten categories of information listed in the FOIA request, Plaintiffs seek records pertaining to:

1. The "legal basis in domestic, foreign and international law upon which unmanned aerial vehicles" can be used to execute targeted killings, including who may be targeted with this weapon system, where and why;

2. . . . .

3. The "selection of human targets for drone strikes and any limits on who may be targeted by a drone strike;"

4. "[C]ivilian casualties in drone strikes," including measures to limit civilian casualties;

5. The "assessment or evaluation of individual drone strikes after the fact," including how the number and identities of victims are determined;

6. "[G]eographical or territorial limits on the use of UAVs to kill targeted individuals;"

7. The "number of drone strikes that have been executed for the purpose of killing human targets, the location of each such strike, and the agency of the government or branch of the military that undertook each such strike;"

8. The "number, identity, status, and affiliation of individuals killed in drone strikes;"

9. "[W]ho may pilot UAVs, who may cause weapons to be fired from UAVs, or who may otherwise be involved in the operation of UAVs for the purpose of executing targeted killings," including records pertaining to the involvement of CIA personnel, government contractors, or other non-military personnel, and;

10. The "training, supervision, oversight, or discipline of UAV operators and others involved in the decision to execute a targeted killing using a drone."

Cole Decl., Ex. A (Jan. 13, 2010 FOIA Request) at 5–8 (emphasis omitted). In briefing, Plaintiffs

State; the amended complaint added the CIA as co-defendant. *See* Am. Compl. [Dkt. # 11]. In this Opinion, the Court addresses only Plaintiffs' FOIA request for CIA records.

abandoned their request of the CIA for information on category 2 and subcategory 1(B) as listed in the FOIA request, both of which concern records on the understanding, cooperation or involvement of foreign governments in drone strikes. *See* Pls.' Opp'n & Cross-Mot. for Summ. J. [Dkts. ## 20, 21] ("Pls.' Opp'n") at 3.

## II.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party; however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.

Federal district courts have original jurisdiction over civil actions arising under federal statutes. *See* 28 U.S.C. § 1331.  As Plaintiffs bring suit under FOIA, this Court has original jurisdiction.  FOIA cases are typically and appropriately decided on motions for summary judgment. *See, e.g., Rushford v. Civiletti*, 485 F. Supp. 477, 481 n.13 (D.D.C. 1980); *Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007).

Jurisdiction in a FOIA case is dependent upon a showing that an agency has

(1) improperly (2) withheld (3) agency records. *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989); *United We Stand America, Inc. v. IRS*, 359 F.3d 595, 598 (D.C. Cir. 2004). The agency bears the burden to demonstrate – not the requester to disprove – that it has not improperly withheld agency records. *Tax Analysts*, 492 U.S. at 142 n.3. This is consistent with the purpose of FOIA which was "enacted to facilitate public access to Government documents," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), in order "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). "Consistently with this purpose, as well as the plain language of the Act, the strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *Ray*, 502 U.S. at 173.

An agency may meet its burden solely on the basis of information provided in agency declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not, standing alone, carry the government's burden." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Id*. at 862 (internal quotation marks omitted). Further, the "court owes substantial weight to detailed agency explanations in the national security context." *King v. U.S. Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987). A "defendant in a FOIA action is entitled to summary judgment if the defendant proves that it has fully discharged its obligations under the

Act." *Reliant Energy*, 520 F. Supp. 2d at 200.

   The exemptions under FOIA "cover not only the content of protected government records but also the fact of their existence or nonexistence, if that fact itself properly falls within the exemption." *Larson*, 565 F.3d at 861. Thus, an agency may refuse to confirm or deny the existence of responsive records – an answer commonly known as a Glomar response – when "to answer the FOIA inquiry would cause harm cognizable under an FOIA exception." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982); *see also Larson*, 565 F.3d at 861. A Glomar response takes its name from the Hughes Glomar Explorer, an oceanic research vessel at issue in the case that first authorized the government to refuse to confirm or deny the existence of records responsive to a FOIA request. *See generally Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976).

## III. ANALYSIS

   Neither side disputes the customary principles that govern FOIA requests to the CIA. In this matter, the CIA has invoked FOIA Exemptions 1 and 3 to justify its Glomar response. The CIA "invoked the Glomar response in this case because confirming or denying the existence or nonexistence of CIA records responsive to Plaintiffs' FOIA request would reveal classified information that is protected from disclosure by statute. . . . [S]uch a response would implicate information concerning clandestine intelligence activities, intelligence sources and methods, and U.S. foreign relations and foreign activities." Cole Decl. ¶ 12; *see also* ¶ 15 ("[T]he CIA asserted a Glomar response to Plaintiffs' request because the existence or nonexistence of CIA records responsive to this request is a currently and properly classified fact, the disclosure of which reasonably could be expected to cause damage to the national security. What is classified is not just individual records themselves on a document-by-document basis, but also the mere fact of whether

or not the CIA possesses responsive records that pertain to drone strikes.").

## A. Exemption 3

FOIA Exemption 3 authorizes the withholding of agency records on subject-matters specifically exempted from disclosure by a non-FOIA statute, provided that such statute "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). To properly invoke Exemption 3, the CIA "need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson*, 565 F.3d at 865.

The CIA first points to the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 403-4 *et seq.* ("CIA Act"), which exempts the CIA from "any . . . law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 403g. Secondly, the CIA proffers the National Security Act of 1947, as amended, 50 U.S.C. § 401 *et seq.* (the "NSA"), which mandates that the "Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1). It is well-established that both statutory provisions cited by the CIA qualify as withholding statutes for purposes of Exemption 3. *See, e.g., ACLU v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011); *Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980); *Majed Subh v. CIA*, 760 F. Supp. 2d 66, 70 (D.D.C. 2011).

### 1. Whether Drone Strikes Relate to "Functions" of CIA Personnel Under the CIA Act?

The CIA claims it properly relies upon § 403g of the CIA Act to protect information

relating to the "functions" of its personnel; that is, "information relating to its core functions – which plainly include clandestine intelligence activities, intelligence sources and methods and foreign liaison relationships." Cole Decl. ¶ 41. Plaintiffs counter that the CIA presents an overbroad reading of CIA "functions" under the statute. To be sure, the D.C. Circuit has recognized that § 403g is not without limits: it does not sanction the CIA to "refuse to provide any information at all about anything it does" under the guise that such information pertains to personnel "functions." *Phillippi*, 546 F.2d at 1015 n.14. The provision is designed primarily to shield the CIA from having to divulge "information about its internal structure." *Id*. Accordingly, § 403g of the CIA Act offers a limited sanctuary from the CIA's FOIA obligations because "[o]nly the specific information on the CIA's personnel and internal structure that is listed in the statute will obtain protection from disclosure." *Baker v. CIA*, 580 F.2d 664, 670 (D.C. Cir. 1978).

The CIA's Information Review Officer responds that the CIA is "charged with carrying out a number of important functions on behalf of the United States, which include, among other activities, collecting and analyzing foreign intelligence and counterintelligence." Cole Decl. ¶ 13. "A defining characteristic of the CIA's intelligence activities is that they are typically carried out through clandestine means, and therefore they must remain secret in order to be effective." *Id*. "In the context of FOIA, this means that the CIA must carefully evaluate whether its response to a particular FOIA request could jeopardize the clandestine nature of its intelligence activities or otherwise reveal previously undisclosed information about its sources, capabilities, authorities, interests, strengths, weaknesses, resources, etc." *Id*.

"Hypothetically, if the CIA were to respond to this request by admitting that it possessed responsive records, it would indicate that the CIA was involved in drone strikes or at least

had an intelligence interest in drone strikes – perhaps by providing supporting intelligence, as an example." *Id*. ¶ 19. "In either case, such a response would reveal a specific clandestine intelligence activity or interest of the CIA, and it would provide confirmation that the CIA had the capability and resources to be involved in these specific activities." *Id*. On the other hand, by revealing it had no responsive records, that fact "would indicate that the CIA had no involvement or interest in drone strikes." *Id*. ¶ 21. "Such a response would reveal sensitive information about the CIA's capabilities, interests, and resources that is protected from disclosure." *Id*.

       The fact of the existence or nonexistence of responsive information falls within the ambit of § 403g because whether the CIA cooperates with, is interested in, or actually directs drone strikes pertains to (possible) functions of CIA personnel. *See Riquelme v. CIA*, 453 F. Supp. 2d 103, 111 (D.D.C. 2006) (accepting CIA's argument that FOIA request seeking information relating to CIA agents' "activities, assistance, participation, involvement, and contacts" speaks to the "functions" of CIA agents, protected from disclosure under § 403g). Plaintiffs' FOIA request – sent to multiple agencies – is clearly designed, at least in part, to determine which agencies, and its personnel, are involved in drone strikes and in what capacities. *See* FOIA Request at 4 ("Reports also suggest that in addition to Air Force and Special Forces personnel, non-military personnel including CIA agents are making targeting decisions, piloting drones, and firing missiles . . . [i]t appears, therefore, that lethal force is being exercised by individuals who are not in the military chain of command."); *id*. at 5 ("It is unclear who may be targeted by a drone strike, how targets are selected . . . and who is making operational decisions about particular strikes."); *id*. at 6 (seeking records regarding "whether drones can be used by the CIA . . . in order to execute targeted killings"); *id*. at 7 (requesting records "pertaining to the assessment or evaluation of individual drone strikes after the

fact," including how the performance of those operating and involved in drone strikes is assessed); *id.* at 8 (seeking records "pertaining to the involvement of CIA personnel" in drone strikes and the piloting and operation of drones).

The CIA affidavit, which is entitled to "substantial weight," *see Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999), asserts that disclosing the existence or nonexistence of responsive records could reveal the functions of CIA personnel, including their involvement or noninvolvement in drone strikes and any related intelligence interest in drone strikes. *See* Cole Decl. ¶¶ 19–21, 41. It could reveal functions of CIA personnel if, for instance, the CIA possessed records responsive to the target selection categories of the request, but not the post-strike analysis and evaluation categories, or if the CIA possessed records relevant to these categories but not to information on the training, supervision, oversight or discipline of drone operators. And if the CIA possessed no records responsive to these categories, it could reveal that CIA personnel were not performing any of these potential functions related to drone strikes.

The CIA declaration offers "reasonable specificity of detail rather than merely conclusory statements" and has not been "called into question by contradictory evidence in the record or by evidence of agency bad faith." *Halperin*, 629 F.2d at 148. "If the agency's statements meet this standard, the court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency." *Id.* In the end, the CIA is justifiably concerned that revealing the existence or nonexistence of records sought on the various topics sought by Plaintiffs could alone reveal information on the CIA's internal structure and its capabilities and potential interests and involvement in/operation of the drone program. Although the matter is not entirely free from doubt,

the Court is satisfied that the CIA has properly invoked § 403g of the CIA Act to withhold this fact

under Exemption 3.

### 2. Whether Drone Strikes Relate to "Intelligence Sources or Methods" Under NSA?

Whatever the ambit of § 403g of the CIA Act, the CIA correctly contends that its

Glomar response is justified because the information sought by Plaintiffs relates to "intelligence

sources and methods," protected from disclosure under the NSA. 50 U.S.C. § 403-1(i)(1).[2]  Again,

Plaintiffs challenge the information withheld as not properly falling within the coverage offered by

the cited statute, here § 403-1(i)(1).  Plaintiffs believe that CIA's Glomar response must be rejected

because a program that targets certain persons for death or incapacitation cannot be deemed a means

of collecting intelligence, so that neither a source nor a method of intelligence gathering is implicated

by the fact of whether CIA has responsive records.  Instead, Plaintiffs argue that they simply seek

basic information about the "scope, limits, oversight, and legal basis of this killing program."  Pls.'

Opp'n at 18.  Plaintiffs attempt to cabin the realm of protectable "intelligence sources and methods"

to a concept of "foreign intelligence" analogous to "securing all possible data pertaining to foreign

governments or the national defense and security of the United States."  *CIA v. Sims*, 471 U.S. 159,

170 (1985) (internal quotation marks omitted).

*Sims* explained that through the statutory predecessor to § 403-1(i)(1) of the NSA,

Congress vested the Director of Central Intelligence[3] with "very broad authority to protect all sources

---

[2]  Although § 403-1(i)(1) of the NSA provides that the "Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure," the CIA may rely upon this statutory provision to withhold records under FOIA.  *See, e.g., Larson*, 565 F.3d at 865.

[3]  Per § 403-1(i)(1), the "Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  The statutory precursors to § 403-1(i)(1), *i.e.*, 50

of intelligence information from disclosure" and "broad power to protect the secrecy and integrity

of the intelligence process." 471 U.S. at 168–70.  In focusing more on the definition of intelligence

"sources" than "methods," the Supreme Court rejected the D.C. Circuit's definition of "intelligence

sources" which was limited to sources requiring confidentiality as a condition of providing

information.  *Id.* at 168.  The Supreme Court explained:

> The plain meaning of the statutory language, as well as the legislative history of the National Security Act, however, indicates that Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure.  The Court of Appeals' narrowing of this authority not only contravenes the express intention of Congress, but also overlooks the practical necessities of modern intelligence gathering – the very reason Congress entrusted this Agency with sweeping power to protect its "intelligence sources and methods."

> . . . . Section 102(d)(3) [of the NSA] specifically authorizes the Director of Central Intelligence to protect "intelligence sources and methods" from disclosure.  Plainly the broad sweep of this statutory language comports with the nature of the Agency's unique responsibilities.  To keep informed of other nations' activities bearing on our national security the Agency must rely on a host of sources. At the same time, the Director must have the authority to shield those Agency activities and sources from any disclosures that would unnecessarily compromise the Agency's efforts.

*Id.* at 169–70.

Accordingly, the Supreme Court held the "'plain meaning' of § 102(d)(3) [codified

at § 403-1(i)(1)] may not be squared with any limiting definition that goes beyond the requirement

U.S.C. § 403-3(c)(7) and 50 U.S.C. § 403(d)(3), had previously entrusted the identical responsibility to the Director of Central Intelligence.  Pursuant to the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, the newly-created Director of National Intelligence assumed the duties previously delegated to the Director of Central Intelligence, a position which then ceased to exist.  *See, e.g., Wolf v. CIA*, 473 F.3d 370, 377 n.6 (D.C. Cir. 2007); *Majed Subh*, 760 F. Supp. 2d at 70 n.4.  The CIA is now headed by the Director of the Central Intelligence Agency, who reports to the Director of National Intelligence.

that the information fall within the Agency's mandate to conduct foreign intelligence." *Sims*, 471

U.S. at 169.  "Congress simply and pointedly protected all sources of intelligence that provide, or

are engaged to provide, information the Agency needs to perform its statutory duties with respect

to foreign intelligence." *Id*. at 169–70.  Against a congressional backdrop "highlighting the

requirements of effective intelligence operations," *id*. at 172, the Court noted that Congress

authorized the CIA to protect intelligence sources and methods to ensure "the most effective

accomplishment of the intelligence mission related to the national security." *Id*. (internal quotation

omitted).

　　　　At first blush, there is force to Plaintiffs' argument that a "targeted-killing program

is not an intelligence program" in the most strict and traditional sense, the argument bolstered by the

principle that FOIA exemptions are to be narrowly construed.  *See Public Citizen, Inc. v. Rubber*

*Mfrs. Ass'n*, 533 F.3d 810, 813 (D.C. Cir. 2008).  Nonetheless, Plaintiffs seek too narrow a reading

of the authority conferred by the NSA to protect "intelligence sources and methods."  The "Supreme

Court has recognized the broad sweep of 'intelligence sources' warranting protection in the interest

of national security." *Wolf v. CIA*, 473 F.3d 370, 375 (D.C. Cir. 2007); *see also Fitzgibbon v. CIA*,

911 F.2d 755, 760–63 (D.C. Cir. 1990).  Moreover, the *Sims* Court warned that limiting definitions

of the NSA's reach had "ignored[d] the realities of intelligence work, which often involves

seemingly innocuous sources as well as unsuspecting individuals who provide valuable intelligence

information." *Fitzgibbon*, 911 F.2d at 760 (quoting *Sims*, 471 U.S. at 176).  "Relying on this broad

statutory authority, and mindful of 'the practical necessities of modern intelligence gathering,' [*Sims*,

471 U.S. at 169], the Supreme Court held that the proper reading of the statute is that 'an intelligence

source provides, or is engaged to provide, information the Agency needs to fulfill its statutory

obligations.'" *Fitzgibbon*, 911 F.2d at 761 (quoting *Sims*, 471 U.S. at 177).

The Court has no reason to second-guess the CIA as to which programs that may or may not be of interest implicate the gathering of intelligence, *see Wolf*, 473 F.3d at 377 ("The Supreme Court gives even greater deference to CIA assertions of harm to intelligence sources and methods under the National Security Act."). The CIA need only "demonstrate[] that the information withheld logically falls within the claimed exemption." *ACLU*, 628 F.3d at 619; *see also Fitzgibbon*, 911 F.2d at 762 (explaining that in determining whether the material withheld "relates to intelligence sources and methods . . . we accord substantial weight and due consideration to the CIA's affidavits").

Ms. Cole declares that, "[i]ntelligence sources and methods are the basic practices and procedures used by the CIA to accomplish its mission. They can include human assets, foreign liaison relationships, sophisticated technological devices, collection activities, cover mechanisms, and other sensitive intelligence tools." Cole Decl. ¶ 33. Knowing whether the CIA lacks or maintains records responsive to Plaintiffs' FOIA request "would reveal a specific clandestine intelligence activity or interest of the CIA, and it would provide confirmation that the CIA had the capability and resources to be involved in these specific activities." *Id*. ¶ 19. Responding to Plaintiffs' request, the CIA argues, would reveal whether the CIA maintains an intelligence interest in, cooperates with, or directly operates a program of drone strikes. *See id*. ¶¶ 32–35, 40.

The CIA further explains that it "must do more than prevent explicit references to an intelligence source or method; it must also prevent indirect references to such a source or method." *Id*. ¶ 35. By reviewing officially disclosed information about CIA capabilities, hostile groups "have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and

methods from disparate details to defeat the CIA's collection efforts." *Id.* "Thus, even seemingly innocuous, indirect references to an intelligence source or method could have significant adverse effects when juxtaposed with other publicly-available data." *Id.*

"Because 'the purpose of national security exemptions to the FOIA is to protect intelligence sources before they are compromised and harmed, not after,' *Halperin*, 629 F.2d at 149, 'the Director of Central Intelligence may protect all intelligence sources, regardless of their provenance.'" *Wolf*, 473 F.3d at 377 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 762 (D.C. Cir. 1990)).   Taking into account the deference owed the CIA's declaration in the FOIA context, the Court finds the CIA's justification for its concerns about unauthorized disclosure of intelligence sources or methods to be both "logical" and "plausible." *ACLU*, 628 F.3d at 619 (quoting *Larson*, 565 F.3d at 862).

Lastly, Plaintiffs' argument that a program of drone strikes cannot form the basis of, or involve, intelligence sources or methods also ignores the scope of the CIA's specific authority to engage in activities beyond "traditional" intelligence gathering (however defined), such as intelligence activities and operations, covert operations, and foreign relations activities.  Executive Order 12333, as amended, includes within the CIA's mandate the requirement that it, *inter alia*, "[c]ollect . . ., analyze, produce, and disseminate foreign intelligence and counterintelligence;" "[c]onduct counterintelligence activities;" "[c]onduct covert action activities approved by the President;" "[c]onduct foreign intelligence liaison relationships;" and "[p]erform such other functions and duties related to intelligence as the Director [of the Central Intelligence Agency] may direct." *See* United States Intelligence Activities, Executive Order No. 12333, 46 Fed. Reg. 59941 (Dec. 4, 1981), *as amended by* Further Amendments to Executive Order 12333, Executive Order No.

13470, 73 Fed. Reg. 45325, § 1.7(a) (July 30, 2008); *see also* 50 U.S.C. § 403-4a(d) (authorizing the Director of the Central Intelligence Agency to, *inter alia*, "collect intelligence through human sources and by other appropriate means" and "perform such other functions and duties related to intelligence affecting the national security as the President or the Director of National Intelligence may direct"); *id*. § 403-4a(f) (directing the Director of the CIA to "coordinate the relationships between elements of the intelligence community and the intelligence or security services of foreign governments or international organizations on all matters involving intelligence related to the national security or involving intelligence acquired through clandestine means").

   The Supreme Court noted that the authority granted under the NSA "may not be squared with any limiting definition that goes beyond the requirement that the information fall within the Agency's mandate to conduct foreign intelligence." *ACLU*, 628 F.3d at 622 (quoting *Sims*, 471 U.S. at 169); *see also Sims*, 471 U.S. at 169–70 ("Congress simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the Agency needs to perform its statutory duties with respect to foreign intelligence."). It would surprise no one that the CIA may be authorized to engage in more than gathering facts around the world; the NSA's grant of protection to "intelligence sources and methods" cannot be so limited. *See, e.g, Riquelme*, 453 F. Supp. 2d at 108–11 (finding agency's Glomar response proper under Exemption 1 and 3 relating to "clandestine activities" including whether CIA engaged in activities related to the ascension of a general to power in a particular nation or participated in training of officers in the School of the Americas).

   Confirming the existence or nonexistence of pertinent agency records on drone strikes could reasonably be expected to lead to the unauthorized disclosure of intelligence sources and/or

methods. *See Halperin*, 629 F.2d at 147.[4]   The CIA has properly classified this fact under § 403-1(i)(1) of the NSA, as protected by FOIA Exemption 3.

## B. Has the Agency Acknowledged the Existence of Records?

Plaintiffs next contend that former CIA Director Leon J. Panetta has officially admitted that some or all of the requested records exist so that they are no longer FOIA exempt. When "information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim." *Fitzgibbon*, 911 F.2d at 765.   To be officially acknowledged:  "(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure." *ACLU*, 628 F.3d at 620–21.  Moreover, as the D.C. Circuit "further explained in *Wolf*, '[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure.  This insistence on exactitude recognizes the Government's vital interest in information relating to national security and foreign affairs.'" *Id*. at 621 (quoting *Wolf*, 473 F.3d at 378).  Ultimately, the "fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not

---

[4] Plaintiffs further argue that the fact that some documents may need to be redacted does not justify a blanket Glomar response, Pls.' Opp'n at 18–19, which may be correct in most cases.  The CIA responds that if it had to admit the existence of responsive records, and thereby be obligated to provide a Vaughn index – indicating the number and nature of withheld records – such disclosure alone would reveal the depth and breadth of the CIA's possible involvement in the drone program. Cole Decl. ¶ 20.  "If, for instance, the CIA possessed 10,000 responsive records, that might indicate a significant CIA involvement or interest in drone strikes whereas 10 responsive records might indicate minimal involvement or interest." *Id*.  "Similarly, disclosing the dates of the responsive records would provide a timeline of the CIA's activities that could provide a roadmap to when and where the CIA is operating or not operating." *Id*.

cause harm cognizable under a FOIA exemption." *Wolf*, 473 F.3d at 378.  Plaintiffs bear the burden of demonstrating that the information they seek has been officially acknowledged.  *See id*.

This question is somewhat muddled by the CIA's stated reason for its *Glomar* response, which is essentially that to respond to the FOIA request would reveal whether or not the CIA was involved or interested in drone strike operations, in any capacity.  *See* Cole Decl. ¶¶ 19, 22. Plaintiffs seize on this rationale and contend that it is no longer operative because of the following statements by then-Director Panetta which arguably acknowledged CIA involvement in drone strikes.

For instance, on May 18, 2009, Director Panetta spoke before the Pacific Council on International Policy, and during a question and answer session, the following exchange with Director Panetta occurred:

> Q. [Audience Member] You mentioned that you believe the strategy in Pakistan is working – the President's strategy in Pakistan in the tribal regions, which is the drone – the remote drone strikes.  You've seen the figures recently from David Kilcullen and others that the strikes have killed 14 midlevel operatives and 700 civilians in collateral damage.  And his assessment as a counterinsurgency expert is it's creating more anti-Americanism than it is disrupting al-Qaeda networks. . . . .

> A. [Panetta] . . . On the first issue, obviously because these are covert and secret operations I can't go into particulars.  I think it does suffice to say that these operations have been very effective because they have been very precise in terms of the targeting and it involved a minimum of collateral damage.  I know that some of the – sometimes the criticisms kind of sweep into other areas from either plane attacks or attacks from F-16s and others that go into these areas, which do involve a tremendous amount of collateral damage.  And sometimes I've found in discussing this that all of this is kind of mixed together. But I can assure you that in terms of that particular area, it is very precise and it is very limited in terms of collateral damage and, very frankly, it's the only game in town in terms of confronting and trying to disrupt the al-Qaeda leadership. . . . .

Pls.' Opp'n, Ex. B (Leon Panetta Remarks at the Pacific Council on International Policy (May 18, 2009)) at 9–10.

        Contrary to Plaintiffs' argument, these comments by Director Panetta did not officially disclose the CIA's involvement in the drone strike program.   Responding to the questioner's perception of the drone strikes as the "President's strategy in Pakistan," Director Panetta spoke generally of his knowledge of "covert and secret operations" in Pakistan and his assessment that those operations had been precise with minimal collateral damage.   Even if Director Panetta were speaking squarely on the issue of drone strikes, he never acknowledged the CIA's involvement in such program.   That Director Panetta acknowledged that such a program exists and he had some knowledge of it, or that he was able to assess its success, is simply not tantamount to a specific acknowledgment of the CIA's involvement in such program, nor does it waive the CIA's ability to properly invoke Glomar.   *See, e.g., Wilner v. NSA*, 592 F.3d 60, 70 (2d Cir. 2009) ("[A]n agency may invoke the *Glomar* doctrine in response to a FOIA request regarding a publicly revealed matter.")[5];

---

[5]   In *Wilner*, the Second Circuit reviewed a FOIA request for records obtained under the Terrorist Surveillance Program ("TSP"), a clandestine program initiated after September 11, 2001, in which the National Security Agency intercepted international communications of people with known links to terrorist organizations without warrants or oversight by the Foreign Intelligence Surveillance Court.   592 F.3d at 65–66.   Plaintiffs' FOIA requests sought information from the Government on whether it had intercepted any of their communications, to which the Government provided a Glomar response.   *Id*. at 64.   Plaintiffs argued the Glomar response was improper because the Government had officially disclosed the existence of the TSP.   The Circuit noted that the existence of the TSP had been officially acknowledged by President George W. Bush and former CIA Director Michael Hayden, but that the "specific methods used, targets of surveillance, and information obtained through the program have not been disclosed."   *Id*. at 69–70.

The Second Circuit explained, "Here, although the public is aware that the TSP exists, the government has found it necessary to keep undisclosed the details of the program's operations and scope–the subject of plaintiffs' FOIA request in this case.   The fact that the public is aware of the program's existence does not mean that the public is entitled to have information regarding the operation of the program, its targets, the information it has yielded, or other highly sensitive national

*Students Against Genocide v. Dep't of State*, 50 F. Supp. 2d 20, 25 (D.D.C. 1995) ("[T]here is

certainly no 'cat out of the bag' philosophy underlying FOIA so that any public discussion of

protected information dissipates the protection which would otherwise shield the information

sought."); *Phillippi v. CIA*, 655 F.2d 1325, 1331 (D.C. Cir. 1981) ("There may be much left to hide,

and if there is not, that itself may be worth hiding.").

Plaintiffs also quote selected statements from an interview Director Panetta gave to

the *Washington Post*, which was printed on March 17, 2010. The Court quotes a few paragraphs:

> Relentless attacks against al-Qaida in the Pakistan tribal region
> appear to have driven Osama bin Laden and other top leaders deeper
> into hiding, leaving the organization rudderless and less capable of
> planning sophisticated operations, CIA Director Leon Panetta said
> Wednesday.
>
> ....
>
> Panetta credited an increasingly aggressive campaign against al-Qaida
> and its Taliban allies, including more frequent strikes and better
> coordination with Pakistan, in a near-acknowledgment of the CIA's
> war against extremists in Pakistan. He called it "the most aggressive
> operation that CIA has been involved in in our history."
>
> "Those operations are seriously disrupting al-Qaida," Panetta said.
> "It's pretty clear from all the intelligence we are getting that they are
> having a very difficult time putting together any kind of command
> and control, that they are scrambling. And that we really do have
> them on the run."

---

security information that the government has continued to classify. Indeed, the fact that the TSP's
existence has been made public reinforces the government's continuing stance that it is necessary
to keep confidential the details of the program's operations and scope." *Id*. at 70. The Circuit
upheld the Glomar response and held that "an agency may issue a Glomar response to FOIA requests
seeking information obtained under a 'publicly acknowledged' intelligence program such as the
Terrorist Surveillance Program at least when the existence of such information has not already been
publicly disclosed." *Id*. at 77. Similarly, even if Director Panetta had confirmed that the drone
program exists, the statements offered by Plaintiffs did not specifically acknowledge that the CIA
is involved directly or indicate whether the CIA has responsive records.

> The comments came as a senior U.S. intelligence official revealed new details of a March 8 killing of a top al-Qaida commander in the militant stronghold of Miram Shah in North Waziristan, in Pakistan's autonomous tribal region. The al-Qaida official died in what local news reports described as a missile strike by an unmanned aerial vehicle. The CIA formally declines to acknowledge U.S. participation in such attacks inside Pakistan territory.

Pls.' Opp'n, Ex C (Mar. 17, 2010 Article "Al-Qaida Crippled as Leaders Stay in Hiding, CIA Chief Says) at 1.

The *Post* story focused on relentless attacks targeting al-Qaida in Pakistan, and appeared to speak to the joint efforts of the military and non-military agencies of the U.S. Government (and perhaps even its allies) in the efforts against terrorism there. Director Panetta merely admitted that the CIA's operations in Pakistan, left undefined, were the most aggressive ever undertaken by the CIA. While the story cited "more frequent strikes" as one example of the aggressive campaign waged in Pakistan, the reference is just as easily read to describe part of a larger campaign in Pakistan, in which the CIA played an undefined role. Furthermore, the article specified that the CIA formally declined to acknowledge U.S. participation in the use of unmanned aerial vehicles in Pakistan; it would be contradictory under the circumstances to read Director Panetta's reference to the CIA operations as a specific reference to drone strikes.

Plaintiffs argue that Director Panetta had gone "so far as to acknowledge the targets of particular strikes." Pls.' Opp'n at 12. In a *Wall Street Journal* article on the March 8, 2010 drone strike killing of Hussein al-Yemeni, Director Panetta commented, "We now believe that al-Yemeni, who was one of the top 20 [al Qaeda leaders], was one of those who was hit." Director Panetta was also quoted as saying, "He is somebody who we believe was one of those who was involved in providing explosives for the Khost attack." *Id.*, Ex D (Mar. 18, 2010 Article "Drone Kills Suspect

in CIA Suicide Bombing") at 1.  The article continued:

> Killing Mr. al-Yemeni was very important to the CIA because of his status in al Qaeda and his involvement in the Khost attack, Mr. Panetta said.  Mr Panetta didn't speak directly to the circumstances of the death; the CIA doesn't discuss covert action.
>
> "Anytime we get a high value target that is in the top leadership of al Qaeda, it seriously disrupts their operations," Mr. Panetta said.  "No. 1 that we are not going to hesitate to go after them wherever they try to hide, and No. 2 that we are continuing to target their leadership."

*Id*. at 2.

Similarly, in speaking with ABC News, Mr. Panetta echoed the comment, stating in response to a question about the possible whereabouts of Osama bin Laden:

> But having said that, the more we continue to disrupt Al Qaida's operations, and we are engaged in the most aggressive operations in the history of the CIA in that part of the world, and the result is that we are disrupting their leadership.  We've taken down more than half of their Taliban leadership, of their Al Qaida leadership.  We just took down number three in their leadership a few weeks ago.

*Id*., Ex. E (June 27, 2010 Transcript of *This Week* "Jake Tapper Interviews CIA Director Leon Panetta") at 4.

Plaintiffs argue that these comments, together with other news stories, bar the CIA from relying on a generalized Glomar response here; that the "fact underlying the CIA's *Glomar* response is identical to the fact officially acknowledged:  that the CIA is involved in drone strikes." Pls.' Opp'n at 15.  Interesting as it is, Plaintiffs' argument misperceives the applicable legal standard. Whereas Director Panetta spoke generally, Plaintiffs fail to cite any official disclosure containing the *exact* information sought by Plaintiffs.  Director Panetta's comments lacked a specific reference to any particular CIA action except that the CIA was involved in undefined, aggressive operations

in Pakistan.  In all the statements cited by Plaintiffs, Director Panetta's references to "we" or "our" could have just as easily referred to the joint efforts of all U.S. military and civilian resources dedicated in Afghanistan and Pakistan.  The gist of the stories was that the U.S. had al-Qaida on the run and was disrupting its networks.  Further, two of the statements cited by Plaintiffs stated specifically that the CIA did not officially speak to covert actions.

Ultimately, Plaintiffs attempt to impose an exactitude lacking in Director Panetta's generalized statements.  "We have noted, however, that 'while the logic of FOIA postulates that an exemption can serve no purpose once information … becomes public, we must be confident that the information sought is truly public and that the requester receive no more than what is publicly available before we find a waiver.'"  *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001) (quoting *Cottone v. Reno*, 193 F.3d 550, 555 (D.C. Cir. 1999)).

Here, Plaintiffs seek exactly what is *not* publicly available – an official CIA acknowledgment of the fact that it is or is not involved in the drone strike program.  *See Public Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993) ("FOIA plaintiffs cannot simply show that similar information has been released, but must establish that a specific fact already has been placed in the public domain.").  Even were the public to believe this to be a foregone conclusion, the statements cited by Plaintiffs demonstrate that the CIA has carefully and specifically refused to acknowledge any role or interest in such program.  To the contrary of demonstrating public disclosure, the tenor, deliberate ambiguity, and explicit disclaimers of involvement in targeted attacks in the statements cited by Plaintiffs further illustrate this point.  *See Wolf*, 473 F.3d at 378 ("The insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'") (quoting *Public Citizen v. Dep't of State*, 11 F.3d 198, 203

(D.C. Cir. 1993)).

Even less can it be said that Director Panetta officially confirmed the existence of CIA *records* on drone strikes – which the CIA argues is the relevant inquiry here.  *See* Def.'s Opp'n at 14.  "In the Glomar context, then, if the prior disclosure establishes the existence (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue–the existence of records–and the specific request for that information."  *Wolf*, 473 F.3d at 379; *see also Wilner*, 592 F.3d at 70 ("An agency only loses its ability to provide a *Glomar* response when the existence or nonexistence of the particular records covered by the *Glomar* response has been officially and publicly disclosed.").  Certainly none of the comments by former Director Panetta on which Plaintiffs rely constituted an explicit admission "that a specific record exists."  *Wilner*, 592 F.3d at 70.

Plaintiffs submitted ten detailed requests for records, covering the gamut from the "legal basis" for drone strikes; the selection of human targets; civilian casualties; post-strike assessments; limits to the use of drones; the agency of government or branch of the military involved; the supervision, oversight, discipline, or training of drone operators and those involved in targeting decisions, and more.  There is nothing in the various statements submitted by Plaintiffs which speaks to any records on these points; only by inference from former Director Panetta's statements might one conclude that the CIA might have some kind(s) of documentation somewhere.  Thus, even if former Director Panetta could be understood colloquially to have suggested some sort of CIA involvement in drone strikes, he neither referenced specific records nor referenced records that go to the exact requests posed by Plaintiffs.

Lastly, despite speculation or overt factual assertions of the CIA's involvement in

drone strikes rampant in the various articles cited in Plaintiffs' briefs, the statements of journalists, "experts," or even unofficial or unidentified sources (even were they CIA personnel) are not "official" disclosures by the CIA.  *See Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999); *ACLU*, 628 F.3d at 621 (explaining that a leaked report, not released pursuant to a government declassification process, could not be considered officially acknowledged).  Ultimately, "[i]t is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so."  *ACLU*, 628 F.3d at 621–22 (quoting *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975)).

Plaintiffs fail to demonstrate that the CIA has officially acknowledged either the CIA's involvement in a drone strike program or the existence or nonexistence of pertinent agency records.  Plaintiffs' arguments to the contrary, the CIA has not waived its ability to issue a broad Glomar response.

## C.  FOIA Exemption 1

FOIA Exemption 1 also authorizes the CIA's Glomar response.  Exemption 3 and 1 are independent exemptions; the "[p]roper invocation of, and affidavit support for, either Exemption, standing alone, may justify the CIA's Glomar response."  *Wolf*, 473 F.3d at 375; *see also Gardels*, 689 F.2d at 1106.  Although the Court need not consider the CIA's invocation of Exemption 1 to affirm its Glomar response, already found proper under Exemption 3, *see Larson*, 565 F.3d at 862–63, the Court nonetheless considers the CIA's reliance on Exemption 1 and finds it proper.

Exemption 1 of FOIA protects matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or

foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1); *see also Larson*, 565 F.3d at 861.  Executive Order 13526 governs the classification of national security information.  *See* Classified National Security Information, Executive Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13526").  Information can be properly classified under Executive Order 13526 if four requirements are met:  (1) an original classification authority classifies the information; (2) the United States Government owns, produces, or controls the information; (3) the information falls within one or more of eight protected categories listed in section 1.4 of the Executive Order; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in a specified level of damage to the national security, and the original classification authority is able to identify or describe the damage.  *Id*. § 1.1(a).  Executive Order 13526 expressly authorizes an agency to "refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."  *Id*. § 3.6(a).

Mary Ellen Cole, the Information Review Officer for the CIA's National Clandestine Service, holds original classification authority and has determined that "the existence or nonexistence of [responsive] records is a currently and properly classified fact" under the control of the U.S. Government.  Cole Decl. ¶¶ 3, 5, 30.  Ms. Cole explains that this fact is protected from disclosure by § 1.4(c) and (d) of the Executive Order, which permits the classification of information concerning "intelligence activities (including covert action), intelligence sources or methods, or cryptology," and "foreign relations or foreign activities of the United States, including confidential sources," respectively.  Cole Decl. ¶ 30 (quoting E.O. 13526 § 1.4(c), (d)).  Ms. Cole explains with sufficient detail that the unauthorized disclosure of the existence or nonexistence of records

reasonably could be expected to result in specific and identifiable damage to the national security.

Through Ms. Cole's Affidavit, the CIA has sufficiently demonstrated that disclosure of records sought by Plaintiffs would cause damage to national security by providing insight into the CIA's intelligence activities, sources and methods, which are properly classifiable under § 1.4(c) of Executive Order 13526.   The Court has already determined that the records sought pertain to "intelligence sources and methods" under the NSA; such analysis applies here as well.   *See infra* Part III(A)(2); *Military Audit Project*, 656 F.2d at 736 n.39.   Information on drone strikes is even easier to fit within the purview of intelligence activities.   As the CIA states cogently, "Clandestine intelligence techniques, capabilities, or devices are valuable only so long as they remain unknown and unsuspected.   Once an intelligence source or method (or the fact of its use in a certain situation) is discovered, its continued successful use by the CIA is seriously jeopardized."   Cole Decl. ¶ 34. The fact of whether or not the CIA has responsive records would reveal whether the CIA has an interest in, or can employ, drone technology.   *Id.* ¶ 17.   "That fact could be extremely valuable to the targets of CIA intelligence efforts, who could carry out their activities with the knowledge that the CIA would be unable to monitor their activities using that particular technology."   *Id*.

Independently, the CIA also demonstrates that the fact of whether or not the CIA maintains responsive records also implicates "foreign relations or foreign activities of the United States, including confidential sources."   E.O. 13526 § 1.4(d).   Because the CIA's operations are conducted almost exclusively outside the United States, they inherently involve foreign activities.   *See* Cole Decl. ¶ 36.   "Although it is generally known that the CIA conducts clandestine intelligence operations, identifying an interest in a particular matter or publicly disclosing a particular intelligence activity could cause the affected or interested foreign government to respond in ways that would

damage U.S. national interests." *Id*. ¶ 37.  The CIA argues that to acknowledge officially whether it has responsive records could be construed by foreign governments as an affirmation that the CIA has operated undetected in their borders, or has taken intelligence operations against its citizens or residents, which could adversely affect U.S. relations with such nations. *See id*.; *cf. Afshar v. Dep't of State*, 702 F.2d 1125, 1130–31 (D.C. Cir. 1983) ("Also, even if a fact – such as the existence of such a liaison – is the subject of widespread media and public speculation, its official acknowledgment by an authoritative source might well be new information that could cause damage to the national security.  Unofficial leaks and public surmise can often be ignored by foreign governments that might perceive themselves to be harmed by disclosure of their cooperation with the CIA, but official acknowledgment may force a government to retaliate.").

The information sought by Plaintiffs directly "implicat[es] national security, a uniquely executive purview." *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 926–27 (D.C. Cir. 2003); *see also Larson*, 565 F.3d at 865 ("Today we reaffirm our deferential posture in FOIA cases regarding the 'uniquely executive purview' of national security.").  Since the United States is at war in Afghanistan against a guerrilla enemy disassociated from any nation or state, it surprises no one that U.S. information concerning its enemies comes predominately from the intelligence community and is classified and closely guarded to protect sources, covert actions and operations, U.S. agents, related intelligence activities and methods, and any workings with foreign governments and foreign agencies.  While Plaintiffs may hold a general knowledge of the existence and use of drones, that knowledge does not mean that the underlying intelligence efforts that reveal and guide weapons to targets are somehow unprotected under FOIA and open to any requester.

In reviewing the CIA's basis for anticipating harm from a non-Glomar response, the

"test is not whether the court personally agrees in full with the CIA's evaluation of the danger – rather, the issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in which the CIA is expert and given by Congress a special role." *Gardels*, 689 F.2d at 1105. The fact that the public may already speak freely of the existence of drones, or speculate openly that such a program may be directed in part or in whole by the CIA, does not emasculate the CIA's warnings of harm were it forced to acknowledge officially the existence or nonexistence of requested records.

Plaintiffs counter that because information on the program is "already in the public domain in whole or in part," *i.e.*, "it is no secret that the CIA uses drones to target and kill individuals," that "no additional harm could reasonably be expected to flow from the CIA's confirmation that it possesses records responsive to Plaintiffs' FOIA request." *See* Pls.' Opp'n at 20, 22–23. However, the D.C. Circuit has foreclosed this argument: "that the information withheld by the CIA is 'so widely disseminated' that it could not cause harm to national security is foreclosed by our requirement . . . that information be 'officially acknowledged.'" *ACLU*, 628 F.3d at 625. "The 'officially acknowledged' test recognizes that even if information exists in some form in the public domain that does not mean that official disclosure will not cause harm cognizable under a FOIA exemption." *Id*.[6] As explained above, the CIA has never officially acknowledged its involvement in the drone program publicly.

---

[6] Plaintiffs' additional authority, consisting of statements by John A. Rizzo, acting general counsel at the CIA until his retirement in 2009, does not do more: unauthorized disclosure of classified facts does not officially disclose those facts. *See Afshar*, 702 F.2d at 1133–34 (noting that books by former CIA agents, even where the books had been pre-screened and approved by the CIA, did not constitute official and documented disclosures for purposes of waiving an exemption); *Wilson v. CIA*, 586 F.3d 171, 189 (2d Cir. 2009) ("A former employee's public disclosure of classified information cannot be deemed an 'official' act of the [Central Intelligence] Agency.").

More to the point, leaving hostile groups guessing as to the CIA's possible interest or involvement in, or control over, drone strikes could itself be of eminent benefit. *See Military Audit Project*, 656 F.2d at 743-45 (noting that, despite widespread speculation, the lack of an authoritative acknowledgment of a covert project's actual purpose could itself prove beneficial by leaving foreign agencies with "lingering doubts whether some other purpose motivated the project"); *Frugone*, 169 F.3d at 775 (acknowledging CIA's asserted benefit of Glomar response that by denying it had records on a subject it "would lessen the burden facing a foreign intelligence agency attempting to track the CIA's covert activities abroad"). The CIA has met its burden of showing that the release of any acknowledgment of responsive records could damage national security; FOIA "bars the courts from prying loose from the government even the smallest bit of information that is properly classified or would disclose intelligence sources or methods." *Afshar*, 702 F.2d at 1130.[7]

Courts "have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927. The Court finds that the CIA has adequately justified its Glomar response under FOIA Exemption 1. Accordingly, the CIA is independently entitled to summary judgment under Exemption 1.

---

[7] The CIA also offers to supplement its unclassified declaration with a classified declaration containing additional information were the Court to find its affidavit insufficient. The D.C. Circuit has cautioned courts against performing *in camera* review of redacted information when an agency meets its burden by affidavit. *ACLU*, 628 F.3d at 626. "*In camera* inspection is particularly a last resort in national security situations like this case—a court should not resort to it routinely on the theory that 'it can't hurt.'" *Id.* (quoting *Larson*, 565 F.3d at 870). The Court finds that it would be neither necessary nor appropriate to take the CIA up on its offer where, as here, it has provided specific information that the information withheld properly falls within the exemptions cited, that this information is not contradicted in the record, and there is no evidence of agency bad faith. *See id.*

## IV.  CONCLUSION

In short, the CIA has convinced the Court that FOIA Exemptions 1 and 3 apply to any records it might possibly have that are sought by Plaintiffs and that its Glomar response was appropriate.  The CIA's motion for summary judgment [Dkt. # 15] will be granted, and Plaintiffs' motion for partial summary judgment [Dkt. # 21] will be denied.  A memorializing Order accompanies this Memorandum Opinion.

Date: September 9, 2011                          _____/s/_____
                                                ROSEMARY M. COLLYER
                                                United States District Judge