**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 1:10-cv-00436-RMC |
| | ) |
| CENTRAL INTELLIGENCE AGENCY, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT CIA'S MOTION FOR SUMMARY JUDGMENT

Defendant United States Central Intelligence Agency ("the CIA") hereby moves for summary judgment pursuant to Fed. R. Civ. P. 56(b) and Local Rule 7(h)(2) for the reasons stated in the attached memorandum.

Dated: August 9, 2013

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

/s/Amy E. Powell
_____
AMY E. POWELL (N.Y. Bar)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.

Washington, D.C. 20001
Telephone: (202) 514-9836
Fax: (202) 616-8202
amy.powell@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:10-cv-00436-RMC |
| CENTRAL INTELLIGENCE AGENCY, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
CIA'S MOTION FOR SUMMARY JUDGMENT**

STUART DELERY
Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

AMY E. POWELL (N.Y. Bar)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W
Washington, D.C. 20001
Telephone: (202) 514-9836
Fax: (202) 616-8202
amy.powell@usdoj.gov

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

    Administrative Background and District Court Decision ....................................2

    Subsequent Disclosures and S.D.N.Y. Litigation ..............................................4

    D.C. Circuit Proceedings .....................................................................................5

    Additional Disclosures.........................................................................................7

ARGUMENT ......................................................................................................7

I.      THE APPLICABLE FOIA AND SUMMARY JUDGMENT STANDARDS ..................8

II.    THE CIA PROPERLY PROVIDED A "NO NUMBER, NO LIST"
       RESPONSE PURSUANT TO EXEMPTIONS 1 AND 3 ................................................11

    A.    The No Number, No List Response....................................................11

    B.    The CIA's No Number, No List Response Is Proper Under Exemption 3 ...........13

        1.    The CIA's No Number, No List Response is Proper Under
           the CIA Act ................................................................................15

        2.    The CIA's No Number, No List Response is Proper Under
           the NSA......................................................................................20

    C.    The CIA's No Number, No List Response Is Proper Under Exemption 1 ...........22

        1.    An Original Classification Authority Has Classified the Information.......23

        2.    The United States Owns, Produces, or Controls the Information..............23

        3.    The Information Falls Within the Protected Categories Listed
           in Section 1.4 of E.O. 13526....................................................23

        4.    An Original Classification Authority Has Properly Determined
           that the Unauthorized Disclosure of the Withheld Information
           Reasonably Could Be Expected to Result in Damage to the National
           Security and Has Identified that Damage .................................25

i

III.    THE CIA HAS NOT OFFICIALLY ACKNOWLEDGED THE
        INFORMATION PROTECTED BY ITS NO NUMBER, NO LIST RESPONSE...........27

CONCLUSION ...........................................................................................................................31

## TABLE OF AUTHORITIES

**CASES**                                                                                           **PAGE(S)**

*ACLU v. DOJ*, 808 F. Supp. 2d 280 (D.D.C. 2011),
    vacated  by *ACLU v. CIA*,
    710 F.3d 422 (D.C. Cir. 2013) ..................................................................passim

*Afshar v. Dep't of State*,
    702 F.2d 1125 (D.C. Cir. 1983) ...............................................................passim

Am. Civil Liberties Union v. DOJ,
    265 F. Supp. 2d 20 (D.D.C. 2003) ................................................................. 10

Assassination Archives & Research Ctr. v. CIA,
    334 F.3d 55 n.3 (D.C. Cir. 2003) ................................................................... 14

Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.,
    830 F.2d 331 (D.C. Cir. 1987) ....................................................................... 10

Baker v. CIA,
    580 F.2d 664 (D.C. Cir. 1978) ....................................................................... 15

*Bassiouni v. CIA*,
    392 F.3d 244 (7th Cir. 2004) ...................................................................passim

*CIA v. Sims*,
    471 U.S. 159 (1985) ................................................................................passim

Ctr. for Nat. Sec. Studies v. DOJ,
    331 F.3d 918 (D.C. Cir. 2003) ....................................................................8, 10

Dep't of Interior v. Klamath Water Users Protective Ass'n,
    532 U.S. 1, 121 S. Ct. 1060, 149 L. Ed. 2d 87 (2001) .........................................9

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C. Cir. 1990) ...................................................................passim

*Frugone v. CIA*,
    169 F.3d 772 (D.C. Cir. 1999) ...................................................................passim

Gardels v. C. I. A.,
    689 F.2d 1100 (D.C. Cir. 1982) .................................................................14, 15

iii

*Goland v. CIA,*
607 F.2d 339 (D.C. Cir. 1978) .................................................................15, 19

*Halperin v. CIA,*
629 F.2d 144 (D.C. Cir. 1980) ..........................................................................21

*Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.,*
608 F.2d 1381 (D.C. Cir. 1979) ........................................................................12

*\*Jarvik v. CIA,*
741 F. Supp. 2d 106 (D.D.C. 2010) .................................................................12

*John Doe Agency v. John Doe Corp.,*
493 U.S. 146, 110 S. Ct. 471, 107 L. Ed. 2d 462 (1989) ............................... 8, 9

*Judicial Watch, Inc. v. DOD,*
715 F.3d 937 (D.C. Cir. 2013) ..........................................................................24

*King v. DOJ,*
830 F.2d 210 (D.C. Cir. 1987) ......................................................................9, 10

*Kissinger v. Reporters Comm. for Freedom of the Press,*
445 U.S. 136, 100 S. Ct. 960, 63 L. Ed. 2d 267 (1980) .....................................9

*Krikorian v. Dep't of State,*
984 F.2d 461 (D.C. Cir. 1993) ..........................................................................14

*Larson v. Dep't of State,*
565 F.3d 857 (D.C. Cir. 2009) ...............................................................10, 15, 20

*Military Audit Project v. Casey,*
656 F.2d 724 (D.C. Cir. 1981) ..............................................................9, 30, 31

*Miller v. Casey,*
730 F.2d 773 (D.C. Cir. 1984) ..........................................................................20

*Minier v. CIA,*
88 F.3d 796 (9th Cir. 1996)..................................................................................9

*Moore v. CIA,*
666 F.3d 1330 (D.C. Cir. 2011) ...............................................................11, 30

*Morley v. CIA,*
699 F. Supp. 2d 244 (D.D.C. 2010) *, vacated in part,*
466 F. App'x 1 (D.C. Cir. 2012) .......................................................................22

iv

*New York Times Co. v. DOJ,*
    915 F. Supp. 2d 508 (S.D.N.Y. 2013) ......................................................................passim

*Phillippi v. CIA,*
    546 F.2d 1009 (D.C. Cir. 1976) ..................................................................................4, 11

*Phillippi v. CIA*
    655 F.2d 1325 (D.C. Cir. 1981) ......................................................................................30

*Pub. Citizen v. Dep't of State,*
    11 F.3d 198 (D.C. Cir. 1993) ..........................................................................................28

*Ray v. Turner,*
    587 F.2d 1187 (D.C. Cir. 1978) ......................................................................................10

*Reliant Energy Power Generation, Inc. v. F.E.R.C.,*
    520 F. Supp. 2d 194 (D.D.C. 2007) .................................................................................9

*Riquelme v. CIA,*
    453 F. Supp. 2d 103 (D.D.C. 2006) ....................................................................15, 21, 26

*SafeCard Servs., Inc. v. S.E.C.,*
    926 F.2d 1197 (D.C. Cir. 1991) .......................................................................................9

*Schlesinger v. CIA,*
    591 F. Supp. 60 (D.D.C. 1984) ......................................................................................28

*Snepp v. United States,*
    444 U.S. 507 n.3, 100 S. Ct. 763, 62 L. Ed. 2d 704 (1980) ............................................30

*Students Against Genocide v. Dep't of State,*
    50  F. Supp. 2d 20  (D.D.C. 1995)  ................................................................................30

*Talbot v. CIA,*
    578 F. Supp. 2d 24 n.3 (D.D.C. 2008) ...........................................................................20

*Wilner v. Nat'l Sec. Agency,*
    592 F.3d 60 (2d Cir. 2009) .............................................................................................11

*Wilson v. CIA,*
    586 F.3d 171 (2d Cir. 2009) ......................................................................................29, 30

*Wolf v. CIA,*
    473 F.3d 370 (D.C. Cir. 2007) ..........................................................................21, 27, 28, 29

**STATUTES**

5 U.S.C.A. § 552 ...................................................................................................................passim

5 U.S.C.A. § 552(b)(1) ........................................................................................................... 22

5 U.S.C.A. § 552(b)(3) ........................................................................................................... 14

50 U.S.C. § 3002 .................................................................................................................... 20

50 U.S.C. § 3024(i)(1) ...................................................................................................... 14, 20

50 U.S.C. § 3035 .................................................................................................................... 15

50 U.S.C. § 3141 .................................................................................................................... 13

50 U.S.C. § 3507 .............................................................................................................. 14, 15

**MISCELLANEOUS**

Exec. Order No. 12333 ................................................................................................ 15, 16, 20

Exec. Order No. 13470 ........................................................................................................... 16

Exec. Order 13526, § 1.1(a)(4) .................................................................................... 14, 23, 25

## <u>INTRODUCTION</u>

The Government has carefully considered how best to provide the American people as much information as possible about sensitive counterterrorism operations consistent with the protection of our national security.  Accordingly, the Government has disclosed key elements of the principles and procedures involved in the decision to use targeted lethal force, but continues to safeguard properly classified details pertaining to these operations, the disclosure of which could reasonably be expected to damage the Government's counterterrorism efforts.

Pursuant to the Freedom of Information Act ("FOIA"), Plaintiffs American Civil Liberties Union and American Civil Liberties Union Foundation (collectively, "the ACLU") have sought a variety of records from Defendant Central Intelligence Agency ("CIA") and other agencies related to "the use of unmanned aerial vehicles ('UAVs') — commonly referred to as 'drones' … — by the CIA and the Armed Forces for the purposes of killing targeted individuals."  The types of records sought include, for example, targeting information, damage assessments, piloting information, and legal opinions about general and specific uses of weaponized drones to conduct these strikes.  The D.C. Circuit Court of Appeals held that the CIA could not sustain its initial Glomar response in light of certain statements made by high-level government officials about U.S. Government drone operations. The D.C. Circuit determined that although these statements did not acknowledge that the CIA itself operated drones, it was "neither logical nor plausible for the CIA to maintain that it would reveal anything not already in the public domain to say that the Agency 'at least has an intelligence interest in such strikes." *ACLU v. CIA*, 710 F.3d 422, 430 (D.C. Cir. 2013).  Accordingly, the D.C. Circuit reversed and remanded the case to this Court for further proceedings, noting that the degree of detail that the Agency was required to disclose remained "open for the district court's determination on remand." *Id*. at 434.

In light of recent official disclosures about targeted lethal operations, and in accordance with the opinion of the D.C. Circuit, the CIA has now acknowledged that it has a general intelligence interest in this topic and possesses records responsive to the ACLU request. However, the CIA has determined that it cannot provide additional information about its responsive records without revealing classified material or statutorily-protected information related to intelligence activities, sources and methods and/or Agency functions. The CIA's determination in this regard, which is based on the Agency's expertise in the national security realm, is entitled to substantial deference, and entitles it to summary judgment.

## **BACKGROUND**

Administrative Background and District Court Decision

This action arises from several FOIA requests from Plaintiffs to the CIA, the Department of Defense ("DOD"), the Department of State ("State"), and the Department of Justice ("DOJ"). Plaintiffs' requests, dated January 13, 2010, in which the ACLU alleges that drones are operated "by the CIA and the Armed Forces for the purpose of killing targeted individuals" and notes "reports" suggesting that "non-military personnel including CIA agents are making targeting decisions, piloting drones, and firing missiles." The FOIA request seeks records pertaining to the following ten categories of information, each of which concerns "drone strikes": [1]

1.     The "legal basis in domestic, foreign and international law" for such drone strikes, including who may be targeted with this weapon system, where and why;[2]

---

[1] The ACLU's request uses the term "drone strike" to mean "targeted killing" with a drone. Accordingly, this Memorandum will use the term "drone strikes" for convenience. *See* Declaration of Mary Ellen Cole ("Cole Decl.") ¶ 7, Exhibit A at 5 ("CIA Request") (Filed October 1, 2010, Doc. No. 15).

[2] During the previous round of summary judgment briefing, Plaintiffs' abandoned categories 1(b) and 2 of their original request.

3.      "[T]he selection of human targets for drone strikes and any limits on who may be targeted by a drone strike;"

4.      "[C]ivilian casualties in drone strikes;"

5.      The "assessment or evaluation of individual drone strikes after the fact;"

6.      "[G]eographical or territorial limits on the use of UAVs to kill targeted individuals;"

7.      The "number of drone strikes the have been executed for the purpose of killing human targets, the location of each such strike, and the agency of the government or branch of the military that undertook each such strike;"

8.      The "number, identity, status, and affiliation of individuals killed in drone strikes;"

9.      "[W]ho may pilot UAVs, who may cause weapons to be fired from UAVs, or who may otherwise be involved in the operation of UAVs for the purpose of executing targeted killings;" and

10.     The "training, supervision, oversight, or discipline of UAV operators and others involved in the decision to execute a targeted killing using a drone."

*See* Declaration of Mary Ellen Cole ("Cole Decl.") Exhibit A (the "CIA Request") (filed October 1, 2010 as Doc. No. 15).   Most of these categories include several sub-categories seeking specific information about drone strikes.

By letter dated March 9, 2010, the CIA issued a response to Plaintiffs' request, stating that "[t]he fact of the existence or nonexistence of requested records is currently and properly classified and is intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended."   This response is commonly known as a

Glomar response.[3]   Plaintiffs administratively appealed the March 9 determination, s*ee* Cole Decl. ¶ 8, Exhibit B, and while the appeal was pending, filed an Amended Complaint in this matter on June 1, 2010, adding the CIA as a co-defendant to their previously-filed lawsuit against DOD, State, and DOJ.

This Court upheld the CIA's Glomar determination, holding that the existence or non-existence of responsive records was currently and properly classified and exempt pursuant to statute because to reveal the existence or non-existence of records would reveal whether or not CIA was involved in or at least had an intelligence interest in drone strikes.  The Court agreed that to reveal such information could reveal intelligence activities, and intelligence sources and methods, as well as functions of the CIA, all of which are exempt from disclosure under FOIA Exemptions 1 and 3.  *See ACLU v. DOJ*, 808 F. Supp. 2d 280, 286-93, 298-301 (D.D.C. 2011).  This Court originally rejected ACLU's contention that the CIA had previously officially acknowledged such involvement or interest.  *Id*. at 293-98.

Subsequent Disclosures and S.D.N.Y. Litigation

While the ACLU's appeal was pending, the Executive Branch declassified and disclosed certain additional information about U.S. counterterrorism operations, including targeted lethal operations with drones.  *See* Declaration of Martha Lutz ("Lutz Decl.") at ¶11.  On March 5, 2012, the Attorney General, Eric Holder, gave a speech which discussed legal issues pertaining to the use of lethal force against a senior operational leader of Al Qaida and associated forces, including when the individual is a U.S. citizen.  *See* Declaration of Amy Powell ("Powell

---

[3] *See Moore v. Bush*, 601 F. Supp. 2d 6, 14 n.6 (D.D.C. 2009) ("The '*Glomar*' response is named after the ship involved in *Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976). In that case, the FOIA requester sought information regarding a ship named the 'Hughes Glomar Explorer,' and the CIA refused to confirm or deny whether it had any relationship with the vessel because to do so would compromise national security or would divulge intelligence sources and methods.").

Decl."), at ¶2.  On April 30, 2012, John Brennan, who was then Assistant to the President for Homeland Security and Counterterrorism, gave a speech in which he explained in broad terms the standards and process of review for authorizing strikes against a specific member of al-Qaida outside the hot battlefield of Afghanistan.  *Id.* ¶3.  Neither speech discussed whether the CIA played a role in such operations.

In FOIA litigation in the Southern District of New York, *see New York Times v. DOJ*, No. 11-9336, appeal pending No. 13-422 (2d Cir.) and *ACLU v. DOJ*, 12-794, appeal pending, No. 13-445 (2d Cir.), the CIA acknowledged that it possessed copies of the Holder and Brennan speeches, which were responsive to a request seeking, *inter alia*, legal analysis pertaining to the use of targeted lethal force against U.S. citizens.  Lutz Decl. ¶11 & n.4. Because the CIA is a critical component of the national security apparatus of the United States and because those speeches covered a wide range of counterterrorism issues, the CIA determined that it would not harm national security to reveal that it possessed copies of those speeches.  *Id.*  Accordingly, instead of asserting a Glomar response in New York, the CIA disclosed that it possessed responsive records and withheld all details about those records – a "no number, no list" response. *See* Lutz Decl. ¶11; *see generally NY Times v. DOJ*, 915 F. Supp. 2d 508 (S.D.N.Y. 2013).[4]

<u>D.C. Circuit Proceedings</u>

In light of the newly declassified information, the CIA moved the D.C. Circuit Court of Appeals to remand this case so that the district court could determine the effect of these disclosures on the case at bar, but that motion was denied.  *See* Docket No. 10-436, Doc. No. 41 (D.C. Cir. July 11, 2012).

---

[4] The district court in SDNY entered summary judgment for the CIA.  *See NY Times v. DOJ*, 915 F. Supp. 2d 508 (S.D.N.Y. 2013).  The appeal is pending.

The D.C. Circuit reversed the decision of the District Court, holding that, given the statement by the President and other high-level government officials, the CIA's Glomar response was no longer appropriate.   On appeal, the ACLU had argued primarily that the CIA had previously officially disclosed that it not only has an interest in drone strikes, but also conducts drone strike operations.   The D.C. Circuit refused to adopt the ACLU's position; rather, the Court noted that Plaintiffs' FOIA request was not limited to drones purportedly operated by the CIA but instead sought records related to drones operated by the CIA or the Armed Forces.   In light of these statements, the D.C. Circuit found that the CIA "proffered no reason to believe that disclosing whether it has any documents at all about drone strikes [would] reveal whether the Agency itself – as opposed to some other U.S. entity such as the Defense Department – operates drones." *ACLU v. CIA*, 710 F.3d 422, 428 (D.C. Cir. 2013).  The Court determined that although certain official statements "do not acknowledge that the CIA itself operates drones, they leave no doubt that some U.S. agency does," *id.* at 429; the Court found it was "neither logical nor plausible for the CIA to maintain that it would reveal anything not already in the public domain to say that the Agency 'at least has an intelligence interest' in such strikes," *id.* at 430.

The D.C. Circuit left open the issue as to "[j]ust how detailed a disclosure must be made."  *Id*. at 432.  The Court noted that "there is no fixed rules establishing what a Vaughn index must look like, and a district court has considerable latitude to determine its requisite form and detail in a particular case."  *Id*.  The D.C. Circuit then discussed a variety of acceptable submissions and mechanisms available to the Agency, including a detailed Vaughn index, *in camera* review of documents or an index, a "no number, no list" response, a partial no number no list response, or even a partial Glomar response.  *Id*. at 433-34.  The Court of Appeals noted that a pure no number, no list response would require "a particularly persuasive affidavit" but

stated that "all such issues remain open for the district court's determination upon remand." *Id.* at 434.

<u>Additional Disclosures</u>

Subsequent to the D.C. Circuit decision, the Executive Branch has declassified and disclosed a limited amount of additional information about the use of targeted lethal force.  Lutz Decl. ¶16.  President Obama directed the Attorney General to disclose additional information about targeted lethal operations that, until that point, had been properly classified.  Powell Decl. ¶4.  In a letter to the Chairman of the Senate Judiciary Committee dated May 22, 2013, the Attorney General publicly acknowledged for the first time that the United States specifically targeted and killed one U.S. citizen, Anwar al-Aulaqi, in the conduct of U.S. counterterrorism operations and further identified three other U.S. citizens who were not specifically targeted but had been killed in counterterrorism operations since 2009.  *Id.* This acknowledgement was followed by President Obama's speech at the National Defense University in which he explained that he had declassified this information in order "to facilitate transparency and debate on the issue, and to dismiss some of the more outlandish claims" but still acknowledged the "necessary secrecy" surrounding such operations.  *Id.* at ¶5.  Notwithstanding these additional official disclosures, it remains the case that no authorized Executive Branch official has disclosed the precise nature of the CIA's involvement in the use of targeted lethal force.  Lutz Decl. ¶48.

## **ARGUMENT**

As set forth below and in the attached declarations, the CIA acknowledges possessing certain records responsive to the ACLU request, but beyond that limited acknowledgement, the details of those records, including the number and nature of responsive documents, remain currently and properly classified facts exempt from disclosure under FOIA Exemptions 1 and 3.

Official CIA disclosure of such details would reveal sensitive national security information concerning intelligence activities, intelligence sources and methods, and the foreign activities of the United States.   It would provide important insights into the CIA's activities to terrorist organizations, foreign intelligence services, or other hostile groups, and could affect the foreign relations of the United States.   *See* Lutz Decl. ¶¶43-47.   The CIA has properly asserted a "no number, no list" response, which should be accorded substantial deference in light of the Agency's considerable national security expertise.   The CIA is entitled to a grant of summary judgment in its favor.

## I.      THE APPLICABLE FOIA AND SUMMARY JUDGMENT STANDARDS

FOIA's "basic purpose" reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (internal citation omitted).   "Congress recognized, however, that public disclosure is not always in the public interest[.]" *CIA v. Sims*, 471 U.S. 159, 166-67 (1985).   Accordingly, in passing FOIA, "Congress sought 'to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy.'" *John Doe Agency*, 493 U.S. at 152 (quoting H.R. Rep. No. 89-1497, at 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423).   As this Circuit has recognized, "FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C. Cir. 2003) (citing *John Doe Agency*, 493 U.S. at 152).

FOIA mandates disclosure of government records unless the requested information falls within one of nine enumerated exemptions.   *See* 5 U.S.C. § 552(b).   "A district court only has

jurisdiction to compel an agency to disclose improperly withheld agency records," *i.e.*, records that do "not fall within an exemption." *Minier v. CIA*, 88 F.3d 796, 803 (9th Cir. 1996); *see also* 5 U.S.C. § 552(a)(4)(B) (providing the district court with jurisdiction only "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant"); *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980) ("Under 5 U.S.C. § 552(a)(4)(B)[,] federal jurisdiction is dependent upon a showing that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records.'"). While narrowly construed, FOIA's statutory exemptions "are intended to have meaningful reach and application," *John Doe Agency*, 493 U.S. at 152; *see also Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

Summary judgment is the procedural vehicle by which most FOIA actions are resolved. *See Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007). The government bears the burden of proving that the withheld information falls within the exemptions it invokes. *See* 5 U.S.C. § 552(a)(4)(B); *King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987). In a FOIA case, a court may grant summary judgment to the government entirely on the basis of information set forth in an agency's affidavits or declarations that provide "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Such declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted).

In reviewing the applicability of FOIA Exemptions 1 and 3, it is important to note that the information sought by Plaintiffs directly "implicat[es] national security, a uniquely executive purview." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926-27. While courts review *de novo* an agency's withholding of information pursuant to a FOIA request, "de novo review in FOIA cases is not everywhere alike." *Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987). Although *de novo* review provides for "an objective, independent judicial determination," courts nonetheless defer to an agency's determination in the national security context, acknowledging that "the executive ha[s] unique insights into what adverse affects might occur as a result of public disclosure of a particular classified record." *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978) (internal quotation marks omitted). Courts have specifically recognized the "propriety of deference to the executive in the context of FOIA claims which implicate national security." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927-28.

For these reasons, courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927; *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) ("Today we reaffirm our deferential posture in FOIA cases regarding the 'uniquely executive purview' of national security."). Consequently, "in the national security context, the reviewing court must give 'substantial weight'" to agency declarations. *Am. Civil Liberties Union v. DOJ*, 265 F. Supp. 2d 20, 27 (D.D.C. 2003) (quoting *King*, 830 F.2d at 217); *see Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (holding that the district court erred in "perform[ing] its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure"); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) (because "courts have little expertise in either international diplomacy or

counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure could cause to national security).   Accordingly, FOIA "bars the courts from prying loose from the government even the smallest bit of information that is properly classified or would disclose intelligence sources or methods." *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

The following discussion and accompanying declarations, including the CIA's classified declaration, establish that, pursuant to these standards of review, the CIA's no number, no list response is appropriate in this case, and the CIA is therefore entitled to summary judgment in its favor.

## II.   THE CIA PROPERLY PROVIDED A "NO NUMBER, NO LIST" RESPONSE PURSUANT TO EXEMPTIONS 1 AND 3

### A.   The No Number, No List Response

A no number, no list response is employed where the "details that would appear in a Vaughn index" are protected by a FOIA exemption.  *Bassiouni v. CIA*, 392 F.3d 244, 246 (7th Cir. 2004).   Although the "*Glomar* doctrine is well settled as a proper response to a FOIA request" *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009); *see also Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011); *Phillippi v. CIA*, 546 F.2d 1009, 1012 (D.C. Cir. 1976), the D.C. Circuit has not finally ruled upon the propriety of a no number, no list response.   However, the Seventh and other district courts have upheld such a response.  *Bassiouni*, 392 F.3d at 246; *Jarvik v. CIA,* 741 F. Supp. 2d 106, 111-113 (D.D.C. 2010); *NY Times v. DOJ*, 915 F. Supp. 2d 508, 550 (S.D.N.Y. 2013), appeal pending.   And in this case, the Court of Appeals approved the possibility of a no number, list response when justified by a "particularly persuasive affidavit;" the Court left the question in the first instance to the district court.  *See* 710 F.3d at 433-34.

The "no number, no list" response permits the agency to acknowledge the existence of responsive records but to withhold the additional details about those documents that normally set forth in the Vaughn index because information about the volume or nature of the responsive records is itself exempt from disclosure. *See Bassiouni,* 392 F.3d at 246-247 (upholding such a response); *Jarvik v. CIA,* 741 F. Supp. 2d 106, 111-113 (D.D.C. 2010) (same); *NY Times v. DOJ*, 915 F. Supp. 2d 508, 550 (S.D.N.Y. 2013) (same), appeal pending; *see also Hayden v. NSA,* 608 F.2d 1381, 1384 (D.C. Cir. 1979) (recognizing that an agency need not provide the number of responsive records or an index describing them if that information is itself exempt from disclosure).

In the SDNY litigation, the district court upheld the CIA's assertion of a no number, no list response to a request for records about targeted lethal operations against terrorists who are U.S. citizens.  The court explained:

> When the Government issues a Glomar or No Number, No List response, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal. Moreover, courts play a rather limited role when such responses are filed:  When a court finds that the government's public affidavits sufficiently allege the necessity of a Glomar or No Number, No List response, *ex parte* and *in camera* review of additional, confidential material is unnecessary and beyond the role assigned to the judiciary by applicable law. . . .  Nevertheless, in supporting a Glomar or No Number, No List response, the Government must provide specific, non-conclusory justifications for withholding the requested information.

*NY Times*, 915 F. Supp. 2d at 551 (internal citations and alterations omitted).

Here, the CIA has submitted a detailed declaration explaining why the number and nature of the responsive records are exempt from disclosure pursuant to FOIA Exemptions 1 and 3. Although "there are no relevant documents for the court to examine other than the affidavits

which explain the Agency's refusal" to number or list the responsive documents, *see NY Times v. DOJ*, 915 F. Supp. 2d at 551, the CIA initiated a search to determine whether a more detailed response would reveal exempt information.  *See* Lutz Decl. ¶17.  This search was reasonably calculated to locate responsive documents that are not exempt from search under 50 U.S.C. § 3141[5] (formerly codified at 50 U.S.C. § 431)[6].  The search was overseen by information management professionals with appropriate experience in conducting such searches, who used terms such as "Predator," "drones," "UAV," "targeted killing" and "lethal operations."  *Id*.  The searches of offices likely to possess responsive records supported a determination that a no number, no list response was required.  *Id*.  Although the public declaration is sufficiently detailed to permit the Court to determine that information about the number and nature of responsive records is classified, the CIA has submitted an additional declaration *ex parte* and *in camera* to provide further details to the Court regarding the number and nature of its responsive documents and to explain why that information is properly covered by FOIA Exemptions 1 and 3.

### B.     The CIA's No Number, No List Response Is Proper Under Exemption 3

The CIA has properly invoked Exemption 3 in support of its no number, no list response.  FOIA Exemption 3 exempts from disclosure records that are "specifically exempted from disclosure by [another] statute" if the relevant statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular

---

[5] CIA operational files are generally exempt from FOIA under 50 U.S.C. § 3141 unless one of the narrow exceptions applies (they do not in this case).

[6] The Office of Law Revision Counsel recently implemented an editorial reclassification of Title 50 of the U.S. Code.  *See* http://uscodebeta.house.gov/editorialreclassification/reclassification.html.  The Memorandum uses both current and former sections the first time a section is cited.

criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. §552(b)(3). The Central Intelligence Agency Act of 1949, as amended, exempts the CIA from any law requiring the disclosure of certain information about the CIA, including the CIA's "functions." 50 U.S.C. § 3507 ("Protection of nature of Agency's functions") (formerly codified at 50 U.S.C. § 403g). And the National Security Act of 1947, as amended, directs the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1) (formerly codified at 50 U.S.C. § 403-1(i)(1)).

The CIA's mandate to withhold information under Exemption 3 is broader than its authority under Exemption 1 pursuant to Executive Order 13526. *See Gardels v. CIA*, 689 F.2d 1100, 1107 (D.C. Cir. 1982). Most importantly, these statutes do not require a determination that the disclosure of information would be expected to result in damage to the national security. *See Sims*, 471 U.S. at 167; *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 58 n.3 (D.C. Cir. 2003) ("Because we conclude that the Agency easily establishes that the records ... are exempt from disclosure under Exemption 3, we do not consider the applicability of Exemption 1."); *Fitzgibbon*, 911 F.2d at 761-62 ("the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage."); *Krikorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993); *see also Electronic Privacy Information Center v. NSA*, 678 F.3d 926, 931 (D.C. Circ. 2012) ("NSA need not make a specific showing of potential harm to national security in order to justify withholding information under [similar Exemption 3 statute], because 'Congress has already, in enacting the statute, decided that disclosure of NSA activities is potentially harmful.'"). *Compare* 50 U.S.C. §§ 3024, 3507, *with* E.O. 13526, § 1.1(a)(4). In other words, so long as the information being sought pertains to intelligence sources, methods, or CIA functions, it may be withheld under Exemption 3 regardless of whether

14

it is classified.   "FOIA Exemptions 1 and 3 are independent; agencies may invoke the
exemptions independently and courts may uphold agency action under one exemption without
considering the applicability of the other."  *Larson*, 565 F.3d at 862-63 (citing *Gardels*, 689 F.2d
at 1106-07).

### 1.   The CIA's No Number, No List Response is Proper Under the CIA Act

It is well-established that the Central Intelligence Agency Act of 1949, as amended, 50
U.S.C. § 3035 *et seq.* (the "CIA Act") (formerly codified at 50 U.S.C. § 403-4), satisfies the
criteria for withholding of information pursuant to Exemption 3.  *See Fitzgibbon*, 911 F.2d at 761
(recognizing that courts have determined that the CIA Act is an Exemption 3 statute and noting
that "[t]his conclusion is supported by the plain meaning of the statute, by the legislative history
of FOIA, and by every federal court of appeals that has considered the matter"); *Baker v. CIA*,
580 F.2d 664, 667 (D.C. Cir. 1978).  Section 6 of the CIA Act exempts CIA from the provision
of any law requiring the publication or disclosure of several categories of information relating to
the CIA's organization and workforce, including the "functions" of its personnel.  *See* 50 U.S.C.
§ 3507; *see also* Lutz Decl. ¶ 24.   Accordingly, the CIA Act protects information that would
reveal the functions of the CIA, which "plainly include clandestine intelligence activities and
intelligence sources and methods." Lutz Decl. ¶ 24; *see, e.g., Goland v. CIA*, 607 F.2d 339, 351
(D.C. Cir. 1978) (holding that intelligence sources and methods are "functions" of the CIA
within the meaning of the CIA Act, and thus exempt from disclosure under Exemption 3);
*Riquelme*, 453 F. Supp. 2d at 111-12 (same).  Indeed, Executive Order 12333, as amended,
provides that the CIA shall, among other functions, "[c]ollect . . ., analyze, produce, and
disseminate foreign intelligence and counterintelligence," "[c]onduct covert action activities
approved by the President," and "[c]onduct foreign intelligence liaison relationships."  *See*

United States Intelligence Activities, Exec. Order No. 12333, 46 Fed. Reg. 59941 (Dec. 4, 1981), amended most recently by Exec. Order No. 13470, 75 Fed. Reg. 45325 (July 30, 2008); *see also* 50 U.S.C. § 3036(d)(1), 3036(f) (formerly at §403-4a(d)(1), §403-4a(f)) (authorizing functions of the CIA).

The Lutz Declaration explains that providing further detail about the CIA's responsive records would require the CIA to disclose information about its core functions.  Lutz Decl. ¶¶24, 32-39.  The CIA has therefore determined that providing the number or nature of the responsive records would require the CIA to disclose information about its functions, an outcome the CIA Act expressly prohibits.  *Id*.  Providing additional details regarding the nature or volume of requested records would disclose statutorily-protected information regarding CIA functions, including (1) the nature of the CIA's role in drone strike operations, and (2) intelligence activities, sources and methods.  Indeed, this Court previously agreed that the request sought to reveal functions of the CIA, explaining that "whether the CIA cooperates with, is interested in, or actually directs drone strikes pertains to (possible) functions of CIA personnel," and that "Plaintiffs' FOIA request—sent to multiple agencies—is clearly designed, at least in part, to determine which agencies, and its personnel, are involved in drone strikes and in what capacities."  808 F. Supp. 2d at 288-89.  Plaintiffs did not appeal the applicability of these exemptions, only the issue of waiver.  Although the Court of Appeals subsequently held that the CIA could acknowledge possessing an "intelligence interest" in drone strikes given the statements made by high-level government officials, the functions revealed by providing the volume and details of responsive records goes well beyond an "intelligence interest" and remains protected.  *See* Lutz Decl. ¶¶28-29; *infra* Part III.

The Lutz Declaration explains that the number and nature of responsive records would tend to reveal "whether or not the CIA has been granted the authority to engage in drone strikes, what role the Agency plays (if any) in the execution of drone strikes – especially in comparison to other agencies, and/or the amount of resources it devotes to this arena."  Lutz Decl. ¶¶31-36. Hypothetically, if the CIA publicly acknowledged possessing thousands of records responsive to the ACLU's request, that response would tend to reveal that the Agency is either engaging in drone strikes or is directly involved in their execution; conversely, a small volume of records would be more consistent with the a passive role.  *Id.* ¶¶31-32.

Indeed, the request appears to be designed in part to ferret out precisely what role the CIA may play in drone strikes in comparison to other agencies.  *See* Lutz Decl. ¶28; *see also* FOIA Request at 4 ("Reports also suggest that in addition to Air Force and Special Forces personnel, non-military personnel including CIA agents are making targeting decisions, piloting drones, and firing missiles"); *id.* at 5 ("It is unclear who may be targeted by a drone strike, how targets are selected ... and who is making operational decisions about particular strikes."); *id.* at 6 (requesting records specifically regarding "whether drones can be used by the CIA . . . to execute targeted killings").  Accordingly, the request seeks to discover specific functions of CIA personnel – whether they are involved specifically in piloting, target selection, or post-strike assessments and whether that role is active, passive, extensive or circumscribed.  Lutz Decl. ¶42. As the Lutz Declaration explains, "[t]hese operational activities are all roles that individual officers could theoretically perform, and therefore information related to these potential functions falls within the CIA Act's zone of protection."  *Id.*

An examination of particular categories of the request supports the CIA's conclusion that revealing volume and details would reveal whether or not the CIA had particular authorities.  For

example, the first category of the FOIA Request seeking all records "pertaining to the legal basis in domestic, foreign and international law" upon which drones may be used "to execute targeted killings."   As the Lutz Declaration explains, "[i]f the CIA had been granted the extraordinary authority to engage in drone strikes, one would logically expect that the legality of such operations would be carefully and extensively documented" inside and outside the Agency.   Lutz Decl. ¶33.   "Conversely, if the CIA possessed only a handful of documents . . . , that would tend to reveal that it did not possess such extraordinary authority and was minimally involved . . . ." *Id*.   At the very least, any volume of responsive records would tend to reveal information about agency "priorities, resources and workforce."  *Id*. ¶36.

The provision of even a general index of documents would reveal information about the extent of the CIA's authorities and operational involvement in this area.   A disclosure of dates of documents, for example, could provide a timeline of when the Agency's authorities or capabilities did or did not exist.   Combined with publicly available information, dates could also be used to determine what if any specific operations included CIA involvement.  *See* Lutz Decl. ¶38.   Similarly, references to authors and recipients of records and other generic descriptors could reveal whether CIA's interest was analytical, operational or strictly informational.  *Id*. ¶¶38-39.

Other categories of Plaintiffs' request more directly seek information about CIA's purported functions pertaining to the execution of drone strikes.  *See* FOIA Request at 7 (seeking records "pertaining to the assessment or evaluation of individual drone strikes after the fact," including how the performance of those operating and involved in drone strikes is assessed); *id*. at 8 (seeking records "pertaining to the involvement of CIA personnel" in drone strikes and the piloting and operation of drones).   If the CIA possessed several hundred or even thousands of

records responsive to these categories, that information would tend to reveal that the CIA is itself operating drones, whereas a minimal amount of documentation would suggest the converse.  *See* Lutz Decl. ¶34.  Similar analysis applies to the portions of the request seeking records on who may be targeted, assessments of the effects of strikes, and compilations of strikes over time.  *Id*.

In addition to revealing the authorities of the CIA, revealing the volume and nature of responsive records would tend to reveal information concerning intelligence sources and methods, which are also "functions" under the CIA Act.  *See Goland*, 607 F.2d at 351; *see* Lutz Decl. ¶¶24, 38, 41.  Generally, if the CIA were involved in these operations, as Plaintiffs' contend, confirmation would reveal "an intelligence activity of the Agency – one that relies upon the operational deployment of its sources and methods."  *Id*. ¶41.  Moreover, disclosing the volume and dates could be used as described above to determine whether or not the CIA specifically was involved in particular operations, including whether or not there are unacknowledged operations, the specific countries in which the CIA had a presence or not, and particularized targets on which CIA may have collected human intelligence, all of which tends to expose intelligence sources and methods.  *Id*. ¶¶ 38, 41, 43, 46; *cf. Bassiouni,* 392 F.3d at 245 ("A list of documents could show clusters of dates that reveal when the agency acquired the information. Knowing which documents entered the files, and when, could permit an astute inference how the information came to the CIA's attention-and, in the intelligence business, 'how' often means 'from whom.'").

Accordingly, the volume and nature of responsive documents is properly withheld under the CIA Act because this information pertains to the functions of Agency personnel.

## 2. The CIA's No Number, No List Response is Proper Under the NSA

The National Security Act of 1947, as amended, 50 U.S.C. § 3002 *et seq.* (formerly § 401 *et. seq*) (the "NSA") also satisfies the criteria for withholding of information pursuant to Exemption 3. *See*, *e.g.*, *Sims*, 471 U.S. at 167-68 (finding that the NSA "qualifies as a withholding statute under Exemption 3"); *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) ("Section 403 [of the NSA] is an Exemption 3 statute."). The NSA provides that the "Director of National Intelligence ("DNI") shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1) (formerly codified at 50 U.S.C. § 403-1); Cole Decl. ¶ 40.[7] In *CIA v. Sims*, the Supreme Court, recognizing the "wide-ranging authority" provided by the NSA to protect intelligence sources and methods, held that it was "the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." 471 U.S. at 180. The Court observed that Congress did not limit the scope of "intelligence sources and methods" in any way. *Id*. at 183. Rather, it "simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the Agency needs to perform its statutory duties with respect to foreign intelligence." *Id*. at 169-70.

---

[7] Courts have recognized that not just the DNI, but also CIA and other agencies may rely upon the amended NSA to withhold records under FOIA. *See*, *e.g.*, *Larson*, 565 F.3d at 862-63, 865; *Talbot v. CIA*, 578 F. Supp. 2d 24, 28-29 n.3 (D.D.C. 2008). Furthermore, the President specifically preserved CIA's ability to invoke the NSA to protect its intelligence sources and methods. *See*, *e.g.*, Exec. Order No. 12,333, § 1.6(d) (as revised after the NSA was amended) (reprinted in 50 U.S.C. § 401 note) (requiring that the CIA Director "[p]rotect intelligence and intelligence sources, methods, and activities from unauthorized disclosure in accordance with guidance from the [DNI]"). Here, the CIA has explained that "[u]nder the direction of the DNI … and consistent with section 1.6(d) of Executive Order 12333, the CIA is authorized to protect CIA sources and methods from unauthorized disclosure." Lutz Decl. ¶ 23.

The only question for the court is whether the agency has demonstrated that responding to the request "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." *Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980); *see, e.g.*, *Wolf*, 473 F.3d at 377-78 (relying on the NSA in holding that CIA's affidavits "establish that disclosure of information regarding whether or not CIA records of a foreign national exist would be unauthorized under Exemption 3 because it would be reasonably harmful to intelligence sources and methods"); *Riquelme*, 453 F. Supp. 2d at 111-12 (affirming CIA's Glomar response pursuant to the NSA and CIA Act regarding certain alleged CIA activities in Paraguay and, *inter alia*, information relating to a foreign national because the fact of the existence or nonexistence of such records "are pertinent to the Agency's intelligence sources and methods").  Such broad discretion is proper under the Exemption 3 analysis because even "superficially innocuous information" might reveal valuable intelligence sources and methods.  *Sims*, 471 U.S. at 178; *see also Fitzgibbon*, 911 F.2d at 762 ("the fact that the District Court at one point concluded that certain contacts between CIA and foreign officials were 'nonsensitive' does not help [plaintiff] because apparently innocuous information can be protected and withheld").

As discussed above, the Lutz Declaration explains that providing the number or nature of the responsive records can reasonably be expected to lead to unauthorized disclosure of CIA intelligence sources and methods.  *See generally* Part II.B.1, *supra*. This Court previously held that the existence or non-existence of responsive records pertained to "intelligence sources and methods," as that authority is broadly construed under the NSA.  *See* 808 F. Supp. 2d at 289-93. The same principles establish that disclosure of the number and nature of these records would indicate the level of the CIA's involvement which would in turn reveal protected intelligence sources and methods.

Accordingly, the CIA has properly concluded that a no number, no list response is necessary to safeguard CIA functions and intelligence sources and methods from unauthorized disclosure.  The records sought by Plaintiffs–information that would disclose the existence or nonexistence of clandestine CIA functions, intelligence activities, sources and/or methods–falls squarely within the scope of the protective mandate provided by the CIA Act and the NSA.  Thus, the CIA's no number, no list response is justified by Exemption 3.

### C.      The CIA's No Number, No List Response Is Proper Under Exemption 1

FOIA Exemption 1 exempts from disclosure records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).  Pursuant to Executive Order 13,526, an agency may withhold information that an official with original classification authority has been determined to be classified because its "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security" and it "pertains to" one of the categories of information specified in the Executive Order, including "intelligence activities (including covert action), intelligence sources or methods," and "foreign relations or foreign activities of the United States."  Exec. Order 13,526, § 1.4(c), (d), 75 Fed. Reg. 707, 709 (Dec. 29, 2009).

As noted above, when it comes to matters affecting the national security, courts accord "substantial weight" to an agency's declarations concerning classified information, *King*, 830 F.2d at 217, and deference to the expertise of agencies involved in national security and foreign relations.  *Fitzgibbon*, 911 F.2d at 766; *Frugone*, 169 F.3d at 775.  Given that the CIA has met the prerequisites for classification under the Executive Order, the volume and nature of responsive CIA records are exempt from disclosure under FOIA Exemption 1.

### 1.      An Original Classification Authority Has Classified the Information

Martha Lutz, the Chief of the Litigation Support Unit, has affirmed that she holds original classification authority under a delegation of authority pursuant to section 1.3(c) of E.O. 13526. Lutz Decl. ¶3.  She found that "the volume or nature" of the CIA's responsive documents "is currently and properly classified."  *Id*. ¶7.  Thus, the information withheld satisfies the Executive Order's classification requirement that an original classification authority classified the information.

### 2.      The United States Owns, Produces, or Controls the Information

The number and volume of records responsive to Plaintiffs' requests is owned by and under the control of the United States Government.  Lutz Decl. ¶19.  Accordingly, the withheld information satisfies the second classification requirement regarding U.S. Government information.

### 3.      The Withheld Information Falls Within the Protected Categories Listed in Section 1.4 of E.O. 13526

The CIA has determined, and has articulated with reasonable specificity, that the information protected from disclosure falls squarely within certain delineated categories of information set forth in sections 1.4(c) and (d) of E.O. 13526.  Lutz Decl. ¶41.[8]

First, Section 1.4(c) of the Order permits the classification of information concerning "intelligence activities (including covert action), intelligence sources or methods, or cryptology.").  Specifically, if the CIA engaged in drone strikes as Plaintiffs allege, "such involvement would be an intelligence activity of the Agency – one that relies upon the

---

[8] The Lutz Declaration also asserts that the number and nature of the responsive records has not been classified in order to conceal violations of law, or inefficiency, administrative error; to prevent embarrassment to a person, organization or agency; to restrain competition; or prevent or delay the release of information that does not require protection in the interest of national security.  Lutz Decl. ¶ 21.

operational deployment of its sources and methods." Lutz Decl. ¶41.  As Lutz explains, "such involvement could be based on not only the CIA's foreign intelligence gathering functions, but also its ability to conduct covert action and other activities as directed by the President." *Id.*; *see also* 50 U.S.C. § 3093 (formerly codified at §413b); *Morley v. CIA*, 699 F. Supp. 2d 244 (D.D.C. 2010) (finding that CIA's alleged participation in covert action fell under Exemption 1), vacated in part on other grounds, 466 Fed. Appx. 1 (D.C. Cir. 2012).  Moreover, as described above in Part II.B.1, revealing the volume and details of responsive records would tend to reveal intelligence sources and methods.

Second, Section 1.4(d) of the Order permits classification of information concerning "foreign relations or foreign activities of the United States, including confidential sources."  The CIA has determined that official acknowledgement of the volume and nature of responsive records would reveal information pertaining to the foreign relations and foreign activities of the United States.  As this Court previously held, "[b]ecause the CIA's operations are conducted almost exclusively outside the United States, they inherently involve foreign activities."  *ACLU v. DOJ*, 808 F. Supp. 2d at 299; *see also* Lutz Decl. ¶ 40; *see also Judicial Watch v. DOD*, 715 F.3d 937, 941 (D.C. Cir. 2013) (finding that images of Usama Bin Laden taken during acknowledged operation overseas "pertained to" U.S. "foreign activities.").  The CIA has furthermore determined that official confirmation of the volume and nature of responsive CIA records concerning drone strikes would reveal information that impacts the foreign relations of the United States.  As explained in the Lutz Declaration, providing even general descriptors of the records at issue, such as volume, dates and recipients, would tend to reveal the nature of CIA involvement in specific overseas operations, and operation in particular foreign countries.  Lutz

Decl. ¶45.  In turn, the belief that CIA was operating within their borders could cause foreign countries to respond in ways that would damage foreign relations.  *Id.*

This type of information falls squarely with section 1.4(d) of E.O. 13526.

> **4.     An Original Classification Authority Has Properly Determined that the Unauthorized Disclosure of the Withheld Information Reasonably Could Be Expected to Result in Damage to the National Security and Has Identified that Damage**

Finally, the CIA has determined, and explained in reasonably specific detail, that the unauthorized disclosure of this information reasonably could be expected to cause damage to the national security of the United States.  As explained in the Lutz Declaration, if CIA were to provide the number and nature of responsive records, it would reveal the nature of CIA involvement and interest in drone strikes.  Lutz Decl. ¶¶31-36. Such a disclosure would cause damage to national security by providing insight into the CIA's capabilities and interests and by harming foreign relations.  *Id.* ¶¶43-47.

As the Lutz Declaration explains, "it would benefit terrorist organizations such as al-Qa'ida to know with certainty the specific intelligence activities that the CIA has or has not been authorized to engage in" and revealing such information "could provide valuable insight into the CIA's authorities, capabilities, and resources that our enemies could use to reduce the effectiveness of the CIA's intelligence operations."  Lutz Decl. ¶¶43-44.  For example, if the CIA were to confirm that it possesses the extraordinary authority alleged by Plaintiffs, this would tend to reveal that the CIA has authorities that extend beyond its traditional intelligence-gathering role.  *Id.*  Such a confirmation could lead to heightened suspicions that other "non-traditional" activities are being carried out in a given country.  *Id.*  In turn, this revelation could lead government and people to attribute certain actions, rightly or wrongly, to the CIA, which

could harm both foreign affairs and the effectiveness of future operations.  *Id*.  Conversely, the absence of such authority would allow terrorists in certain areas to operate more freely and openly knowing that they could not be targeted by the CIA via drones or other non-traditional intelligence activities.  *Id*.

Furthermore, confirmation of the CIA's alleged execution of drone strikes would raise inferences as to where the CIA is "operating clandestinely inside their borders, either with or without the knowledge and/or consent of the local government." Lutz Decl. ¶45.   These inferences could "cause those countries to respond in ways that would damage foreign relations and U.S. national interests" because in many part of the world, the involvement of the CIA specifically, as opposed to the U.S. government generally, can engender increased hostility.  The CIA has explained that these harms would result from official disclosure of a specific CIA role.  *Id*.  Moreover, the harms described in the Lutz Declaration are unique to disclosure of a CIA role in drone strikes, as distinct from a general U.S. Government role.  As Lutz explains, "the U.S. military and CIA have different roles, capabilities, and authorities, and admissions of their respective activities result in different responses by unfriendly foreign powers, including terrorist organizations, as well as by U.S. foreign partners."  *Id*. ¶¶43-44.

Finally, providing additional details about the dates and nature of responsive records would allow people to compare those details with publicly available information to create a timeline showing specific operations in which the CIA was or was not involved, which could reveal information about where and when the CIA had a presence in a particular foreign country (or not) and the existence or absence of source reporting with respect to particular targets.  Such information can be used by hostile groups to damage U.S. intelligence collection efforts, harm foreign relations, or reveal gaps in the Agency's capabilities.  Lutz Decl. ¶45; *see also Riquelme*

*v. CIA*, 453 F. Supp. 2d 103, 109 (D.D.C. 2006) (upholding CIA's Glomar response under Exemption 1 because "officially acknowledging that the CIA has recruited or collected intelligence information on a foreign national, or conducted clandestine activities in a foreign country, may also qualify for classification on the ground that it could hamper future foreign relations with the government of that country" and a "denial that the CIA has records ... could serve to damage national security by alerting certain individuals that they are not CIA intelligence targets") (internal quotations and citations omitted)).

The CIA's public declaration establishes that the withheld information is currently and properly classified and exempt from disclosure. Although the public declaration is sufficient to meet the Agency's burden, especially taking into account the deference accorded the Agency in the national security context, the Court may refer to the CIA's classified declaration for additional explanation that supports this determination.

## III.   THE CIA HAS NOT OFFICIALLY ACKNOWLEDGED THE INFORMATION PROTECTED BY ITS NO NUMBER, NO LIST RESPONSE

Plaintiffs have previously alleged that the CIA has officially acknowledged conducting drone strikes. An agency may be compelled to provide information over a valid FOIA exemption claim only when the specific information at issue has already been fully, publicly, and officially disclosed. *See ACLU v. CIA,* 710 F.3d at 426-27; *Wolf*, 473 F.3d at 378. Plaintiffs "bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Id*. (quoting *Afshar*, 702 F.2d at 1130). The Plaintiffs must show (1) that the requested information is "as specfic as the information previously released;" (2) that the requested information "match[es] the previous information;" and (3) that the information has "already . . . been made public through an official and documented disclosure." *Id*. As this

27

Circuit noted in *Wolf*, "[t]he insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'"  *Id.* (quoting *Public Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993).

The Lutz Declaration confirms that the CIA has not officially acknowledged the volume or nature of responsive CIA records related to drone strikes, the relevant legal inquiry.  *See Wolf*, 473 F.3d at 379; *see also NY Times v. DOJ*, 915 F. Supp. 2d at 552.  Nor has it officially acknowledged any of the protected underlying information implicated by Plaintiffs' request, such as the nature of the CIA's involvement in drone strikes.  Lutz Decl. ¶ 48.

In the appeal of this matter, the D.C. Circuit concluded that a number of statements by authorized Executive Branch officials constituted a waiver of the CIA's Glomar response and, in light of these statements, found that "it is neither logical nor plausible" for the Agency to maintain that it does not have "at least an 'intelligence interest'" in drone strikes.  *See ACLU v. CIA*, 710 F.3d at 430.  This finding was, however, narrow in scope; the Court of Appeals determined that, given its interest in the subject matter, the CIA could generally acknowledge possessing records responsive to Plaintiffs' request.  However, the D.C. Circuit did not further define the nature of that interest and appears to have explicitly rejected the ACLU's argument that the CIA had officially acknowledged conducting strikes, noting that certain statements by President Obama and then-Assistant to the President John Brennan "do not acknowledge that the CIA itself operates drones."  *Id.*  Instead, the Court found only that the CIA could acknowledge having an intelligence interest in strikes conducted by the U.S. Government, and that there was no reason that such a disclosure would reveal whether or not "the Agency itself – as opposed to some other U.S. entity such as the Defense Department – operates drones."  *Id.* at 428.

Accordingly, the D.C. Circuit has explicitly rejected the ACLU's argument that there is any acknowledged CIA operational role in drone strikes based on the statements discussed in the D.C. Circuit opinion.  Further, none of the statements cited thus far by Plaintiffs constitute official acknowledgment of CIA's alleged role in drone strikes.  *See* Lutz Decl. ¶¶11-16 (reviewing official disclosures regarding the use of targeted lethal force); ¶¶28-29 (explaining the significant difference between an intelligence interest versus the alleged operational role); ¶48 (confirming that there has been no authorized disclosure of the CIA's role).  This is consistent with the finding of the court in the Southern District of New York, which upheld the CIA's no number, no list response to the FOIA request at issue in that case.  *NY Times v. DOJ*, 915 F. Supp. 2d at 552 ("Plaintiffs have provided the Court with every public pronouncement by a senior Executive Branch official that touches on the intelligence community's involvement in the Government's targeted killing program.  In none of these statements is there a reference to any particular records pertaining to the program, let alone the number or nature of those records.").

Generally, the other statements Plaintiffs have cited as "acknowledgements" are, in fact, either unsourced, come from former government officials, or are attributed to anonymous individuals.  As the Second Circuit explained, "anything short of [an official] disclosure necessarily preserves some increment of doubt regarding the reliability of the publicly available information." *Wilson v. CIA*, 586 F.3d 171, 195 (2d Cir. 2009).  Morever, "the law will not infer official disclosure . . . from . . . widespread public discussion of a classified matter," and such publicity or statements are insufficient to undermine the CIA's predictions of harm from official confirmation or denial.  *See id*. at 195; *see also Wolf,* 473 F.3d at 378 ("An agency's official acknowledgment of information by prior disclosure, however, cannot be based on mere public

speculation, no matter how widespread."); *Military Audit Project v. Casey*, 656 F.2d 724, 745 (D.C. Cir. 1981) (explaining importance of maintaining "lingering doubts"); *Students Against Genocide v. Dep't of State*, 50 F. Supp. 2d 20, 25 (D.D.C. 1999) ("[T]here is certainly no 'cat out of the bag' philosophy underlying FOIA so that any public discussion of protected information dissipates the protection which would otherwise shield the information sought."); *see also Snepp v. United States*, 444 U.S. 507, 510 n.3 (1980) (recognizing government's "compelling interest in protecting . . . the appearance of confidentiality so essential to the effective operation of our foreign intelligence service").

With respect to statements by former government employees and others not authorized to speak for the CIA, the courts have been clear that "statements made by a person not authorized to speak for the Agency" do not waive a Glomar response. *Wilson*, 586 F.3d at 186-87; *see also Moore v. CIA*, 666 F.3d 1330, 1331 (D.C. Cir. 2011); *Frugone*, 169 F.3d at 774 (noting "we do not deem official a disclosure made by someone other than the agency from which the information is being sought" and concluding that "only the CIA can waive its right to assert an exemption"); *Afshar*, 702 F.2d at 1130-31 ("Unofficial leaks and public surmise can often be ignored by foreign governments that might perceive themselves to be harmed by disclosure of their cooperation with the CIA, but official acknowledgement may force a government to retaliate."); *Military Audit Project*, 656 F.2d at 744 (requiring "authoritative" disclosure); *Schlesinger v. CIA*, 591 F. Supp. 60, 66 (D.D.C. 1984) (construing official disclosure to mean "direct acknowledgments by an authoritative government source.")

In sum, at no time has the CIA specifically acknowledged the number or nature of responsive records; nor has the CIA acknowledged the nature of CIA involvement in drone strikes as defined by the Plaintiffs. The inferences drawn by the ACLU or by journalists do not

constitute official acknowledgements on behalf of the CIA.  *See Phillippi*, 655 F.2d at 1331;

*Military Audit Project*, 656 F.2d at 745; *Afshar*, 702 F.2d at 1130-31.

## **CONCLUSION**

For the foregoing reasons, Defendant CIA respectfully requests that the Court grant

summary judgment in its favor.


Dated: August 9, 2013                                Respectfully submitted,

                                                     STUART F. DELERY
                                                     Assistant Attorney General

                                                     RONALD C. MACHEN JR.
                                                     United States Attorney

                                                     ELIZABETH J. SHAPIRO
                                                     Deputy Director, Federal Programs Branch

                                                     /s/Amy E. Powell
                                                     AMY E. POWELL (N.Y. Bar)
                                                     Trial Attorney
                                                     United States Department of Justice
                                                     Civil Division, Federal Programs Branch
                                                     20 Massachusetts Avenue, N.W.
                                                     Washington, D.C. 20001
                                                     Telephone: (202) 514-9836
                                                     Fax: (202) 616-8202
                                                     amy.powell@usdoj.gov