IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION,
et al.,
            Plaintiffs,
        v.

DEPARTMENT OF JUSTICE, et al.,
            Defendants.

Case No. 1:10-CV-00436-RMC

DECLARATION OF MARTHA M. LUTZ
CHIEF OF THE LITIGATION SUPPORT UNIT
CENTRAL INTELLIGENCE AGENCY

I, MARTHA M. LUTZ, hereby declare and state:

1.    I am the Chief of the Litigation Support Unit of the
Central Intelligence Agency ("CIA" or "Agency").  I have held
this position since October 2012.  Prior to assuming this
position, I served as the Information Review Officer ("IRO") for
the Director's Area of the CIA for over thirteen years.  In that
capacity, I was responsible for making classification and
release determinations for information originating within the
Director's Area, which includes the Office of the Director of
the CIA and the Office of General Counsel, among others.  I have
held other administrative and professional positions within the
CIA since 1989.

2.    As the Chief of the Litigation Support Unit, I am
authorized to assess the current, proper classification of CIA

information based on the classification criteria of Executive Order 13526 and applicable CIA regulations. I am also responsible for the classification review of documents and information, including documents which become the subject of court proceedings or public requests for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. As part of my official duties, it is my responsibility to ensure that any determinations as to the public release or withholding of any such documents or information are proper and do not jeopardize national security.

3.    As a senior CIA official under a written delegation of authority pursuant to section 1.3(c) of Executive Order 13526, as amended, I hold original classification authority at the TOP SECRET level. I am authorized, therefore, to conduct classification reviews and to make original classification and declassification decisions.

4.    Under the authority delegated to the Director of Information Management Services by the Associate Deputy Director of the CIA, I also have been designated Records Validation Officer ("RVO"). As RVO, I am authorized to sign declarations on behalf of the CIA regarding its searches for records and the contents of any located records, regardless of the directorate or independent office of origination.

5.     Through the exercise of my official duties, I have become familiar with this civil action and the underlying FOIA request. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

6.     This declaration is being submitted in support of the CIA's motion for summary judgment in this proceeding. The purpose of this declaration is to explain, to the greatest extent possible on the public record, the basis for the CIA's updated response to Plaintiffs' FOIA request and the applicable FOIA exemptions that support that response. I am also submitting a classified declaration for the Court's *ex parte*, *in camera* review that contains additional information justifying the CIA's response that cannot be filed on the public record.

7.     As set forth below and in my classified declaration, I have determined that although the CIA can acknowledge that it possesses documents responsive to Plaintiffs' request, it cannot provide details regarding the volume or nature of these records because this information is currently and properly classified pursuant to Exemption (b)(1). This "no number, no list" response is necessary because, as described below, revealing details about the number and nature of responsive records would reveal information that concerns intelligence activities, intelligence sources and methods, and U.S. foreign relations and

3

foreign activities, the disclosure of which reasonably could be expected to harm the national security of the United States.

8.    Additionally, and separately, I have determined that providing details regarding the volume or nature of responsive records would reveal information concerning intelligence sources and methods and the functions of CIA personnel. The Director of the Central Intelligence Agency is authorized by the National Security Act of 1947, as well as the CIA Act of 1949, to protect intelligence sources and methods, as well as core functions of the CIA, from disclosure. The CIA therefore asserts FOIA Exemption (b)(3) in conjunction with these withholding statutes as additional bases for its "no number, no list" response.

I.    **BACKGROUND**

9.    By letter of 13 January 2010,[1] Plaintiffs requested ten categories of "records pertaining to the use of unmanned aerial vehicles ('UAVs') – commonly referred to as 'drones' and including the MQ-1 Predator and MQ-9 Reaper – by the CIA and the Armed Forces for the purposes of killing targeted individuals." The request refers to this subject as "drone strikes" for short. A full recounting of Plaintiffs' request and copies of the administrative record associated with it are addressed in the Declaration of Mary Ellen Cole, filed 30 September 2010 ("Cole

---

[1] The letter is misdated as 13 January 2009.

4

Declaration"). In summary, the categories of records requested by Plaintiffs consist of those relating to: the legal basis for drone strikes; the selection of human targets for drone strikes; civilian casualties in connection with drone strikes; after-the-fact assessments or evaluations of individual drones strikes; geographical or territorial limits on the use of drones; logs, charts, or lists pertaining to the number of drone strikes, locations of strikes, and the agency/branch that undertook each strike; logs, charts, or lists pertaining to the number, identity, status, and affiliation of individuals killed in drone strikes; the piloting of drones; and the training, supervision, oversight or, discipline of drone operators.[2]

10. In its initial motion for summary judgment, the CIA asserted a "Glomar response" on the basis of FOIA Exemptions (b)(1) and (b)(3), asserting that the Agency could neither confirm nor deny that it possessed any responsive records. The Cole Declaration submitted in support of this motion asserted that "[a]n official CIA acknowledgement that confirms or denies the existence or nonexistence of records responsive to Plaintiffs' FOIA request would reveal, among other things, whether or not the CIA is involved in drone strikes *or at least*

---

[2] I understand that Plaintiffs have informed the Department of Justice that they are no longer pursuing Category 2, which sought records concerning any "agreements, understandings, cooperation, or coordination between the U.S. and the governments of Afghanistan, Pakistan," or other countries concerning drone strikes, and Subcategory 1(b), which sought records regarding whether drones could be used against targets nominated by a foreign government.

*has an intelligence interest in drone strikes.*" (emphasis
added).  On 9 September 2011, the district court granted summary
judgment in the CIA's favor.  Plaintiffs then appealed.

    11.  While Plaintiffs' appeal was pending, the Executive
Branch publicly disclosed additional information about
U.S. counterterrorism activities, including the use of drones in
targeted lethal operations.  For instance, on 5 March 2012, the
Attorney General gave a speech at Northwestern University Law
School in which he discussed legal issues pertaining to the use
of lethal force against senior operational leaders of al-Qa'ida
or associated forces, including those who possess U.S.
citizenship.  On 30 April 2012, John Brennan, who was then
Assistant to the President for Homeland Security and
Counterterrorism and is now Director of the CIA, gave a speech
that included an extensive discussion about the United States
Government's use of drones to conduct targeted lethal
operations.  In separate FOIA litigation pending in the Southern
District of New York,[3] the CIA subsequently acknowledged that it
possessed copies of these two speeches, which were responsive to
the FOIA request in that case seeking records about, among other
things, legal and policy issues pertaining to the targeted use
of lethal force against U.S. citizens (regardless of whether

---

[3] *New York Times Co. v. U.S. Dep't of Justice*, No. 11-cv-9336, 2013 WL 50209
(S.D.N.Y. Jan. 3, 2013) (appeal pending).

remotely piloted aircraft were used). Because the CIA is a critical component of the national security apparatus of the United States and because these speeches covered a wide variety of issues relating to U.S. counterterrorism efforts, the CIA determined that it did not harm national security to reveal that it possessed copies of these speeches.[4]

12. Because these two speeches discussed the legality of targeted lethal operations, they were also responsive to Plaintiffs' request in this case (although they post-dated the CIA's initial response to Plaintiffs' FOIA request). See Category No. 1. In light of these acknowledgements, the CIA sought to remand this case to the district court so that the district court could determine the effect of these acknowledgements on the case, but that motion was denied.

13. The U.S. Government made additional disclosures pertaining to targeted lethal operations subsequent to the CIA's remand motion. In February 2013, the Senate Select Committee on Intelligence held a confirmation hearing on the President's nomination of John Brennan to be Director of the CIA. During the hearing, Mr. Brennan answered questions about U.S. drone operations based on his experience serving as Assistant to the

---

[4] The CIA further explained that it could not provide the number or nature of all of its responsive records on that topic without disclosing information that continued to be protected from disclosure by FOIA exemptions (b)(1) and (b)(3). See Id., Declaration of John Bennett (20 June 2012). This "no number, no list" response was upheld by the district court and is now on appeal in the Second Circuit.

President for Homeland Security and Counterterrorism, a position
that oversees counterterrorism policy as carried out by the U.S.
military as well as the Intelligence Community.  In early March
2013, a white paper from the Department of Justice was released
that discussed the lawfulness of lethal operations directed
against U.S. citizens who are senior operational leaders of al-
Qa'ida or associated forces.  This paper did not discuss the
CIA.

     14.  On 15 March 2013, the U.S. Court of Appeals for the
District of Columbia Circuit issued an opinion that reversed the
district court's decision on the CIA's motion for summary
judgment.  The Court of Appeals noted that Plaintiffs' FOIA
request was not limited to information about drones operated by
the CIA, but instead more broadly sought records pertaining to
the use of drones by either the CIA or the Armed Forces.  The
Court of Appeals found that, based on the record, the CIA
"proffered no reason to believe that disclosing whether it has
any documents at all about drone strikes [would] reveal whether
the Agency itself - as opposed to some other U.S. entity such as
the Defense Department - operates drones."  710 F.3d 422, 428.
The Court of Appeals determined that although certain statements
made by high-level government officials "do not acknowledge that
the CIA itself operates drones," in light of these statements
"it is neither logical nor plausible for the CIA to maintain

                              8

that it would reveal anything not already in the public domain
to say that the Agency 'at least has an intelligence interest'
in such strikes." *Id.* at 429-30.  As such, the Court of Appeals
reversed and remanded the case to the district court.  In doing
so, it discussed the range of potential options for the CIA's
supplemental response, including the possibility of a "no
number, no list" response.  The Court of Appeals concluded by
noting that "all such issues remain open for the district
court's determination upon remand." *Id.* at 432-44.

15.  Subsequent to the Court of Appeals' decision,
President Obama directed the Attorney General to disclose
additional information about targeted lethal operations that,
until that point, had been properly classified.  In a letter to
the Chairman of the Senate Judiciary Committee dated 22 May
2013, the Attorney General publicly acknowledged that "[s]ince
2009, the United States, in the conduct of U.S. counterterrorism
operations against al-Qa'ida and its associated force outside of
areas of active hostilities, has specifically targeted and
killed one U.S. citizen, Anwar al-Aulaqi."  The Attorney General
also identified "three other U.S. citizens who have been killed
in such U.S. counterterrorism operations over that same time
period:  Samir Khan, 'Abd al-Rahman Anwar al-Aulaqi, and Jude
Kenan Mohammed."  He further noted that "these individuals were
not specifically targeted by the United States."  The Attorney

General's letter also discussed the legal considerations "for the use of lethal force in a foreign country against a U.S. Citizen who is a senior operational leader of al-Qa'ida or its associated forces, and who is actively engaged in planning to kill Americans," and the decision to target Anwar al-Aulaqi specifically.

16.   This acknowledgement was followed by President Obama's speech at the National Defense University on 23 May 2013.   In his speech, President Obama discussed the fact that the United States Government has conducted targeted lethal operations using drones and that Anwar al-Aulaqi and three other U.S. citizens were killed in those operations.   President Obama explained that he had declassified this information in order "to facilitate transparency and debate on the issue, and to dismiss some of the more outlandish claims," but still acknowledged the "necessary secrecy" involved in such operations.

17.   After the case was remanded back to the district court, the CIA initiated a search for records responsive to Plaintiffs' FOIA request.   This search was reasonably calculated to locate responsive documents that are not exempt from search under 50 U.S.C. § 3141 (formerly codified at 50 U.S.C. § 431),[5]

---

[5] The Office of Law Revision Counsel recently implemented an editorial reclassification of Title 50 of the U.S. Code.  *See* http://uscodebeta.house.gov/editorialreclassification/reclassification.html. To avoid confusion, this declaration cites both the current and former sections.

and it was overseen by information management professionals with appropriate experience in conducting such searches. These searches covered the relevant records repositories and used terms such as "Predator," "UAV," "drone," "targeted killing," and "lethal operation." As explained in more detail in my classified declaration, the Agency's search focused on the offices of the Director's Area, including the Offices of the Director, Deputy Director, and Executive Director of the CIA, and the Office of General Counsel; and the Directorate of Intelligence. Given the functions of these offices and the nature of the allegations in Plaintiffs' request (which were accepted as true for the purpose of formulating the search of non-exempt files), these offices were most likely to possess non-exempt,[6] responsive records to the extent they existed. This search was sufficient to allow the CIA to determine that a "no number, no list" response was required.

---

[6] The CIA did not search the files of the National Clandestine Service ("NCS") or the Directorate of Science and Technology ("DS&T") because the NCS and DS&T files likely to contain responsive records (to the extent they exist) are located in designated "operational files" that are exempt from search under 50 U.S.C. § 3141. These designated NCS files currently document the conduct of foreign intelligence or counterintelligence operations or intelligence or security liaison arrangements or information exchanges with foreign governments or their intelligence or security services, and the designated DS&T files currently document the means by which foreign intelligence or counterintelligence is collected through scientific and technical systems. I have also determined that none of the exceptions to the operational files exemption apply.

## II.   APPLICABLE FOIA EXEMPTIONS

### A.   FOIA Exemption (b)(1)

18.   FOIA Exemption (b)(1) provides that the FOIA does not require the production of records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."   5 U.S.C. § 552(b)(1).

19.   Section 1.1(a) of Executive Order 13526 provides that information may be originally classified under the terms of this order only if all of the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of Executive Order 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage.

20.   Consistent with sections 1.1(a) of Executive Order 13526, and as described below, I have now determined that although the mere existence of records responsive to Plaintiffs'

12

request is not classified, the number and nature of these records constitutes classified information that pertains to "intelligence activities (including covert action), intelligence sources or methods" and the "foreign relations or foreign activities of the United States" under section 1.4(c) and (d) of the Executive Order.  This information is owned by and under the control of the U.S. Government, and its unauthorized disclosure reasonably could be expected to damage the national security of the United States for the reasons explained below and in my classified declaration.

21.   In accordance with section 1.7 of the Executive Order, I hereby certify that these determinations have not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security.

**B.    FOIA Exemption (b)(3)**

22.   FOIA Exemption (b)(3) provides that the FOIA does not apply to matters that are:  specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria

13

for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).

23.   Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024 (formerly codified at 50 U.S.C. § 403-1(i)(1))(the "National Security Act"), provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure." Accordingly, the National Security Act constitutes a federal statute which "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3). Under the direction of the DNI pursuant to section 102A, and consistent with section 1.6(d) of Executive Order 12333, the CIA is authorized to protect CIA sources and methods from unauthorized disclosure.[7] As discussed below and in my classified declaration, providing a description of the volume and nature of the records responsive to Plaintiffs' request would reveal information that pertains to intelligence sources and methods, which the National Security Act is designed to protect.

24.   Additionally, and separately, section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 3507

---

[7] Section 1.6(d) of Executive Order 12333, as amended, 3 C.F.R. 200 (1981), *reprinted in* 50 U.S.C.A. § 401 note at 25 (West Supp. 2009), and as amended by Executive Order 13470, 73 Fed. Reg. 45,323 (July 30, 2008) requires the Director of the Central Intelligence Agency to "[p]rotect intelligence and intelligence sources, methods, and activities from unauthorized disclosure in accordance with guidance from the [DNI][.]"

(formerly codified at 50 U.S.C. § 403g) (the "CIA Act"),
provides that the CIA shall be exempted from the provisions of
"any other law" (in this case, the FOIA) which requires the
publication or disclosure of, *inter alia*, the "functions" of the
CIA.  Accordingly, under section 6, the CIA is exempt from
disclosing information relating to its core functions – which
plainly include clandestine intelligence activities and
intelligence sources and methods.  The CIA Act therefore
constitutes a federal statute which "establishes particular
criteria for withholding or refers to particular types of
matters to be withheld."  5 U.S.C. § 552(b)(3).  As explained
below and in my classified declaration, acknowledging the number
and nature of records responsive to Plaintiffs' request would
require the CIA to disclose information about its core
functions, an outcome that the CIA Act expressly prohibits.

     25.  Given that information about the number and nature of
responsive records falls within the ambit of both the National
Security Act and the CIA Act, such information is exempt from
disclosure under FOIA Exemption (b)(3).  In contrast to
Executive Order 13526, the statutes described above do not
require the CIA to identify or even describe the damage to
national security that reasonably could be expected to result
from the unauthorized disclosure of this information.  FOIA

Exemptions (b)(1) and (b)(3) thus apply independently and co-extensively to Plaintiffs' requests.

**III. THE CIA'S "NO NUMBER, NO LIST" RESPONSE**

26. The CIA is charged with carrying out a number of important intelligence functions on behalf of the United States, which include, among other activities, collecting and analyzing foreign intelligence and counterintelligence (particularly intelligence provided or enabled by human sources, called human intelligence or HUMINT), as well as conducting other intelligence activities at the direction of the President, including covert action. A defining characteristic of the CIA's intelligence activities is that they are typically carried out clandestinely, and therefore they must remain secret in order to be effective. In the context of FOIA, this means that the CIA must carefully evaluate whether its response to a particular FOIA request could jeopardize the clandestine nature of its intelligence activities or otherwise reveal previously undisclosed information about its authorities, capabilities, interests, and resources that would provide valuable insight to hostile intelligence services, terrorist groups, or other enemies of the United States. The Agency must likewise ensure that its responses to FOIA requests do not endanger its relationships with its sources or intelligence partners, which can include both individuals and the intelligence and security

services of foreign governments.  At the same time, the CIA is
mindful that, notwithstanding the inherently clandestine nature
of its activities, if information being sought about its
operations, sources, or methods is not classified or otherwise
exempt from disclosure, the Agency is required to release that
information to the American public in response to a proper FOIA
request.

27.  This backdrop informed the CIA's updated response to
Plaintiffs' FOIA request.  In light of the additional official
disclosures that have been made, and in accordance with the
Court of Appeals' decision, the fact that the Agency has an
intelligence interest in this topic is no longer classified and
the CIA can acknowledge that it possesses records responsive to
Plaintiffs' request.  In other words, given the CIA's role in
the Executive Branch and the recent official disclosures
pertaining to U.S. drone operations, the Agency can now admit
that it possesses responsive documents on topics such as the
legality of drone strikes and civilian casualties, issues that
have been the subject of considerable public discourse in recent
years.  Not surprisingly, these topics have simultaneously been
discussed internally within the Executive Branch, and it is not
revealing to admit that the CIA has been one of the many
agencies that has been privy to these discussions and therefore
possesses records relating thereto.

28. Plaintiffs' request, however, does not seek documents that would reflect only a mere intelligence interest in the topic of drone strikes. Rather, Plaintiffs' request is plainly designed to uncover records about the specific operational role the CIA purportedly plays in the execution of drone strikes. The preamble to Plaintiffs' request repeatedly alleges that the CIA itself engages in drone strikes and it characterizes the request as seeking information about the "rules and standards" that both CIA and the Department of Defense ("DoD") use "to determine when and where these weapons may be used, the targets that they may be used against, and the processes in place to decide whether their use is legally permissible in particular circumstances, especially in the face of anticipated civilian casualties." Request at p. 2. In short, while in the abstract there is a difference between records reflecting a mere "intelligence interest" in drone strikes versus operational involvement, Plaintiffs' request makes no such distinction, and in fact, is focused on the latter.

29. From a national security perspective, there is a considerable difference between having a passive interest in drone strikes (for instance, by virtue of having a seat at the table during inter-agency discussions) and being operationally involved in carrying them out in foreign lands, as alleged by Plaintiffs. Although the Agency has taken this distinction into

account when formulating its response to Plaintiffs' FOIA
request, the CIA also recognizes that providing any detailed
information beyond the admission that it maintains an
intelligence interest in the topic would implicate the national
security concerns outlined below. Disclosure of information
about the depth or breadth of CIA's operational involvement (or
lack thereof) would expose protected activities, sources,
methods, and functions of the Agency. Whether active or
passive, extensive or circumscribed, the CIA's precise role in
these activities remains exempt from disclosure.

30.   For these reasons, although the CIA can now
acknowledge that it possesses documents responsive to
Plaintiffs' FOIA request, it still cannot process the request in
the normal manner. Instead, the Agency must issue a "no number,
no list" response. This response is required because the number
of responsive records about drone strikes that the Agency
possesses remains classified and protected from disclosure by
statute, as is information about the nature of these records
(the types of records, their dates, etc.).

31.   When the CIA can reveal the existence of records
responsive to a FOIA request but cannot describe or even
enumerate on the public record their volume or nature, it issues
a "no number, no list" response. The "no number, no list"
response protects classified or otherwise exempt information

19

pertaining to intelligence activities, sources, or methods by
withholding the number of responsive documents in addition to
descriptive information such as the nature of the record, its
date, author, and subject matter, as well as the specific part
of the request to which the record is responsive.  In this case,
disclosure of the volume or nature of records responsive to any
of the categories in Plaintiffs' request would reveal
information pertaining to intelligence activities, intelligence
sources and methods, the foreign activities of the United
States, and the functions of CIA personnel.  This information
would tend to reveal, among other things, whether or not the CIA
has been granted the authority to engage in drone strikes, what
role the Agency plays (if any) in the execution of drone strikes
– especially in comparison to other agencies, and/or the amount
of resources it devotes to this arena.  The unauthorized
disclosure of this information reasonably could be expected to
harm the national security of the United States, and therefore
it must be withheld under FOIA Exemption (b)(1).  Additionally,
and separately, a response other than the "no number, no list"
response would reveal information about intelligence sources and
methods and functions of CIA personnel that is protected from
disclosure by statute.  The CIA's response is therefore
independently supported by FOIA Exemption (b)(3).

32.    There are several underlying equities protected by the
CIA's "no number, no list" response.  Among other things,
disclosure of the volume of responsive records would tend to
reveal whether or not the CIA itself has the authority to engage
in targeted lethal strikes against terrorists using drones.   To
illustrate using a hypothetical, if the CIA publicly
acknowledged that it possessed thousands of records responsive
to the ACLU's request, that fact would tend to reveal that the
Agency is either engaging in drone strikes or is otherwise
directly involved in their execution.   Such an admission would
go much further than admitting that the Agency had a mere
"intelligence interest" in the topic. Conversely, if the CIA
revealed that it possessed only a few dozen records responsive
to the ACLU's request, that fact would tend to indicate that the
Agency is not carrying out drone strikes or is not otherwise
involved in their execution.   This smaller volume of records
would be more consistent with the Agency simply being a
participant in inter-agency discussions on this topic.   Under
either scenario, the number of responsive records that the CIA
possesses is itself a classified fact that is protected from
disclosure by Executive Order and statute, thereby necessitating
the CIA's "no number, no list" response.

33.    This concern is borne out by an examination of the
specific categories of Plaintiffs' FOIA request.  For instance,

Category No. 1 of the Plaintiffs' request seeks all records "pertaining to the legal basis in domestic, foreign and international law upon which unmanned aerial vehicles...can be used to execute targeted killings...."  If the CIA had been granted the extraordinary authority to engage in drone strikes, one would logically expect that the legality of such operations would be carefully and extensively documented by its Office of General Counsel and other attorneys within the Executive Branch. Conversely, if the CIA possessed only a handful of documents responsive to these requests, that would tend to reveal that it did not possess such extraordinary authority and was minimally involved in these operations (if at all).

34.   Similarly, if the CIA possessed several hundred or even thousands of records on the piloting of drones (Categories No. 9 and 10), that would tend to reveal that the CIA itself is operating them, whereas minimal documentation would indicate that it is not.  Indeed, there would be little reason for the Agency to possess significant records pertaining to piloting of drones unless it maintained a role in their operations.  The same is true for the categories seeking records on who may be targeted by drones and where (Categories No. 3 and 6), assessments of the effectiveness of strikes and civilian casualties (Categories No. 4 and 5), or compilations of strikes over time (Categories No. 7 and 8).

35.   This concern is further compounded by the fact that the Agency's response to this request can and would be compared to those of other agencies.  Indeed, in this case Plaintiffs issued the same request to three other agencies, including DoD, and nothing would prevent them or another requester from issuing additional requests in the future.  If the CIA were to disclose the volume of responsive records that it maintains, that number could be readily compared to the quantity of records maintained by those other agencies.  This comparison would allow the public to logically deduce how the CIA's involvement in drone strikes (or lack thereof) compares to DoD or other intelligence agencies.  This is especially true if the Agency were required to provide a breakdown of its responsive records, which would allow comparisons that could be used to determine the extent to which different agencies were involved in specific aspects such as piloting drones, selecting targets, assessing the results, etc.

36.   Even if the volume of responsive records were at a level that would not definitively reveal whether or not the CIA is engaging in drone strikes or is otherwise operationally involved in their execution, at the very least this information would reveal the level of resources the Agency is devoting to this arena.  Generally speaking, information about the CIA's budget, priorities, resources, and workforce is classified not

only in the aggregate, but also when limited to a specific aspect of its operations.  In this case, a high volume of the records would tend to reflect that the Agency has the resources to expend significant funds and manpower to the execution and/or analysis of drone strikes carried about by the U.S. Government. Conversely, a small number of records would indicate that these U.S. Government activities are not an Agency priority or that the Agency is only able to devote minimal resources to them.

37.   The emphasis thus far has been on the potential revelation of the number of responsive CIA records.  However, the concerns noted above would be multiplied if the CIA were required to also reveal additional information about the nature, dates, and other descriptive information about the records that are responsive to these requests – information that would typically be included in a *Vaughn* index.

38.   For one, when compared with the number of responsive documents, disclosure of the dates of these records would provide a timeline of when the Agency's authority and/or ability to participate in drone strikes did or did not exist between 11 September 2001 and the present (the timeframe of the Plaintiffs' request).  In addition, excluding the Usama Bin Laden operation (which did not involve a drone strike), at present the U.S. Government has acknowledged responsibility for the deaths of only the four noted individuals in

counterterrorism operations outside of areas of active
hostilities, and there has been no official acknowledgement that
the CIA was involved in these or any other specific operations.
However, providing a timeline of the Agency's responsive
records, combined with their volume, could be compared to
publicly reported information about alleged strikes to determine
whether or not the U.S. Government, and the CIA specifically,
were involved in particular operations beyond those that have
been acknowledged.  Providing this timeline could reveal
information about CIA intelligence activities, sources, and
methods – including the specific countries in which the CIA had
a presence (or not) at a particular point in time, whether the
CIA had an intelligence interest in the targeted individual,
and/or the existence or absence of human source reporting (given
that human source intelligence is the focus of the Agency's
foreign intelligence mission).

     39.  When combined with the volume and dates, descriptions
of the responsive records could also reveal information about
the nature of the CIA's involvement in these activities (or lack
thereof).  For instance, disclosure of the authors and
recipients of the records would reveal the extent to which the
CIA itself was generating the records, versus being a recipient
of records from other entities (such as the White House, DoD, or
other intelligence agencies).  Similarly, references to "legal

memoranda" from either the CIA's Office of General Counsel or
the Department of Justice would reveal the extent to which the
CIA's involvement required formal legal analysis, which would
raise the same concerns discussed above.  Even providing more
generic descriptions – such as "assessment" or "log" – and the
length of the document would tend to reveal whether the record
is analytical, operational, or strictly informational in
character.  All of this information, in turn, could be combined
to reveal the nature of the CIA's involvement in these
activities as well as a detailed timeline related thereto.

    40.  The information being protected by the CIA's "no
number, no list" response falls within the ambit of protection
provided by Executive Order 13526, the National Security Act,
and the CIA Act.  As an initial matter, information about the
nature of the CIA's involvement in drone strikes, which take
place in foreign territories, quite plainly pertains to "foreign
activities of the United States" under Section 1.4(d) of
Executive Order 13526.  Such information could also affect the
"foreign relations" of the United States and therefore falls
under this same provision.

    41.  The information being protected also relates to
"intelligence activities (including covert action)" and
"intelligence sources and methods" and therefore falls under
Section 1.4(c) of the Executive Order as well as the National

Security Act.  As defined in Section 6.1 of the Executive Order,
"intelligence activities" means all activities that elements of
the Intelligence Community are authorized to conduct pursuant to
law or Executive Order 12333, as amended.  Section 1.4(c) of
Executive Order 13526 further provides that these intelligence
activities can include "covert action" in addition to more
traditional intelligence-gathering activities.  If, as alleged by
Plaintiffs, the CIA engages in or is otherwise directly involved
in drone strikes, such involvement would be an intelligence
activity of the Agency – one that relies upon the operational
deployment of its sources and methods.  Theoretically, such
involvement could be based on not only the CIA's foreign
intelligence gathering functions, but also its ability to
conduct covert action and other activities as directed by the
President.  Conversely, a response that reveals minimal CIA
involvement would show that the Agency is not engaging in these
alleged intelligence activities or is not deploying its sources
and methods in this manner.

42.  Finally, in addition to relating to intelligence
activities, sources, and methods, information about the nature
of the CIA's involvement in drone strikes – including the
involvement of CIA employees (or lack thereof) in specific
activities such as the piloting of drones, target selection, and
post-strike assessments – also directly relates to the possible

"functions" of CIA personnel under the CIA Act.  These operational activities are all roles that individual officers could theoretically perform, and therefore information related to these potential functions falls within the CIA Act's zone of protection.

43.   The harm to national security that reasonably could be expected to result from disclosure of the number and nature of responsive CIA records – a showing that is not required under the CIA Act or National Security Act – is addressed in my classified declaration.  Publicly, I can say that it would benefit terrorist organizations such as al-Qa'ida to know with certainty the specific intelligence activities that the CIA has or has not been authorized to engage in.  Here, it has been officially acknowledged that the U.S. Government (and more specifically, the U.S. military) engages in drone strikes. However, whether or not the CIA also engages in such strikes has not been officially confirmed or denied.  This distinction is important, as the U.S. military and CIA have different roles, capabilities, and authorities, and admissions of their respective activities result in different responses by unfriendly foreign powers, including terrorist organizations, as well as by U.S. foreign partners.  The potential damage to the national security or foreign relations of the United States therefore is different.  As noted below, an official admission

that CIA is engaging in certain activity may result in quite a different reaction among foreign nations than if the U.S. military were engaging in that activity.  In addition, the CIA is more focused on the collecting human intelligence from individuals and through cooperation with foreign intelligence services, and therefore revealing information about the CIA's role in these operations (or lack thereof) may tend to reveal the extent to which such sources are being employed.

44.  As a result, revealing the information being protected by the CIA's "no number, no list" response could provide valuable insight into the CIA's authorities, capabilities, and resources that our enemies could use to reduce the effectiveness of the CIA's intelligence operations and harm foreign relations.  This is particularly true with regard to whether or not the CIA's intelligence activities against members of al-Qa'ida and other terrorist groups may involve the use of targeted lethal force using a drone.  Hypothetically, if it was officially confirmed that the CIA possesses this extraordinary authority, it would reveal that the CIA had been granted authorities against terrorists that go beyond traditional intelligence-gathering activities.  This, in turn, could lead to heightened suspicion that the CIA was involved in additional "non-traditional" activities designed to disrupt terrorist activities other than through the use of lethal force.  This revelation

could lead to the belief by other governments and their people, rightly or wrongly, that the CIA was responsible for certain suspicious activities carried out within their countries, which could harm the foreign affairs of the United States and also reduce the effectiveness of future CIA operations.  On the other hand, if it was officially confirmed that the CIA did not have this authority, it would allow terrorists in certain areas to operate more freely and openly knowing that they could not be targeted by the CIA via drones or other non-traditional intelligence activities.

45.   More generally, any response by the CIA that could be seen as a confirmation of its alleged engagement or operational involvement in drone strikes could raise questions with other countries about whether the CIA is operating clandestinely inside their borders, either with or without the knowledge and/or consent of the local government.  This belief could cause those countries to respond in ways that would damage foreign relations and U.S. national interests.  This is especially true because the association of the CIA with certain overseas activities, as opposed to the U.S. Government generally or the U.S. military, can engender increased hostility among local populations in certain parts of the world.

46.   Finally, as noted above, if the CIA is required to provide additional details about the dates of its responsive

the belief by other governments and their people, rightly or wrongly, that the CIA was responsible for certain suspicious activities carried out within their countries, which could harm the foreign affairs of the United States and also reduce the effectiveness of future CIA operations. On the other hand, if it was officially confirmed that the CIA did not have this authority, it would allow terrorists in certain areas to operate more freely and openly knowing that they could not be targeted by the CIA via drones or other non-traditional intelligence activities.

45. More generally, any response by the CIA that could be seen as a confirmation of its alleged engagement or operational involvement in drone strikes could raise questions with other countries about whether the CIA is operating clandestinely inside their borders, either with or without the knowledge and/or consent of the local government. This belief could cause those countries to respond in ways that would damage foreign relations and U.S. national interests. This is especially true because the association of the CIA with certain overseas activities, as opposed to the U.S. Government generally or the U.S. military, can engender increased hostility among local populations in certain parts of the world.

46. Finally, as noted above, if the CIA is required to provide additional details about the dates of its responsive

30

records and their nature, its response could be compared to
publicly available information to create a timeline showing
specific operations in which the CIA was or was not involved.
Providing this timeline could reveal information about the
specific countries in which the CIA has had a presence (or not)
at a particular point in time, whether the CIA had an
intelligence interest in the targeted individual, and/or the
existence or absence of human source reporting.  In addition to
providing information about the Agency's resources, disclosing
the CIA's presence in a particular foreign country reasonably
could be expected to damage U.S. relations with that country for
the reasons noted immediately above.  Such confirmation could
also present a security threat to the CIA personnel currently in
that country.  Conversely, confirming the Agency's lack of
presence in a particular country or lack of interest in a
specific individual could reveal gaps in its resource allocation
or collection efforts.  Revealing the Agency's involvement in a
particular operation could also provide terrorist groups and
other adversarial organizations with valuable information that
could be used to identify the sources that provided intelligence
for that operation, whereas confirmation of the Agency's non-
involvement would indicate the absence of reliable sources
and/or weaknesses in the Agency's intelligence capabilities.

31

47.   Under any of these plausible scenarios, damage to national security reasonably could be expected to result from the public disclosure of the number and nature of Agency's responsive records.  For these reasons, the CIA has determined that it must issue a "no number, no list" response to Plaintiffs' request pursuant to FOIA Exemptions (b)(1) and (b)(3).

## VI.   The Absence of Authorized Official Disclosures

48.   As discussed above, the President and other senior Executive Branch officials have made certain official disclosures about the U.S. Government's use of drones in targeted lethal operations against terrorists.  *See supra* ¶¶ 11-13, 15-16.  However, although certain operations of the U.S. Government have been declassified, no authorized CIA or Executive Branch official has publicly disclosed the precise nature of the CIA's involvement in these activities.  I am also aware of the additional statements cited for support by Plaintiffs.  Media speculation and non-authoritative reports do not constitute official disclosures on behalf of the CIA and therefore do not undermine the CIA's determination.

*       *       *

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of August 2013.

Martha Lutz
Chief, Litigation Support Unit
Central Intelligence Agency