**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN CIVIL LIBERTIES UNION, et al.,

Plaintiffs,

v.

CENTRAL INTELLIGENCE AGENCY,

Defendant.

Civil Action No. 1:10-cv-00436 RMC

**DECLARATION OF AMY E. POWELL**

I, Amy E. Powell, declare as follows:

1. I am a trial attorney at the United States Department of Justice, representing the Defendant in the above-captioned matter. I am competent to testify as to the matters set forth in this declaration.

2. Attached to this declaration as Exhibit A is a true and correct copy of a document entitled "Attorney General Eric Holder Speaks at Northwestern University School of Law," dated March 5, 2012, as retrieved on August 9, 2013 from http://www.justice.gov/iso/opa/ag/speeches/2012/ag-speech-1203051.html.

3. Attached to this declaration as Exhibit B is a true and correct copy of a Transcript of Remarks by John O. Brennan on April 30, 2012, as copied on August 9, 2013 from http://www.wilsoncenter.org/event/the-efficacy-and-ethics-us-counterterrorism-strategy/ with some formatting changes by the undersigned in order to enhance readability.

4. Attached to this declaration as Exhibit C is a true and correct copy of a letter to the Chairman of the Senate Judiciary Committee dated May 22, 2013, as retrieved on August 9, 2013 from http://www.justice.gov/slideshow/AG-letter-5-22-13.pdf.

5. Attached to this declaration as Exhibit D is a true and correct copy of a document titled "Remarks by the President at the National Defense University" dated May 23, 2013, as retrieved on August 9, 2013 from http://www.whitehouse.gov/the-press-office/2013/05/23/remarks-president-national-defense-university.

This Declaration was executed on August 9, 2013 in Washington, D.C..

I declare under penalty of perjury that the foregoing is true and correct.

AMY E. POWELL

# Powell Declaration
# Exhibit A

JUSTICE NEWS

## Attorney General Eric Holder Speaks at Northwestern University School of Law

Chicago ~ Monday, March 5, 2012

*As prepared for delivery*

Thank you, Dean [Daniel] Rodriguez, for your kind words, and for the outstanding leadership that you provide – not only for this academic campus, but also for our nation's legal community. It is a privilege to be with you today – and to be among the distinguished faculty members, staff, alumni, and students who make Northwestern such an extraordinary place.

For more than 150 years, this law school has served as a training ground for future leaders; as a forum for critical, thoughtful debate; and as a meeting place to consider issues of national concern and global consequence. This afternoon, I am honored to be part of this tradition. And I'm grateful for the opportunity to join with you in discussing a defining issue of our time – and a most critical responsibility that we share: how we will stay true to America's founding – and enduring – promises of security, justice and liberty.

Since this country's earliest days, the American people have risen to this challenge – and all that it demands. But, as we have seen – and as President John F. Kennedy may have described best – "In the long history of the world, only a few generations have been granted the role of defending freedom in its hour of maximum danger."

Half a century has passed since those words were spoken, but our nation today confronts grave national security threats that demand our constant attention and steadfast commitment. It is clear that, once again, we have reached an "hour of danger."

We are a nation at war. And, in this war, we face a nimble and determined enemy that cannot be underestimated.

Like President Obama – and my fellow members of his national security team – I begin each day with a briefing on the latest and most urgent threats made against us in the preceding 24 hours. And, like scores of attorneys and agents at the Justice Department, I go to sleep each night thinking of how best to keep our people safe.

I know that – more than a decade after the September 11 th attacks; and despite our recent national security successes, including the operation that brought to justice Osama bin Laden last year – there are people currently plotting to murder Americans, who reside in distant countries as well as within our own borders. Disrupting and preventing these plots – and using every available and appropriate tool to keep the American people safe – has been, and will remain, this Administration's top priority.

But just as surely as we are a nation at war, we also are a nation of laws and values. Even when under attack, our actions must always be grounded on the bedrock of the Constitution – and must always be consistent with statutes, court precedent, the rule of law and our founding ideals. Not only is this the right thing to do – history has shown that it is also the most effective approach we can take in combating those who seek to do us harm.

This is not just my view. My judgment is shared by senior national security officials across the government. As the President reminded us in 2009, at the National Archives where our founding documents are housed, "[w]e uphold our most cherished values not only because doing so is right, but because it strengthens our country and it

keeps us safe. Time and again, our values have been our best national security asset." Our history proves this. We do not have to choose between security and liberty – and we will not.

Today, I want to tell you about the collaboration across the government that defines and distinguishes this Administration's national security efforts. I also want to discuss some of the legal principles that guide – and strengthen – this work, as well as the special role of the Department of Justice in protecting the American people and upholding the Constitution.

Before 9/11, today's level of interagency cooperation was not commonplace. In many ways, government lacked the infrastructure – as well as the imperative – to share national security information quickly and effectively. Domestic law enforcement and foreign intelligence operated in largely independent spheres. But those who attacked us on September 11 $^{th}$chose both military and civilian targets. They crossed borders and jurisdictional lines. And it immediately became clear that no single agency could address these threats, because no single agency has all of the necessary tools.

To counter this enemy aggressively and intelligently, the government had to draw on all of its resources – and radically update its operations. As a result, today, government agencies are better postured to work together to address a range of emerging national security threats. Now, the lawyers, agents and analysts at the Department of Justice work closely with our colleagues across the national security community to detect and disrupt terrorist plots, to prosecute suspected terrorists, and to identify and implement the legal tools necessary to keep the American people safe. Unfortunately, the fact and extent of this cooperation are often overlooked in the public debate – but it's something that this Administration, and the previous one, can be proud of.

As part of this coordinated effort, the Justice Department plays a key role in conducting oversight to ensure that the intelligence community's activities remain in compliance with the law, and, together with the Foreign Intelligence Surveillance Court, in authorizing surveillance to investigate suspected terrorists. We must – and will continue to – use the intelligence-gathering capabilities that Congress has provided to collect information that can save and protect American lives. At the same time, these tools must be subject to appropriate checks and balances – including oversight by Congress and the courts, as well as within the Executive Branch – to protect the privacy and civil rights of innocent individuals. This Administration is committed to making sure that our surveillance programs appropriately reflect all of these interests.

Let me give you an example. Under section 702 of the Foreign Intelligence Surveillance Act, the Attorney General and the Director of National Intelligence may authorize annually, with the approval of the Foreign Intelligence Surveillance Court, collection directed at identified categories of foreign intelligence targets, without the need for a court order for each individual subject. This ensures that the government has the flexibility and agility it needs to identify and to respond to terrorist and other foreign threats to our security. But the government may not use this authority intentionally to target a U.S. person, here or abroad, or anyone known to be in the United States.

The law requires special procedures, reviewed and approved by the Foreign Intelligence Surveillance Court, to make sure that these restrictions are followed, and to protect the privacy of any U.S. persons whose nonpublic information may be incidentally acquired through this program. The Department of Justice and the Office of the Director of National Intelligence conduct extensive oversight reviews of section 702 activities at least once every sixty days, and we report to Congress on implementation and compliance twice a year. This law therefore establishes a comprehensive regime of oversight by all three branches of government. Reauthorizing this authority before it expires at the end of this year is the top legislative priority of the Intelligence Community.

But surveillance is only the first of many complex issues we must navigate. Once a suspected terrorist is captured, a decision must be made as to how to proceed with that individual in order to identify the disposition

that best serves the interests of the American people and the security of this nation.

Much has been made of the distinction between our federal civilian courts and revised military commissions. The reality is that both incorporate fundamental due process and other protections that are essential to the effective administration of justice – and we should not deprive ourselves of any tool in our fight against al Qaeda.

Our criminal justice system is renowned not only for its fair process; it is respected for its results. We are not the first Administration to rely on federal courts to prosecute terrorists, nor will we be the last. Although far too many choose to ignore this fact, the previous Administration consistently relied on criminal prosecutions in federal court to bring terrorists to justice. John Walker Lindh, attempted shoe bomber Richard Reid, and 9/11 conspirator Zacarias Moussaoui were among the hundreds of defendants convicted of terrorism-related offenses – without political controversy – during the last administration.

Over the past three years, we've built a remarkable record of success in terror prosecutions. For example, in October, we secured a conviction against Umar Farouk Abdulmutallab for his role in the attempted bombing of an airplane traveling from Amsterdam to Detroit on Christmas Day 2009. He was sentenced last month to life in prison without the possibility of parole. While in custody, he provided significant intelligence during debriefing sessions with the FBI. He described in detail how he became inspired to carry out an act of jihad, and how he traveled to Yemen and made contact with Anwar al-Aulaqi, a U.S. citizen and a leader of al Qaeda in the Arabian Peninsula. Abdulmutallab also detailed the training he received, as well as Aulaqi's specific instructions to wait until the airplane was over the United States before detonating his bomb.

In addition to Abdulmutallab, Faizal Shahzad, the attempted Times Square bomber, Ahmed Ghailani, a conspirator in the 1998 U.S. embassy bombings in Kenya and Tanzania, and three individuals who plotted an attack against John F. Kennedy Airport in 2007, have also recently begun serving life sentences. And convictions have been obtained in the cases of several homegrown extremists, as well. For example, last year, United States citizen and North Carolina resident Daniel Boyd pleaded guilty to conspiracy to provide material support to terrorists and conspiracy to murder, kidnap, maim, and injure persons abroad; and U.S. citizen and Illinois resident Michael Finton pleaded guilty to attempted use of a weapon of mass destruction in connection with his efforts to detonate a truck bomb outside of a federal courthouse.

I could go on. Which is why the calls that I've heard to ban the use of civilian courts in prosecutions of terrorism-related activity are so baffling, and ultimately are so dangerous. These calls ignore reality. And if heeded, they would significantly weaken – in fact, they would cripple – our ability to incapacitate and punish those who attempt to do us harm.

Simply put, since 9/11, hundreds of individuals have been convicted of terrorism or terrorism-related offenses in Article III courts and are now serving long sentences in federal prison. Not one has ever escaped custody. No judicial district has suffered any kind of retaliatory attack. These are facts, not opinions. There are not two sides to this story. Those who claim that our federal courts are incapable of handling terrorism cases are not registering a dissenting opinion — they are simply wrong.

But federal courts are not our only option. Military commissions are also appropriate in proper circumstances, and we can use them as well to convict terrorists and disrupt their plots. This Administration's approach has been to ensure that the military commissions system is as effective as possible, in part by strengthening the procedural protections on which the commissions are based. With the President's leadership, and the bipartisan backing of Congress, the Military Commissions Act of 2009 was enacted into law. And, since then, meaningful improvements have been implemented.

It's important to note that the reformed commissions draw from the same fundamental protections of a fair trial that underlie our civilian courts. They provide a presumption of innocence and require proof of guilt beyond a reasonable doubt. They afford the accused the right to counsel – as well as the right to present evidence and cross-examine witnesses. They prohibit the use of statements obtained through torture or cruel, inhuman, or degrading treatment. And they secure the right to appeal to Article III judges – all the way to the United States Supreme Court. In addition, like our federal civilian courts, reformed commissions allow for the protection of sensitive sources and methods of intelligence gathering, and for the safety and security of participants.

A key difference is that, in military commissions, evidentiary rules reflect the realities of the battlefield and of conducting investigations in a war zone. For example, statements may be admissible even in the absence of Miranda warnings, because we cannot expect military personnel to administer warnings to an enemy captured in battle. But instead, a military judge must make other findings – for instance, that the statement is reliable and that it was made voluntarily.

I have faith in the framework and promise of our military commissions, which is why I've sent several cases to the reformed commissions for prosecution. There is, quite simply, no inherent contradiction between using military commissions in appropriate cases while still prosecuting other terrorists in civilian courts. Without question, there are differences between these systems that must be – and will continue to be – weighed carefully. Such decisions about how to prosecute suspected terrorists are core Executive Branch functions. In each case, prosecutors and counterterrorism professionals across the government conduct an intensive review of case-specific facts designed to determine which avenue of prosecution to pursue.

Several practical considerations affect the choice of forum.

First of all, the commissions only have jurisdiction to prosecute individuals who are a part of al Qaeda, have engaged in hostilities against the United States or its coalition partners, or who have purposefully and materially supported such hostilities. This means that there may be members of certain terrorist groups who fall outside the jurisdiction of military commissions because, for example, they lack ties to al Qaeda and their conduct does not otherwise make them subject to prosecution in this forum. Additionally, by statute, military commissions cannot be used to try U.S. citizens.

Second, our civilian courts cover a much broader set of offenses than the military commissions, which can only prosecute specified offenses, including violations of the laws of war and other offenses traditionally triable by military commission. This means federal prosecutors have a wider range of tools that can be used to incapacitate suspected terrorists. Those charges, and the sentences they carry upon successful conviction, can provide important incentives to reach plea agreements and convince defendants to cooperate with federal authorities.

Third, there is the issue of international cooperation. A number of countries have indicated that they will not cooperate with the United States in certain counterterrorism efforts — for instance, in providing evidence or extraditing suspects – if we intend to use that cooperation in pursuit of a military commission prosecution. Although the use of military commissions in the United States can be traced back to the early days of our nation, in their present form they are less familiar to the international community than our time-tested criminal justice system and Article III courts. However, it is my hope that, with time and experience, the reformed commissions will attain similar respect in the eyes of the world.

Where cases are selected for prosecution in military commissions, Justice Department investigators and prosecutors work closely to support our Department of Defense colleagues. Today, the alleged mastermind of the bombing of the U.S.S. Cole is being prosecuted before a military commission. I am proud to say that trial attorneys from the Department of Justice are working with military prosecutors on that case, as well as others.

And we will continue to reject the false idea that we must choose between federal courts and military commissions, instead of using them both. If we were to fail to use all necessary and available tools at our disposal, we would undoubtedly fail in our fundamental duty to protect the Nation and its people. That is simply not an outcome we can accept.

This Administration has worked in other areas as well to ensure that counterterrorism professionals have the flexibility that they need to fulfill their critical responsibilities without diverging from our laws and our values. Last week brought the most recent step, when the President issued procedures under the National Defense Authorization Act. This legislation, which Congress passed in December, mandated that a narrow category of al Qaeda terrorist suspects be placed in temporary military custody.

Last Tuesday, the President exercised his authority under the statute to issue procedures to make sure that military custody will not disrupt ongoing law enforcement and intelligence operations — and that an individual will be transferred from civilian to military custody only after a thorough evaluation of his or her case, based on the considered judgment of the President's senior national security team. As authorized by the statute, the President waived the requirements for several categories of individuals where he found that the waivers were in our national security interest. These procedures implement not only the language of the statute but also the expressed intent of the lead sponsors of this legislation. And they address the concerns the President expressed when he signed this bill into law at the end of last year.

Now, I realize I have gone into considerable detail about tools we use to identify suspected terrorists and to bring captured terrorists to justice. It is preferable to capture suspected terrorists where feasible – among other reasons, so that we can gather valuable intelligence from them – but we must also recognize that there are instances where our government has the clear authority – and, I would argue, the responsibility – to defend the United States through the appropriate and lawful use of lethal force.

This principle has long been established under both U.S. and international law. In response to the attacks perpetrated – and the continuing threat posed – by al Qaeda, the Taliban, and associated forces, Congress has authorized the President to use all necessary and appropriate force against those groups. Because the United States is in an armed conflict, we are authorized to take action against enemy belligerents under international law. The Constitution empowers the President to protect the nation from any imminent threat of violent attack. And international law recognizes the inherent right of national self-defense. None of this is changed by the fact that we are not in a conventional war.

Our legal authority is not limited to the battlefields in Afghanistan. Indeed, neither Congress nor our federal courts has limited the geographic scope of our ability to use force to the current conflict in Afghanistan. We are at war with a stateless enemy, prone to shifting operations from country to country. Over the last three years alone, al Qaeda and its associates have directed several attacks – fortunately, unsuccessful – against us from countries other than Afghanistan. Our government has both a responsibility and a right to protect this nation and its people from such threats.

This does not mean that we can use military force whenever or wherever we want. International legal principles, including respect for another nation's sovereignty, constrain our ability to act unilaterally. But the use of force in foreign territory would be consistent with these international legal principles if conducted, for example, with the consent of the nation involved – or after a determination that the nation is unable or unwilling to deal effectively with a threat to the United States.

Furthermore, it is entirely lawful – under both United States law and applicable law of war principles – to target

specific senior operational leaders of al Qaeda and associated forces. This is not a novel concept. In fact, during World War II, the United States tracked the plane flying Admiral Isoroku Yamamoto – the commander of Japanese forces in the attack on Pearl Harbor and the Battle of Midway – and shot it down specifically because he was on board. As I explained to the Senate Judiciary Committee following the operation that killed Osama bin Laden, the same rules apply today.

Some have called such operations "assassinations." They are not, and the use of that loaded term is misplaced. Assassinations are unlawful killings. Here, for the reasons I have given, the U.S. government's use of lethal force in self defense against a leader of al Qaeda or an associated force who presents an imminent threat of violent attack would not be unlawful — and therefore would not violate the Executive Order banning assassination or criminal statutes.

Now, it is an unfortunate but undeniable fact that some of the threats we face come from a small number of United States citizens who have decided to commit violent attacks against their own country from abroad. Based on generations-old legal principles and Supreme Court decisions handed down during World War II, as well as during this current conflict, it's clear that United States citizenship alone does not make such individuals immune from being targeted. But it does mean that the government must take into account all relevant constitutional considerations with respect to United States citizens – even those who are leading efforts to kill innocent Americans. Of these, the most relevant is the Fifth Amendment's Due Process Clause, which says that the government may not deprive a citizen of his or her life without due process of law.

The Supreme Court has made clear that the Due Process Clause does not impose one-size-fits-all requirements, but instead mandates procedural safeguards that depend on specific circumstances. In cases arising under the Due Process Clause – including in a case involving a U.S. citizen captured in the conflict against al Qaeda – the Court has applied a balancing approach, weighing the private interest that will be affected against the interest the government is trying to protect, and the burdens the government would face in providing additional process. Where national security operations are at stake, due process takes into account the realities of combat.

Here, the interests on both sides of the scale are extraordinarily weighty. An individual's interest in making sure that the government does not target him erroneously could not be more significant. Yet it is imperative for the government to counter threats posed by senior operational leaders of al Qaeda, and to protect the innocent people whose lives could be lost in their attacks.

Any decision to use lethal force against a United States citizen – even one intent on murdering Americans and who has become an operational leader of al-Qaeda in a foreign land – is among the gravest that government leaders can face. The American people can be – and deserve to be – assured that actions taken in their defense are consistent with their values and their laws. So, although I cannot discuss or confirm any particular program or operation, I believe it is important to explain these legal principles publicly.

Let me be clear: an operation using lethal force in a foreign country, targeted against a U.S. citizen who is a senior operational leader of al Qaeda or associated forces, and who is actively engaged in planning to kill Americans, would be lawful at least in the following circumstances: First, the U.S. government has determined, after a thorough and careful review, that the individual poses an imminent threat of violent attack against the United States; second, capture is not feasible; and third, the operation would be conducted in a manner consistent with applicable law of war principles.

The evaluation of whether an individual presents an "imminent threat" incorporates considerations of the relevant window of opportunity to act, the possible harm that missing the window would cause to civilians, and the likelihood of heading off future disastrous attacks against the United States. As we learned on 9/11, al Qaeda

has demonstrated the ability to strike with little or no notice – and to cause devastating casualties. Its leaders are continually planning attacks against the United States, and they do not behave like a traditional military – wearing uniforms, carrying arms openly, or massing forces in preparation for an attack. Given these facts, the Constitution does not require the President to delay action until some theoretical end-stage of planning – when the precise time, place, and manner of an attack become clear. Such a requirement would create an unacceptably high risk that our efforts would fail, and that Americans would be killed.

Whether the capture of a U.S. citizen terrorist is feasible is a fact-specific, and potentially time-sensitive, question. It may depend on, among other things, whether capture can be accomplished in the window of time available to prevent an attack and without undue risk to civilians or to U.S. personnel. Given the nature of how terrorists act and where they tend to hide, it may not always be feasible to capture a United States citizen terrorist who presents an imminent threat of violent attack. In that case, our government has the clear authority to defend the United States with lethal force.

Of course, any such use of lethal force by the United States will comply with the four fundamental law of war principles governing the use of force. The principle of necessity requires that the target have definite military value. The principle of distinction requires that only lawful targets – such as combatants, civilians directly participating in hostilities, and military objectives – may be targeted intentionally. Under the principle of proportionality, the anticipated collateral damage must not be excessive in relation to the anticipated military advantage. Finally, the principle of humanity requires us to use weapons that will not inflict unnecessary suffering.

These principles do not forbid the use of stealth or technologically advanced weapons. In fact, the use of advanced weapons may help to ensure that the best intelligence is available for planning and carrying out operations, and that the risk of civilian casualties can be minimized or avoided altogether.

Some have argued that the President is required to get permission from a federal court before taking action against a United States citizen who is a senior operational leader of al Qaeda or associated forces. This is simply not accurate. "Due process" and "judicial process" are not one and the same, particularly when it comes to national security. The Constitution guarantees due process, not judicial process.

The conduct and management of national security operations are core functions of the Executive Branch, as courts have recognized throughout our history. Military and civilian officials must often make real-time decisions that balance the need to act, the existence of alternative options, the possibility of collateral damage, and other judgments – all of which depend on expertise and immediate access to information that only the Executive Branch may possess in real time. The Constitution's guarantee of due process is ironclad, and it is essential – but, as a recent court decision makes clear, it does not require judicial approval before the President may use force abroad against a senior operational leader of a foreign terrorist organization with which the United States is at war – even if that individual happens to be a U.S. citizen.

That is not to say that the Executive Branch has – or should ever have – the ability to target any such individuals without robust oversight. Which is why, in keeping with the law and our constitutional system of checks and balances, the Executive Branch regularly informs the appropriate members of Congress about our counterterrorism activities, including the legal framework, and would of course follow the same practice where lethal force is used against United States citizens.

Now, these circumstances are sufficient under the Constitution for the United States to use lethal force against a U.S. citizen abroad – but it is important to note that the legal requirements I have described may not apply in every situation – such as operations that take place on traditional battlefields.

The unfortunate reality is that our nation will likely continue to face terrorist threats that – at times – originate with our own citizens. When such individuals take up arms against this country – and join al Qaeda in plotting attacks designed to kill their fellow Americans – there may be only one realistic and appropriate response. We must take steps to stop them – in full accordance with the Constitution. In this hour of danger, we simply cannot afford to wait until deadly plans are carried out – and we will not.

This is an indicator of our times – not a departure from our laws and our values. For this Administration – and for this nation – our values are clear. We must always look to them for answers when we face difficult questions, like the ones I have discussed today. As the President reminded us at the National Archives, "our Constitution has endured through secession and civil rights, through World War and Cold War, because it provides a foundation of principles that can be applied pragmatically; it provides a compass that can help us find our way."

Our most sacred principles and values – of security, justice and liberty for all citizens – must continue to unite us, to guide us forward, and to help us build a future that honors our founding documents and advances our ongoing – uniquely American – pursuit of a safer, more just, and more perfect union. In the continuing effort to keep our people secure, this Administration will remain true to those values that inspired our nation's founding and, over the course of two centuries, have made America an example of strength and a beacon of justice for all the world. This is our pledge.

Thank you for inviting me to discuss these important issues with you today.

# Powell Declaration
# Exhibit B

http://www.wilsoncenter.org/event/the-efficacy-and-ethics-us-counterterrorism-strategy/#

Transcript of Remarks by John O. Brennan

Assistant to the President for Homeland Security and Counterterrorism

"The Ethics and Efficacy of the President's Counterterrorism Strategy"

Jane Harman:
Good afternoon, everyone. Welcome to the Wilson Center, and a special welcome to our chairman of the board Joe Gildenhorn and his wife Alma, who are very active on the Wilson -- who is very active on the Wilson council. This afternoon's conversation is, as I see it, a great tribute to the kind of work we do here. We care intensely about having our most important policymakers here, and in getting objective accounts of what the United States government and other governments around the world are doing. On September 10th, 2001, I had lunch with L. Paul Bremer. Jerry Bremer, as he is known, had chaired the congressionally chartered Commission on Terrorism on which I served.

It was one of three task forces to predict a major terror attack on U.S. soil. At that lunch, we lamented that no one was taking our report seriously. The next day, the world changed. In my capacity as a senior Democrat on the House intelligence committee, I was headed to the U.S. Capitol at 9:00 a.m. on 9/11 when an urgent call from my staff turned me around. To remind, most think that the Capitol, in which the intelligence committee offices were then located was the intended target of the fourth hijacked plane. Congress shut down. A terrible move, I thought, and 250 or so members mingled on the Capitol lawn, obvious targets if that plane had arrived. I frantically tried to reach my youngest child, then at a D.C. high school, but the cell towers were down.

I don't know where John Brennan was that day, but I do know that the arch of our lives came together after that when he served as deputy executive director of the CIA, when I became the ranking member on the House intelligence committee, when he became the first director of the Terrorist Threat Integration Center, an organization that was set up by then-President Bush 43, when I was the principle author of legislation which became the Intelligence Reform and Terrorism Prevention Act, a statute which we organized our intelligence community for the first time since 1947, and renamed TTIC, the organization that John had headed, the National Counter Terrorism Center, when he served as the first director of the NCTC, when I chaired the intelligence subcommittee of the homeland security committee, when he moved into the White House as deputy national security advisor for homeland security and counterterrorism, and assistant to the president, and when I succeeded Lee Hamilton here at the Wilson Center last year.

Finally, when he became President Obama's point person on counterterrorism strategy, and when the Wilson Center commenced a series of programs which as still ongoing, the first of which we held on 9/12/2011 to ask what the next 10 years should look like, and whether this country needs a clearer legal framework around domestic intelligence.

Clearly, the success story of the past decade is last May's takedown of Osama bin Laden. At the center of that effort were the senior security leadership of our country. I noticed Denis McDonough in the audience, right here in the front row, and certainly it included President Obama and John Brennan. They made the tough calls.

But I also know, and we all know, how selfless and extraordinary were the actions of unnamed intelligence officials and Navy SEALs. The operation depended on their remarkable skills and personal courage. They performed the mission. The Wilson Center is honored to welcome John Brennan here today on the eve of this first anniversary of the bin Laden raid. President Obama will headline events tomorrow, but today we get an advance peek from the insider's insider, one of President Obama's most influential aides with a broad portfolio to manage counterterrorism strategy in far-flung places like Pakistan, Yemen, and Somalia. Activities in this space, as I mentioned, at the Wilson Center are ongoing, as are terror threats against our country.

I often say we won't defeat those threats by military might alone, we must win the argument. No doubt our speaker today agrees that security and liberty are not a zero sum game. We either get more of both, or less. As Ben Franklin said, "Those who would give up essential liberty to purchase a little temporary safety deserve neither liberty nor safety." So, as we welcome John Brennan, I also want to congratulate him and President Obama for nominating the full complement of members to the Privacy and Civil Liberties Board, another part of the 2004 intelligence reform law, and a key part of assuring that America's counterterrorism efforts also protect our constitution and our values. At the end of today's event, we would appreciate it if everyone would please remain seated, while Mr. Brennan departs the building. Thank you for coming, please welcome John Brennan.

[applause]

John Brennan:
Thank you so much Jane for the very kind introduction, and that very nice and memorable walk down memory lane as our paths did cross so many times over the years, but thank you also for your leadership of the Wilson Center. It is a privilege for me to be here today, and to speak at this group. And you have spent many years in public service, and it continues here at the Wilson Center today, and there are few individuals in this country who can match the range of Jane's expertise from the armed services to intelligence to homeland security, and anyone who has appeared before her committee knew firsthand just how extensive and deep that expertise was. So Jane, I'll just say that I'm finally glad to be sharing the stage with you instead of testifying before you. It's a privilege to be next to you. So to you and everyone here at the Woodrow Wilson Center, thank you for your invaluable contributions, your research, your scholarship, which help further our national security every day.
I very much appreciate the opportunity to discuss President Obama's counterterrorism strategy, in particular its ethics and its efficacy.

It is fitting that we have this discussion here today at the Woodrow Wilson Center. It was here in August of 2007 that then-Senator Obama described how he would bring the war in Iraq to a

responsible end and refocus our efforts on "the war that has to be won," the war against al-Qaeda, particularly in the tribal regions of Afghanistan and Pakistan.

He said that we would carry on this fight while upholding the laws and our values, and that we would work with allies and partners whenever possible. But he also made it clear that he would not hesitate to use military force against terrorists who pose a direct threat to America. And he said that if he had actionable intelligence about high-value terrorist targets, including in Pakistan, he would act to protect the American people.

So it is especially fitting that we have this discussion here today. One year ago today, President Obama was then facing the scenario that he discussed here at the Woodrow Wilson Center five years ago, and he did not hesitate to act. Soon thereafter, our special operations forces were moving toward the compound in Pakistan where we believed Osama bin Laden might be hiding. By the end of the next day, President Obama could confirm that justice had finally been delivered to the terrorist responsible for the attacks of September 11th, 2001, and for so many other deaths around the world.

The death of bin Laden was our most strategic blow yet against al-Qaeda. Credit for that success belongs to the courageous forces who carried out that mission, at extraordinary risk to their lives; to the many intelligence professionals who pieced together the clues that led to bin Laden's hideout; and to President Obama, who gave the order to go in.

Now one year later, it's appropriate to assess where we stand in this fight. We've always been clear that the end of bin Laden would neither mark the end of al-Qaida, nor our resolve to destroy it. So along with allies and partners, we have been unrelenting. And when we assess that al-Qaida of 2012, I think it is fair to say that, as a result of our efforts, the United States is more secure and the American people are safer. Here's why.

In Pakistan, al-Qaida's leadership ranks have continued to suffer heavy losses. This includes Ilyas Kashmiri, one of al-Qaida's top operational planners, killed a month after bin Laden. It includes Atiyah Abd al-Rahman, killed when he succeeded Ayman al-Zawahiri, al-Qaida's deputy leader. It includes Younis al-Mauritani, a planner of attacks against the United States and Europe, until he was captured by Pakistani forces.

With its most skilled and experienced commanders being lost so quickly, al-Qaida has had trouble replacing them. This is one of the many conclusions we have been able to draw from documents seized at bin Laden's compound, some of which will be published online, for the first time, this week by West Point's Combating Terrorism Center. For example, bin Laden worried about, and I quote, "The rise of lower leaders who are not as experienced and this would lead to the repeat of mistakes."

Al-Qaida leaders continue to struggle to communicate with subordinates and affiliates. Under intense pressure in the tribal regions of Pakistan, they have fewer places to train and groom the next generation of operatives. They're struggling to attract new recruits. Morale is low, with intelligence indicating that some members are giving up and returning home, no doubt aware that this is a fight they will never win. In short, al-Qaida is losing badly. And bin Laden knew it at the time of his death. In documents we seized, he confessed to "disaster after disaster." He even

urged his leaders to flee the tribal regions, and go to places, "away from aircraft photography and bombardment."

For all these reasons, it is harder than ever for al-Qaida core in Pakistan to plan and execute large-scale, potentially catastrophic attacks against our homeland. Today, it is increasingly clear that compared to 9/11, the core al-Qaida leadership is a shadow of its former self. Al-Qaida has been left with just a handful of capable leaders and operatives, and with continued pressure is on the path to its destruction. And for the first time since this fight began, we can look ahead and envision a world in which the al-Qaida core is simply no longer relevant.

Nevertheless, the dangerous threat from al-Qaida has not disappeared. As the al-Qaida core falters, it continues to look to affiliates and adherents to carry on its murderous cause. Yet these affiliates continue to lose key commanders and capabilities as well. In Somalia, it is indeed worrying to witness al-Qaida's merger with al-Shabaab, whose ranks include foreign fighters, some with U.S. passports. At the same time, al-Shabaab continues to focus primarily on launching regional attacks, and ultimately, this is a merger between two organizations in decline.

In Yemen, al-Qaida in the Arabian Peninsula, or AQAP, continues to feel the effects of the death last year of Anwar al-Awlaki, its leader of external operations who was responsible for planning and directing terrorist attacks against the United States. Nevertheless, AQAP continues to be al-Qaida's most active affiliate, and it continues to seek the opportunity to strike our homeland. We therefore continue to support the government of Yemen in its efforts against AQAP, which is being forced to fight for the territory it needs to plan attacks beyond Yemen. In north and west Africa, another al-Qaida affiliate, al-Qaida in the Islamic Maghreb, or AQIM, continues its efforts to destabilize regional governments and engages in kidnapping of Western citizens for ransom activities designed to fund its terrorist agenda. And in Nigeria, we are monitoring closely the emergence of Boko Haram, a group that appears to be aligning itself with al-Qaida's violent agenda and is increasingly looking to attack Western interests in Nigeria, in addition to Nigerian government targets.

More broadly, al-Qaida's killing of innocents, mostly Muslim men, women and children, has badly tarnished its image and appeal in the eyes of Muslims around the world.

John Brennan:

Thank you. More broadly, al-Qaida's killing of innocents, mostly men women and children, has badly tarnished its appeal and image in the eyes of Muslims around the world. Even bin Laden and his lieutenants knew this. His propagandist, Adam Gadahn, admitted that they were now seen "as a group that does not hesitate to take people's money by falsehood, detonating mosques, and spilling the blood of scores of people." Bin Laden agreed that "a large portion" of Muslims around the world "have lost their trust" in al-Qaida.

So damaged is al-Qaida's image that bin Laden even considered changing its name. And one of the reasons? As bin Laden said himself, U.S. officials "have largely stopped using the phrase 'the war on terror' in the context of not wanting to provoke Muslims." Simply calling them al-Qaida, bin Laden said, "reduces the feeling of Muslims that we belong to them."

To which I would add, that is because al-Qaida does not belong to Muslims. Al-Qaida is the antithesis of the peace, tolerance, and humanity that is the hallmark of Islam.

Despite the great progress we've made against al-Qaida, it would be a mistake to believe this threat has passed. Al-Qaida and its associated forces still have the intent to attack the United States. And we have seen lone individuals, including American citizens, often inspired by al-Qaida's murderous ideology, kill innocent Americans and seek to do us harm.

Still, the damage that has been inflicted on the leadership core in Pakistan, combined with how al-Qaida has alienated itself from so much of the world, allows us to look forward. Indeed, if the decade before 9/11 was the time of al-Qaida's rise, and the decade after 9/11 was the time of its decline, then I believe this decade will be the one that sees its demise. This progress is no accident.

It is a direct result of intense efforts made over more than a decade, across two administrations, across the U.S. government and in concert with allies and partners. This includes the comprehensive counterterrorism strategy being directed by President Obama, a strategy guided by the President's highest responsibility, to protect the safety and the security of the American people. In this fight, we are harnessing every element of American power: intelligence, military, diplomatic, development, economic, financial, law enforcement, homeland security, and the power of our values, including our commitment to the rule of law. That's why, for instance, in his first days in office, President Obama banned the use of enhanced interrogation techniques, which are not needed to keep our country safe. Staying true to our values as a nation also includes upholding the transparency upon which our democracy depends.

A few months after taking office, the president travelled to the National Archives where he discussed how national security requires a delicate balance between secrecy and transparency. He pledged to share as much information as possible with the American people "so that they can make informed judgments and hold us accountable." He has consistently encouraged those of us on his national security team to be as open and candid as possible as well.

Earlier this year, Attorney General Holder discussed how our counterterrorism efforts are rooted in, and are strengthened by, adherence to the law, including the legal authorities that allow us to pursue members of al-Qaida, including U.S. citizens, and to do so using technologically advanced weapons.

In addition, Jeh Johnson, the general counsel at the Department of Defense, has addressed the legal basis for our military efforts against al-Qaida. Stephen Preston, the general counsel at the CIA, has discussed how the agency operates under U.S. law.

These speeches build on a lecture two years ago by Harold Koh, the State Department legal adviser, who noted that "U.S. targeting practices, including lethal operations conducted with the use of unmanned aerial vehicles, comply with all applicable law, including the laws of war."

Given these efforts, I venture to say that the United States government has never been so open regarding its counterterrorism policies and their legal justification. Still, there continues to be

considerable public and legal debate surrounding these technologies and how they are sometimes used in the fight against al-Qaida.

Now, I want to be very clear. In the course of the war in Afghanistan and the fight against al-Qaida, I think the American people expect us to use advanced technologies, for example, to prevent attacks on U.S. forces and to remove terrorists from the battlefield. We do, and it has saved the lives of our men and women in uniform. What has clearly captured the attention of many, however, is a different practice, beyond hot battlefields like Afghanistan, identifying specific members of al-Qaida and then targeting them with lethal force, often using aircraft remotely operated by pilots who can be hundreds, if not thousands, of miles away. And this is what I want to focus on today.

Jack Goldsmith, a former assistant attorney general in the administration of George W. Bush and now a professor at Harvard Law School, captured the situation well. He wrote:

"The government needs a way to credibly convey to the public that its decisions about who is being targeted, especially when the target is a U.S. citizen, are sound. First, the government can and should tell us more about the process by which it reaches its high-value targeting decisions. The more the government tells us about the eyeballs on the issue and the robustness of the process, the more credible will be its claims about the accuracy of its factual determinations and the soundness of its legal ones. All of this information can be disclosed in some form without endangering critical intelligence."

Well, President Obama agrees. And that is why I am here today.

I stand here as someone who has been involved with our nation's security for more than 30 years. I have a profound appreciation for the truly remarkable capabilities of our counterterrorism professionals, and our relationships with other nations, and we must never compromise them. I will not discuss the sensitive details of any specific operation today. I will not, nor will I ever, publicly divulge sensitive intelligence sources and methods. For when that happens, our national security is endangered and lives can be lost. At the same time, we reject the notion that any discussion of these matters is to step onto a slippery slope that inevitably endangers our national security. Too often, that fear can become an excuse for saying nothing at all, which creates a void that is then filled with myths and falsehoods. That, in turn, can erode our credibility with the American people and with foreign partners, and it can undermine the public's understanding and support for our efforts. In contrast, President Obama believes that done carefully, deliberately and responsibly we can be more transparent and still ensure our nation's security.

So let me say it as simply as I can. Yes, in full accordance with the law, and in order to prevent terrorist attacks on the United States and to save American lives, the United States Government conducts targeted strikes against specific al-Qaida terrorists, sometimes using remotely piloted aircraft, often referred to publicly as drones. And I'm here today because President Obama has instructed us to be more open with the American people about these efforts.

Broadly speaking, the debate over strikes targeted at individual members of al-Qaida has centered on their legality, their ethics, the wisdom of using them, and the standards by which

they are approved. With the remainder of my time today, I would like to address each of these in turn.

First, these targeted strikes are legal. Attorney General Holder, Harold Koh, and Jeh Johnson have all addressed this question at length. To briefly recap, as a matter of domestic law, the Constitution empowers the president to protect the nation from any imminent threat of attack. The Authorization for Use of Military Force, the AUMF, passed by Congress after the September 11th attacks authorized the president "to use all necessary and appropriate forces" against those nations, organizations, and individuals responsible for 9/11. There is nothing in the AUMF that restricts the use of military force against al-Qaida to Afghanistan.

As a matter of international law, the United States is in an armed conflict with al-Qaida, the Taliban, and associated forces, in response to the 9/11 attacks, and we may also use force consistent with our inherent right of national self-defense. There is nothing in international law that bans the use of remotely piloted aircraft for this purpose or that prohibits us from using lethal force against our enemies outside of an active battlefield, at least when the country involved consents or is unable or unwilling to take action against the threat.

Second, targeted strikes are ethical. Without question, the ability to target a specific individual, from hundreds or thousands of miles away, raises profound questions. Here, I think it's useful to consider such strikes against the basic principles of the law of war that govern the use of force.

Targeted strikes conform to the principle of necessity, the requirement that the target have definite military value. In this armed conflict, individuals who are part of al-Qaida or its associated forces are legitimate military targets. We have the authority to target them with lethal force just as we target enemy leaders in past conflicts, such as Germans and Japanese commanders during World War II.

Targeted strikes conform to the principles of distinction, the idea that only military objectives may be intentionally targeted and that civilians are protected from being intentionally targeted. With the unprecedented ability of remotely piloted aircraft to precisely target a military objective while minimizing collateral damage, one could argue that never before has there been a weapon that allows us to distinguish more effectively between an al-Qaida terrorist and innocent civilians.

Targeted strikes conform to the principle of proportionality, the notion that the anticipated collateral damage of an action cannot be excessive in relation to the anticipated military advantage. By targeting an individual terrorist or small numbers of terrorists with ordnance that can be adapted to avoid harming others in the immediate vicinity, it is hard to imagine a tool that can better minimize the risk to civilians than remotely piloted aircraft.

For the same reason, targeted strikes conform to the principle of humanity which requires us to use weapons that will not inflict unnecessary suffering. For all these reasons, I suggest to you that these targeted strikes against al-Qaida terrorists are indeed ethical and just.

Of course, even if a tool is legal and ethical, that doesn't necessarily make it appropriate or advisable in a given circumstance. This brings me to my next point.

Targeted strikes are wise. Remotely piloted aircraft in particular can be a wise choice because of geography, with their ability to fly hundreds of miles over the most treacherous terrain, strike their targets with astonishing precision, and then return to base. They can be a wise choice because of time, when windows of opportunity can close quickly and there just may be only minutes to act.

They can be a wise choice because they dramatically reduce the danger to U.S. personnel, even eliminating the danger altogether. Yet they are also a wise choice because they dramatically reduce the danger to innocent civilians, especially considered against massive ordnance that can cause injury and death far beyond their intended target.

In addition, compared against other options, a pilot operating this aircraft remotely, with the benefit of technology and with the safety of distance, might actually have a clearer picture of the target and its surroundings, including the presence of innocent civilians. It's this surgical precision, the ability, with laser-like focus, to eliminate the cancerous tumor called an al-Qaida terrorist while limiting damage to the tissue around it, that makes this counterterrorism tool so essential.

There's another reason that targeted strikes can be a wise choice, the strategic consequences that inevitably come with the use of force. As we've seen, deploying large armies abroad won't always be our best offense.

Countries typically don't want foreign soldiers in their cities and towns. In fact, large, intrusive military deployments risk playing into al-Qaida's strategy of trying to draw us into long, costly wars that drain us financially, inflame anti-American resentment, and inspire the next generation of terrorists. In comparison, there is the precision of targeted strikes.

I acknowledge that we, as a government, along with our foreign partners, can and must do a better job of addressing the mistaken belief among some foreign publics that we engage in these strikes casually, as if we are simply unwilling to expose U.S forces to the dangers faced every day by people in those regions. For, as I'll describe today, there is absolutely nothing casual about the extraordinary care we take in making the decision to pursue an al-Qaida terrorist, and the lengths to which we go to ensure precision and avoid the loss of innocent life.

Still, there is no more consequential a decision than deciding whether to use lethal force against another human being, even a terrorist dedicated to killing American citizens. So in order to ensure that our counterterrorism operations involving the use of lethal force are legal, ethical, and wise, President Obama has demanded that we hold ourselves to the highest possible standards and processes.

This reflects his approach to broader questions regarding the use of force. In his speech in Oslo accepting the Nobel Peace Prize, the president said that "all nations, strong and weak alike, must adhere to standards that govern the use of force." And he added:

"Where force is necessary, we have a moral and strategic interest in binding ourselves to certain rules of conduct. And even as we confront a vicious adversary that abides by no rules, I believe

the United States of America must remain a standard bearer in the conduct of war. That is what makes us different from those whom we fight. That is a source of our strength."

The United States is the first nation to regularly conduct strikes using remotely piloted aircraft in an armed conflict. Other nations also possess this technology, and any more nations are seeking it, and more will succeed in acquiring it. President Obama and those of us on his national security team are very mindful that as our nation uses this technology, we are establishing precedents that other nations may follow, and not all of those nations may -- and not all of them will be nations that share our interests or the premium we put on protecting human life, including innocent civilians.

If we want other nations to use these technologies responsibly, we must use them responsibly. If we want other nations to adhere to high and rigorous standards for their use, then we must do so as well. We cannot expect of others what we will not do ourselves. President Obama has therefore demanded that we hold ourselves to the highest possible standards, that, at every step, we be as thorough and as deliberate as possible.

This leads me to the final point I want to discuss today, the rigorous standards and process of review to which we hold ourselves today when considering and authorizing strikes against a specific member of al-Qaida outside the hot battlefield of Afghanistan. What I hope to do is to give you a general sense, in broad terms, of the high bar we require ourselves to meet when making these profound decisions today. That includes not only whether a specific member of al-Qaida can legally be pursued with lethal force, but also whether he should be.

Over time, we've worked to refine, clarify, and strengthen this process and our standards, and we continue to do so. If our counterterrorism professionals assess, for example, that a suspected member of al-Qaida poses such a threat to the United States to warrant lethal action, they may raise that individual's name for consideration. The proposal will go through a careful review and, as appropriate, will be evaluated by the very most senior officials in our government for a decision.

First and foremost, the individual must be a legitimate target under the law. Earlier, I described how the use of force against members of al-Qaida is authorized under both international and U.S. law, including both the inherent right of national self-defense and the 2001 Authorization for Use of Military Force, which courts have held extends to those who are part of al-Qaida, the Taliban, and associated forces. If, after a legal review, we determine that the individual is not a lawful target, end of discussion. We are a nation of laws, and we will always act within the bounds of the law.

Of course, the law only establishes the outer limits of the authority in which counterterrorism professionals can operate. Even if we determine that it is lawful to pursue the terrorist in question with lethal force, it doesn't necessarily mean we should. There are, after all, literally thousands of individuals who are part of al-Qaida, the Taliban, or associated forces, thousands upon thousands. Even if it were possible, going after every single one of these individuals with lethal force would neither be wise nor an effective use of our intelligence and counterterrorism resources.

As a result, we have to be strategic. Even if it is lawful to pursue a specific member of al-Qaida, we ask ourselves whether that individual's activities rise to a certain threshold for action, and whether taking action will, in fact, enhance our security.

For example, when considering lethal force we ask ourselves whether the individual poses a significant threat to U.S. interests. This is absolutely critical, and it goes to the very essence of why we take this kind of exceptional action. We do not engage in legal action -- in lethal action in order to eliminate every single member of al-Qaida in the world. Most times, and as we have done for more than a decade, we rely on cooperation with other countries that are also interested in removing these terrorists with their own capabilities and within their own laws. Nor is lethal action about punishing terrorists for past crimes; we are not seeking vengeance. Rather, we conduct targeted strikes because they are necessary to mitigate an actual ongoing threat, to stop plots, prevent future attacks, and to save American lives.

And what do we mean when we say significant threat? I am not referring to some hypothetical threat, the mere possibility that a member of al-Qaida might try to attack us at some point in the future. A significant threat might be posed by an individual who is an operational leader of al-Qaida or one of its associated forces. Or perhaps the individual is himself an operative, in the midst of actually training for or planning to carry out attacks against U.S. persons and interests. Or perhaps the individual possesses unique operational skills that are being leveraged in a planned attack. The purpose of a strike against a particular individual is to stop him before he can carry out his attack and kill innocents. The purpose is to disrupt his plans and his plots before they come to fruition.

In addition, our unqualified preference is to only undertake lethal force when we believe that capturing the individual is not feasible. I have heard it suggested that the Obama Administration somehow prefers killing al-Qaida members rather than capturing them. Nothing could be further from the truth. It is our preference to capture suspected terrorists whenever and wherever feasible.

For one reason, this allows us to gather valuable intelligence that we might not be able to obtain any other way. In fact, the members of al-Qaida that we or other nations have captured have been one of our greatest sources of information about al-Qaida, its plans, and its intentions. And once in U.S. custody, we often can prosecute them in our federal courts or reformed military commissions, both of which are used for gathering intelligence and preventing future terrorist attacks.

You see our preference for capture in the case of Ahmed Warsame, a member of al-Shabaab who had significant ties to al-Qaida in the Arabian Peninsula. Last year, when we learned that he would be traveling from Yemen to Somalia, U.S. forces captured him in route and we subsequently charged him in federal court.

The reality, however, is that since 2001 such unilateral captures by U.S. forces outside of hot battlefields, like Afghanistan, have been exceedingly rare. This is due in part to the fact that in many parts of the world our counterterrorism partners have been able to capture or kill dangerous individuals themselves.

Moreover, after being subjected to more than a decade of relentless pressure, al-Qaida's ranks have dwindled and scattered. These terrorists are skilled at seeking remote, inhospitable terrain, places where the United States and our partners simply do not have the ability to arrest or capture them. At other times, our forces might have the ability to attempt capture, but only by putting the lives of our personnel at too great a risk. Oftentimes, attempting capture could subject civilians to unacceptable risks. There are many reasons why capture might not be feasible, in which case lethal force might be the only remaining option to address the threat, prevent an attack, and save lives.

Finally, when considering lethal force we are of course mindful that there are important checks on our ability to act unilaterally in foreign territories. We do not use force whenever we want, wherever we want. International legal principles, including respect for a state's sovereignty and the laws of war, impose constraints. The United States of America respects national sovereignty and international law.

Those are some of the questions we consider; the high standards we strive to meet. And in the end, we make a decision, we decide whether a particular member of al-Qaida warrants being pursued in this manner. Given the stakes involved and the consequences of our decision, we consider all the information available to us, carefully and responsibly.

We review the most up-to-date intelligence, drawing on the full range of our intelligence capabilities. And we do what sound intelligence demands, we challenge it, we question it, including any assumptions on which it might be based. If we want to know more, we may ask the intelligence community to go back and collect additional intelligence or refine its analysis so that a more informed decision can be made.

We listen to departments and agencies across our national security team. We don't just hear out differing views, we ask for them and encourage them. We discuss. We debate. We disagree. We consider the advantages and disadvantages of taking action. We also carefully consider the costs of inaction and whether a decision not to carry out a strike could allow a terrorist attack to proceed and potentially kill scores of innocents.

Nor do we limit ourselves narrowly to counterterrorism considerations. We consider the broader strategic implications of any action, including what effect, if any, an action might have on our relationships with other countries. And we don't simply make a decision and never revisit it again. Quite the opposite. Over time, we refresh the intelligence and continue to consider whether lethal force is still warranted.

In some cases, such as senior al-Qaida leaders who are directing and planning attacks against the United States, the individual clearly meets our standards for taking action. In other cases, individuals have not met our standards. Indeed, there have been numerous occasions where, after careful review, we have, working on a consensus basis, concluded that lethal force was not justified in a given case.

As President Obama's counterterrorism advisor, I feel that it is important for the American people to know that these efforts are overseen with extraordinary care and thoughtfulness. The president expects us to address all of the tough questions I have discussed today. Is capture

really not feasible? Is this individual a significant threat to U.S. interests? Is this really the best option? Have we thought through the consequences, especially any unintended ones? Is this really going to help protect our country from further attacks? Is this going to save lives?

Our commitment to upholding the ethics and efficacy of this counterterrorism tool continues even after we decide to pursue a specific terrorist in this way. For example, we only authorize a particular operation against a specific individual if we have a high degree of confidence that the individual being targeted is indeed the terrorist we are pursuing. This is a very high bar. Of course, how we identify an individual naturally involves intelligence sources and methods, which I will not discuss. Suffice it to say, our intelligence community has multiple ways to determine, with a high degree of confidence, that the individual being targeted is indeed the al-Qaida terrorist we are seeking.

In addition, we only authorize a strike if we have a high degree of confidence that innocent civilians will not be injured or killed, except in the rarest of circumstances. The unprecedented advances we have made in technology provide us greater proximity to target for a longer period of time, and as a result allow us to better understand what is happening in real time on the ground in ways that were previously impossible. We can be much more discriminating and we can make more informed judgments about factors that might contribute to collateral damage.

I can tell you today that there have indeed been occasions when we decided against conducting a strike in order to avoid the injury or death of innocent civilians. This reflects our commitment to doing everything in our power to avoid civilian casualties, even if it means having to come back another day to take out that terrorist, as we have done previously. And I would note that these standards, for identifying a target and avoiding the loss of innocent -- the loss of lives of innocent civilians, exceed what is required as a matter of international law on a typical battlefield. That's another example of the high standards to which we hold ourselves.

Our commitment to ensuring accuracy and effectiveness continues even after a strike. In the wake of a strike, we harness the full range of our intelligence capabilities to assess whether the mission in fact achieved its objective. We try to determine whether there was any collateral damage, including civilian deaths. There is, of course, no such thing as a perfect weapon, and remotely piloted aircraft are no exception.

As the president and others have acknowledged, there have indeed been instances when, despite the extraordinary precautions we take, civilians have been accidently killed or worse -- have been accidentally injured, or worse, killed in these strikes. It is exceedingly rare, but it has happened. When it does, it pains us, and we regret it deeply, as we do any time innocents are killed in war. And when it happens we take it very, very seriously. We go back and we review our actions. We examine our practices. And we constantly work to improve and refine our efforts so that we are doing everything in our power to prevent the loss of innocent life. This too is a reflection of our values as Americans.

Ensuring the ethics and efficacy of these strikes also includes regularly informing appropriate members of Congress and the committees who have oversight of our counterterrorism programs. Indeed, our counterterrorism programs, including the use of lethal force, have grown more

effective over time because of congressional oversight and our ongoing dialogue with members and staff.

This is the seriousness, the extraordinary care, that President Obama and those of us on his national security team bring to this weightiest of questions: Whether to pursue lethal force against a terrorist who is plotting to attack our country.

When that person is a U.S. citizen, we ask ourselves additional questions. Attorney General Holder has already described the legal authorities that clearly allow us to use lethal force against an American citizen who is a senior operational leader of al-Qaida. He has discussed the thorough and careful review, including all relevant constitutional considerations, that is to be undertaken by the U.S. government when determining whether the individual poses an imminent threat of violent attack against the United States.

To recap, the standards and processes I've described today, which we have refined and strengthened over time, reflect our commitment to: ensuring the individual is a legitimate target under the law; determining whether the individual poses a significant threat to U.S. interests; determining that capture is not feasible; being mindful of the important checks on our ability to act unilaterally in foreign territories; having that high degree of confidence, both in the identity of the target and that innocent civilians will not be harmed; and, of course, engaging in additional review if the al-Qaida terrorist is a U.S. citizen.

Going forward, we'll continue to strengthen and refine these standards and processes. As we do, we'll look to institutionalize our approach more formally so that the high standards we set for ourselves endure over time, including as an example for other nations that pursue these capabilities. As the president said in Oslo, in the conduct of war, America must be the standard bearer.

This includes our continuing commitment to greater transparency. With that in mind, I have made a sincere effort today to address some of the main questions that citizens and scholars have raised regarding the use of targeted lethal force against al-Qaida. I suspect there are those, perhaps some in this audience, who feel we have not been transparent enough. I suspect there are those, both inside and outside our government, who feel I have been perhaps too open. If both groups feel a little bit unsatisfied, then I probably struck the right balance today.

Again, there are some lines we simply will not and cannot cross because, at times, our national security demands secrecy. But we are a democracy. The people are sovereign. And our counterterrorism tools do not exist in a vacuum. They are stronger and more sustainable when the American people understand and support them. They are weaker and less sustainable when the American people do not. As a result of my remarks today, I hope the American people have a better understanding of this critical tool, why we use it, what we do, how carefully we use it, and why it is absolutely essential to protecting our country and our citizens.

I would just like to close on a personal note. I know that for many people in our government and across the country the issue of targeted strikes raised profound moral questions. It forces us to confront deeply held personal beliefs and our values as a nation. If anyone in government who works in this area tells you they haven't struggled with this, then they haven't spent much time

thinking about it. I know I have, and I will continue to struggle with it as long as I remain in counterterrorism.

But I am certain about one thing. We are at war. We are at war against a terrorist organization called al-Qaida that has brutally murdered thousands of Americans, men, women and children, as well as thousands of other innocent people around the world. In recent years, with the help of targeted strikes, we have turned al-Qaida into a shadow of what it once was. They are on the road to destruction.

Until that finally happens, however, there are still terrorists in hard-to-reach places who are actively planning attacks against us. If given the chance, they will gladly strike again and kill more of our citizens. And the president has a Constitutional and solemn obligation to do everything in his power to protect the safety and security of the American people.

Yes, war is hell. It is awful. It involves human beings killing other human beings, sometimes innocent civilians. That is why we despise war. That is why we want this war against al-Qaida to be over as soon as possible, and not a moment longer. And over time, as al-Qaida fades into history and as our partners grow stronger, I'd hope that the United States would have to rely less on lethal force to keep our country safe.

Until that happens, as President Obama said here five years ago, if another nation cannot or will not take action, we will. And it is an unfortunate fact that to save many innocent lives we are sometimes obliged to take lives, the lives of terrorists who seek to murder our fellow citizens.

On behalf of President Obama and his administration, I am here to say to the American people that we will continue to work to safeguard this nations -- this nation and its citizens responsibly, adhering to the laws of this land and staying true to the values that define us as Americans, and thank you very much.

Jane Harman:
Thank you, Mr. Brennan. As it is almost 1:00, I hope you can stay a few extra minutes to take questions, and I would just like to make a comment, ask you one question, and then turn over to our -- turn it over to our audience for questions. Please no statements. Ask questions. First your call for greater transparency is certainly appreciated by me. I think that the clearer we can make our policies, and the better we can explain them, and the more debate we can have in the public square about them, the more: one, they will be understood; and two, they will persuade the would-be suicide bomber about to strap on a vest that there is a better answer. We do have to win the argument in the end with the next generation, not just take out those who can't be rehabilitated in this generation, and I see you nodding, so I know you agree and I'm not going to ask you a question about that. I also want to say how honored we are that you would make this important speech at the Wilson Center. There is new material here, for those who may have missed it. The fact that the U.S. conducts targeted strikes using drones has always been something that I, as a public official, danced around because I knew it had not been officially acknowledged by our government. I was one of those members of Congress briefed on this program, I have seen the feed that shows how we do these things, I'm not going to comment on specific operations or areas of the world, but I do think it is important that our government has acknowledged this, and set out, as carefully as possible, the reasons why we do it, and I want to

commend you personally as well as Eric Holder, Jeh Johnson, and Harold Koh for carefully laying out the legal framework, and also add that at the Wilson Center, we will continue to debate these issues, and see what value we can add free from spin on a non-partisan basis to helping to articulate even more clearly the reasons why, as you said, war is hell, and why, as you said, there is no decision more consequential than deciding to use legal force, so thank you very much for making those remarks here.

My question is this: One thing I don't think you mentioned in that enormously important address was the rise of Islamist parties, which have been elected in Tunisia, Egypt, and probably will be elected, and exist in Turkey and other countries. Do you think that having Islamist inside the tent, in a political sphere, also helps diminish the threat of outside groups like al-Qaida?

John Brennan:
Well, hopefully political pluralism is breaking out in the Middle East, and we're going to find in many countries the ability of various constituencies to find expression through political parties. And certainly, we are very strong advocates of using the political system, the laws, to be able to express the views of individual groups within different countries, and so rather than finding expression through violent extremism, these groups have the opportunity now, and since they've never had before in countries like Tunisia, and in Egypt, Yemen, other places, where they can in fact participate meaningfully in the political system. This is going to take some time for these systems to be able to mature sufficiently so that there can be a very robust and democratic system there, but certainly those individuals who are parties -- who are associated with parties that have a religious basis to them, they can find now the opportunity now to be able to participate in that political system.

Jane Harman:
My second and final question, and I see all of you with your hands about to be raised, and again, please just state a question as I'm about to do. You just mentioned Yemen, that has been part of your broader portfolio, I know you made many trips there, and you were a key architect of the deal to get Saleh to agree to -- the 40 year autocrat ruler -- to agree to accept immunity, leave the country, and then to be replaced by an elected leader, in this case, his vice president in a restructured government. Do you think a Yemen-type solution could work in Syria? Do you think there's any possibility of getting the Bashar family out of Syria and structuring a new government there, and perhaps in having the -- Russia lead the effort to do that, because of its close ties to Syria, and the fact that it is still unfortunately arming and supporting the Syrian regime?

John Brennan:
Well, each of these countries in the Middle East are facing different types of circumstances, and they have unique histories. Yemen was fortunate that they do -- did have a degree of political pluralism there, Ali Abdullah Saleh in fact allowed certain political institutions to develop, and we were very fortunate to have a peaceful transition from the previous regime to the government of President Hadi now. Certainly, there needs to be some way found for progress in Syria. It's outrageous what's happening in that country, the continued death of Syrian citizens at the hands of a brutal authoritarian government. This is something that needs to stop, and the international community has come together on it, so I'd like to be able to see something that would be able to transition peacefully, but the sooner it can be done, obviously, the more lives we've saved.

Jane Harman:
Thank you very much. Please identify yourselves, and ask a question only. The woman straight ahead of me, yes. Just wait for the mic.

Tara McKelvy:

Hi, my name is Tara McKelvy, I'm a scholar here, and I'm a correspondent for Newsweek and The Daily Beast, and you talked a little bit about the struggle that you have in this process of the targeted strikes, and General Cartwright talked to me about the question of surrender, that's not really an option when you use a Predator drone, for instance. I'm wondering if you can talk about which kinds of issues that you found most troubling when you think about these strikes.

John Brennan:
Well, as I said, one of the considerations that we go through is the feasibility of capture. We would prefer to get these individuals so that they can be captured. Working with local governments, what we like to be able to do is provide them the intelligence that they can get the individuals, so it doesn't have to be U.S. forces that are going on the ground in certain areas. But if it's not feasible, either because it's too risky from the standpoint of forces or the government doesn't have the will or the ability to do it, then we make a determination whether or not the significance of the threat that the person poses requires us to take action, so that we're able to mitigate the threat that they pose. I mean, these are individuals that could be involved in a very active plot, and if it is allowed to continue, you know, it could result in attacks either in Yemen against the U.S. embassy, or here in the homeland that could kill, you know, dozens if not hundreds of people. So what we always want to do, though, is look at whether or not there is an option to get this person and bring them to justice somehow for intelligence collection purposes, as well as to try them for their crimes.

Jane Harman:
Thank you, man in the green shirt right here.

Robert Baum:
Robert Baum from the Wilson Center and the University of Missouri. Thank you for your comments. I did want to ask about one area where we seem to be less successful, the events in Mali and Nigeria seem to suggest that we've been less successful in containing al-Qaida, and I was wondering if you could talk a little bit about your efforts in West Africa and also urge you to emphasize the importance of economic development as a way of -- the strategic development of economic development in combating the terrorism. Thank you.

John Brennan:
You raised two important points. One is what are we doing in terms of confronting the terrorist threat that emanates in places like Mali and Nigeria, and other areas, and then what we need to do further upstream as far as the type of development assistance, and assistance to these countries, so they can build the institutions that are going to be able to address the needs of the people. Nigeria's a particularly dangerous situation right now with Boko Haram that has the links with al-Qaida, but also has links with al-Shabaab, as well AQIM. It has this radical offshoot, Ansaru, that really is focused on U.S. or Western interests, and so there is a domestic

challenge that Boko Haram poses to Nigeria, and as we well know, there's the north-south struggle within Nigeria, and tensions between the Christian-Muslim communities. So we are trying to work with the Nigerian government as well as other governments are, as well, to try to give them the capabilities they need to confront the terrorist threat, but then also the issue is the building up those political institutions within Nigeria so that they can deal with this, not just from a law enforcement or internal security perspective, but also to address those needs that are fueling some of these fires of violent extremism.

Mali, you know, because of the recent coup, we've been trying to work across the Sahel with Mali, and Niger, and Mauritania, and other countries to address the growing phenomenon and threat of al-Qaida Islamic Maghreb that is a unique organization because it has a criminal aspect to it. You know, it kidnaps these individuals for large ransoms. We're outraged whenever, you know, countries or organizations pay these huge sums to al-Qaida, whether it be in the Sahel or in Yemen because it just is able to feed their activities, but Mali right now, with the coup, and then you have the Tuareg rebellion up in the north, and then that area that basically is such a large expansive territory, that also, you know, requires both a balancing of addressing the near-term threats that are posed by al-Qaida, but also trying to give the government in Mali, in Bamako, the ability to build up those institutions, address the development needs, they have the different sort of ethnic and tribal rivalries that are there, so it's a complicated area. I've worked very closely with the -- talking with my French and British colleagues as well as with others in the region, about how there might be some way to address some of these broader African issues that manifest themselves, unfortunately, in the kidnappings, and the piracy, and the criminal activities, and terrorist attacks, so there's an operational cadence in Africa now that is concerning in a number of parts of the continent.

Jane Harman:
Back there, middle, yeah.

John Brennan:
I can take another 10 minutes [inaudible].

Leanne Erdberg:

Hi there, Leanne Erdberg [spelled phonetically] from the State Department. How can we ensure that executive interagency actors, when they are undertaking counterterrorism actions, are held to appropriate standards, and processes as we ask them to act as prosecutors, judges, and juries, and how we can ensure that intelligence is held to the same standards and processes that evidence is?

John Brennan:
Okay, well as I tried to say in my remarks, we're not carrying out these actions to retaliate for past transgressions. We are not a court, we're not trying to determine guilt or innocence, and then carry out a strike in retaliation. What we're trying to do is prevent the loss of lives through terrorist attacks, so it's not as though we're, you know, sort of judge and jury on, again, their involvement in past activities. We see a threat developing, we follow it very carefully, we identify the individuals who are responsible for allowing that plot and that plan to go forward, and then we make a determination about whether or not we have the solid intelligence base, and that's why I tried to say in my remarks, we have standards. You know, the intelligence is

brought forward, we evaluate that, there's interagency meetings that a number of us are involved in on a ongoing basis, scrutinizing that intelligence, determining whether or not we have a degree of confidence that that person is indeed involved in carrying out this plan to kill Americans. If it reaches that level, then what we do is we look at it according to the other standards that I talked about in terms of infeasibility of capture, determination that we are able to have the intelligence that will give us, you know, a high degree of confidence that, you know, we can track an individual and find them, and be confident that we're taking action against an individual who really is involved in carrying out an attack. You know, if we -- if we didn't have to take these actions, and we still had -- and we had confidence that there wasn't going to be a terrorist attack, I think everybody would be very, very pleased. We only decide to take that action if there is no other option available, if there is not the option of capture, if the local government will not take action, if we cannot do something that will prevent that attack from taking place, and the only available option is taking that individual off of the battlefield, and we're going to do it in a way that gives us the confidence that we are not going to, in fact, inflict collateral damage. So again, it really is a very rigorous system of standards and processes that we go through.

Jane Harman:
Thank you. In the far back. Yes, you.

Jon Harper:

Sir, I was wondering if you could tell us --

Jane Harman:
Identify yourself, please.

Jon Harper:

Oh, sorry, Jon Harper with the Asahi Shimbun. It's a Japanese paper. I was wondering if you could tell me how many times or what percentage of the time have proposals to target a specific individual been denied, and also if you could address the issue of signature strikes, which I guess aren't necessarily targeted against specific individuals, but people who are engaging in suspicious activities. Could you comment on what the criteria is for targeting them? Thank you.

John Brennan:

Well, I'm not going to go into sort of how many times, what proportion of instances there have been sort of either approvals or declinations of these recommendations that come forward, but I can just tell you that there have been a -- numerous times where individuals that were put forward for consideration for this type of action was declined. You make reference to signature strikes that are frequently reported in the press. I was speaking here specifically about targeted strikes against individuals who are involved. Everything we do, though, that is carried out against al-Qaida is carried out consistent with the rule of law, the authorization on the use of military force, and domestic law. And we do it with a similar rigor, and there are various ways that we can make sure that we are taking the actions that we need to prevent a terrorist attack. That's the whole purpose of whatever action we use, the tool we use, it's to prevent attack, and to save lives. And so I spoke today, for the first time openly, about, again, what's commonly

referred to in the press as drones, remotely piloted aircraft, that can give you that type of laser-like precision that can excise that terrorist or that threat in a manner that, again, with the medical metaphor, that will not damage the surrounding tissue, and so what we're really trying to do -- al-Qaida's a cancer throughout the world, it has metastasized in so many different places, and when that metastasized tumor becomes lethal and malignant, that's when we're going to take the action that we need to.

Jane Harman:
Last question will be the woman in the back at the edge.

Homai Emdah:

Sorry.  What about in a country like Pakistan --

Jane Harman:
Could you identify yourself please.

Homai Emdah:
Homai Emdah [spelled phonetically], Express News.  Mr. Brennan, what about in a country like Pakistan where drone strikes are frequently carried out, and the Pakistani government has, over the last few months, repeatedly protested to the U.S. government about an end to drone strikes, which is also the subject of discussion between Ambassador Grossman when he was in Islamabad.  You mentioned that countries can be incapable or unwilling to carry out -- to arrest militants, so how do you deal with a country like Pakistan which doesn't accept drone strikes officially?

John Brennan:
We have an ongoing dialogue with many countries throughout the world on counterterrorism programs, and some of those countries we are involved in very detailed discussions about the appropriate tools to bring to bear.  In the case of Pakistan, as you pointed out, Ambassador Grossman was there just very recently.  There are ongoing discussions with the government of Pakistan about how best to address the terrorist threat that emanates from that area, and I will point out, that, you know, so many Pakistanis have been killed by that malignant tumor that is within the sovereign borders of Pakistan.  It's -- and many, many brave Pakistanis have given their lives against these terrorist and militant organizations.  And so, as the parliament recently said in its resolution, that Pakistan needs to rid itself of this -- these foreign militants and these foreign terrorists that have taken root inside of Pakistan.  So we are committed to working very closely on an ongoing basis with the Pakistani government which includes, you know, the various components, intelligence, security, and various civilian departments and agencies in order to help them address the terrorist threat, but also so that they can help us make sure that Pakistan and that area near Afghanistan is never, ever again used as a launching pad for attacks here in the United States.

Jane Harman:
Thank you.  Let me just conclude by saying that former CIA director Mike Hayden used to use the analogy of a football field, the lines on the football field, and he talked about our intelligence operatives and others as the players on the field, and he said, "We need them to get chalk on their

cleats." Go up right up to the line in carrying out what are approved policies of the United States, and if you think about it that way, it is really important to have policies that are transparent, so that those who are carrying out the mission and those in the United States, and those around the world who are trying to understand the mission, know where the lines are. If we don't know where the lines are, some people will be risk-averse, other will commit excesses, and we've certainly seen a few of those, Abu Ghraib comes to mind, over recent years which are black eyes on our country. And so I just want to applaud the fact that John Brennan has come over here from the White House, spent over an hour with us laying out in great detail what the rules are for something that has been revealed today, which is the use of drones in certain operations, targeted operations. The debate will continue, no question, people in this audience and listening in have different points of view, we certainly know that one young woman did during his remarks, but that's why the Wilson Center's here. To offer a platform free of spin and partisan rhetoric to debate these issues thoroughly, and you honored us by coming here today, Mr. Brennan, thank you very much.

John Brennan:
Thank you very much Jane, thank you.


[applause]


[end of transcription]

# Powell Declaration
# Exhibit C



Office of the Attorney General
Washington, D. C. 20530

May 22, 2013

The Honorable Patrick J. Leahy
Chairman
Committee on the Judiciary
United States Senate
Washington, DC 20530

Dear Mr. Chairman:

Since entering office, the President has made clear his commitment to providing Congress and the American people with as much information as possible about our sensitive counterterrorism operations, consistent with our national security and the proper functioning of the Executive Branch. Doing so is necessary, the President stated in his May 21, 2009 National Archives speech, because it enables the citizens of our democracy to "make informed judgments and hold [their Government] accountable."

In furtherance of this commitment, the Administration has provided an unprecedented level of transparency into how sensitive counterterrorism operations are conducted. Several senior Administration officials, including myself, have taken numerous steps to explain publicly the legal basis for the United States' actions to the American people and the Congress. For example, in March 2012, I delivered an address at Northwestern University Law School discussing certain aspects of the Administration's counterterrorism legal framework. And the Department of Justice and other departments and agencies have continually worked with the appropriate oversight committees in the Congress to ensure that those committees are fully informed of the legal basis for our actions.

The Administration is determined to continue these extensive outreach efforts to communicate with the American people. Indeed, the President reiterated in his State of the Union address earlier this year that he would continue to engage with the Congress about our counterterrorism efforts to ensure that they remain consistent with our laws and values, and become more transparent to the American people and to the world.

To this end, the President has directed me to disclose certain information that until now has been properly classified. You and other Members of your Committee have on numerous occasions expressed a particular interest in the Administration's use of lethal force against U.S. citizens. In light of this fact, I am writing to disclose to you certain information about the number of U.S. citizens who have been killed by U.S. counterterrorism operations outside of areas of active hostilities. Since 2009, the United States, in the conduct of U.S. counterterrorism operations against al-Qa'ida and its

associated forces outside of areas of active hostilities, has specifically targeted and killed one U.S. citizen, Anwar al-Aulaqi. The United States is further aware of three other U.S. citizens who have been killed in such U.S. counterterrorism operations over that same time period: Samir Khan, 'Abd al-Rahman Anwar al-Aulaqi, and Jude Kenan Mohammed. These individuals were not specifically targeted by the United States.

As I noted in my speech at Northwestern, "it is an unfortunate but undeniable fact" that a "small number" of U.S. citizens "have decided to commit violent attacks against their own country from abroad." Based on generations-old legal principles and Supreme Court decisions handed down during World War II, as well as during the current conflict, it is clear and logical that United States citizenship alone does not make such individuals immune from being targeted. Rather, it means that the government must take special care and take into account all relevant constitutional considerations, the laws of war, and other law with respect to U.S. citizens – even those who are leading efforts to kill their fellow, innocent Americans. Such considerations allow for the use of lethal force <u>in a foreign country</u> against a U.S. citizen who is a senior operational leader of al-Qa'ida or its associated forces, and who is actively engaged in planning to kill Americans, in the following circumstances: (1) the U.S. government has determined, after a thorough and careful review, that the individual poses an imminent threat of violent attack against the United States; (2) capture is not feasible; and (3) the operation would be conducted in a manner consistent with applicable law of war principles.

These conditions should not come as a surprise: the Administration's legal views on this weighty issue have been clear and consistent over time. The analysis in my speech at Northwestern University Law School is entirely consistent with not only the analysis found in the unclassified white paper the Department of Justice provided to your Committee soon after my speech, but also with the classified analysis the Department shared with other congressional committees in May 2011 – months before the operation that resulted in the death of Anwar al-Aulaqi. The analysis in my speech is also entirely consistent with the classified legal advice on this issue the Department of Justice has shared with your Committee more recently. In short, the Administration has demonstrated its commitment to discussing with the Congress and the American people the circumstances in which it could lawfully use lethal force in a foreign country against a U.S. citizen who is a senior operational leader of al-Qa'ida or its associated forces, and who is actively engaged in planning to kill Americans.

Anwar al-Aulaqi plainly satisfied all of the conditions I outlined in my speech at Northwestern. Let me be more specific. Al-Aulaqi was a senior operational leader of al-Qa'ida in the Arabian Peninsula (AQAP), the most dangerous regional affiliate of al-Qa'ida and a group that has committed numerous terrorist attacks overseas and attempted multiple times to conduct terrorist attacks against the U.S. homeland. And al-Aulaqi was not just a senior leader of AQAP – he was the group's chief of external operations, intimately involved in detailed planning and putting in place plots against U.S. persons.

In this role, al-Aulaqi repeatedly made clear his intent to attack U.S. persons and his hope that these attacks would take American lives. For example, in a message to

Muslims living in the United States, he noted that he had come "to the conclusion that *jihad* against America is binding upon myself just as it is binding upon every other able Muslim." But it was not al-Aulaqi's words that led the United States to act against him: they only served to demonstrate his intentions and state of mind, that he "pray[ed] that Allah [would] destro[y] America and all its allies." Rather, it was al-Aulaqi's actions – and, in particular, his direct personal involvement in the continued planning and execution of terrorist attacks against the U.S. homeland – that made him a lawful target and led the United States to take action.

For example, when Umar Farouk Abdulmutallab – the individual who attempted to blow up an airplane bound for Detroit on Christmas Day 2009 – went to Yemen in 2009, al-Aulaqi arranged an introduction via text message. Abdulmutallab told U.S. officials that he stayed at al-Aulaqi's house for three days, and then spent two weeks at an AQAP training camp. Al-Aulaqi planned a suicide operation for Abdulmutallab, helped Abdulmutallab draft a statement for a martyrdom video to be shown after the attack, and directed him to take down a U.S. airliner. Al-Aulaqi's last instructions were to blow up the airplane when it was over American soil. Al-Aulaqi also played a key role in the October 2010 plot to detonate explosive devices on two U.S.-bound cargo planes: he not only helped plan and oversee the plot, but was also directly involved in the details of its execution – to the point that he took part in the development and testing of the explosive devices that were placed on the planes. Moreover, information that remains classified to protect sensitive sources and methods evidences al-Aulaqi's involvement in the planning of numerous other plots against U.S. and Western interests and makes clear he was continuing to plot attacks when he was killed.

Based on this information, high-level U.S. government officials appropriately concluded that al-Aulaqi posed a continuing and imminent threat of violent attack against the United States. Before carrying out the operation that killed al-Aulaqi, senior officials also determined, based on a careful evaluation of the circumstances at the time, that it was not feasible to capture al-Aulaqi. In addition, senior officials determined that the operation would be conducted consistent with applicable law of war principles, including the cardinal principles of (1) necessity – the requirement that the target have definite military value; (2) distinction – the idea that only military objectives may be intentionally targeted and that civilians are protected from being intentionally targeted; (3) proportionality – the notion that the anticipated collateral damage of an action cannot be excessive in relation to the anticipated concrete and direct military advantage; and (4) humanity – a principle that requires us to use weapons that will not inflict unnecessary suffering. The operation was also undertaken consistent with Yemeni sovereignty.

While a substantial amount of information indicated that Anwar al-Aulaqi was a senior AQAP leader actively plotting to kill Americans, the decision that he was a lawful target was not taken lightly. The decision to use lethal force is one of the gravest that our government, at every level, can face. The operation to target Anwar al-Aulaqi was thus subjected to an exceptionally rigorous interagency legal review: not only did I and other Department of Justice lawyers conclude after a thorough and searching review that the

operation was lawful, but so too did other departments and agencies within the U.S. government.

The decision to target Anwar al-Aulaqi was additionally subjected to extensive policy review at the highest levels of the U.S. Government, and senior U.S. officials also briefed the appropriate committees of Congress on the possibility of using lethal force against al-Aulaqi. Indeed, the Administration informed the relevant congressional oversight committees that it had approved the use of lethal force against al-Aulaqi in February 2010 – well over a year before the operation in question – and the legal justification was subsequently explained in detail to those committees, well before action was taken against Aulaqi. This extensive outreach is consistent with the Administration's strong and continuing commitment to congressional oversight of our counterterrorism operations – oversight which ensures, as the President stated during his State of the Union address, that our actions are "consistent with our laws and system of checks and balances."

The Supreme Court has long "made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 578, 587 (1952). But the Court's case law and longstanding practice and principle also make clear that the Constitution does not prohibit the Government it establishes from taking action to protect the American people from the threats posed by terrorists who hide in faraway countries and continually plan and launch plots against the U.S. homeland. The decision to target Anwar al-Aulaqi was lawful, it was considered, and it was just.

* * * * *

This letter is only one of a number of steps the Administration will be taking to fulfill the President's State of the Union commitment to engage with Congress and the American people on our counterterrorism efforts. This week the President approved and relevant congressional committees will be notified and briefed on a document that institutionalizes the Administration's exacting standards and processes for reviewing and approving operations to capture or use lethal force against terrorist targets outside the United States and areas of active hostilities; these standards and processes are either already in place or are to be transitioned into place. While that document remains classified, it makes clear that a cornerstone of the Administration's policy is one of the principles I noted in my speech at Northwestern: that lethal force should not be used when it is feasible to capture a terrorist suspect. For circumstances in which capture is feasible, the policy outlines standards and procedures to ensure that operations to take into custody a terrorist suspect are conducted in accordance with all applicable law, including the laws of war. When capture is not feasible, the policy provides that lethal force may be used only when a terrorist target poses a continuing, imminent threat to Americans, and when certain other preconditions, including a requirement that no other reasonable alternatives exist to effectively address the threat, are satisfied. And in all circumstances there must be a legal basis for using force against the target. Significantly,

the President will soon be speaking publicly in greater detail about our counterterrorism operations and the legal and policy framework that governs those actions.

I recognize that even after the Administration makes unprecedented disclosures like those contained in this letter, some unanswered questions will remain. I assure you that the President and his national security team are mindful of this Administration's pledge to public accountability for our counterterrorism efforts, and we will continue to give careful consideration to whether and how additional information may be declassified and disclosed to the American people without harming our national security.

Sincerely,

Eric H. Holder, Jr.
Attorney General

cc:     Ranking Member Charles Grassley
        Chairman Dianne Feinstein
        Vice Chairman Saxby Chambliss
        Chairman Carl Levin
        Ranking Member James Inhofe
        Chairman Bob Goodlatte
        Ranking Member John Conyers, Jr.
        Chairman Mike Rogers
        Ranking Member C.A. Dutch Ruppersberger
        Chairman Howard P. McKeon
        Ranking Member Adam Smith
        Chairman Robert Menendez
        Ranking Member Bob Corker
        Chairman Ed Royce
        Ranking Member Eliot Engel
        Majority Leader Harry Reid
        Minority Leader Mitch McConnell
        Speaker John Boehner
        Majority Leader Eric Cantor
        Minority Leader Nancy Pelosi
        Minority Whip Steny Hoyer

# Powell Declaration
# Exhibit D

The White House

Office of the Press Secretary

For Immediate Release May 23, 2013

# Remarks by the President at the National Defense University

National Defense University
Fort McNair
Washington, D.C.

2:01 P.M. EDT

THE PRESIDENT: Good afternoon, everybody. Please be seated.

It is a great honor to return to the National Defense University. Here, at Fort McNair, Americans have served in uniform since 1791 -- standing guard in the earliest days of the Republic, and contemplating the future of warfare here in the 21st century.

For over two centuries, the United States has been bound together by founding documents that defined who we are as Americans, and served as our compass through every type of change. Matters of war and peace are no different. Americans are deeply ambivalent about war, but having fought for our independence, we know a price must be paid for freedom. From the Civil War to our struggle against fascism, on through the long twilight struggle of the Cold War, battlefields have changed and technology has evolved. But our commitment to constitutional principles has weathered every war, and every war has come to an end.

With the collapse of the Berlin Wall, a new dawn of democracy took hold abroad, and a decade of peace and prosperity arrived here at home. And for a moment, it seemed the 21st century would be a tranquil time. And then, on September 11, 2001, we were shaken out of complacency. Thousands were taken from us, as clouds of fire and metal and ash descended upon a sun-filled morning. This was a different kind of war. No armies came to our shores, and our military was not the principal target. Instead, a group of terrorists came to kill as many civilians as they could.

And so our nation went to war. We have now been at war for well over a decade. I won't review the full history. What is clear is that we quickly drove al Qaeda out of Afghanistan, but then shifted our focus and began a new war in Iraq. And this carried significant consequences for our fight against al Qaeda, our standing in the world, and -- to this day -- our interests in a vital region.

Meanwhile, we strengthened our defenses -- hardening targets, tightening transportation security, giving law enforcement new tools to prevent terror. Most of these changes were sound. Some caused inconvenience. But some, like expanded surveillance, raised difficult questions about the balance that we strike between our interests in security and our values of privacy. And in some cases, I believe we compromised our basic values -- by using torture to interrogate our enemies, and detaining individuals in a way that ran counter to the rule of law.

So after I took office, we stepped up the war against al Qaeda but we also sought to change its course. We relentlessly targeted al Qaeda's leadership. We ended the war in Iraq, and brought nearly 150,000 troops home. We pursued a new strategy in Afghanistan, and increased our training of Afghan forces. We unequivocally banned torture, affirmed our commitment to civilian courts, worked to align our policies with the rule of law, and expanded our consultations with Congress.

Today, Osama bin Laden is dead, and so are most of his top lieutenants. There have been no large-scale attacks on the United States, and our homeland is more secure. Fewer of our troops are in harm's way, and over the next 19 months they will continue to come home. Our alliances are strong, and so is our standing in the world. In sum, we are safer because of our efforts.

Now, make no mistake, our nation is still threatened by terrorists. From Benghazi to Boston, we have been tragically reminded of that truth. But we have to recognize that the threat has shifted and evolved from the one that came to our shores on 9/11. With a decade of experience now to draw from, this is the moment to ask ourselves hard questions -- about the nature of today's threats and how we should confront them.

And these questions matter to every American.

WATCH THE VIDEO

May 23, 2013 8:26 PM
President Obama Speaks on the U.S. Counterterrorism Strategy

BLOG POSTS ON THIS ISSUE

August 09, 2013 12:40 PM EDT
Announcing the 2013 Presidential Medal of Freedom Recipients
Yesterday, the White House released the names of the recipients of the 2013 Presidential Medal of Freedom.

August 09, 2013 10:45 AM EDT
The Affordable Care Act: Speaking to Women's Unique Health Needs
The Affordable Care Act protects women. Learn about all the benefits the Affordable Care Act provides come October 1st.

August 09, 2013 12:00 AM EDT
West Wing Week: 08/09/13 or "Rock Solid Foundation"
Welcome to the West Wing Week, your guide to everything that's happening at 1600 Pennsylvania Avenue.

VIEW ALL RELATED BLOG POSTS

Facebook YouTube

Twitter Vimeo
Flickr iTunes
Google+ LinkedIn

For over the last decade, our nation has spent well over a trillion dollars on war, helping to explode our deficits and constraining our ability to nation-build here at home. Our servicemembers and their families have sacrificed far more on our behalf. Nearly 7,000 Americans have made the ultimate sacrifice. Many more have left a part of themselves on the battlefield, or brought the shadows of battle back home. From our use of drones to the detention of terrorist suspects, the decisions that we are making now will define the type of nation -- and world -- that we leave to our children.

So America is at a crossroads. We must define the nature and scope of this struggle, or else it will define us. We have to be mindful of James Madison's warning that "No nation could preserve its freedom in the midst of continual warfare." Neither I, nor any President, can promise the total defeat of terror. We will never erase the evil that lies in the hearts of some human beings, nor stamp out every danger to our open society. But what we can do -- what we must do -- is dismantle networks that pose a direct danger to us, and make it less likely for new groups to gain a foothold, all the while maintaining the freedoms and ideals that we defend. And to define that strategy, we have to make decisions based not on fear, but on hard-earned wisdom. That begins with understanding the current threat that we face.

Today, the core of al Qaeda in Afghanistan and Pakistan is on the path to defeat. Their remaining operatives spend more time thinking about their own safety than plotting against us. They did not direct the attacks in Benghazi or Boston. They've not carried out a successful attack on our homeland since 9/11.

Instead, what we've seen is the emergence of various al Qaeda affiliates. From Yemen to Iraq, from Somalia to North Africa, the threat today is more diffuse, with Al Qaeda's affiliates in the Arabian Peninsula -- AQAP -- the most active in plotting against our homeland. And while none of AQAP's efforts approach the scale of 9/11, they have continued to plot acts of terror, like the attempt to blow up an airplane on Christmas Day in 2009.

Unrest in the Arab world has also allowed extremists to gain a foothold in countries like Libya and Syria. But here, too, there are differences from 9/11. In some cases, we continue to confront state-sponsored networks like Hezbollah that engage in acts of terror to achieve political goals. Other of these groups are simply collections of local militias or extremists interested in seizing territory. And while we are vigilant for signs that these groups may pose a transnational threat, most are focused on operating in the countries and regions where they are based. And that means we'll face more localized threats like what we saw in Benghazi, or the BP oil facility in Algeria, in which local operatives -- perhaps in loose affiliation with regional networks -- launch periodic attacks against Western diplomats, companies, and other soft targets, or resort to kidnapping and other criminal enterprises to fund their operations.

And finally, we face a real threat from radicalized individuals here in the United States. Whether it's a shooter at a Sikh Temple in Wisconsin, a plane flying into a building in Texas, or the extremists who killed 168 people at the Federal Building in Oklahoma City, America has confronted many forms of violent extremism in our history. Deranged or alienated individuals -- often U.S. citizens or legal residents -- can do enormous damage, particularly when inspired by larger notions of violent jihad. And that pull towards extremism appears to have led to the shooting at Fort Hood and the bombing of the Boston Marathon.

So that's the current threat -- lethal yet less capable al Qaeda affiliates; threats to diplomatic facilities and businesses abroad; homegrown extremists. This is the future of terrorism. We have to take these threats seriously, and do all that we can to confront them. But as we shape our response, we have to recognize that the scale of this threat closely resembles the types of attacks we faced before 9/11.

In the 1980s, we lost Americans to terrorism at our Embassy in Beirut; at our Marine Barracks in Lebanon; on a cruise ship at sea; at a disco in Berlin; and on a Pan Am flight -- Flight 103 -- over Lockerbie. In the 1990s, we lost Americans to terrorism at the World Trade Center; at our military facilities in Saudi Arabia; and at our Embassy in Kenya. These attacks were all brutal; they were all deadly; and we learned that left unchecked, these threats can grow. But if dealt with smartly and proportionally, these threats need not rise to the level that we saw on the eve of 9/11.

Moreover, we have to recognize that these threats don't arise in a vacuum. Most, though not all, of the terrorism we faced is fueled by a common ideology -- a belief by some extremists that Islam is in conflict with the United States and the West, and that violence against Western targets, including civilians, is justified in pursuit of a larger cause. Of course, this ideology is based on a lie, for the United States is not at war with Islam. And this ideology is rejected by the vast majority of Muslims, who are the most frequent victims of terrorist attacks.

Nevertheless, this ideology persists, and in an age when ideas and images can travel the globe in an instant, our response to terrorism can't depend on military or law enforcement alone. We need all elements of national power to win a battle of wills, a battle of ideas. So what I want to discuss here today is the components of such a comprehensive counterterrorism strategy.

First, we must finish the work of defeating al Qaeda and its associated forces.

In Afghanistan, we will complete our transition to Afghan responsibility for that country's security. Our troops will come home. Our combat mission will come to an end. And we will work with the Afghan government to train security forces, and sustain a counterterrorism force, which ensures that al Qaeda can never again establish a safe haven to launch attacks against us or our allies.

Beyond Afghanistan, we must define our effort not as a boundless "global war on terror," but rather as a series of persistent, targeted efforts to dismantle specific networks of violent extremists that threaten America. In many cases, this will involve partnerships with other countries. Already, thousands of Pakistani soldiers have lost their lives fighting extremists. In Yemen, we are supporting security forces that have reclaimed territory from AQAP. In Somalia, we helped a coalition of African nations push al-Shabaab out of its strongholds. In Mali, we're providing military aid to French-led intervention to push back al Qaeda in the Maghreb, and help the people of Mali reclaim their future.

Much of our best counterterrorism cooperation results in the gathering and sharing of intelligence, the arrest and prosecution of terrorists. And that's how a Somali terrorist apprehended off the coast of Yemen is now in a prison in New York. That's how we worked with European allies to disrupt plots from Denmark to Germany to the United Kingdom. That's how intelligence collected with Saudi Arabia helped us stop a cargo plane from being blown up over the Atlantic. These partnerships work.

But despite our strong preference for the detention and prosecution of terrorists, sometimes this approach is foreclosed. Al Qaeda and its affiliates try to gain foothold in some of the most distant and unforgiving places on Earth. They take refuge in remote tribal regions. They hide in caves and walled compounds. They train in empty deserts and rugged mountains.

In some of these places -- such as parts of Somalia and Yemen -- the state only has the most tenuous reach into the territory. In other cases, the state lacks the capacity or will to take action. And it's also not possible for America to simply deploy a team of Special Forces to capture every terrorist. Even when such an approach may be possible, there are places where it would pose profound risks to our troops and local civilians -- where a terrorist compound cannot be breached without triggering a firefight with surrounding tribal communities, for example, that pose no threat to us; times when putting U.S. boots on the ground may trigger a major international crisis.

To put it another way, our operation in Pakistan against Osama bin Laden cannot be the norm. The risks in that case were immense. The likelihood of capture, although that was our preference, was remote given the certainty that our folks would confront resistance. The fact that we did not find ourselves confronted with civilian casualties, or embroiled in an extended firefight, was a testament to the meticulous planning and professionalism of our Special Forces, but it also depended on some luck. And it was supported by massive infrastructure in Afghanistan.

And even then, the cost to our relationship with Pakistan -- and the backlash among the Pakistani public over encroachment on their territory -- was so severe that we are just now beginning to rebuild this important partnership.

So it is in this context that the United States has taken lethal, targeted action against al Qaeda and its associated forces, including with remotely piloted aircraft commonly referred to as drones.

As was true in previous armed conflicts, this new technology raises profound questions -- about who is targeted, and why; about civilian casualties, and the risk of creating new enemies; about the legality of such strikes under U.S. and international law; about accountability and morality. So let me address these questions.

To begin with, our actions are effective. Don't take my word for it. In the intelligence gathered at bin Laden's compound, we found that he wrote, "We could lose the reserves to enemy's air strikes. We cannot fight air strikes with explosives." Other communications from al Qaeda operatives confirm this as well. Dozens of highly skilled al Qaeda commanders, trainers, bomb makers and operatives have been taken off the battlefield. Plots have been disrupted that would have targeted international aviation, U.S. transit systems, European cities and our troops in Afghanistan. Simply put, these strikes have saved lives.

Moreover, America's actions are legal. We were attacked on 9/11. Within a week, Congress overwhelmingly authorized the use of force. Under domestic law, and international law, the United States is at war with al Qaeda, the Taliban, and their associated forces. We are at war with an organization that right now would kill as many Americans as they could if we did not stop them first. So this is a just war -- a war waged proportionally, in last resort, and in self-defense.

And yet, as our fight enters a new phase, America's legitimate claim of self-defense cannot be the end of the discussion. To say a military tactic is legal, or even effective, is not to say it is wise or moral in every instance. For the same human progress that gives us the technology to strike half a world away also demands the discipline to constrain that power -- or risk abusing it. And that's why, over the last four years, my administration has worked vigorously to establish a framework that governs our use of force against terrorists --- insisting upon clear guidelines, oversight and accountability that is now codified in Presidential Policy Guidance that I signed yesterday.

In the Afghan war theater, we must -- and will -- continue to support our troops until the transition is complete at the end of 2014. And that means we will continue to take strikes against high value al Qaeda targets, but also against forces that are massing to support attacks on coalition forces. But by the end of 2014, we will no longer have the same need for force protection, and the progress we've made against core al Qaeda will reduce the need for unmanned strikes.

Beyond the Afghan theater, we only target al Qaeda and its associated forces. And even then, the use of drones is heavily constrained. America does not take strikes when we have the ability to capture individual terrorists; our preference is always to detain, interrogate, and prosecute. America cannot take strikes wherever we choose; our actions are bound by consultations with partners, and respect for state sovereignty.

America does not take strikes to punish individuals; we act against terrorists who pose a continuing and imminent threat to the American people, and when there are no other governments capable of effectively addressing the threat. And before any strike is taken, there must be near-certainty that no civilians will be killed or injured -- the highest standard we can set.

Now, this last point is critical, because much of the criticism about drone strikes -- both here at home and abroad -- understandably centers on reports of civilian casualties. There's a wide gap between U.S. assessments of such casualties and nongovernmental reports. Nevertheless, it is a hard fact that U.S. strikes have resulted in civilian casualties, a risk that exists in every war. And for the families of those civilians, no words or legal construct can justify their loss. For me, and those in my chain of command, those deaths will haunt us as long as we live, just as we are haunted by the civilian casualties that have occurred throughout conventional fighting in Afghanistan and Iraq.

But as Commander-in-Chief, I must weigh these heartbreaking tragedies against the alternatives. To do nothing in the face of terrorist networks would invite far more civilian casualties -- not just in our cities at home and our facilities abroad, but also in the very places like Sana'a and Kabul and Mogadishu where terrorists seek a foothold. Remember that the terrorists we are after target civilians, and the death toll from their acts of terrorism against Muslims dwarfs any estimate of civilian casualties from drone strikes. So doing nothing is not an option.

Where foreign governments cannot or will not effectively stop terrorism in their territory, the primary alternative to targeted lethal action would be the use of conventional military options. As I've already said, even small special operations carry enormous risks. Conventional airpower or missiles are far less precise than drones, and are likely to cause more civilian casualties and more local outrage. And invasions of these territories lead us to be viewed as occupying armies, unleash a torrent of unintended consequences, are difficult to contain, result in large numbers of civilian casualties and ultimately empower those who thrive on violent conflict.

So it is false to assert that putting boots on the ground is less likely to result in civilian deaths or less likely to create enemies in the Muslim world. The results would be more U.S. deaths, more Black Hawks down, more confrontations with local populations, and an inevitable mission creep in support of such raids that could easily escalate into new wars.

Yes, the conflict with al Qaeda, like all armed conflict, invites tragedy. But by narrowly targeting our action against those who want to kill us and not the people they hide among, we are choosing the course of action least likely to result in the loss of innocent life.

Our efforts must be measured against the history of putting American troops in distant lands among hostile populations. In Vietnam, hundreds of thousands of civilians died in a war where the boundaries of battle were blurred. In Iraq and Afghanistan, despite the extraordinary courage and discipline of our troops, thousands of civilians have been killed. So neither conventional military action nor waiting for attacks to occur offers moral safe harbor, and neither does a sole reliance on law enforcement in territories that have no functioning police or security services -- and indeed, have no functioning law.

Now, this is not to say that the risks are not real. Any U.S. military action in foreign lands risks creating more enemies and impacts public opinion overseas. Moreover, our laws constrain the power of the President even during wartime, and I have taken an oath to defend the Constitution of the United States. The very precision of drone strikes and the necessary secrecy often involved in such actions can end up shielding our government from the public scrutiny that a troop deployment invites. It can also lead a President and his team to view drone strikes as a cure-all for terrorism.

And for this reason, I've insisted on strong oversight of all lethal action. After I took office, my administration began briefing all strikes outside of Iraq and Afghanistan to the appropriate committees of Congress. Let me repeat that: Not only did Congress authorize the use of force, it is briefed on every strike that America takes. Every strike. That includes the one instance when we targeted an American citizen -- Anwar Awlaki, the chief of external operations for AQAP.

This week, I authorized the declassification of this action, and the deaths of three other Americans in drone strikes, to facilitate transparency and debate on this issue and to dismiss some of the more outlandish claims that have been made. For the record, I do not believe it would be constitutional for the government to target and kill any U.S. citizen -- with a drone, or with a shotgun -- without due process, nor should any President deploy armed drones over U.S. soil.

But when a U.S. citizen goes abroad to wage war against America and is actively plotting to kill U.S. citizens, and when neither the United States, nor our partners are in a position to capture him before he carries out a plot, his citizenship should no more serve as a shield than a sniper shooting down on an innocent crowd should be protected from a SWAT team.

That's who Anwar Awlaki was -- he was continuously trying to kill people. He helped oversee the 2010 plot to detonate explosive devices on two U.S.-bound cargo planes. He was involved in planning to blow up an airliner in 2009. When Farouk Abdulmutallab -- the Christmas Day bomber -- went to Yemen in 2009, Awlaki hosted him, approved his suicide operation, helped him tape a martyrdom video to be shown after the attack, and his last instructions were to blow up the airplane when it was over American soil. I would have detained and prosecuted

Awlaki if we captured him before he carried out a plot, but we couldn't. And as President, I would have been derelict in my duty had I not authorized the strike that took him out.

Of course, the targeting of any American raises constitutional issues that are not present in other strikes -- which is why my administration submitted information about Awlaki to the Department of Justice months before Awlaki was killed, and briefed the Congress before this strike as well. But the high threshold that we've set for taking lethal action applies to all potential terrorist targets, regardless of whether or not they are American citizens. This threshold respects the inherent dignity of every human life. Alongside the decision to put our men and women in uniform in harm's way, the decision to use force against individuals or groups -- even against a sworn enemy of the United States -- is the hardest thing I do as President. But these decisions must be made, given my responsibility to protect the American people.

Going forward, I've asked my administration to review proposals to extend oversight of lethal actions outside of warzones that go beyond our reporting to Congress. Each option has virtues in theory, but poses difficulties in practice. For example, the establishment of a special court to evaluate and authorize lethal action has the benefit of bringing a third branch of government into the process, but raises serious constitutional issues about presidential and judicial authority. Another idea that's been suggested -- the establishment of an independent oversight board in the executive branch -- avoids those problems, but may introduce a layer of bureaucracy into national security decision-making, without inspiring additional public confidence in the process. But despite these challenges, I look forward to actively engaging Congress to explore these and other options for increased oversight.

I believe, however, that the use of force must be seen as part of a larger discussion we need to have about a comprehensive counterterrorism strategy -- because for all the focus on the use of force, force alone cannot make us safe. We cannot use force everywhere that a radical ideology takes root; and in the absence of a strategy that reduces the wellspring of extremism, a perpetual war -- through drones or Special Forces or troop deployments -- will prove self-defeating, and alter our country in troubling ways.

So the next element of our strategy involves addressing the underlying grievances and conflicts that feed extremism -- from North Africa to South Asia. As we've learned this past decade, this is a vast and complex undertaking. We must be humble in our expectation that we can quickly resolve deep-rooted problems like poverty and sectarian hatred. Moreover, no two countries are alike, and some will undergo chaotic change before things get better. But our security and our values demand that we make the effort.

This means patiently supporting transitions to democracy in places like Egypt and Tunisia and Libya -- because the peaceful realization of individual aspirations will serve as a rebuke to violent extremists. We must strengthen the opposition in Syria, while isolating extremist elements -- because the end of a tyrant must not give way to the tyranny of terrorism. We are actively working to promote peace between Israelis and Palestinians -- because it is right and because such a peace could help reshape attitudes in the region. And we must help countries modernize economies, upgrade education, and encourage entrepreneurship -- because American leadership has always been elevated by our ability to connect with people's hopes, and not simply their fears.

And success on all these fronts requires sustained engagement, but it will also require resources. I know that foreign aid is one of the least popular expenditures that there is. That's true for Democrats and Republicans -- I've seen the polling -- even though it amounts to less than one percent of the federal budget. In fact, a lot of folks think it's 25 percent, if you ask people on the streets. Less than one percent -- still wildly unpopular. But foreign assistance cannot be viewed as charity. It is fundamental to our national security. And it's fundamental to any sensible long-term strategy to battle extremism.

Moreover, foreign assistance is a tiny fraction of what we spend fighting wars that our assistance might ultimately prevent. For what we spent in a month in Iraq at the height of the war, we could be training security forces in Libya, maintaining peace agreements between Israel and its neighbors, feeding the hungry in Yemen, building schools in Pakistan, and creating reservoirs of goodwill that marginalize extremists. That has to be part of our strategy.

Moreover, America cannot carry out this work if we don't have diplomats serving in some very dangerous places. Over the past decade, we have strengthened security at our embassies, and I am implementing every recommendation of the Accountability Review Board, which found unacceptable failures in Benghazi. I've called on Congress to fully fund these efforts to bolster security and harden facilities, improve intelligence, and facilitate a quicker response time from our military if a crisis emerges.

But even after we take these steps, some irreducible risks to our diplomats will remain. This is the price of being the world's most powerful nation, particularly as a wave of change washes over the Arab World. And in balancing the trade4offs between security and active diplomacy, I firmly believe that any retreat from challenging regions will only increase the dangers that we face in the long run. And that's why we should be grateful to those diplomats who are willing to serve.

Targeted action against terrorists, effective partnerships, diplomatic engagement and assistance -- through such a comprehensive strategy we can significantly reduce the chances of large-scale attacks on the homeland and mitigate threats to Americans overseas. But as we guard against dangers from abroad, we cannot neglect the daunting challenge of terrorism from within our borders.

As I said earlier, this threat is not new. But technology and the Internet increase its frequency and in some cases its lethality. Today, a person can consume hateful propaganda, commit themselves to a violent agenda, and learn

how to kill without leaving their home. To address this threat, two years ago my administration did a comprehensive review and engaged with law enforcement.

And the best way to prevent violent extremism inspired by violent jihadists is to work with the Muslim American community -- which has consistently rejected terrorism -- to identify signs of radicalization and partner with law enforcement when an individual is drifting towards violence. And these partnerships can only work when we recognize that Muslims are a fundamental part of the American family. In fact, the success of American Muslims and our determination to guard against any encroachments on their civil liberties is the ultimate rebuke to those who say that we're at war with Islam.

Thwarting homegrown plots presents particular challenges in part because of our proud commitment to civil liberties for all who call America home. That's why, in the years to come, we will have to keep working hard to strike the appropriate balance between our need for security and preserving those freedoms that make us who we are. That means reviewing the authorities of law enforcement, so we can intercept new types of communication, but also build in privacy protections to prevent abuse.

That means that -- even after Boston -- we do not deport someone or throw somebody in prison in the absence of evidence. That means putting careful constraints on the tools the government uses to protect sensitive information, such as the state secrets doctrine. And that means finally having a strong Privacy and Civil Liberties Board to review those issues where our counterterrorism efforts and our values may come into tension.

The Justice Department's investigation of national security leaks offers a recent example of the challenges involved in striking the right balance between our security and our open society. As Commander-in-Chief, I believe we must keep information secret that protects our operations and our people in the field. To do so, we must enforce consequences for those who break the law and breach their commitment to protect classified information. But a free press is also essential for our democracy. That's who we are. And I'm troubled by the possibility that leak investigations may chill the investigative journalism that holds government accountable.

Journalists should not be at legal risk for doing their jobs. Our focus must be on those who break the law. And that's why I've called on Congress to pass a media shield law to guard against government overreach. And I've raised these issues with the Attorney General, who shares my concerns. So he has agreed to review existing Department of Justice guidelines governing investigations that involve reporters, and he'll convene a group of media organizations to hear their concerns as part of that review. And I've directed the Attorney General to report back to me by July 12th.

Now, all these issues remind us that the choices we make about war can impact -- in sometimes unintended ways -- the openness and freedom on which our way of life depends. And that is why I intend to engage Congress about the existing Authorization to Use Military Force, or AUMF, to determine how we can continue to fight terrorism without keeping America on a perpetual wartime footing.

The AUMF is now nearly 12 years old. The Afghan war is coming to an end. Core al Qaeda is a shell of its former self. Groups like AQAP must be dealt with, but in the years to come, not every collection of thugs that labels themselves al Qaeda will pose a credible threat to the United States. Unless we discipline our thinking, our definitions, our actions, we may be drawn into more wars we don't need to fight, or continue to grant Presidents unbound powers more suited for traditional armed conflicts between nation states.

So I look forward to engaging Congress and the American people in efforts to refine, and ultimately repeal, the AUMF's mandate. And I will not sign laws designed to expand this mandate further. Our systematic effort to dismantle terrorist organizations must continue. But this war, like all wars, must end. That's what history advises. That's what our democracy demands.

And that brings me to my final topic: the detention of terrorist suspects. I'm going to repeat one more time: As a matter of policy, the preference of the United States is to capture terrorist suspects. When we do detain a suspect, we interrogate them. And if the suspect can be prosecuted, we decide whether to try him in a civilian court or a military commission.

During the past decade, the vast majority of those detained by our military were captured on the battlefield. In Iraq, we turned over thousands of prisoners as we ended the war. In Afghanistan, we have transitioned detention facilities to the Afghans, as part of the process of restoring Afghan sovereignty. So we bring law of war detention to an end, and we are committed to prosecuting terrorists wherever we can.

The glaring exception to this time-tested approach is the detention center at Guantanamo Bay. The original premise for opening GTMO -- that detainees would not be able to challenge their detention -- was found unconstitutional five years ago. In the meantime, GTMO has become a symbol around the world for an America that flouts the rule of law. Our allies won't cooperate with us if they think a terrorist will end up at GTMO.

During a time of budget cuts, we spend $150 million each year to imprison 166 people -- almost $1 million per prisoner. And the Department of Defense estimates that we must spend another $200 million to keep GTMO open at a time when we're cutting investments in education and research here at home, and when the Pentagon is struggling with sequester and budget cuts.

As President, I have tried to close GTMO. I transferred 67 detainees to other countries before Congress imposed restrictions to effectively prevent us from either transferring detainees to other countries or imprisoning them here in the United States.

These restrictions make no sense. After all, under President Bush, some 530 detainees were transferred from GTMO with Congress's support. When I ran for President the first time, John McCain supported closing GTMO -- this was a bipartisan issue. No person has ever escaped one of our super-max or military prisons here in the United States -- ever. Our courts have convicted hundreds of people for terrorism or terrorism-related offenses, including some folks who are more dangerous than most GTMO detainees. They're in our prisons.

And given my administration's relentless pursuit of al Qaeda's leadership, there is no justification beyond politics for Congress to prevent us from closing a facility that should have never have been opened. (Applause.)

AUDIENCE MEMBER: Excuse me, President Obama --

THE PRESIDENT: So -- let me finish, ma'am. So today, once again --

AUDIENCE MEMBER: There are 102 people on a hunger strike. These are desperate people.

THE PRESIDENT: I'm about to address it, ma'am, but you've got to let me speak. I'm about to address it.

AUDIENCE MEMBER: You're our Commander-In-Chief --

THE PRESIDENT: Let me address it.

AUDIENCE MEMBER: -- you an close Guantanamo Bay.

THE PRESIDENT: Why don't you let me address it, ma'am.

AUDIENCE MEMBER: There's still prisoners --

THE PRESIDENT: Why don't you sit down and I will tell you exactly what I'm going to do.

AUDIENCE MEMBER: That includes 57 Yemenis.

THE PRESIDENT: Thank you, ma'am. Thank you. (Applause.) Ma'am, thank you. You should let me finish my sentence.

Today, I once again call on Congress to lift the restrictions on detainee transfers from GTMO. (Applause.)

I have asked the Department of Defense to designate a site in the United States where we can hold military commissions. I'm appointing a new senior envoy at the State Department and Defense Department whose sole responsibility will be to achieve the transfer of detainees to third countries.

I am lifting the moratorium on detainee transfers to Yemen so we can review them on a case-by-case basis. To the greatest extent possible, we will transfer detainees who have been cleared to go to other countries.

AUDIENCE MEMBER: -- prisoners already. Release them today.

THE PRESIDENT: Where appropriate, we will bring terrorists to justice in our courts and our military justice system. And we will insist that judicial review be available for every detainee.

AUDIENCE MEMBER: It needs to be --

THE PRESIDENT: Now, ma'am, let me finish. Let me finish, ma'am. Part of free speech is you being able to speak, but also, you listening and me being able to speak. (Applause.)

Now, even after we take these steps one issue will remain -- just how to deal with those GTMO detainees who we know have participated in dangerous plots or attacks but who cannot be prosecuted, for example, because the evidence against them has been compromised or is inadmissible in a court of law. But once we commit to a process of closing GTMO, I am confident that this legacy problem can be resolved, consistent with our commitment to the rule of law.

I know the politics are hard. But history will cast a harsh judgment on this aspect of our fight against terrorism and those of us who fail to end it. Imagine a future -- 10 years from now or 20 years from now -- when the United States of America is still holding people who have been charged with no crime on a piece of land that is not part of our country. Look at the current situation, where we are force-feeding detainees who are being held on a hunger strike. I'm willing to cut the young lady who interrupted me some slack because it's worth being passionate about. Is this who we are? Is that something our Founders foresaw? Is that the America we want to leave our children? Our sense of justice is stronger than that.

We have prosecuted scores of terrorists in our courts. That includes Umar Farouk Abdulmutallab, who tried to blow up an airplane over Detroit; and Faisal Shahzad, who put a car bomb in Times Square. It's in a court of law that we will try Dzhokhar Tsarnaev, who is accused of bombing the Boston Marathon. Richard Reid, the shoe bomber, is, as we speak, serving a life sentence in a maximum security prison here in the United States. In sentencing Reid, Judge William Young told him, "The way we treat you... is the measure of our own liberties."

AUDIENCE MEMBER: How about Abdulmutallab -- locking up a 16-year-old -- is that the way we treat a 16-year old? (Inaudible) -- can you take the drones out of the hands of the CIA? Can you stop the signature strikes killing people on the basis of suspicious activities?

THE PRESIDENT: We're addressing that, ma'am.

AUDIENCE MEMBER: -- thousands of Muslims that got killed -- will you compensate the innocent families -- that will make us safer here at home. I love my country. I love (inaudible) --

THE PRESIDENT: I think that -- and I'm going off script, as you might expect here. (Laughter and applause.) The voice of that woman is worth paying attention to. (Applause.) Obviously, I do not agree with much of what she said, and obviously she wasn't listening to me in much of what I said. But these are tough issues, and the suggestion that we can gloss over them is wrong.

When that judge sentenced Mr. Reid, the shoe bomber, he went on to point to the American flag that flew in the courtroom. "That flag," he said, "will fly there long after this is all forgotten. That flag still stands for freedom."

So, America, we've faced down dangers far greater than al Qaeda. By staying true to the values of our founding, and by using our constitutional compass, we have overcome slavery and Civil War and fascism and communism. In just these last few years as President, I've watched the American people bounce back from painful recession, mass shootings, natural disasters like the recent tornados that devastated Oklahoma. These events were heartbreaking; they shook our communities to the core. But because of the resilience of the American people, these events could not come close to breaking us.

I think of Lauren Manning, the 9/11 survivor who had severe burns over 80 percent of her body, who said, "That's my reality. I put a Band-Aid on it, literally, and I move on."

I think of the New Yorkers who filled Times Square the day after an attempted car bomb as if nothing had happened.

I think of the proud Pakistani parents who, after their daughter was invited to the White House, wrote to us, "We have raised an American Muslim daughter to dream big and never give up because it does pay off."

I think of all the wounded warriors rebuilding their lives, and helping other vets to find jobs.

I think of the runner planning to do the 2014 Boston Marathon, who said, "Next year, you're going to have more people than ever. Determination is not something to be messed with."

That's who the American people are -- determined, and not to be messed with. And now we need a strategy and a politics that reflects this resilient spirit.

Our victory against terrorism won't be measured in a surrender ceremony at a battleship, or a statue being pulled to the ground. Victory will be measured in parents taking their kids to school; immigrants coming to our shores; fans taking in a ballgame; a veteran starting a business; a bustling city street; a citizen shouting her concerns at a President.

The quiet determination; that strength of character and bond of fellowship; that refutation of fear -- that is both our sword and our shield. And long after the current messengers of hate have faded from the world's memory, alongside the brutal despots, and deranged madmen, and ruthless demagogues who litter history -- the flag of the United States will still wave from small-town cemeteries to national monuments, to distant outposts abroad. And that flag will still stand for freedom.

Thank you very, everybody. God bless you. May God bless the United States of America. (Applause.)

3:00 P.M. EDT

Case 1:10-cv-00436-RMC   Document 29-5   Filed 08/09/13   Page 48 of 48