**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
|     |     |
| --- | --- |
| AMERICAN CIVIL LIBERTIES UNION, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CENTRAL INTELLIGENCE AGENCY, | ) ) ) |
| Defendant. | ) ) |

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 10-436 (RMC)

## OPINION

The Central Intelligence Agency (CIA) engages in covert actions in foreign countries on behalf of the United States and, by necessity, practice, and statute, keeps its activities secret.  The American Civil Liberties Union and the American Civil Liberties Union Foundation (collectively ACLU) are concerned about CIA activities overseas.  Relying on the Freedom of Information Act, ACLU requested all CIA records pertaining to the United States' use of drone strikes to carry out targeted killings of alleged Islamist terrorists overseas.  CIA initially provided a *Glomar* response to ACLU, *i.e.*, it refused to confirm or deny that CIA had such records, which this Court approved.  *See ACLU v. Dep't of Justice*, 808 F. Supp. 2d 280 (D.D.C. 2011) (*Drones I*).  Thereafter various government officials made public statements about a U.S. operational role in drone strikes.  The D.C. Circuit reversed and ordered CIA to begin the FOIA process anew.  *See ACLU v. CIA*, 710 F.3d. 422, 430 (D.C. Cir. 2013) (*Drones II*).

On remand, ACLU narrowed its request, and CIA searched for and acknowledged the existence of twelve legal memoranda and thousands of classified intelligence products responsive to the narrowed request.  CIA released a redacted version of a classified DOJ White Paper, but has withheld the other eleven legal memoranda and all of the intelligence products on

1

the basis that disclosing these records would compromise classified, statutorily-protected, and privileged information.  ACLU objects to CIA's response and asserts that some records must be released, specifically those records that (1) contain information that has already been officially acknowledged; (2) contain legal analysis or statistical or factual information that is not intertwined with classified intelligence information; and (3) have not been shown by CIA to be subject to a privilege.

Both parties move for summary judgment.  For the reasons set forth below, the Court will grant CIA's Motion for Summary Judgment and deny ACLU's Cross-Motion for Summary Judgment.

## I.  FACTS

In September 2001, Congress authorized the use of military force against enemies of the United States.  Authorization for Use of Military Force (AUMF), Pub. L. No. 107–40, 115 Stat. 224 (reprinted at 50 U.S.C. § 1541 note).  Since that time, the United States and its allies have been engaged in a war with al-Qa'ida[1] and its associated forces in Afghanistan, Pakistan and elsewhere.  One of the recently-used weapons by the United States is an unmanned drone, which can deliver a missile strike against an enemy target with greater precision and less risk to innocent humans than a traditional bomb.  ACLU has sued CIA over its refusal to release records concerning the United States' use of drones.  *See* Am. Compl. [Dkt. 11].

### A.  Original FOIA Request

In a January 13, 2010 letter,[2] ACLU submitted a request for documents under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to CIA's Information and Privacy

---

[1] Al-Qa'ida may also be referred to as "al-Qaeda" and "Al-Qaida."  *See infra* at 5.

[2] The letter was incorrectly dated January 13, 2009.

Coordinator[3] seeking "records pertaining to the use of unmanned aerial vehicles ('UAVs')—

commonly referred to as 'drones' and including the MQ–1 Predator and MQ–9 Reaper—by CIA

and the Armed Forces for the purpose of killing targeted individuals."  CIA 1st Mot. [Dkt. 15],

Declaration of Mary Ellen Cole (Cole Decl.), Ex. A (Jan. 13, 2010 FOIA Request) at 2.  ACLU

specifically requested all records containing ten categories of information:

> 1.  The "legal basis in domestic, foreign and international law upon which unmanned aerial vehicles" can be used to execute targeted killings, including who may be targeted with this weapon system, where and why;
>
> 2.  . . . .[4]
>
> 3.  The "selection of human targets for drone strikes and any limits on who may be targeted by a drone strike;"
>
> 4.  "[C]ivilian casualties in drone strikes," including measures to limit civilian casualties;
>
> 5.  The "assessment or evaluation of individual drone strikes after the fact," including how the number and identities of victims are determined;
>
> 6.  "[G]eographical or territorial limits on the use of UAVs to kill targeted individuals;"
>
> 7.  The "number of drone strikes that have been executed for the purpose of killing human targets, the location of each such strike,

---

[3] ACLU submitted the same January 13, 2010 FOIA request to the Department of Defense (DOD), Department of Justice (DOJ), DOJ's Office of Legal Counsel (OLC), and Department of State (State).  ACLU originally sued DOD, DOJ, and State.  *See* Compl. ¶¶ 9–11 (filed 3/16/10).  The Amended Complaint added CIA as a co-defendant.  *See* Am. Compl. [Dkt. 11] ¶ 12 (filed 6/1/10).  The parties stipulated to dismissal the complaint against DOD, DOJ, and State on October 26, 2011.  *See* Stipulation [Dkt. 38].  This Opinion addresses only the FOIA request to CIA.

[4] During the first round of summary judgment briefing, ACLU abandoned its request for information in categories 1(b) and 2, both of which concerned records on the understanding, cooperation or involvement of foreign governments in drone strikes.  *See* Pls. Opp'n to CIA 1st Mot. [Dkt. 20] at 3.

and the agency of the government or branch of the military that undertook each such strike;"

8. The "number, identity, status, and affiliation of individuals killed in drone strikes;"

9. "[W]ho may pilot UAVs, who may cause weapons to be fired from UAVs, or who may otherwise be involved in the operation of UAVs for the purpose of executing targeted killings," including records pertaining to the involvement of CIA personnel, government contractors, or other non-military personnel, and;

10. The "training, supervision, oversight, or discipline of UAV operators and others involved in the decision to execute a targeted killing" using a drone.

Jan. 13, 2010 FOIA Request at 5–8 (emphasis omitted).

### B.  Prior Proceedings

CIA responded to the Jan. 13, 2010 FOIA Request on March 9, 2010, stating that "the CIA [could] neither confirm nor deny the existence or nonexistence of records responsive to [ACLU's] request."  Cole Decl., Ex. B (Mar. 9, 2010 CIA Response).  CIA stated that the "fact of the existence or nonexistence of requested records is currently and properly classified and is intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended."[5]  *Id.*  CIA specifically relied on FOIA Exemptions 1 and 3 as the basis for its response.  *Id.*  ACLU filed an administrative appeal on April 22, 2010 but then filed the Amended Complaint in this litigation (adding CIA as a defendant) and CIA closed the administrative file.

---

[5] CIA's response is commonly known as a *Glomar* response, which is named after the ship *Hughes Glomar Explorer*, about which records were sought in *Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976).  The *Phillippi* requester sought information regarding the ship, and CIA refused to confirm or deny that it had any records because to do so would have compromised national security or would have revealed intelligence sources and methods.  CIA's response was sustained by the D.C. Circuit.  *Id.*; *see also Moore v. Bush*, 601 F. Supp. 2d 6, 14 n.6 (D.D.C. 2009).

CIA moved for summary judgment on October 1, 2010, arguing that it could neither confirm nor deny the existence of responsive records.  ACLU opposed, citing *inter alia*, a May 18, 2009 response to a question by then-CIA Director Leon J. Panetta after a speech, about the United States' use of drone strikes in Pakistan.  Director Panetta responded:

> On the first issue, obviously because these are covert and secret operations I can't go into particulars.  I think it does suffice to say that these operations have been very effective because they have been very precise in terms of the targeting and it involved a minimum of collateral damage.  I know that some of the— sometimes the criticisms kind of sweep into other areas from either plane attacks or attacks from F–16s and others that go into these areas, which do involve a tremendous amount of collateral damage.  And sometimes I've found in discussing this that all of this is kind of mixed together.  But I can assure you that in terms of that particular area, it is very precise and it is very limited in terms of collateral damage and, very frankly, it's the only game in town in terms of confronting and trying to disrupt the al-Qaeda leadership.

Pl. Opp'n to CIA 1st Mot. [Dkt. 20], Declaration of Alexander Abdo, Ex. B (May 18, 2009 Panetta Remarks at the Pacific Council on International Policy) at 10.  ACLU also quoted from an interview Director Panetta gave to the Washington Post.  *Id.*, Ex. C at 1 ("In an interview with the Washington Post, Mr. Panetta described the drone strikes in Pakistan as 'the most aggressive operation that CIA has been involved in in our history.'") (quoting Joby Warrick & Peter Finn, *Al-Qaida Crippled as Leaders Stay in Hiding, CIA Chief Says*, Wash. Post, Mar. 17, 2010).

This Court granted CIA's Motion for Summary Judgment on September 9, 2011, finding that CIA's *Glomar* response was justified under FOIA Exemption 3 based on the non-disclosure provisions of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 403–4 *et seq.* (CIA Act), and the National Security Act of 1947, as amended, 50 U.S.C. § 401

*et seq.* (the NSA).  *See Drones I*, 808 F. Supp. 2d at 287–93.[6]  With respect to Director Panetta's comments, the Court found that:

> [C]omments by Director Panetta did not officially disclose the CIA's involvement in the drone strike program . . . . Even if Director Panetta were speaking squarely on the issue of drone strikes, he never acknowledged the CIA's involvement in such program.  That Director Panetta acknowledged that such a program exists and he had some knowledge of it, or that he was able to assess its success, is simply not tantamount to a specific acknowledgment of the CIA's involvement in such program, nor does it waive the CIA's ability to properly invoke Glomar.

*Id.* at 294 (citing *Wilner v. NSA*, 592 F.3d 60, 70 (2d Cir. 2009) (other citations omitted)).  This Court noted that "Plaintiffs seek exactly what is *not* publicly available—an official CIA acknowledgment of the fact that it is or is not involved in the drone strike program."  *Id.* at 296 (citing *Public Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993)).  This Court also ruled that CIA's *Glomar* response was independently authorized under FOIA Exemption 1 based on Executive Order 13526, as well as the potential damage to national security that could occur by providing insight into CIA's foreign intelligence activities.  *Id.* at 298–301.

ACLU filed its notice of appeal on November 9, 2011.  Thereafter, on January 30, 2012, President Obama appeared on a live internet video forum, and stated:

> I think that we have to be judicious in how we use drones.  But understand that probably our ability to respect the sovereignty of other countries . . . is enhanced by the fact that we are able to pinpoint-strike an al Qaeda operative in a place where the capacities of th[e] military in that country may not be able to get them.  So obviously a lot of these strikes have been . . . going after al Qaeda suspects who are up in very tough terrain along the border between Afghanistan and Pakistan.

---

[6] The CIA Act exempts CIA from "any . . . law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency."  50 U.S.C. § 403g.  The NSA mandates that the "Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 403–1(i)(1).

*President Obama Hangs out with America*, White House Blog (Jan. 30, 2012),

http://www.whitehouse.gov/blog/2012/01/30/president-obama-hangs-out-america (last visited

June 18, 2015); The White House, *Your Interview with the President—2012*, YouTube, at 28:37–

29:23 (Jan. 30, 2012), http://www.youtube.com/watch?v=eeTj5qMGTAI; *see id.* at 26:20–30:18

(President Obama Hangout) (last visited June 18, 2015).

On April 20, 2012, then-Assistant to the President for Homeland Security and

Counterterrorism John Brennan remarked:

> So let me say it is as simply as I can.  Yes, in full accordance with
> the law . . . the United States Government conducts targeted strikes
> against specific al-Qaida terrorists, sometimes using remotely
> piloted aircraft, often referred to publicly as drones.  And I'm here
> today because President Obama has instructed us to be more open
> with the American people about these efforts.

John O. Brennan, *The Ethics and Efficacy of the President's Counterterrorism Strategy*, Wilson

Center (Apr. 30, 2012), http://www.wilsoncenter.org/event/the-efficacy-and-ethics-us-

counterterrorism-strategy (last visited June 18, 2015).

The D.C. Circuit reversed this Court on March 15, 2013.  *See Drones II*, 710 F.3d

at 434.  The Circuit noted that ACLU's FOIA request was not limited to information about

drones operated by CIA, but more broadly sought records pertaining to the use of drones by

either CIA or the Armed Forces.  *Id.* at 428.  The Circuit held that the Government had

acknowledged officially that CIA has an "intelligence interest" in drone strikes.  *Id.* at 430.

Taking judicial notice of the statements made by President Obama and Mr. Brennan, *see id.* at

431 n.10, the D.C. Circuit concluded that, "[g]iven these official acknowledgements . . . it is

neither logical nor plausible for the CIA to maintain that it would reveal anything not already in

the public domain to say that the Agency 'at least has an intelligence interest' in such strikes,'"

*id.* at 430 (quoting Cole Decl. ¶ 12); *see also id.* at 431 ("In short, although the President and Messrs. Brennan and Panetta did not say that the CIA possesses responsive documents, what they did say makes it neither 'logical' nor 'plausible' to maintain that the Agency does not have any documents relating to drones.").

The Circuit remanded for this Court to determine "'whether the *contents*—as distinguished from the *existence*—of the officially acknowledged records may be protected from disclosure by Exemptions 1 and 3.'" *Id.* at 432 (quoting *Wolf v. CIA*, 473 F.3d 370, 380 (D.C. Cir. 2007)).  The Circuit instructed that, "with the failure of the CIA's broad *Glomar* response, the case must now proceed to the filing of a *Vaughn* index[7] or other description of the kind of documents the Agency possesses, followed by litigation regarding whether the exemptions apply to those documents." *Id.* at 432.

The Circuit also addressed the propriety of a "no number, no list" response, by which an agency acknowledges the existence of responsive documents, but declines to further describe or enumerate them or provide any other information.

> [A] "no number, no list" response might be viewed as a kind of *Vaughn* index, albeit a radically minimalist one.  Such a response would only be justified in unusual circumstances, and only by a particularly persuasive affidavit.  Nor is there any reason to regard this approach as subject to an on/off switch . . . . [O]nce an agency acknowledges that it has some responsive documents, there [is] a variety of forms that subsequent filings in the district court may take. A pure "no number, no list" response is at one end of that continuum; a traditional *Vaughn* index is at the other.  Not quite as minimalist as a pure "no number, no list" response might be a "no number, no list" response (or even a *Glomar* response) with respect

---

[7] A *Vaughn* index, which is named after the case *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), generally "indicates in some descriptive way which documents the agency is withholding and which FOIA exemptions . . . apply . . . . [T]here is no fixed rule establishing what a *Vaughn* index must look like, and a district court has considerable latitude to determine its requisite form and detail in a particular case." *Drones II*, 710 F.3d at 432.

> to a limited category of documents, coupled with a *Vaughn* index
> for the remainder.

*Drones II*, 710 F.3d at 433–34.[8]

### C.  Additional Disclosures

After *Drones II*, the Executive Branch continued to declassify and disclose previously-classified information.  *See* CIA 2nd Mot. [Dkt. 49], Declaration of Martha Lutz (Lutz Decl. I) ¶¶ 15-16.  On May 22, 2013, Attorney General Eric Holder wrote to Senator Patrick J. Leahy, Chairman of the Senate Judiciary Committee, regarding counterterrorism operations.  *Id.*, Declaration of Amy Powell (Powell Decl.), Ex. C (May 22, 2013 Letter from Holder to Leahy).  Attorney General Holder wrote:

> I am . . . disclos[ing] to you certain information about the number of
> U.S. citizens who have been killed by U.S. counterterrorism
> operations outside of areas of active hostilities.  Since 2009, the
> United States, in the conduct of U.S. counterterrorism operations
> against al-Qa'ida and its associated forces outside of areas of active
> hostilities, has specifically targeted and killed one U.S. citizen,
> Anwar al-Aulaqi.  The United States is further aware of three other
> U.S. citizens who have been killed in such U.S. counterterrorism
> operations over that same time period: Samir Khan, 'Abd al-
> Rahman Anwar al-Aulaqi, and Jude Kenan Mohammed.  These
> individuals were not specifically targeted by the United States.

*Id.* at 1–2.

Further, on May 23, 2013, President Obama himself disclosed that Anwar al-Aulaqi and three other U.S. citizens were killed in lethal drone operations overseas.  *See* Powell Decl., Ex. D (May 23, 2013 Remarks by the President at the National Defense University) at 4 (noting that there was "one instance when [the United States] targeted . . . Anwar Awlkaki [sic],"

---

[8] These comments were prompted by CIA arguments in an analogous FOIA case in the 2nd Circuit.  *See New York Times Co. v. Dep't of Justice*, 752 F.3d 123 (2d Cir. 2014), *revised and superseded by* 756 F.3d 100 (2d Cir. 2014), *amended on denial of rehearing by* 758 F.3d 436 (2d Cir. 2014).

and that the President "authorized the declassification of this action, and the deaths of three other Americans in drone strikes, to facilitate transparency and debate on this issue and to dismiss some of the more outlandish claims that have been made").

### D.  New York Litigation

The analogous FOIA litigation in New York, referenced above, was brought by ACLU and the New York Times in the Southern District of New York, seeking records from multiple agencies regarding drone strikes on U.S. citizens.  *See New York Times Co. v. Dep't of Justice*, No. 11-cv-9336 (CM) (S.D.N.Y. filed Dec. 20, 2011), *Am. Civil Liberties Union v. Dep't of Justice*, No. 12-cv-794 (CM) (S.D.N.Y filed Feb. 1, 2012).  The District Court granted summary judgment in favor of the government, approving CIA's proffered "no-number no-list" response to the parties' FOIA requests, because details about the records, including their nature and number, had not been waived by official public acknowledgment.  *See N.Y. Times Co. v. Dep't of Justice*, 915 F. Supp. 2d 508, 550-53 (S.D.N.Y. 2013).  On appeal, the Second Circuit affirmed in part, reversed in part, and remanded after concluding that the government had officially "identified CIA as an agency that had an operational role in targeted drone killings." *See N.Y. Times Co. v. Dep't of Justice*, 756 F.3d 100, 122, 124 (2d Cir. 2014).  In addition to ordering the release of a portion of an Office of Legal Counsel opinion, it held that CIA's no number, no list response was "insufficiently justified" and ordered CIA to submit a classified *Vaughn* index "to the District Court on remand for *in camera* inspection and determination of appropriate disclosure and appropriate redaction."  *Id*. at 124.[9]

_____

[9] The Second Circuit agreed with the D.C. Circuit that a no number, no list response could be appropriate in certain—albeit unusual—circumstances "and only by a particularly persuasive affidavit."  *Drones II*, 710 F.3d at 433.  However, because it determined that CIA had publicly disclosed its operational role in targeted drone killings, the Second Circuit ruled that the

After remand,

> the Government redacted and released one additional OLC
> memorandum related to a contemplated operation against Anwar al-
> Aulaqi and one classified DOJ White Paper on the same subject.
> With respect to all responsive OLC memoranda, the district court
> has upheld the Government's withholdings in their entirety. The
> defendants have filed motions for summary judgment with respect
> to the remaining documents in dispute.

CIA 3rd Mot. [Dkt. 67-1] at 8 n.4.  Proceedings continue before the U.S. District Court of the

Southern District of New York.

### E.  Revised FOIA Request Here

In this case, on remand from the D.C. Circuit, CIA filed a second motion for

summary judgment on August 9, 2013, Dkt. 49, which relied on a "no number, no list" response

to ACLU's FOIA request.  Subsequently, in light of the Second Circuit's decision, CIA

withdrew its second motion for summary judgment and the parties conferred on how to proceed.

*See* Status Report [Dkt. 62].  Based on those discussions, ACLU amended its FOIA request,

limiting it to two categories of items:

> (1) Any and all final legal memoranda (as well as the latest version
> of draft legal memoranda which were never finalized) concerning
> the U.S. Government's use of armed drones to carry out
> premeditated killings; and (2) four types of records routinely
> compiled by the CIA for analytical purposes containing charts or
> compilations about U.S. Government strikes sufficient to show the
> identity of the intended targets, assessed number of people killed,
> dates, status of those killed, agencies involved, the location of each
> strike, and the identities of those killed if known.

CIA Notice [Dkt. 73] at 1.  ACLU agreed to exclude any legal memoranda being considered in

the analogous FOIA proceedings in the Southern District of New York.  *Id.* at 2.  In addition,

"[d]uring the negotiations between the parties, the ACLU was advised the CIA possessed

---

"Appellees' main argument for the use of *Glomar* and no number, no list responses
evaporate[d]."  *N.Y. Times Co.*, 756 F.3d at 110, 122.

additional materials about U.S. Government strikes that was not routinely compiled for analytical purposes." *Id*. However, "the parties agreed that only the four specific types of intelligence products would be subject to the litigation." *Id*. ACLU filed no response or objection to the CIA's clarifying Notice.

On November 25, 2014, CIA filed a third motion for summary judgment, Dkt. 67, acknowledging that its search yielded records responsive to ACLU's narrowed request. In total, CIA identified twelve documents responsive to ACLU's request for legal memoranda and thousands of intelligence products responsive to the four types of intelligence products covered by ACLU's request. *See* CIA 3rd Mot., Declaration of Martha M. Lutz (Lutz Decl. II) [Dkt. 67-2] ¶¶ 8, 9. CIA asserts that, with one exception, "disclosure of these documents would compromise classified, statutorily-protected, and privileged information." Lutz Decl. II ¶ 7. CIA invokes FOIA Exemptions 1, 3, and 5 to protect these records. *Id*. ¶ 7. CIA has also filed a classified declaration of Ms. Lutz for *ex parte, in camera* review. *See* Notice of Classified Lodging [Dkt. 68]. ACLU filed a cross-motion for summary judgment, Dkt. 70, arguing that CIA has not justified its withholding of responsive records. ACLU asks the Court to review the legal memoranda *in camera* to determine if any must be released and to direct CIA to segregate and disclose "strike metadata"[10] from the responsive intelligence products. *See* Opp'n and

---

[10] Although it does not define "strike metadata," ACLU appears to use the term to capture the underlying factual information it requested, *i.e.*, "the identity of the intended targets, assessed number of people killed, dates, status of those killed, agencies involved, the location of each strike, and the identifies of those killed if known." *See* CIA Notice at 1. Use of the term "metadata" for such information downplays the reality of the FOIA request. *See* Metadata Definition, Merriam-Webster Dictionary available at http://www.merriam-webster.com/dictionary/metadata ("data that provides information about other data") (last visited June 18, 2015); Metadata Definition, TechTerms.com available at http://techterms.com/definition/metadata ("A text document's metadata may contain information about how long the document is, who the author is, when the document was written, and a short summary of the document.") (last visited June 18, 2015).

Cross-Mot. For Summ. J. [Dkt. 69] at 32 (Opp'n).  ACLU does not challenge the adequacy of

CIA's search for responsive records.

### F.   Supplemental Authority

On February 12, 2014, ACLU filed a Notice of Supplemental Authority for the

proposition that CIA's role in drone strikes has now been officially and publicly acknowledged.

*See* Notice of Supp. Auth. [Dkt. 56] (Supp. Auth.).  ACLU quoted a news article concerning an

exchange between Director of National Intelligence (DNI) James Clapper and Senator Bill

Nelson during a hearing of the Senate Armed Services Committee:

> Senator Nelson: It is—you tell me if this is correct—the
> administration's policy that they are exploring shifting the use of
> drones, unmanned aerial vehicle strikes, from the CIA to the DOD.
> Is that an accurate statement?
>
> Clapper: Yes, sir, it is.  And again, that would be best left to a closed
> session.

Supp. Auth. at 1.[11]  Directed to respond to the Supplemental Authority, CIA did not dispute the

accuracy of the quote.  *See* CIA Supp. Br. [Dkt. 60] at 2.

## II.  LEGAL STANDARDS

CIA contends that it is entitled to judgment as a matter of law because there is no

genuine dispute as to any material fact.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247 (1986).  Summary judgment is properly granted against a party who

"after adequate time for discovery and upon motion . . . fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

---

[11] ACLU cited Siobhan Gorman, *CIA's Drones, Barely Secret, Receive Rare Public Nod*, Wall
St. J. Washington Wire Blog (Feb. 11, 2014), http://blogs.wsj.com/washwire/2014/02/11/cias-
drones-barely-secret-receive-rare-public-nod/ (last visited June 18, 2015).

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In ruling

on a motion for summary judgment, a court must draw all justifiable inferences in the

nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson*, 477

U.S. at 255.  A nonmoving party, however, must establish more than "[t]he mere existence of a

scintilla of evidence" in support of its position.  *Id.* at 252.

       In a FOIA case, a district court decides de novo whether an agency properly

withheld information under a claimed exemption.  *Mead Data Cent., Inc. v. Dep't of Air Force*,

566 F.2d 242, 251 (D.C. Cir. 1977).  "The underlying facts are viewed in the light most

favorable to the [FOIA] requester," *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C.

Cir. 1983), and the exemptions are narrowly construed, *FBI v. Abramson*, 456 U.S. 615, 630

(1982).

       FOIA cases are typically and appropriately decided on motions for summary

judgment. *Miscavige v. IRS*, 2 F.3d 366, 368 (11th Cir. 1993); *Rushford v. Civiletti*, 485 F.

Supp. 477, 481 n.13 (D.D.C. 1980), *aff'd*, *Rushford v. Smith*, 656 F.2d 900 (D.C. Cir. 1981).  In

a FOIA case, a district court may award summary judgment solely on the basis of information

provided by the agency in affidavits when the affidavits describe "the documents and the

justifications for nondisclosure with reasonably specific detail, demonstrate that the information

withheld logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*,

656 F.2d 724, 738 (D.C. Cir. 1981).  Affidavits submitted by the agency to demonstrate the

adequacy of its response are presumed to be in good faith.  *Ground Saucer Watch, Inc. v. CIA*,

692 F.2d 770, 771 (D.C. Cir. 1981).  An agency must demonstrate that "each document that falls

within the class requested either has been produced, is unidentifiable, or is wholly [or partially]

exempt" from FOIA's requirements. *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal quotation marks and citation omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Wolf*, 473 F.3d at 374–75).

FOIA also requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b)(9); *see also Oglesby v. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996). Reasonably segregable information—that is, information that can be separated from the exempt portions of a document—must be produced unless the non-exempt portions are "inextricably intertwined with exempt portions." *Trans-Pacific Policing Agreement v. Customs Serv.*, 177 F.3d 1022, 1027 (D.C. Cir. 1999); *Juarez v. Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008) ("[D]ocuments may be withheld in their entirety when non-exempt portions are inextricably intertwined with exempt portions.") (internal quotations omitted). A district court has "'an affirmative duty to consider the segregability issue sua sponte.'" *Id.* at 60.

### III.  ANALYSIS

The question is whether ACLU can obtain certain legal memoranda concerning the U.S. Government's use of drone strikes and four type of records "routinely compiled by the CIA for analytical purposes containing charts or compilations about U.S. Government strikes sufficient to show" the detailed information requested on covert government actions. *See* CIA Notice at 1.

CIA has invoked FOIA Exemptions 1, 3, and 5 to justify its withholding of records. ACLU maintains that CIA has improperly withheld information that has already been officially disclosed and that CIA has not justified any of the cited FOIA Exemptions. In the course of this litigation, CIA submitted two public declarations from Ms. Lutz. *See* Lutz Decl. I

15

[Dkt. 49-2] and Lutz Decl. II [Dkt. 67-2].  Ms. Lutz declares that she carefully "conducted a page-by-page and line-by-line review [of the responsive documents] and determined that there is no reasonably segregable, non-exempt portions of documents that can be released without potentially compromising classified information, intelligence sources and methods, and/or material protected by privilege."  Lutz Decl. II ¶ 31.  CIA also lodged *ex parte* and *in camera* an additional classified declaration from Ms. Lutz providing details about the withheld records that cannot be placed on the public record.  *See* Notice of Classified Lodging [Dkt. 68].  The Court has carefully, and repeatedly, reviewed the entire record.

### A.  CIA's Response to ACLU's Revised FOIA Request

CIA informed ACLU that its search yielded twelve legal memoranda and thousands of intelligence products.  *See* Lutz Decl. II ¶¶ 8, 9.  CIA did not prepare a traditional *Vaughn* Index, listing or describing the responsive records.  ACLU does not request that CIA supplement its response with a descriptive *Vaughn* index.  Rather, the CIA has submitted a distinctly modified *Vaughn* Index that addresses each *kind* of requested document—(1) legal memoranda and 2) four types of intelligence products that contain charts or compilations of U.S. drone strikes—and the bases for their withholding.  Although more fulsome than a bare-bones response that "we cannot tell you the number of documents or list them," CIA was not more forthcoming as regards the intelligence products.

The D.C. Circuit recognized that a no number, no list response could legitimately be lodged on remand, but stressed that this Court should carefully scrutinize CIA's proffered reasons.  *See Drones II*, 710 F.3d at 433 (ruling that a no number/no list response "would only be justified in unusual circumstances, and only by a particularly persuasive affidavit").  Based on CIA's limited disclosures, this guidance from the Circuit, and the information in the Lutz

Declarations, the Court finds that CIA's response to ACLU's revised FOIA request has been fully explained and adequately justified.

### B. FOIA Exemption 1

Under Exemption 1, FOIA does not require the production of records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). CIA relies upon Executive Order 13526 (E.O. 13526), 75 Fed. Reg. 707 (Dec. 29, 2009), which governs the classification and protection of national security information, to withhold the legal memoranda, other than the released portions of the DOJ White Paper, and all of the responsive intelligence products. *See* Lutz Decl. II ¶¶ 24, 25. Information can be properly classified under E.O. 13526 if four requirements are met: (1) an original classification authority has classified the information; (2) the United States Government owns, produces, or controls the information; (3) the information pertains to one or more of eight protected categories listed in Section 1.4 of the E.O.; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in a specified level of damage to the national security, and the original classification authority is able to identify or describe the damage. E.O. 13526 § 1.1(a).

CIA has made an affirmative showing that (1) all of the withheld records were classified by Ms. Lutz, an original classification authority, (2) all of the withheld records are owned, produced or controlled by the United States Government, and (3) that disclosure of the withheld records could reasonably be expected to result in damage to national security. *See* Lutz Decl. II ¶¶ 12, 13, 15, 18, 22-26. ACLU offered no rejoinder to the first two requirements and expressly declined to address CIA's position that disclosure of the information reasonably could

be expected to harm national security.[12]  *See* Opp'n at 25-27, 29-31.[13]  Because ACLU does not

oppose CIA's affirmations with respect to these three requirements, the Court treats the

arguments as conceded.  *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F.

Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 Fed. Appx. 8 (D.C. Cir. 2004) ("It is well understood in

this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only

certain arguments raised by the defendant, a court may treat those arguments that the plaintiff

failed to address as conceded.").

      ACLU objects only to CIA's statements that the withheld records come under one

or more of eight protected categories listed in Section 1.4 of E.O. 13526.  CIA argues that the

withheld records fall into two of those categories: (1) "intelligence activities (including covert

action), intelligence sources or methods, or cryptology" and (2) "foreign relations or foreign

activities of the United States, including confidential sources."  CIA 3rd Mot. at 18 (citing Exec.

Order 13526 §1.4(c), (d)).  Specifically, CIA maintains that the legal memoranda, including the

redacted portions of the DOJ White Paper, concern classified intelligence activities, sources, and

methods, and that the redacted portions of the DOJ White Paper, which discuss a contemplated

CIA operation in Yemen, and the intelligence products, which include information about U.S.

---

[12] ACLU argues that the Court should not afford customary deference to CIA's determination
that harm could result if the requested records were released, *see Ctr. for Nat. Sec. Studies v. U.S.
Dept. of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003), because the D.C. Circuit refused to accept
CIA's earlier *Glomar* response.  This argument confuses ACLU's own generalized suspicion of
CIA and the Circuit's carefully drawn legal distinctions.  Rather than question CIA's entitlement
to deference, the Circuit specifically found it acted without bad faith or wrongdoing.  *See Drones
II*, 710 F.3d at 430.  Neither does this Court find any basis to limit customary deference.
ACLU's argument fails to address or counter the two Lutz Declarations or the NSA and CIA
Acts.

[13] ACLU did not file a Reply in support of its Cross-Motion for Summary Judgment.

government drone strikes, concern the foreign relations or foreign activities of the United States. *Id*. (citing Lutz Decl. II ¶¶ 6, 9, 23, 25).

ACLU's objection is presented in three parts.  First, ACLU contends that the legal analysis in the memoranda is not an intelligence activity, source or method, according to the ordinary use of those terms, and therefore cannot be withheld under Exemption 1 because it does not fall within a protected category listed in Section 1.4 of E.O. 13526.  *See* Opp'n at 25-26. Second, it argues that if CIA can justify withholding redacted portions of the DOJ White Paper simply because those portions implicate foreign activities, CIA's position is so expansive as to render CIA exempt from the FOIA altogether.  *Id*. at 26 n.32.  Third, ACLU argues that CIA concedes that "strike metadata" is not itself an intelligence source or method based on Ms. Lutz's statement that "[t]he information contained in these intelligence products would *reveal* the sources and methods of underlying intelligence collection."  *See* Opp'n at 29-30 (citing Lutz Decl. II ¶ 25 (emphasis added)).

Contrary to ACLU's argument, legal analysis need not constitute an intelligence activity, source, or method to be protected from disclosure under Exemption 1.  Section 1.4 of E.O. 13526 directs that "[i]nformation shall not be considered for classification unless it . . . *pertains to* . . . intelligence activities (including covert action), intelligence sources or methods." *See* E.O. 13526 §1.4 (emphasis added).  For something to pertain to something else, it must be related or connected to such a thing.  *See* Pertain Definition, Merriam-Webster Dictionary available at http://www.merriam-webster.com/dictionary/pertain (last visited June 18, 2015). Thus, a legal analysis need not constitute an intelligence activity, source, or method by itself to warrant protection so long as it *pertains to* an intelligence activity, source, or method.  Here, CIA has withheld legal memoranda responsive to ACLU's request for legal memoranda that

"concern[] the U.S. Government's use of armed drones to carry out premeditated killings."  CIA

Notice at 1.  ACLU does not contend that drone strikes are not an intelligence activity or method

(or possibly reveal sources), nor could it.  Thus, it is entirely logical and plausible that the legal

analyses in the withheld memoranda pertain to intelligence activities, sources, and methods.  *See*

*Larson*, 565 F.3d at 862 ("Ultimately, an agency's justification for invoking a FOIA exemption

is sufficient if it appears 'logical' or 'plausible.'") (internal citation omitted).

ACLU's sweeping assertion that CIA can exempt itself from FOIA simply by

linking any kind of record to foreign activities is unfounded.  The argument overlooks the three

other classification requirements of E.O. 13526 (none of which ACLU contests here), including

that CIA demonstrate that the disclosure of withheld records "could reasonably be expected to

cause identifiable or describable damage to the national security."  E.O. 13526 § 1.4.  These

additional requirements express clear limitations on CIA's ability to rely on E.O. 13526 when

invoking Exemption 1.  Thus, ACLU's objection to CIA's withholding of redacted portions of

the DOJ White Paper does not stand.  Ms. Lutz explains that the redacted portions of the White

Paper "discuss[] a contemplated CIA operation in a foreign country–Yemen." Lutz Decl. II ¶ 23.

The Court finds that this information clearly falls within Sections 1.4(c) and (d) of E.O. 13526

because it relates to intelligence activities and foreign activities of the United States.  *See* E.O.

13526 § 1.4

ACLU insists that it only seeks "factual information" from the four kinds of

intelligence products that contain charts or compilations of U.S. drone strikes, not anything that

would reveal an intelligence activity, source, or method.  To the contrary, ACLU seeks explicit

details on U.S. drone strikes that would be "sufficient to show the identity of the intended

targets, assessed number of people killed, dates, status of those killed, agencies involved, the

location of each strike, and the identities of those killed if known." CIA Notice at 1. Such details could reveal the scope of the drone program, its successes and limitations, the "methodology behind the assessments and the priorities of the Agency" and more. *See* Lutz Decl. II ¶ 25. The Court has no doubt that this kind of detail would reveal intelligence activities, sources, and methods and is properly protected under Exemption 1.

CIA alternately designated the intelligence products containing charts and compilations as relating to the "foreign relations and foreign activities of the United States," another protected category listed in Section 1.4 of E.O. 13526. *See Reply* [Dkt. 72] at 5; Lutz Decl. ¶¶ 14, 18. ACLU did not object to this designation. *See generally* Opp'n at 29-31. By failing to address this argument, ACLU has conceded it. *See Hopkins*, 284 F. Supp. 2d at 25.

The Court concludes that CIA has sustained its burden of showing that all the documents at issue were properly withheld from disclosure under FOIA Exemption 1. *See Larson*, 565 F.3d at 865 ("If an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption and evidence in the record does not suggest otherwise, . . . the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions.").[14]

---

[14] Because the Court has determined that all of the withheld records are protected by Exemption 1, the Court does not reach the question of whether Exemption 3 applies as well. S*ee* Lutz Decl. II ¶¶ 24-26 ("Exemption (b)(3) in conjunction with the National Security Act and the CIA Act also applies to all the information for which Exemption (b)(1) was invoked."); Reply at 6 ("[A]ll of the withheld information is protected by Exemption 1."). The Court nonetheless considers whether the legal memoranda are also properly withheld pursuant to Exemption 5.

   **B. FOIA Exemption 5**

   FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency

memoranda or letters which would not be available by law to a party other than an agency in

litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption encompasses material that is

protected under the deliberative process privilege, the attorney-client privilege, and the

presidential communications privilege.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d

854, 862 (D.C. Cir. 1980); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975)

(Exemption 5 includes all documents "normally privileged in the civil discovery context.");

*Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006) (same).

   The deliberative process privilege protects records "reflecting advisory opinions,

recommendations and deliberations comprising part of a process by which governmental

decisions and policies are formulated."  *NLRB*, 421 U.S. at 150.  It also covers

"recommendations, draft documents, proposals, suggestions, and other subjective documents

which reflect the personal opinions of the writer rather than the policy of the agency."  *Coastal*

*States*, 617 F.2d at 866.  To qualify for withholding, material must be both predecisional and

deliberative.  *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005).

> A document is predecisional if it was prepared in order to assist an agency
> decisionmaker in arriving at his decision, rather than to support a decision
> already made.  Material is deliberative if it reflects the give-and-take of
> the consultative process. [The D.C. Circuit's] recent decisions on the
> deliberativeness inquiry have focused on whether disclosure of the
> requested material would tend to discourage candid discussion within an
> agency.

*Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (alteration in

original) (citations and internal quotation marks omitted).  These documents are protected from

release to promote "the quality of agency decisions by protecting open and frank discussion

among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001); *accord Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 617 (D.C. Cir. 1997) ("[T]he quality of administrative decision-making would be seriously undermined if agencies were forced to 'operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters would be impossible.") (quoting *Mead Data Cent.,* 566 F.2d at 256).

The attorney-client privilege protects "confidential communications from clients to their attorneys, as well as communications from attorneys to their clients containing confidential information supplied by the client." *Am. Imm. Council v. Dep't of Homeland Sec.,* 950 F. Supp. 2d 221, 243 (D.D.C.2013) (citing *Tax Analysts v. I.R.S.,* 117 F.3d 607, 618 (D.C. Cir. 1997)). The presidential communications privilege is a "presumptive privilege for [p]residential communications," *United States v. Nixon*, 418 U.S. 683, 708 (1974), that "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008). The privilege protects those "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential," and, once the privilege is invoked, the documents become presumptively privileged. *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997). Further, unlike the deliberative process privilege, which is also encompassed under Exemption 5, the presidential communications privilege "applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones." *Id*. at 745. Along with protecting communications that "directly involve" the President, *see Loving*, 550 F.3d at 39 (quoting *Judicial Watch v. Dep't of Justice*, 365 F.3d 1108, 114 (D.C. Cir.)), the privilege also protects

> communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate.

*In re Sealed Case*, 121 F.3d at 752.

CIA justifies withholding the legal memoranda under the deliberative process, attorney-client, and presidential communication privileges. *See* CIA 3rd Mot. at 24-28.[15] Ms. Lutz avers that "[a]ll of the material for which the deliberative process privilege was asserted reveals an interim stage in intra-agency and inter-agency discussions, which preceded a final decision of the CIA or other agency or component of the Executive Branch." Lutz Decl. II ¶ 28. CIA argues that attorney-client privilege protects "communications between the CIA and DOJ in connection with a request for the provision of legal advice as well as information provided by Agency personnel in furtherance of that advice." *Id*. ¶ 29. Ms. Lutz affirms that "the confidentiality of these communications was maintained." *Id*. Finally, CIA contends that the presidential communication privilege protects those documents which "reflect communications between Executive Branch agencies and presidential advisors for the purpose of presidential decision-making." *Id*. ¶ 30. ACLU protests that Lutz Declaration II fails to provide a foundation for invoking any of the cited privileges because it fails to explain how any of the claimed privileges actually applies to each of the legal memoranda for which they are invoked. *See* Opp'n at 28-29. However, the classified Lutz Declaration, which was provided to the Court for *ex parte*, *in camera* review, *see* Notice of Classified Lodging [Dkt. 68], provides fully detailed descriptions of the legal memoranda with more than sufficient information for this Court to determine the nature of each memo. In this respect, the Court finds that review of the

---

[15] CIA asserts that all of the legal memoranda, other than the released portions of the DOJ White Paper, are also withheld in accord with Exemptions 1 and 3. *See* Lutz Decl. II ¶ 27.

memoranda themselves is unnecessary.  The classified Lutz Declaration has provided the information on which a privileged determination would be made.  As a result, the Court is fully satisfied that the cited privileges have been validly invoked and applied.  Accordingly, the Court concludes that the contested legal memoranda, including the redacted portions of the DOJ White Paper, were properly withheld under Exemption 5 based on the applicable deliberative process, attorney-client, and presidential communication privileges.

### C.  Official Acknowledgement

When "information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."  *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990).  To be officially acknowledged: "(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure."  *ACLU v. DoD*, 628 F.3d 612, 620–21 (D.C. Cir. 2011); *see also Afshar v. Dep't of State*, 702 F.2d 1125, 1133 (D.C. Cir. 1983). The D.C. Circuit has cautioned that "'[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure.  This insistence on exactitude recognizes the Government's vital interest in information relating to national security and foreign affairs.'"  *ACLU v. DoD*, 628 F.3d at 621 (quoting *Wolf*, 473 F.3d at 378).[16]  The fact that information is publicly available "does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA

---

[16] ACLU cites the Second Circuit for the proposition that the official acknowledgment test should not be rigidly applied and that the "matching" requirement of the test "does not require absolute identity."  *See* Opp'n at 20 (citing *N.Y. Times Co.*, 756 F.3d at 120 n.19, 116).  The Second Circuit's opinion directly contradicts binding D.C. Circuit law that strictly construes the "matching" requirement.  *See ACLU v. DoD*, 628 F.3d at 621.

exemption." *Wolf*, 473 F.3d at 378.  ACLU bears the burden of demonstrating that the information it seeks has been officially acknowledged.  *See id.*; *Afshar*, 702 F.2d at 1130 ("[A]a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld.").

ACLU argues that the government has officially acknowledged basic facts about the drone program and information about the program's legal basis; therefore, ACLU concludes that *some* of the records CIA seeks to withhold must be released because the government has waived any FOIA exemptions with regard to such records.  *See* Opp'n at 19-25.  CIA denies that any of the withheld records has been officially acknowledged and dismisses ACLU's argument as speculative.  *See* Reply at 10-11 (citing Lutz Decl. II ¶¶ 22-25).   The Court finds that none of the requested information is available through an official disclosure and, accordingly, CIA has not waived its validly invoked FOIA exemptions with respect to the withheld records.

### 1.   No Waiver of FOIA Exemptions as to Charts and Compilations

Pursuant to its revised FOIA request, ACLU seeks "records routinely compiled by the CIA for analytical purposes containing *charts or compilations* about U.S. Government strikes sufficient to show the *identity of* the intended *targets*, assessed number of *people killed*, *dates*, status of *those killed*, *agencies* involved, the *location* of each strike, and the *identities of those killed* if known."  CIA Notice at 1 (emphasis added).  ACLU argues that the government has officially acknowledged basic facts about U.S. involvement in drone strikes: (1) "[t]he government has acknowledged that it uses drones to carry out targeted killings overseas . . . in Yemen, Pakistan, and Somalia;" (2) "[t]he government has acknowledged that both the DOD and CIA have an *intelligence interest* in the use of drones to carry out targeted killings;" (3) "[t]he government has acknowledged that both the DOD and the CIA have an *operational role* in drone

strikes;" (4) "[t]he government has acknowledged that Anwar al-Aulaqi was targeted, and that U.S. drone strikes have killed two other U.S. citizens in Yemen;" and (5) "[t]he government has officially disclosed the bases on which the government placed Anwar al-Aulaqi on the 'terrorist list' and determined that al-Aulaqi was a legitimate target of lethal force."  Opp'n at 20-22 (emphasis in original).

Many of these allegedly disclosed facts are not relevant to the immediate FOIA request.  Whether the government has acknowledged that CIA has an intelligence interest in drone strikes or an operational role in drone strikes will not aid ACLU.  At best, these alleged disclosures identify the general nature of CIA's connection to drone strikes.  By contrast, ACLU has requested granular details about every drone strike recorded on CIA charts or compilations. *See* CIA Notice at 1.  Further, ACLU did not request information regarding the factual basis for the government's decision to place Anwar al-Aulaqi on the "terrorist list" or the government's determination that he was a legitimate target of lethal force.  *See id.*  Because none of the information requested by ACLU matches these alleged factual disclosures, such disclosures do not constitute a waiver of the FOIA exemptions validly invoked here.  *See ACLU v. DoD*, 628 F.3d at 620 ("information requested must match the information previously disclosed").

ACLU also incorrectly cites Eric Holder's May 22, 2013 letter to Senator Patrick Leahy to support its claim that the government has officially acknowledged that U.S. drone strikes were responsible for the deaths of certain U.S. citizens.  Mr. Holder wrote:

> [T]he President has directed me to disclose certain information that until now has been properly classified. . . . The United States is . . . aware of three other U.S. citizens who have been killed in such U.S. counterterrorism operations . . . Samir Khan, 'Abd al-Rahman Anwar al-Aulaqi, and Jude Kenan Mohammed.

May 22, 2013 Letter from Holder to Leahy at 1-2.  A careful reading of the letter shows that Mr. Holder never stated that these individuals were killed by drone strikes.  As to their cause of

death, Mr. Holder stated that the individuals were killed by "U.S. counterterrorism operations." *Id*. Mr. Holder's statements about counterterrorism operations plainly do not "match" the specific information ACLU requested about drone strikes and are insufficient as a matter of fact and law to compel disclosure of any of the withheld intelligence products. *See ACLU v. DoD*, 628 F.3d at 620.

　　　　　With respect to the remaining alleged disclosures, ACLU attempts to string together snippets of facts from various sources in the hopes that such information collectively is "as specific as" and "matches" the information that has been withheld. This Circuit's case law demonstrates that such an approach cannot satisfy the rigorous demands of the official acknowledgment test. In *Public Citizen v. Dep't of State*, 11 F.3d 198 (D.C. Cir. 1993), the FOIA plaintiff sought documents relating to a meeting between the then-U.S. Ambassador to Iraq and then-President of Iraq Saddam Hussein. *Id*. at 199. Because the Ambassador testified before Congress about the meeting, the plaintiff argued that the State Department had waived any FOIA exemption for the requested records consisting of the Ambassador's post-meeting memoranda, accounts of the meeting, and her recommendations to State Department officials. *Id*. at 200-01. The Circuit rejected the plaintiff's argument because it did not "meet *Afshar*'s requirement that it show that [the Ambassador's] testimony was 'as specific as' the documents it seeks in this case, or that her testimony 'matches' the information contained in the documents." *Id*. at 203. "Even if her testimony effected 'partial disclosures of classified information' contained in the requested documents," the Circuit concluded that "those disclosures did not result in waiver because they did not precisely track the records sought to be released." *Assassination Archives and Research Center v. CIA*, 334 F.3d 55, 60 (D.C. Cir. 2003) (discussing and citing *Public Citizen*, 11 F.3d at 203-04.).

The FOIA plaintiff in *Assassination Archives & Research Ctr. v. CIA* sought release of a CIA-prepared multivolume compendium of information on "Cuban Personalities," which included "personality profiles of, or biographic data on, a number of Cuban individuals." 334 F.3d at 56. The plaintiff argued that CIA waived any applicable FOIA exemption because the biographies of several Cuban nationals had been released under the John F. Kennedy Assassination Records Collection Act (JFK Act), codified at 44 U.S.C. § 2107 note. *Id*. at 59. The plaintiff proffered the declaration of a University of Maryland associate professor who stated, "[a] very high percentage of this volume of documents concerned Cuba, Cuban exiles and Cuban exile organizations and that, in his judgment, the overwhelming majority of Cuban personalities in whom the CIA has had an interest have been disclosed under the JFK Act." *Id*. at 60-61 (international quotation marks omitted). The Circuit acknowledged that "it may be that some information disclosed pursuant to the JFK Act is included in the Compendium," but nonetheless concluded that the plaintiff had not met its burden to "show that information duplicates the contents of the Compendium." *Id*. at 60. The Circuit emphasized that the professor's declaration was deficient because it "made no *specific* showing that any of the JFK Act disclosures revealed information that is as specific as and matches that included in the Compendium." *Id*. at 61 (internal quotation marks omitted).

As with the FOIA plaintiffs in *Public Citizen* and *Assassination Archive*, ACLU has merely pointed to alleged disclosures of vaguely similar information, but has failed to identify officially disclosed information that "precisely track[s]" or "duplicates" the information it has requested. *See Assassination Archive*, 334 F.3d at 60. ACLU has identified public

statements regarding U.S. drones strikes in Yemen, Pakistan, and Somalia[17] and against Anwar

al-Aulaki, but these references merely establish that the Obama Administration has spoken

publicly about the same subject matter as the requested information.  This does not satisfy.  Prior

disclosure of similar subject matter, without more, misses the mark.  The FOIA plaintiff in

*Public Citizen* failed to carry its burden even when it identified Congressional testimony about

[17] ACLU cites a Washington Post article to support its claim that there has been official acknowledgment of U.S. drone strikes in Somalia.  *See* Opp'n at 20 (citing Craig Whitlock, U.S. Carries Out Counterterrorism Strike in Somalia, Wash. Po. (Sept. 1, 2014), http://www.washingtonpost.com/world/national-security/us-carries-out-counterterrorism-strike-in-somalia/2014/09/01/19067e8c-323b-11e4-8f02-03c644b2d7d0_story.html (Wash. Po. Article)).  A video clip of a news briefing by Pentagon Press Secretary Kirby is embedded in the article, but ACLU does not discuss it in any detail.  For the sake of thoroughness, the Court has carefully reviewed it to determine if it constitutes official acknowledgment of any of the requested information.  In his September 1, 2014 news briefing, Press Secretary Kirby stated that U.S. Special Forces conducted a strike near Mogadishu, Somalia that targeted Ahmed Abdi aw-Mohamed, leader of the Al-Shabaab network:

> I know that you have all been tracking events in Somalia last night, so if you just bear with me, I'll walk you through what I can right now. Yesterday, at approximately 11:20 Eastern Time, working from actionable intelligence, U.S. Special Operations Forces, using manned and unmanned aircraft, destroyed an encampment and a vehicle using several Hellfire missiles and laser guided munitions. This operation was a direct strike against the al Shabaab network, specifically the group's leader Ahmed Abdi aw-Mohamed, also known as Ahmed Godane . . . I'm not going to be able to provide specifics about the unit or the intelligence itself and certainly not anything regarded to tactics, techniques and procedures. The operation occurred south of Mogadishu, located in south central Somalia and it did result in the destruction of that vehicle.

*See* Wash. Po. Article.

Press Secretary Kirby acknowledged that the Special Operations Forces—a component of the Department of Defense's United States Special Operations Command—were involved in the attack, but did not reference CIA.  He did not state that the information he relayed had been or would be maintained in any chart or compilation by any agency, much less CIA.  Because Press Secretary Kirby made no link between CIA and the Mogadishu strike, it is entirely speculative whether the identified details of the strike are contained in any of the withheld CIA records.  The briefing was too far afield from CIA to constitute a waiver of the applicable FOIA exemptions.  *ACLU v. DoD*, 628 F.3d at 621.

the very meeting to which the requested documents related. *See Public Citizen*, 11 F.3d at 201.

The *Assassination Archives* FOIA plaintiff failed to carry its burden despite the release of

information under the JFK Act about Cuban nationals. *See Assassination Archives*, 334 F.3d at

60-61. Here, too, ACLU fails to carry its burden by only listing "basic facts" about the U.S.

drone program despite its request for detailed charts and compilations providing information

about U.S. government drone strikes that CIA routinely tracks. In addition, even if *some* of the

disclosed facts are included on one or more of the withheld charts and compilations,

*Assassination Archives* instructs that waiver has not occurred without evidence that the disclosed

information "duplicates" the contents of the intelligence products. *See Assassination Archives*,

334 F.3d at 60-61. ACLU has not met this burden.

      The Court concludes that ACLU has not cleared the "high hurdle" of

demonstrating that any of government statements to which it points is as specific as the details on

the charts and compilations it seeks, or that such statements match the withheld information. *See*

*Pub. Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993). A FOIA plaintiff such as

ACLU is held to a stringent standard because "the Government's vital interest in information

relating to national security and foreign affairs dictates that it must be." *Id*. The Court finds that

CIA has not waived its right to invoke the FOIA Exemptions requiring that the records

containing charts and compilations be withheld.

### 2.  No Waiver of FOIA Exemptions as to Legal Memoranda

      In response to ACLU's request for "final legal memoranda (as well as the latest

version of draft legal memoranda which were never finalized) concerning the U.S. Government's

use of armed drones to carry out premeditated killings," CIA Notice at 1, CIA released portions

of the DOJ White Paper, which "discusses the legal basis upon which CIA could use lethal force

in Yemen against a U.S. citizen," Anwar al-Aulaqi.  Lutz Decl. II ¶ 22.  Beyond the DOJ White

Paper, CIA "determined that, based on [a] page-by-page, line-by-line review of the record, some

information in the DOJ Classified White Paper remains currently and properly classified" and

that "the redacted information goes beyond what has been publicly disclosed." *Id*. ¶¶ 22-23.

Ms. Lutz affirmed that there has been no official acknowledgment of the remaining legal

memoranda.  *Id*. ¶ 24.

   ACLU argues that CIA has waived its FOIA exemptions as to some of the

withheld legal memoranda, or portions thereof, because the government has already disclosed its

analysis of 18 U.S.C. § 1119 (the statute that makes it a crime for "a national of the United

States, [to] kill [] or attempt[] to kill a national of the United States while such national is outside

the United States but within the jurisdiction of another country"); 18 U.S.C. § 956(a) (a statute

that criminalizes conspiracy to commit murder abroad); 18 U.S.C. § 2441(a) (a statute that

makes it a crime for a member of the U.S. armed forces or a U.S. national to "commit[] a war

crime"); E.O. 12333 (an assassination ban); and its constitutional analysis.  *See* Opp'n at 22-24.

ACLU also contends that the government has publicly expressed its commitment to ensuring that

any use of lethal force by the U.S. complies with fundamental law of war principles.  *See id*.

Because CIA did not provide any description of the withheld legal memoranda in a traditional

*Vaughn* index, ACLU requests the Court to review the legal memoranda *in camera* to determine

whether any must be released because they contain information that has been officially

acknowledged.  *See* Opp'n at 32.  A district court has broad discretion to decline to conduct an *in

camera* review of withheld materials.  *See Boyd v. Criminal Div. of U.S. Dep't of Justice*, 475

F.3d 381, 391 (D.C. Cir. 2007).  Based on its careful review of the classified Lutz Declaration,

which contains detailed descriptions of the legal memoranda, the Court concludes that ACLU

has not met its burden to show that there has been official acknowledgment of any of the

withheld legal memoranda.  Therefore, CIA has not waived its right to invoke the FOIA

Exemptions requiring that the eleven legal memoranda and the redacted portions of the DOJ

White Paper be withheld and the Court declines to review them *in camera*.  *See ACLU v. DoD*,

628 F.3d at 620–21.

### D.  Segregability

Even if an agency properly withholds responsive records under a FOIA

exemption, it nevertheless must disclose any non-exempt information that is "reasonably

segregable."  5 U.S.C. § 552(b); *Mead Data Cent.*, 566 F.2d at 260 (D.C. Cir. 1977) ("It has long

been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they

are inextricably intertwined with exempt portions.").  "The question of segregability is by

necessity subjective and context-specific, turning upon the nature of the documents and

information in question."  *Am. Civil Liberties Union v. Dep't of State*, 878 F. Supp. 2d 215, 225

(D.D.C. 2012) (citing *Mead Data Cent.*, 566 F.2d at 261).   A district court need not "order an

agency to commit significant time and resources to the separation of disjointed words, phrases,

or even sentences which taken separately or together have minimal or no information content."

*Mead Data Cent.*, 566 F.2d at 261 n. 55.  An agency cannot rely on mere conclusory statements

that non-exempt material in a document is not reasonably segregable.  *See id*. at 261.  It must

provide a reasonably detailed justification, except where "such a detailed justification . . . would

itself compromise the secret nature of potentially exempt information."  *Id*.  Nonetheless,

"[a]gencies are entitled to a presumption that they complied with the obligation to disclose

reasonably segregable material."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C.

Cir. 2007).

ACLU requests that the Court direct CIA to segregate and disclose the particular factual information it requested, *i.e.*, the "identity of the intended targets, assessed number of people killed, dates, status of those killed, agencies involved, the location of each strike, and the identities of those killed if known," Lutz Decl. II ¶ 6.  *See* Opp'n at 32.  CIA explains that it conducted a page-by-page and line-by-line review of the materials responsive to ACLU's request.  *See* Lutz Decl. II ¶ 31.  CIA released portions of the DOJ White Paper and otherwise "determined that there is no reasonably segregable, non-exempt portions of documents that can be released without potentially compromising classified information, intelligence sources and methods, and/or material protected by privilege."  *Id.*  The three Lutz Declarations provide a reasonably detailed justification that any non-exempt material cannot be segregated and released.  Moreover, the Court concludes that any isolated words or phrases that might not be redacted for release would be meaningless.  The Court finds that CIA has demonstrated that it has not withheld any segregable, non-exempt materials and therefore denies ACLU's request that it order CIA to do so.

## IV.  CONCLUSION

For the reasons set forth above, the Court will grant CIA's Motion for Summary Judgment and deny ACLU's Cross-Motion for Summary Judgment.  A memorializing Order accompanies this Opinion.

Date: June 18, 2015                                          _____/s/_____
                                                            ROSEMARY M. COLLYER
                                                            United States District Judge